IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

G., PARENT AND NEXT FRIEND OF ) Civ. No. 08-00551 ACK-BMK
K., A DISABLED CHILD, ET AL., ) Civ. No. 09-00044 ACK-BMK
                              ) (Consolidated)
        Plaintiffs,          )
                              )
    vs.                       )
                              )
STATE OF HAWAI'I, DEPARTMENT OF )
HUMAN SERVICES, ET AL.,       )
                              )
        Defendants.          )
──────────────────────────────)
                              )
G., PARENT AND NEXT FRIEND OF )
K., A DISABLED CHILD, ET AL., )
                              )
        Plaintiffs,          )
                              )
    vs.                       )
                              )
UNITED STATES DEPARTMENT OF   )
HEALTH AND HUMAN SERVICES, ET )
AL.,                          )
                              )
        Defendants.          )
──────────────────────────────)

ORDER GRANTING IN PART AND DENYING IN PART THE STATE DEFENDANTS'
MOTION TO DISMISS, THE FEDERAL DEFENDANTS' SUBSTANTIVE JOINDER,
AND INTERVENORS' JOINDERS

PROCEDURAL HISTORY

On December 8, 2008, in Civil No. 08-00551 ACK-BMK,

Plaintiffs filed a complaint ("State Complaint" or "St. Compl.")

against Defendants, the State of Hawaii, Department of Human

Services ("State DHS"), and Lillian B. Koller, in her official

capacity as the Director of the DHS (collectively, "State

Defendants").  The gravamen of the State Complaint is that the

State DHS has violated certain provisions of Title XIX of the
Social Security Act, commonly known as the Medicaid Act, 42
U.S.C. § 1396 et seq., by requiring that Plaintiffs enroll with
certain healthcare entities as a condition of receiving Medicaid
benefits in connection with the agency's managed-care program.
On December 29, 2008, the State Defendants filed a motion to
dismiss the State Complaint ("St. Mot."), accompanied by a
memorandum in support ("St. Mem. in Supp."), asserting that
Plaintiffs have failed to state a claim upon which relief can be
granted.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK,
Plaintiffs filed a complaint against Defendants, the United
States Department of Health and Human Services ("Federal DHHS")
and Charles E. Johnson, in his official capacity as the Acting
Secretary of the DHHS ("Secretary") (collectively, "Federal
Defendants").  On February 4, 2009, in Civil No. 09-00044,
Plaintiffs filed a first amended complaint ("Federal First
Amended Complaint" or "Fed. 1st Am. Compl.").  Plaintiffs allege
that the Centers for Medicare and Medicaid Assistance ("CMS"), a
division of the Federal DHHS, has violated certain provisions of
the Medicaid Act by granting a waiver for the State DHS's
managed-care program and by approving the State DHS's contracts
with the healthcare entities.  Plaintiffs contend that their

2

claims are actionable under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 <u>et seq.</u>

On February 19, 2009, Magistrate Judge Barry M. Kurren entered an order granting motions to consolidate Civil Nos. 08-00551 and 09-00044.  On February 25, 2009, the Federal Defendants filed a substantive joinder in the State Defendants' motion to dismiss, accompanied by a supplemental memorandum of points and authorities ("Fed. Joinder Mem.").  On March 5, 2009, this Court granted the Federal Defendants leave to file their substantive joinder.

On March 17, 2009, Judge Kurren granted motions for intervention filed by the healthcare entities, Wellcare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("Ohana") and United Healthcare Insurance Company d/b/a Evercare ("Evercare").  On March 18, 2009, Intervenors filed joinders in the State Defendants' motion to dismiss and the Federal Defendants' substantive joinder.

On April 3, 2009, Plaintiffs filed an opposition to the State Defendants' motion to dismiss, the Federal Defendants' substantive joinder, and the Intervenors' joinders ("Pl. Opp'n").  On April 10, 2009, the State Defendants filed a reply memorandum in support of their motion to dismiss ("St. Reply"), and the Federal Defendants filed a reply brief in support of their

substantive joinder ("Fed. Reply").  On April 13, 2009,

Intervenors filed joinders in the replies.

On April 21, 2009, this Court held a hearing on the

motion and joinders and granted Plaintiffs leave to file a

surreply as to the State Defendants' reply.  On April 23, 2009,

Plaintiffs filed a surreply ("Pl. Surreply").  On April 28, 2009,

the State Defendants submitted a copy of a hearings officer's

decision in In re AlohaCare, No. IC-08-142, a matter that is

currently pending before the Insurance Division of the Department

of Commerce and Consumer Affairs of the State of Hawai'i.

## BACKGROUND

The facts in this Order are recited only for the

purpose of deciding the motion to dismiss and joinders.  They are

not intended to be findings of fact upon which the parties may

rely in future proceedings.

## I.   The Medicaid Act

In 1965, Congress established the Medicaid program.

Clark v. Coye, 60 F.3d 600, 602 (9th Cir. 1995).  Medicaid is "a

cooperative federal-state program that directs federal funding to

states to assist them in providing medical assistance to low-

income individuals."  Ball v. Rogers, 492 F.3d 1094, 1098 (9th

Cir. 2007) (citation and quotation marks omitted).  "A state is

not required to participate in Medicaid, but once it chooses to

do so, it must create a plan that conforms to the requirements of

the Medicaid statute and the federal Medicaid regulations."
Dep't of Health Servs. v. Sec'y of Health & Human Servs., 823
F.2d 323, 325 (9th Cir. 1987).  The Secretary "reviews each plan
to assure that it complies with a long list of federal statutory
and regulatory requirements."  Cmty. Health Ctr. v. Wilson-Coker,
311 F.3d 132, 134 (2d Cir. 2002) (citing 42 U.S.C. §§ 1396,
1396a; 42 C.F.R. § 430.15(a)).  He "has delegated his power to
review and approve plans to CMS Regional Administrators."  Id.
(citing 42 C.F.R. § 430.15(b)).

In 1976, Congress amended the Medicaid statute, adding
42 U.S.C. § 1396b(m),[1/] which allows states to implement their
Medicaid programs through a "managed care" model, as opposed to
the traditional fee-for-service structure.  Health Maintenance
Organization Amendments of 1976, Pub. L. No. 94-460, § 202(a), 90
Stat. 1945, 1957 (1976).  In a fee-for-service system, state
Medicaid programs directly contract with and pay health care
providers, such as physicians, hospitals, and clinics, for
services that they provide to Medicaid beneficiaries.  (St.
Compl. ¶ 19; Fed. 1st Am. Compl. ¶ 21.)  By contrast, under the
managed-care model, states enter into contracts with eligible
risk-bearing entities, which are referred to as "managed care
organizations" ("MCOs") and are commonly known as "health

---

[1/] 42 U.S.C. § 1396b is the codification of Section 1903 of
the Social Security Act.

maintenance organizations" ("HMOs").  (St. Compl. ¶ 19; Fed. 1st Am. Compl. ¶ 21.)  Under such contracts, MCOs assume the responsibility of providing Medicaid services through their own employees or by contracting with independent providers of such services.  (St. Compl. ¶ 19; Fed. 1st Am. Compl. ¶ 21.)  The state pays each MCO on a "capitation" or fixed-amount-per-enrollee basis.  (St. Compl. ¶ 20; Fed. 1st Am. Compl. ¶ 22.); see also Grijalva v. Shalala, 152 F.3d 1115, 1117 (9th Cir. 1998), rev'd on other grounds, 526 U.S. 1096 (1999) (discussing the foregoing framework); see also Equal Access for El Paso, Inc. v. Hawkins, 509 F.3d 697, 700 (5th Cir. 2007) (addressing the foregoing framework under Texas's Medicaid program).

Prior to 1997, in order to require that Medicaid beneficiaries enroll in a managed-care program as a condition of receiving benefits, states generally had to obtain a waiver of the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23).[2]  2 Harvey L. McCormick, Medicare and Medicaid Claims and Procedure § 26:3, at 399 (4th ed. 2005).  Under that provision, beneficiaries are, in effect, afforded "the right to choose among a range of qualified providers[] without government interference."  O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 785 (1980).  A state could obtain a waiver of the "freedom

_____

[2] 42 U.S.C. § 1396a is the codification of Section 1902 of the Social Security Act.

6

of choice" provision from the Secretary pursuant to 42 U.S.C. § 1315(a)[3/] and thereby limit a beneficiary's freedom to choose among providers through a managed-care system. <u>See</u> 42 U.S.C. § 1315(a) ("In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of[, <u>inter alia</u>, the Medicaid Act,] in a State or States-- . . . (1) the Secretary may waive compliance with any of the requirements of[, <u>inter alia</u>, 42 U.S.C. § 1396a,], as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project . . . .").[4/]

In 1997, as part of the Balanced Budget Act of that year, Congress added 42 U.S.C. § 1396u-2,[5/] which permits states to mandate enrollment in a managed-care program without obtaining a waiver of the "freedom of choice" provision from the Secretary. 2 McCormick, <u>Medicare and Medicaid Claims and Procedure</u> § 26:2, at 397; Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4701, 111 Stat. 251, 489-92 (1997). A waiver is not required because 42 U.S.C. § 1396u-2 was crafted as an express exception to the

---

[3/] 42 U.S.C. § 1315 is the codification of Section 1115 of the Social Security Act.

[4/] Alternatively, a state could obtain a waiver of the "freedom of choice" provision from the Secretary under 42 U.S.C. § 1396n(b).

[5/] 42 U.S.C. § 1396u-2 is the codification of Section 1932 of the Social Security Act.

7

"freedom of choice" provision.  <u>See</u> 42 U.S.C. § 1396a(a)(23) ("except as provided . . . in [42 U.S.C. § 1396u-2(a)]"); 42 U.S.C. § 1396u-2(a)(1)(A) ("notwithstanding paragraph . . . (23)(A) of [42 U.S.C. § 1396a(a)]").  In order to utilize that exception, 42 U.S.C. § 1396u-2 requires that a state adhere to certain provisions.[6/]

Two such provisions are 42 U.S.C. §§ 1396u-2(a)(1)(A)(i)(I) and (II).  The former directs that the entity receiving a managed care contract and the contract itself must meet the applicable provisions of 42 U.S.C. § 1396u-2 as well as 42 U.S.C. § 1396b(m).  42 U.S.C. § 1396u-2(a)(1)(A)(i)(I).  And the latter mandates that "the requirements described in the succeeding paragraphs of this subsection [(i.e., subsection (a))] are met."  One such requirement is found in 42 U.S.C. § 1396u-2(a)(3)(A), which, like 42 U.S.C. §§ 1396u-2(a)(1)(A)(i)(I), states that "[a] State must

---

[6/] In addition to permitting states to utilize MCOs, 42 U.S.C. § 1396u-2 authorizes them to employ primary care case management.  Under that model, "a Medicaid beneficiary selects or is assigned to a single primary care provider, which provides or arranges for all covered services and is reimbursed on a fee-for-services basis in addition to receiving a small monthly 'management' fee."  H.R. Conf. Rep. 105-217, at 845 (1997), <u>as reprinted in</u> 1997 U.S.C.C.A.N. 176, 466.  This differs from fully capitated HMOs, which "contract on a risk basis to provide beneficiaries with a comprehensive set of covered services in return for a monthly capitation payment."  <u>Id.</u>  Because the primary care case management model is not at issue here, this Court has omitted certain references to that model in its discussion of 42 U.S.C. § 1396u-2.

permit an individual to choose a managed care entity from not
less than two such entities that meet the applicable requirements
of this section, and of [42 U.S.C. § 1396b(m)]."

Turning to the "applicable requirements . . . of [42
U.S.C. § 1396b(m)]," subsection (1)(C)(i) states that, in order
for an entity to be an MCO, it has to be one that "meets solvency
standards established by the State for private health maintenance
organizations or is licensed by the State as a risk-bearing
entity."  And, with respect to the "applicable requirements of
[42 U.S.C. § 1396u-2]," one such requirement is set forth in
subsection (b)(5), under which an MCO must provide the state with
"adequate assurances (in a time and manner determined by the
Secretary)" that it:  "(A) offers an appropriate range of
services and access to preventive and primary care services for
the population expected to be enrolled in such service area"; and
"(B) maintains a sufficient number, mix, and geographic
distribution of providers of services."  The Secretary has
determined that such assurances must be provided as specified by
the state, but no less frequently than "at the time [an MCO]
enters into a contract with the State."  42 C.F.R.
§ 438.207(c)(1).

Aside from conditioning the state's authority to compel
enrollment on those requirements, 42 U.S.C. § 1396u-2(a) also
provides that a state "may restrict the number of provider

9

agreements with managed care entities under the State plan if such restriction does not substantially impair access to services." 42 U.S.C. § 1396u-2(a)(1)(A)(ii). In addition, the statute provides that a state may not, under 42 U.S.C. § 1396u-2(a)(1), require certain classes of Medicaid beneficiaries to participate in a managed-care program. See 42 U.S.C. § 1396u-2(a)(2). Those classes include: (1) "certain children with special needs," 42 U.S.C. § 1396u-2(a)(2)(A);[7/] and (2) "dual eligibles" or beneficiaries who are eligible for services under both Medicaid and Medicare programs, 42 U.S.C. § 1396u-2(a)(2)(B); see also First Med. Health Plan, Inc. v. Vega-Ramos, 479 F.3d 46, 48 (1st Cir. 2007) ("Medicare beneficiaries who are indigent are referred to as 'dual eligible' beneficiaries, meaning that they also qualify for Medicaid assistance." (citing 42 U.S.C. § 1396u-5(c)(6)(A))).

---

[7/] Under the exemption for "certain children with special needs":

A State may not require under [42 U.S.C. § 1396u-2(a)(1)] the enrollment in a managed care entity of an individual under 19 years of age who--
    (i) is eligible for supplemental security income under title XVI;
    (ii) is described in [42 U.S.C. § 701(a)(1)(D)];
    (iii) is described in [42 U.S.C. § 1396a(e)(3)];
    (iv) is receiving foster care or adoption assistance under part E of title IV; or
    (v) is in foster care or otherwise in an out-of-home placement.
42 U.S.C. § 1396u-2(a)(2)(A).

## II.  Hawaii's QUEST and QExA Managed-Care Programs

Hawaiʻi has elected to participate in the Medicaid program.  "Prior to August 1, 1994, the State of Hawaii provided medical benefits to some of its most financially needy residents through a fee-for-service [] Medicaid program."  Lovell v. Chandler, 303 F.3d 1039, 1045 (9th Cir. 2002).  "Medicaid served the aged, blind, and disabled ("ABD") population, those receiving Aid to Families with Dependent Children [], and those receiving general assistance [] benefits."  Id.

On July 16, 1993,[8/] the Secretary approved a 42 U.S.C. § 1315 demonstration project for Hawaiʻi to conduct the "Hawaii Health QUEST" program, which transformed the state's fee-for-service program into a more cost-effective managed-care-based plan.  See Lovell, 303 F.3d at 1045; Burns-Vidlak by Burns v. Chandler, 165 F.3d 1257, 1259 n.1. (9th Cir. 1999).  Hawaiʻi launched the program on August 1, 1994.  Lovell, 303 F.3d at 1045.  The ABD population was categorically excluded from the QUEST managed-care program, and instead received benefits on a fee-for-services basis.  Id. at 1045.

On October 10, 2007, the State DHS launched a new managed-care program for ABD Medicaid beneficiaries.  (St. Compl.

_____

[8/] The approval date is provided on the CMS's website. Hawaii QUEST Fact Sheet 1 (2008), http://www.cms.hhs.gov/ MedicaidStWaivProgDemoPGI/downloads/Hawaii%20QUEST%20Fact%20Sheet .pdf.

11

¶ 23; Fed. 1st Am. Compl. ¶ 26.)  The State DHS issued a request for proposal ("RFP"), No. RFP-MQD-2008-006, entitled "QUEST Expanded Access (QExA) Managed Care Plans to Cover Eligible Individuals Who Are Aged, Blind, or Disabled."  (St. Compl. ¶ 23; Fed. 1st Am. Compl. ¶ 26.)  The purpose of the QExA RFP was to procure the services of private entities that would be responsible for providing all of the Medicaid-required care to the ABD population.  (St. Compl. ¶ 23; Fed. 1st Am. Compl. ¶ 26.)  While the Medicaid Act authorized the State DHS to contract with as many qualified MCOs (and other statutorily eligible entities) as were willing to participate in the new program, the agency decided to limit the number of contracts to two, the statutory minimum under 42 U.S.C. § 1396u-2(a)(3)(A).  <u>See</u> (St. Compl. ¶ 24; Fed. 1st Am. Compl. ¶ 27).

On February 1, 2008, the State DHS awarded managed-care contracts to the Intervenors in this action, Ohana and Evercare (collectively, "QExA Contractors"), and the contracts ("QExA Contracts") were signed on February 4, 2008.  (St. Compl. ¶¶ 27, 56-57; Fed. 1st Am. Compl. ¶ 58.)  The services the QExA Contracts call for include providing the care for all ABD beneficiaries.  (St. Compl. ¶ 2; Fed. 1st Am. Compl. ¶ 2.)

The Plaintiffs in this case are current Hawai'i Medicaid program beneficiaries who are within the ABD population. (St. Compl. ¶¶ 7-9; Fed. 1st Am. Compl. ¶ 7.)  They allege that

12

Ohana and Evercare were unqualified to receive the QExA Contracts because they did not (1) have HMO insurance licenses issued by the state, as required by 42 U.S.C. § 1396(m)(1)(C)(i), or (2) provide the State DHS with adequate assurances that they had an appropriate range of services and maintained sufficient number, mix, and geographic distribution of providers of services, as required by 42 U.S.C. § 1396u-2(b)(5).  (St. Compl. ¶¶ 55, 61-62, 66, 69; Fed. 1st Am. Compl. ¶¶ 72, 74.)  Plaintiffs further allege that, at the time the QExA RFP was issued, the State DHS lacked (and still lacks) the information necessary to determine whether limiting the number of managed-care contracts to two would substantially impair access to services, in contravention of 42 U.S.C. § 1396u-2(a)(1)(ii).  (St. Compl. ¶¶ 25, 83; <u>cf.</u> Fed. 1st Am. Compl. ¶ 28.)

By letters dated February 7, 2008 and September 12, 2008, the CMS approved the QExA program.  (St. Mot., Ex. 1 at 1, 5.)  By letters transmitted on or around June 13, 2008 and December 17, 2008, counsel for one of the unsuccessful health plans that had submitted a bid for a QExA Contract, AlohaCare, sent complaints to a CMS regional administrator in San Francisco. (Fed. 1st Am. Compl. ¶¶ 88, 91.)  The complaints advised the CMS that:  (1) neither entity that was awarded a QExA Contract was properly licensed at the time the contracts were signed; (2) both QExA Contractors failed to develop and document an actual

provider network at the time their contracts were signed; and (3)
Hawaii's 42 U.S.C. § 1315 waiver could not override the statutory
exemption for children with special needs.  (<u>Id.</u> ¶¶ 88, 92-93.)

Plaintiffs allege that, despite the correspondence, the
CMS has not considered or investigated any of the violations that
AlohaCare's counsel had identified and documented.  (<u>Id.</u> ¶ 94.)
In fact, on January 30, 2009, the CMS approved the QExA
Contracts.  (Fed. Compl. ¶ 2, 18, 95.e; Fed. Joinder Mem. 5.)
Under the QExA program, as of February 1, 2009, all ABD
beneficiaries have been required to enroll with a managed care
organization to receive Medicaid benefits.  (St. Compl. ¶¶ 3, 17,
27, 72; Fed. 1st Am. Compl. ¶¶ 3, 30, 72.)

Plaintiffs allege that their rights under the "freedom
of choice" provision have been violated.  (St. Compl. ¶ 26.)
They further assert that they cannot be required to enroll with
the QExA Contractors because (1) the MCOs were not statutorily
eligible for Medicaid managed-care contracts, as contemplated by
42 U.S.C. § 1396u-2(a)(i), and (2) there has been no
determination as to whether restricting the number of provider
agreements with managed care entities under the State plan to two
would substantially impair access to services, as required by 42
U.S.C. § 1396u-2(a)(ii).  (St. Compl. ¶ 3; Fed. 1st Am. Compl.

¶ 3.)  Plaintiffs also contend that all but one of them[9/] cannot be required to obtain Medicaid-covered care through the QExA program for the additional reason that they fall under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B)'s exemptions for certain children with special needs and dual eligibles.  (St. Compl. ¶¶ 4, 8-9; Fed. 1st Am. Compl. ¶¶ 4, 8-9.)

The CMS allowed the State DHS to mandate enrollment of those exempt classes of beneficiaries by virtue of the waiver authority under 42 U.S.C. § 1315(a).  (See Fed. 1st Am. Compl. ¶ 78.)  Specifically, the CMS granted the State DHS a waiver of the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), "[t]o enable Hawaii to restrict the freedom of choice of providers to groups that could not otherwise be mandated into managed care under [42 U.S.C. § 1396u-2]."  (St. Mot., Ex. 1 at 8.)[10/]

_____

[9/] In the State Complaint, Plaintiff R. was alleged to be a dual eligible.  (St. Compl. ¶¶ 8-9.)  However, in the Federal First Amended Complaint, which was filed after the State Complaint, Plaintiff R. is not alleged to be a dual eligible, but instead "a severely disabled adult."  (Fed. 1st Am. Compl. ¶¶ 8-9.)  Thus, it appears that Plaintiff R. is no longer a dual eligible.  (See id. ¶ 8.)

[10/] Exhibit A to the State Defendants' motion is a copy of the documents from the CMS approving the QExA program, which are public documents.  The documents are available on the CMS's website.  See Hawaii QUEST Current Approval Documents, http://www.cms.hhs.gov/MedicaidStWaivProgDemoPGI/downloads/Hawaii%20QUEST%20Current%20Approval%20Documents.zip.  This Court has taken judicial notice of fact that the Secretary has waived the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), "[t]o
(continued...)

## **LEGAL STANDARDS**

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") permits dismissal of a complaint that fails "to state a claim upon which relief can be granted."  "A Rule 12(b)(6) 'dismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.'"  Zamani v. Carnes, 491 F.3d 990, 996-97 (9th Cir. 2007) (quoting Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001)) (brackets omitted).

Under Rule 12(b)(6), review is generally limited to the contents of the complaint.  Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001); Campanelli v. Bockrath, 100 F.3d 1476, 1479 (9th Cir. 1996).  Courts may also "consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment."  United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003).  Documents whose contents are alleged

---

[10]/(...continued)
enable Hawaii to restrict the freedom of choice of providers to groups that could not otherwise be mandated into managed care under [42 U.S.C. § 1396u-2]."  (St. Mot., Ex. 1 at 8.)  That fact does not appear to be in dispute.  See (Pl. Mem. in Supp. 14-18; Fed. 1st Am. Compl. ¶¶ 78); Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) (explaining that a "court may take judicial notice of 'matters of public record' without converting a motion to dismiss into a motion for summary judgment," but that it "may not take judicial notice of a fact that is 'subject to reasonable dispute'" (quoting Fed. R. Evid. 201)).

in a complaint and whose authenticity are not questioned by any party may also be considered in ruling on a Rule 12(b)(6) motion to dismiss.  <u>See</u> <u>Branch v. Tunnell</u>, 14 F.3d 449, 453-54 (9th Cir. 1994).

On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  <u>Fed'n of African Am. Contractors v. City of Oakland</u>, 96 F.3d 1204, 1207 (9th Cir. 1996).  However, conclusory allegations of law, unwarranted deductions of fact, and unreasonable inferences are insufficient to defeat a motion to dismiss.  <u>See</u> <u>Sprewell</u>, 266 F.3d at 988; <u>Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology</u>, 228 F.3d 1043, 1049 (9th Cir. 2000); <u>In re Syntex Corp. Sec. Litig.</u>, 95 F.3d 922, 926 (9th Cir. 1996).  Moreover, the court need not accept as true allegations that contradict matters properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint.  <u>Sprewell</u>, 266 F.3d at 988.

## <u>DISCUSSION</u>

The State Defendants have moved to dismiss the five counts in the State Complaint, and the Federal Defendants seek dismissal of the one count asserted in the Federal First Amended Complaint.  This Court will first address the Federal Defendants' charge against the Federal First Amended Complaint and then

consider the State Defendants' contentions relating to the State Complaint.

## I. The Federal First Amended Complaint: Reviewability Under the APA

In the sole count in the Federal First Amended Complaint, Plaintiffs allege that the CMS exceeded its authority under 42 U.S.C. § 1315(a) by waiving the prohibition against requiring dual eligibles and certain children with special needs to enroll in managed care, as prescribed by 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B). (Fed. 1st Am. Compl. ¶ 95.d.) In addition, Plaintiffs contend that, when the CMS approved the QExA Contracts: (1) it was aware that the two QExA Contractors were not licensed HMOs, in violation of 42 U.S.C. §§ 1396b(m), 1396b(m)(2)(A)(xii), and 1396u-2(a)(3); (2) it failed to determine whether the State DHS's decision to limit the number of contracts to two would substantially impair access to services, in contravention of 42 U.S.C. § 1396u-2(a)(1)(A)(ii); and (3) neither Ohana nor Evercare provided adequate assurances as to their coverage and provider networks, as required by 42 U.S.C. § 1396u-2(b)(5). (Fed. 1st Am. Compl. ¶¶ 74, 95.a-c, 95.e, 96.)

Plaintiffs assert that, in the face of the foregoing violations, the CMS has taken no action to enforce the law. (Id. ¶ 96.) They allege that the CMS either ignored information that demonstrated the existence of the violations in giving the QExA project its approval or failed to understand that the violations

18

negated the eligibility of the two entities to which contracts were awarded.  (<u>Id.</u>)  Plaintiffs further posit that the CMS effectively authorized Hawai'i to compel Medicaid beneficiaries to enroll with the QExA Contractors even though neither of the QExA Contractors nor the QEXA Contracts met relevant statutory and regulatory conditions.  (<u>Id.</u> ¶ 97.)  Plaintiffs allege that the conduct of the Federal DHHS, by virtue of the CMS, constitutes "agency action" under 5 U.S.C. §§ 706(2)(A)-(C).  (<u>Id.</u> ¶ 98.)

The Federal Defendants assert that Plaintiffs cannot compel them to enforce the Medicaid Act and its related regulations or to investigate whether the QExA Contractors made false representations to the State DHS.  (Fed. Joinder Mem. 2-3.)  While it is true that Plaintiffs allege that the Federal Defendants did not enforce the Medicaid Act, at no point do they ask this Court to compel the Federal Defendants to launch an affirmative investigation.  Rather, in their prayer for relief, Plaintiffs ask this Court to (1) declare that the CMS's decisions to approve the QExA Contracts and to grant a 42 U.S.C. § 1315 waiver were arbitrary and capricious and (2) enjoin the CMS from making any payments for the QExA program.  (Fed. 1st Am. Compl. ¶ 49.)  Accordingly, this Court need not decide whether Plaintiffs have stated a claim to compel the Federal Defendants to conduct an investigation pursuant to the Medicaid Act.

19

The Federal Defendants next argue that Plaintiffs' claims against them cannot proceed under the Medicaid Act or the APA because neither statute affords Plaintiffs a private right of action. (Fed. Joinder Mem. 3.) Plaintiffs do not challenge the Federal Defendants' contention that they have no express or implied right of action under the Medicaid Act. Their argument is instead that this Court may review the CMS's decisions to grant a 42 U.S.C. § 1315(a) waiver and approve the QExA Contracts under the APA. (Pl. Opp'n 26-27.)

Plaintiffs point out that they may contest the 42 U.S.C. § 1315 waiver under the APA in view of the Ninth Circuit's decision in Beno v. Shalala, 30 F.3d 1057 (9th Cir. 1994), which specifically held that "§ 1315(a) waivers are subject to APA review." Id. at 1067. The Federal Defendants' concede as much, but contend that nowhere in the Plaintiffs' pleadings do they challenge the CMS's decision to approve a 42 U.S.C. § 1315(a) waiver. (Fed. Reply 3 n.1, 5 n.2.) The Federal Defendants are incorrect. Plaintiffs have plainly asked this Court to declare that the CMS's decision to allow the state to proceed with the QExA program under its 42 U.S.C. § 1315 waiver authority was arbitrary, capricious, and contrary to law. (See Fed. 1st Am. Compl. 49; see also id. ¶¶ 78, 95.d.)

The remaining question is whether this Court can review the Secretary's decision to approve the QExA Contracts under the

APA.  "The APA embodies a 'basic presumption of judicial review.'"  Beno, 30 F.3d at 1066 (quoting Lincoln v. Vigil, 508 U.S. 182, 190 (1993)).  "Absent an explicit statutory bar, judicial review of agency action is available except in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply and a court would have no meaningful standard against which to judge the agency's exercise of discretion."  Id. (citations and internal quotation marks omitted).

In this case, according to the Federal Defendants, the Secretary reviewed and approved the QExA Contracts pursuant to 42 U.S.C. § 1396b(m).  (Fed. Joinder Mem. 5.)  That section states in relevant part that:

> [N]o payment shall be made under this title to a State with respect to expenditures incurred by it for payment . . . for services provided by any entity . . . unless--
>
> (i) the Secretary has determined that the entity is a medicaid managed care organization as defined in paragraph (1);
>
> . . .
>
> (iii) such services are provided for the benefit of individuals eligible for benefits under this title in accordance with a contract between the State and the entity . . . under which the Secretary must provide prior approval for contracts providing for expenditures in excess of $ 1,000,000 for 1998 and, for a subsequent year, the amount established under this clause for the previous year increased by the percentage

increase in the consumer price index for all
urban consumers over the previous year; [and]

. . .

(xii) such contract, and the entity
complies with the applicable requirements of
[42 U.S.C. § 1396u-2].

42 U.S.C. § 1396b(m)(2)(A).

This section plainly contemplates that the Secretary
will review managed-care contracts and approve them if (1) the
contractor meets the definition of an MCO and (2) the contract
and contractor comply with the applicable requirements of 42
U.S.C. § 1396b(m)(2)(A).  This reading is confirmed by the
implementing regulations.  See 42 C.F.R. § 438.6 ("The CMS
Regional Office must review and approve all MCO . . .
contracts . . . ."); id. § 438.806(a) (directing that federal
financial participation "is available under a comprehensive risk
contract only if -- (1) The [CMS] Regional Office has confirmed
that the contractor meets the definition of an MCO . . . ; and
(2) The contract meets all the requirements of [42 U.S.C.
§ 1396b(m)(2)(A)], the applicable requirements of [42 U.S.C.
§ 1396u-2], and the implementing regulations in this part").

This Court agrees with Plaintiffs that there is no
explicit statutory bar against review of the CMS's approval under
42 U.S.C. § 1396b(m)(2)(A).  Furthermore, the statute is not
drawn in such broad terms that in a given case there is no law to
apply.  See Beno, 30 F.3d at 1066.  The Federal Defendants do not

22

argue otherwise.  They simply point out that, in determining whether agency action is subject to review, a court should closely review the statutory language.  (Fed. Reply 5 n.2.) After carefully reviewing the statutory language set forth in 42 U.S.C. § 1396b(m)(2)(A), this Court concludes that the CMS's decision to approve the QExA Contracts is subject to review under the APA.

Accordingly, the claims that are asserted in the Federal First Amended Complaint are reviewable under the APA.[11/] This Court will now turn to the State Defendants' contentions as to the State Complaint.

## II.   Counts I, III, and V of the State Complaint:  Statutory Standing To Enforce Certain Provisions of the Medicaid Act Through 42 U.S.C. § 1983

In counts I, III, and V of the State Complaint, Plaintiffs claim that the State DHS may not deprive them of their rights under the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23)(A), by requiring them to enroll with the QExA Contractors because the preconditions for compelling managed care

_____

[11/] The Federal Defendants posit that this Court may not review the Secretary's decision not to take action against the QExA Contractors for their alleged misrepresentation of information pursuant to 42 U.S.C. § 1396b(m)(5)(A)(iv).  (Fed. Reply 4.)  That provision states that the Secretary "may" impose monetary penalties upon, or deny payment to, a contractor who has misrepresented or falsified information.  See 42 U.S.C. §§ 1396b(m)(5)(A)(iv), (B).  Yet Plaintiffs have not asked this Court to order that the Secretary take such action in the Federal First Amended Complaint.

enrollment set forth in 42 U.S.C. § 1396u-2(a)(1)(A) have not been met.  The allegedly unsatisfied preconditions are that:  (1) the QExA Contractors do not meet the solvency standards established by the state for private HMOs and are not licensed or certified by the state as a risk-bearing entity, as required by 42 U.S.C. § 1396b(m)(1)(C)(i) (count I), and (2) the contractors have not shown that they have adequate services and provider networks, as required by 42 U.S.C. § 1396u-2(b)(5) (count V). Plaintiffs further allege that the State DHS has not determined whether limiting the number of contractors to two will substantially impair access to services, as required by 42 U.S.C. § 1396u-2(a)(1)(A)(ii) (count III).

The State Defendants argue that this Court should dismiss Plaintiffs' claims because Plaintiffs do not have a right to enforce 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396b(m)(1)(C)(i), 1396u-2(b)(5), or 1396u-2(a)(1)(A)(ii) through 42 U.S.C. § 1983. (Mem. in Supp. 11-16, 22-23, 26-27.)  Plaintiffs counter that their right of action derives not only from those provisions, but also from 42 U.S.C. § 1396a(a)(23)(A), the "freedom of choice" provision itself.  (Pl. Opp'n 5-6.)  Plaintiffs assert (1) that the "freedom of choice" provision confers upon them a right enforceable under 42 U.S.C. § 1983 and (2) that they therefore have statutory standing to claim that, in order for the State DHS to deny them that right by requiring that they enroll in a

24

managed-care program, it must comply with the requirements of 42

U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396b(m)(1)(C)(i), 1396u-2(b)(5),

and 1396u-2(a)(1)(A)(ii).  (Pl. Opp'n 8, 12.)  Plaintiffs thus

seek to enforce the foregoing provisions through 42 U.S.C.

§ 1983.

A.   **The _Blessing_ framework**

        In _Blessing v. Freestone_, 520 U.S. 329 (1997), the

Supreme Court held that, in "'determining whether a particular

statutory provision gives rise to a federal right' redressable

via § 1983,"

> courts must consider whether:  (1) "Congress
> intended that the provision in question
> benefit the plaintiff"; (2) the plaintiff has
> "demonstrated that the right assertedly
> protected by the statute is not so 'vague and
> amorphous' that its enforcement would strain
> judicial competence"; and (3) "the statute
> unambiguously imposes a binding obligation on
> the States," such that "the provision giving
> rise to the asserted right is couched in
> mandatory, rather than precatory terms."

_Ball_, 492 F.3d at 1104 (quoting _Blessing_, 520 U.S. at 340-41).

If all three elements are satisfied, a federal right is

"'presumptively enforceable by § 1983,' subject only to a showing

by the state that 'Congress specifically foreclosed a remedy

under § 1983.'"  _Id._ at 1116 (quoting _Gonzaga Univ. v. Doe_, 536

U.S. 273, 284 & n.4 (2002)).

        As to the first _Blessing_ prong, "'it is rights, not the

broader or vaguer "benefits" or "interests," that may be enforced

under the authority of that section.'" Id. at 1105 (quoting Gonzaga, 536 U.S. at 283). Evidence of congressional intent for a provision to benefit the plaintiff "can be found in a statute's language as well as in its overarching structure." Id. "[T]he statutory provision in question must focus on individual rights to benefits, rather than only the aggregate or systemwide policies and practices of a regulated entity." Watson v. Weeks, 436 F.3d 1152, 1159 (9th Cir. 2006). "[T]he statute must be 'phrased in terms of the persons benefitted with an unmistakable focus on the benefitted class.'" Ball, 492 F.3d at 1106 (quoting Gonzaga, 536 U.S. at 284) (ellipsis omitted) (emphasis in original). Some phrases, such as "No person shall," clearly establish an individual right. Sanchez v. Johnson, 416 F.3d 1051, 1058 (9th Cir. 2005); see also Ball, 492 F.3d at 1108 ("While express use of the term 'individuals' (or 'persons' or similar terms) is not essential to finding a right for § 1983 purposes, usually such use is sufficient for that purpose."). However, "statutory language less direct . . . must be supported by other indicia so unambiguous that we are left without any doubt that Congress intended to create an individual, enforceable right remediable under § 1983." Sanchez, 416 F.3d at 1058. While a statute's language is the primary source of congressional intent to confer a right, a court may also look to the statute's implementing regulations and legislative history in ascertaining

whether the statute was intended to benefit the plaintiff.  <u>Ball</u>, 492 F.3d at 1106; <u>Sanchez</u>, 416 F.3d at 1057 ("'The question whether Congress intended to create a private right of action is definitively answered in the negative where a statute <u>by its terms</u> grants no private rights to any identifiable class.'" (quoting <u>Gonzaga</u>, 536 U.S. at 283-84) (emphasis in original)).

With respect to the second <u>Blessing</u> prong, the question is whether "'the plaintiff has 'demonstrated that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence.'" <u>Ball</u>, 492 F.3d at 1104 (quoting <u>Blessing</u>, 520 U.S. at 340-41).  A statute that, on its face, employs ambiguous standards, such as "reasonable benefits" or "reasonable and adequate," may nevertheless be enforceable if it is accompanied by sufficiently detailed guidance as to how such standards are to be measured.  <u>See</u> <u>Watson</u>, 436 F.3d at 1157-58; <u>Price v. City of Stockton</u>, 390 F.3d 1105, 1111 (9th Cir. 2004) (per curiam).  Such guidance may be found in implementing regulations.  <u>Price</u>, 390 F.3d at 111.

With these precepts in mind, this Court will now turn to the questions of whether Plaintiffs may enforce, via § 1983, the "freedom of choice" provision and the requirements of 42 U.S.C. § 1396u-2(a).

**B.   The "Freedom of Choice" Provision, 42 U.S.C.
     § 1396(a)(23)**

In a recent case, the Ninth Circuit held that certain

provisions of the Medicaid Act created private rights that can be

enforced by beneficiaries via § 1983.  <u>Ball</u>, 492 F.3d at 1103.

In so holding, the court repeatedly relied upon the Sixth

Circuit's decision in <u>Harris v. Olszewski</u>, 442 F.3d 456 (6th Cir.

2006), which determined that the "freedom of choice" provision

"created individual rights enforceable under § 1983."  <u>Ball</u>, 492

F.3d at 1109, 1115, 1117 (citing <u>Harris</u>, 442 F.3d at 461-63).

The <u>Harris</u> court's analysis under the <u>Blessing</u> framework is

discussed in the following subsections.

**1.   Congressional intent to benefit the plaintiff**

Applying the first <u>Blessing</u> prong, the <u>Harris</u> court

looked to the language of the "freedom of choice" provision,

which states in relevant part that:

> A State plan for medical assistance <u>must</u>--
> . . . (23) except as provided . . . in [42
> U.S.C. § 1396u-2(a)] . . . provide that (A)
> any <u>individual</u> eligible for medical
> assistance (including drugs) may obtain such
> assistance from any institution, agency,
> community pharmacy, or person, qualified to
> perform the service or services required
> (including an organization which provides
> such services, or arranges for their
> availability, on a prepayment basis), who
> undertakes to provide him such
> services . . . .

42 U.S.C. § 1396a(a) (emphasis added).  The <u>Harris</u> court

explained that, "in giving any individual eligible for medical

28

assistance a free choice over the provider of that assistance, the statute uses the kind of 'individually focused terminology' that 'unambiguously confers' an 'individual entitlement' under the law." 442 F.3d at 461 (quoting Gonzaga, 536 U.S. at 283, 287) (some internal quotation marks omitted), quoted in Ball, 492 F.3d at 1109; see also Silver v. Baggiano, 804 F.2d 1211, 1217 (11th Cir. 1986) (explaining that "the language of [the 'freedom of choice'] provision is clearly drawn to give Medicaid recipients the right to receive care from the Medicaid provider of their choice, rather than the government's choice"), abrogated on other grounds by Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613 (2002). The court also found instructive the Supreme Court's observation that the "freedom of choice" provision "'gives recipients the right to choose among a range of qualified providers[] without government interference.'" Harris, 442 F.3d at 462 (quoting O'Bannon, 447 U.S. at 785) (brackets in original).

The Harris court's textual analysis is reinforced by the "freedom of choice" provision's legislative history and the administrative regulations interpreting the provision. See Ball, 492 F.3d at 1105-06 (observing that evidence of Congressional intent to create a federal right may be found in a statute's legislative history and agency regulations promulgated under the statute); S. Rep. No. 90-744, at 5, 19, 122 (1967), as reprinted

<u>in</u> 1967 U.S.C.C.A.N. 2834, 2838, 2868, 3021 (explaining that the freedom of choice provision was intended to:  (1) "[a]llow recipients free choice of qualified providers of health services"; (2) provide that "people covered under the medicaid program would have free choice of qualified medical facilities and practitioners"; and (3) require that "recipients of medical assistance under a State title XIX program . . . have freedom in their choice of medical institution or medical practitioner"), <u>quoted in</u> <u>Silver</u>, 804 F.2d at 1217; 42 C.F.R. § 431.51(a)(1) ("[42 U.S.C. § 1396a(a)(23)] provides that recipients may obtain services from any qualified Medicaid provider that undertakes to provide the services to them.").

### 2.   Vagueness and mandatory obligations

As to the second the <u>Blessing</u> prong, the <u>Harris</u> court observed that, "while there may be legitimate debates about the medical care covered by or exempted from the freedom-of-choice provision, the mandate itself does not contain the kind of vagueness that would push the limits of judicial enforcement." 442 F.3d at 462.  The court further noted that "[w]hether a state plan provides an individual with the choice specified in the provision is likely to be readily apparent . . . ." <u>Id.</u>, <u>quoted in</u> <u>Ball</u>, 492 F.3d at 1115.

And, with respect to the third <u>Blessing</u> prong, the <u>Harris</u> court noted that "the 'must . . . provide' language of the

provision confirms that the statute is 'couched in mandatory, rather than precatory, terms.'"  Id. (quoting Blessing, 520 U.S. at 341).

### 3.   Congressional intent to foreclose a remedy

Finally, the Harris court reasoned that other provisions of the Medicaid Act do not "explicitly or implicitly foreclose the private enforcement of [the 'freedom of choice' provision] through § 1983 actions."  Id.  The court observed that "[t]he Medicaid Act does not provide other methods for private enforcement of the Act in federal court."  Id.  The court noted that the fact "[t]hat the Federal Government may withhold federal funds to non-complying States is not inconsistent with private enforcement."  Id. at 463, quoted in Ball, 492 F.3d at 1117.

This Court finds the Harris court's analysis of the "freedom of choice" provision persuasive and therefore concludes that the provision gives rise to a federal right for Medicaid beneficiaries that is redressable via § 1983.  See Ball, 492 F.3d at 1104; Harris, 442 F.3d at 461; Silver, 804 F.2d at 1217 (explaining that "it is clear that recipients have enforceable rights under § 1396a(a)(23)"); Women's Hosp. Found. v. Townsend, Civ. No. 07-711-JJB-DLD, 2008 U.S. Dist. LEXIS 52549, at *23-*24 (D. La. July 10, 2008) (concluding that "the Freedom of Choice Provision satisfies the Blessing and Gonzaga tests" and that a medicaid beneficiary therefore had an enforceable right under

that provision through § 1983).  Here, as Plaintiffs are Medicaid
beneficiaries, they may enforce their rights under the "freedom
of choice" provision through this § 1983 action.

   **C.   The requirements of the managed-care exception to the
         "freedom of choice" provision**

         The "freedom of choice" provisions is, however, subject
to exceptions, one of which is set forth in 42 U.S.C.
§ 1396u-2(a).  That section authorizes states to mandate
enrollment in managed care as a condition of receiving benefits
if the state meets certain requirements.  In theory, if a state
were to mandate enrollment pursuant to 42 U.S.C. § 1396u-2(a) (as
opposed to a § 1315 waiver) without meeting the requirements of
that section, the state would be without authority to mandate
managed care, and its failure to provide benefits consistent with
the "freedom of choice" provision would arguably constitute a
violation of that provision.  But that is not to say that
Plaintiffs necessarily have statutory standing to enforce those
requirements.

         Plaintiffs contend that they must have the right to
enforce the requirements of 42 U.S.C. § 1396u-2(a) simply because
it is an exception to the "freedom of choice" provision.  (Pl.
Opp'n 8.)  While the fact that Plaintiffs' have a right to
enforce the "freedom of choice" provision is relevant in deciding
whether they may also enforce the requirements of 42 U.S.C.
§ 1396u-2(a), insofar as it speaks to the overall statutory

                              32

scheme, that fact is by no means determinative.  Rather, in order for Plaintiffs to enforce those requirements, they must first have a right to do so under the Blessing framework, which calls for a particularized inquiry of the specific provision at issue. With an eye toward that framework, this Court will now consider whether Plaintiffs have a right to enforce the requirements set forth in 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396u-2(a)(1)(A)(ii), 1396u-2(b)(5), and 1396b(m)(1).

### 1.   42 U.S.C. § 1396u-2(a)(1)(A)(ii)

42 U.S.C. § 1396u-2(a)(1)(A)(ii) provides that, when a state employs a mandatory managed-care system, it "may restrict the number of provider agreements with managed care entities under the State plan if such restriction does not substantially impair access to services."

In Hawaii Coalition for Health v. Hawaii, Department of Human Services, 576 F. Supp. 2d 1114 (D. Haw. 2008) ("HCH"), the court explained that the plain language of this section "focuses on when a State may limit the number of managed care provider agreements," and that the section does not identify or refer to "any particular individuals to be benefitted." Id. at 1121.  The court further observed that, "[w]hile program recipients will certainly benefit from having access to services, it does not appear that Congress intended to create an enforceable right through this statute." Id.  The court thus found no evidence

33

that "indicates an 'unmistakable focus on the benefitted class.'" Id. (quoting Gonzaga, 536 U.S. at 284).  Rather, the court determined that the "broad and nonspecific" language of 42 U.S.C. § 1396u-2(a)(1)(A)(ii) supports the conclusion that "it is directed to a general goal and policy, as opposed to conferring individually enforceable rights on Medicaid recipients."  Id. at 1122.

This Court agrees with the HCH court's textual analysis of 42 U.S.C. § 1396u-2(a)(1)(A)(ii) and therefore concludes that the provision was not intended to benefit Plaintiffs.  See Sanchez, 416 F.3d at 1057 ("'The question whether Congress intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class.'" (quoting Gonzaga, 536 U.S. at 283-84) (emphasis in original)).  As such, they lack statutory standing to enforce that provision through § 1983.

## 2.   42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396u-2(b)(5), and 1396b(m)(1)

This Court will next consider whether Plaintiffs have a right to enforce 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396u-2(b)(5), and 1396b(m)(1).  This Court evaluates these provisions together because they are closely related.

   **a. Congressional intent to benefit the plaintiff and mandatory obligations**

   To begin with, 42 U.S.C. § 1396u-2(a), entitled "State option to use managed care," directs in relevant part:

   (1) Use of medicaid managed care organizations . . . .

   (A) In general.  Subject to the succeeding provisions of this section, and <u>notwithstanding</u> paragraph . . . <u>(23)(A) of [42 U.S.C. § 1396a(a)</u>], a State--

   (i) <u>may</u> require an <u>individual</u> who is eligible for medical assistance under the State plan under this title to enroll with a managed care entity as a condition of receiving such assistance (and, with respect to assistance furnished by or under arrangements with such entity, to receive such assistance through the entity), <u>if</u>--

   (I) the entity and the contract with the State meet the applicable <u>requirements</u> of <u>this section</u> and . . . [<u>42 U.S.C. § 1396b(m)</u>]; and

   (II) the <u>requirements</u> described in the succeeding paragraphs of <u>this subsection</u> are met . . . .

42 U.S.C. § 1396u-2(a) (emphasis added).

   One of the "requirements" of "this subsection," subsection (a), is found in 42 U.S.C. § 1396u-2(a)(3)(A), which states that "[a] State <u>must</u> permit an <u>individual</u> to choose a managed care entity from not less than two such entities that meet the applicable <u>requirements</u> of <u>this section</u>, and of [<u>42</u>

U.S.C. § 1396b(m)].″  (Emphasis added.)[12/]  And one of the

requirements of "this section" pertaining to MCOs is set forth in

42 U.S.C. § 1396u-2(b), which states in relevant part that:

>    (b) Beneficiary protections.
>
>    . . . .
>
>    (5) Demonstration of adequate capacity and
>    services.  Each medicaid managed care
>    organization shall provide the State and the
>    Secretary with adequate assurances (in a time
>    and manner determined by the Secretary) that
>    the organization, with respect to a service
>    area, has the capacity to serve the expected
>    enrollment in such service area, including
>    assurances that the organization--
>
>       (A) offers an appropriate range of
>    services and access to preventive and primary
>    care services for the population expected to
>    be enrolled in such service area, and
>
>       (B) maintains a sufficient number, mix,
>    and geographic distribution of providers of
>    services.

(Emphasis added.)

In addition, the "requirements" of 42 U.S.C.

§ 1396b(m), inter alia, define the necessary qualifications of an

MCO as follows:

>    (m) "Health maintenance organization" defined
>    . . . .

_____

[12/] This Court notes that, although Plaintiffs rely on 42
U.S.C. § 1396u-2(a)(1)(A), which incorporates the requirements of
42 U.S.C. § 1396u-2(a)(3)(C), they do not specifically rely on 42
U.S.C. § 1396u-2(a)(3)(C).  This Court nevertheless finds 42
U.S.C. § 1396u-2(a)(3)(C) instructive and discusses its
implications where appropriate.

(1)

(A) The term "health maintenance organization" means[, _inter alia_,] a health maintenance organization . . . , which . . . --

. . .

(ii) has made adequate _provision_ against the risk of insolvency, which provision is satisfactory to the State, meets the requirements of subparagraph (C)(i) (if applicable), and which assures that _individuals_ eligible for benefits under this title are in no case held liable for debts of the organization in case of the organization's insolvency.

. . . .

(C)

(i) . . . a _provision_ meets the _requirements_ of this subparagraph for an organization if the organization meets solvency standards established by the State for private health maintenance organizations or is licensed or certified by the State as a risk-bearing entity.[13/]

42 U.S.C. § 1396b (emphasis added).

To summarize, under 42 U.S.C. § 1396u-2(a), a state need not "[]withstand" or comply with the "freedom of choice" provision, and "may" thereby employ a mandatory managed-care program, "if" certain requirements are met, including the requirement that the state permit an "_individual_ to choose a

---

13/ 42 U.S.C. § 1396b(m)(1)(C) includes a number of exceptions; however, the parties do not contend that those exceptions are applicable here.

managed care entity from not less than two such entities that meet the applicable <u>requirements</u> of this section, and of [42 U.S.C. § 1396b(m)]."  This language is "unmistakably focused" on the right of an "individual," a Medicaid beneficiary, to choose from at least two MCOs that meet the "applicable requirements" of 42 U.S.C. §§ 1396u-2 and 1396b(m).  <u>See</u> <u>Ball</u>, 492 F.3d at 1106; <u>Watson</u>, 436 F.3d at 1160 (holding that the terms of 42 U.S.C. § 1396a(a)(10), which provides that "'[a] State plan . . . must provide for making medical assistance available . . . <u>to all individuals</u>,'" were "unmistakably focused on the specific individuals benefitted" (quoting 42 U.S.C. § 1396a(a)(10)) (ellipses, brackets, and emphasis in original)).

Those "requirements" were plainly intended to benefit the "individual" by ensuring that, in instances where a beneficiary is not permitted to choose his own healthcare providers, the MCOs that a state selects for the beneficiary will meet certain minimum standards, including the standards pertaining to provider-networks and solvency.  The former provides "[b]eneficiary protections" by guaranteeing that an MCO has "the capacity to serve the expected enrollment," while the latter serves to protect "individuals" eligible for Medicaid against the risk of being held liable for debts in the event of the MCO's insolvency.  42 U.S.C. §§ 1396u-2((b)(5), 1396b(m)(1)(A)(ii).

38

The foregoing analysis is reinforced by the legislative history underlying the enactment of 42 U.S.C. § 1396u-2 in 1997. See Ball, 492 F.3d at 1105-06 (observing that evidence of Congressional intent to create a federal right may be found in a statute's legislative history).  The legislative history indicates that, "[t]o control the costs and quality of healthcare, states are increasingly delivering services to their Medicaid populations through [HMOs] and other managed care arrangements."  H.R. Conf. Rep. No. 105-217, at 845 (1997), as reprinted in 1997 U.S.C.C.A.N. 176, 466.  The conference report states that, prior to the 1997 amendment, "to mandate that a beneficiary enroll in a managed care organization, . . . a state [had to] first obtain a waiver of the freedom-of-choice provision of Medicaid law," but that, under the House bill, states would have "the option of requiring individuals eligible for medical assistance under the state plan to enroll in a capitated managed care plan . . . without a . . . waiver."  Id. at 846, as reprinted in 1997 U.S.C.C.A.N. at 467.

In further discussing the House bill, the conference report states that:  "[The bill] also permits states to restrict the number of plans or providers it contracts with, consistent with quality of care.  Individuals must be permitted to choose their . . . managed care entity from among those that meet Medicaid requirements.  Individuals must be given a choice of at

least two managed care entities . . . ." Id. (emphasis added);

see also id. at 848, as reprinted in 1997 U.S.C.C.A.N. at 469.

This language, consistent with the actual statutory language, is

clearly focused on the right of "[i]ndividuals" to choose an MCO

that meets "Medicaid requirements," and not merely on "the

aggregate or systemwide policies and practices of a regulated

entity." See Watson, 436 F.3d at 1159.   In light of 42 U.S.C.

§ 1396u-2(a)(1)(A)(i)'s language, the overall statutory

structure, and the legislative history, this Court concludes that

the requirements set forth in 42 U.S.C. §§ 1396u-2(a)(3)(A),

1396u-2(b)(5), and 1396b(m)(1) were intended to benefit

Plaintiffs as Medicaid beneficiaries.[14]

---

[14] The State Defendants argue that Plaintiffs may not
enforce those requirements, citing HCH.   There, the court held
that Medicaid beneficiaries did not have enforceable rights under
42 U.S.C. § 1396(a)(1)(A)(i) or 1396u-2(b)(5), because those
provisions were not intended to benefit recipients.   576 F. Supp.
2d at 1121-24.   However, the court does not appear to have been
presented with the questions of whether Medicaid beneficiaries
have enforceable rights under the "freedom of choice" provision
or 42 U.S.C. § 1396u-2(a)(3)(A).   This Court believes that, when
those provisions are factored into the analysis, 42 U.S.C.
§§ 1396(a)(1)(A)(i) and 1396u-2(b)(5) were intended to benefit
Medicaid recipients.
    The State Defendants also rely on AlohaCare v. Hawaii,
Department of Human Services, 567 F. Supp. 2d 1238 (D. Haw.
2008), which held that a healthcare provider did not have
statutory standing to enforce, inter alia, 42 U.S.C. § 1396b(m),
1396u-2(b)(5), or 1396u-2(a)(1)(A)(ii) through 42 U.S.C. § 1983,
because those Medicaid provisions were not intended to benefit
providers.   Id. at 1243, 1255-56.   That case is distinguishable
from the case at bar because it considered the rights of
healthcare providers, as opposed to recipients.   The status of
the plaintiff is critical under the first Blessing prong.   See
(continued...)

With respect to the third Blessing prong, because those Medicaid provisions are phrased as "requirements," this Court concludes that they impose binding obligations on the states in the event that the states exercise their option of mandating managed-care enrollment.  See Ball, 492 F.3d at 1104.  In summary, the relevant requirements under 42 U.S.C. § 1396u-2(a) satisfy the first and third prongs of the Blessing framework. See id.

### b.    Vagueness

As to the second Blessing prong, the question is whether the pertinent requirements under 42 U.S.C. § 1396u-2(a)—namely, 42 U.S.C. §§ 1396u-2(b)(5) (assurances as to capacity) and 1396b(m)(1)(C)(i) (solvency standards)—are "'so "vague and ambiguous" that [their] enforcement would strain judicial competence.'"  See Ball, 492 F.3d at 1104 (quoting Blessing, 520 U.S. at 340–41).  Each provision is addressed in turn.

---

14/(...continued)
Ball, 492 F.3d at 1104 (considering whether "'Congress intended that the provision in question benefit the plaintiff'" (quoting Blessing, 520 U.S. at 340–41)); see also Silver, 804 F.2d at 1216–18 (distinguishing between healthcare providers and recipients in discussing whether each had enforceable rights under the "freedom of choice" provision).  Thus, the State Defendants' reliance on AlohaCare is misplaced.

41

### i.   42 U.S.C. § 1396u-2(b)(5)

The Supreme Court's decision in <u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498 (1990), is instructive in ascertaining whether the assurances provision is enforceable via § 1983.  That case involved a Medicaid provision which required that the rates for a state's plan for reimbursing healthcare providers be "reasonable and adequate" to meet the cost of the Medicaid scheme.  <u>Id.</u> at 519.  The Court held that the provision was not too "vague and amorphous" to be judicially enforceable.  <u>Id.</u>  The Court reasoned that the statute and regulation set out factors which a State must consider in adopting its rates.  <u>Id.</u>  The Court illustrated by explaining that, when determining methods of calculating rates that are reasonably related to the costs of an efficient hospital, a state had to consider

> (1) the unique situation (financial and otherwise) of a hospital that serves a disproportionate number of low income patients, (2) the statutory requirements for adequate care in a nursing home, and (3) the special situation of hospitals providing inpatient care when long term care at a nursing home would be sufficient but is unavailable.

<u>Id.</u> at 519 n.17.  The Court further reasoned that, "[w]hile there may be a range of reasonable rates, there certainly are some rates outside that range that no State could ever find to be reasonable and adequate under the Act."  <u>Id.</u> at 519-20.  The Court concluded that, "[a]lthough some knowledge of the hospital

42

industry might be required to evaluate a State's findings with respect to the reasonableness of its rates, such an inquiry is well within the competence of the judiciary." Id. at 520.

In this case, 42 U.S.C. § 1396u-2(b)(5) requires that an MCO provide the state and the Secretary with "adequate assurances," "in a time and manner determined by the Secretary," that it: "(A) offers an appropriate range of services and access to preventative and primary care services for the population to be enrolled"; and "(B) maintains a sufficient number, mix, and geographic distribution of providers of services." (Emphasis added.) The Secretary has directed that MCOs must "submit documentation to the State, in a format specified by the State[,] to demonstrate that it complies with [these] requirements." 42 C.F.R. § 438.207(b). The Secretary has further determined that such assurances must be provided "at the time [an MCO] enters into a contract with the State." 42 C.F.R. § 438.207(c).

At first blush, the statutory terms "adequate," "appropriate," and "sufficient" might seem too vague for judicial enforcement. However, one of the implementing regulations of 42 U.S.C. § 1396u-2(b)(5) appears to furnish specific criteria for states to evaluate in determining whether the assurances are adequate. Specifically, 42 C.F.R. § 438.206(b) provides in relevant part that:

43

The State must ensure, through its contracts, that each MCO . . . meets the following requirements:

(1) Maintains and monitors a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract.  In establishing and maintaining the network, each MCO . . . must consider the following:

(i) The anticipated Medicaid enrollment.

(ii) The expected utilization of services, taking into consideration the characteristics and health care needs of specific Medicaid populations represented in the particular MCO . . . .

(iii) The numbers and types (in terms of training, experience, and specialization) of providers required to furnish the contracted Medicaid services.

(iv) The numbers of network providers who are not accepting new Medicaid patients.

(v) The geographic location of providers and Medicaid enrollees, considering distance, travel time, the means of transportation ordinarily used by Medicaid enrollees, and whether the location provides physical access for Medicaid enrollees with disabilities.

(2) Provides female enrollees with direct access to a women's health specialist within the network for covered care necessary to provide women's routine and preventive health care services.  This is in addition to the enrollee's designated source of primary care if that source is not a women's health specialist.

(3) Provides for a second opinion from a qualified health care professional within the network, or arranges for the enrollee to

obtain one outside the network, at no cost to the enrollee.

(4) If the network is unable to provide necessary services, covered under the contract, to a particular enrollee, the MCO . . . must adequately and timely cover these services out of network for the enrollee, for as long as the MCO . . . is unable to provide them.

(5) Requires out-of-network providers to coordinate with the MCO . . . with respect to payment and ensures that cost to the enrollee is no greater than it would be if the services were furnished within the network.

(6) Demonstrates that its providers are credentialed as required by [42 C.F.R. §] 438.214.

Given this detailed list of factors, it would appear that a court could ascertain whether an entity has provided at least "adequate" assurances pursuant to 42 U.S.C. § 1396u-2(b)(5) by evaluating the factors in light of "a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers." See Ball, 492 F.3d at 1115. Thus, the requirements set forth in 42 U.S.C. § 1396u-2(b)(5) are not so "vague or amorphous" that their enforcement would strain judicial competence. See Wilder, 496 U.S. at 519-20; cf. Wright v. Roanoke Redevelopment & Housing Auth., 479 U.S. 418, 431-32 (1987) (holding that a provision requiring that a "reasonable" amount of utilities be included in rent for low-income housing was not too "vague and amorphous" to confer an enforceable right because the regulations specifically set out guidelines that

public housing authorities were to follow in establishing utility allowances).

### ii.  42 U.S.C. § 1396b(m)(1)(C)(i)

42 U.S.C. § 1396b(m)(1)(C)(i) states that an MCO must make adequate provision against the risk of insolvency and that a provision meets that standard "if the organization meets solvency standards established by the State for private health maintenance organizations or is licensed or certified by the State as a risk-bearing entity."  42 U.S.C. §§ 1396b(m)(1)(A)(ii), (C)(i).  Here, Plaintiffs allege that, under the State DHS's RFP, the QExA Contractors had to comply with "'the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii."  (St. Compl. ¶ 41 (emphasis omitted).) Plaintiffs point out that, in order to obtain an HMO insurance license under Hawai'i Revised Statutes § 432D-8, an applicant is required to have a minimum net worth of $2 million.  (Id. ¶ 40.) Plaintiffs allege that neither one of the QExA Contractors is properly licensed and that they therefore do not qualify as MCOs under 42 U.S.C. § 1396b(m)(1)(C)(i).  In view of 42 U.S.C. § 1396b(m)(1)(C)(i) and the state's alleged implementation of that provision, this Court concludes that the provision is not so "vague and ambiguous" that its enforcement would strain judicial competence.  See Ball, 492 F.3d at 1104.

46

### c. Congressional intent to foreclose a remedy

Having concluded that all three <u>Blessing</u> prongs have been met with respect to 42 U.S.C. §§ 1396u-2(b)(5) and 1396b(m)(1)(C)(i), it follows that those provisions are presumptively enforceable by Plaintiffs through § 1983, "subject only to a showing by the [State Defendants] that 'Congress specifically foreclosed a remedy under § 1983.'" <u>Ball</u>, 492 F.3d at 1116 (quoting <u>Gonzaga</u>, 536 U.S. at 284 & n.4). "A state can meet this burden by 'demonstrating that Congress shut the door to private enforcement either expressly, through specific evidence from the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.'" <u>Id.</u> at 284 n.4 (quoting <u>Gonzaga</u>, 536 U.S. at 284 n.4) (brackets, ellipsis, and internal quotation marks omitted).

The State Defendants do not argue that Congress specifically foreclosed a remedy for violations of 42 U.S.C. § 1396b(m)(1)(C)(i) through § 1983. But they do contend that the statutory language set forth in 42 U.S.C. § 1396u-2(b)(5) that assurances must be given "in a time and manner determined by the Secretary" gives the power of enforcement to the Federal DHHS. (St. Mem. in Supp. 26.) Yet the fact that the Secretary has the authority to determine when assurances must be provided does not demonstrate that Congress specifically shut the door on private

enforcement.   Indeed, the Secretary's power "'to reject Medicaid plans or to withhold federal funding to States whose plans did not comply with federal law' cannot foreclose a § 1983 remedy." Ball, 492 F.3d at 1117 (quoting Blessing 540 U.S. at 347-48). The State Defendants have thus failed to show that Congress specifically foreclosed a remedy for violations of 42 U.S.C. §§ 1396b(m)(1)(C)(i) and 1396u-2(b)(5) through § 1983.

All things considered, this Court concludes that Plaintiffs have statutory standing to assert their claim that the State DHS may not deprive them of their rights under the "freedom of choice" provision by requiring them to enroll with the QExA Contractors because the preconditions for compelling managed care enrollment set forth in 42 U.S.C. §§ 1396b(m)(1)(C)(i) and 1396u-2(b)(5) have not been met.[15/]   This Court will therefore deny the State Defendants' motion to dismiss counts I and V, as well as the joinders in the motion, in that regard.   However, because Plaintiffs do not have a right to enforce 42 U.S.C.

---

[15/] There appears to be an issue as to whether the QExA Contractors were required to have an HMO license, as opposed to an accident-and-health-insurance license, under the Hawai'i Revised Statutes in order to meet state solvency requirements. While the State Defendants raised that issue at the April 21, 2009 hearing and subsequently submitted a copy of a hearing's officer's decision on that point in In re Alohacare, they did not properly raise that point in their motion to dismiss.  Given that the issue was not properly raised, this Court declines to address it at this time.  However, this Court is cognizant that the final disposition in that matter may have significant implications in this case.

§ 1396u-2(a)(1)(A)(ii), this Court will grant the motion to

dismiss Plaintiffs' claim in count III asserting a violation of

that provision, along with the joinders in the motion.

**III. Counts II, III, and V of the State Complaint:  Preemption
     Under the Supremacy Clause**

The State Defendants maintain that this Court should

dismiss the claims in counts II, III, and V that, in compelling

ABD Medicaid beneficiaries to enroll in managed care, the State

DHS has violated preemptive federal law—namely, 42 U.S.C.

§§ 1396u-2(a)(1)(A)(i), 1396b(m)(1), 1396u-2(a)(1)(A)(ii), and

1396u-2(b)(5)—under the Supremacy Clause.[16]

Those provisions of federal law are, of course, part of

the Medicaid Act.  "Medicaid, by definition, is a cooperative

federal-state medical benefits program."  Guzman v. Shewry, 544

F.3d 1073, 1080 (9th Cir. 2008).  "[B]ecause such program

'exemplifies what is often referred to as cooperative

federalism,' 'the case for federal preemption becomes a less

persuasive one.'"  Id. (quoting Washington Dep't of Soc. & Health

Servs. v. Bowen, 815 F.2d 549, 557 (9th Cir. 1987)).

_____

[16] Unlike their standing to enforce the Medicaid Act via
§ 1983, Plaintiffs' standing to assert their preemption claim is
not disputed by the State Defendants.  This is likely
because "a plaintiff seeking injunctive relief under the
Supremacy Clause on the basis of federal preemption need not
assert a federally created 'right,' in the sense that term has
been recently used in suits brought under § 1983, but need only
satisfy traditional standing requirements."  Indep. Living Ctr.
of S. Cal., Inc. v. Shewry, 543 F.3d 1050, 1058 (9th Cir. 2008).

"Federal law may preempt state law under the Supremacy Clause of the Constitution." Siaperas v. Montana State Comp. Ins. Fund, 480 F.3d 1001, 1004 (9th Cir. 2007). "'Preemption can occur in one of three ways: express pre-emption by statute, occupation of the field, or conflict between state and federal regulation.'" Id. In this case, the Medicaid statutes at issue contain no express preemption clauses, and thus express preemption is not applicable here. See 42 U.S.C. §§ 1396u-2, 1396b(m). "Nor is the doctrine of 'field' preemption relevant, as Medicaid is a cooperative federal and state program." Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 74 n.6 (1st Cir. 2001), aff'd sub nom., Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003). Plaintiffs' claims must therefore arise under a conflict preemption analysis.

Conflict preemption occurs "'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Do Sung Uhm v. Humana Health Plan Inc., 540 F.3d 980, 984 (9th Cir. 2008) (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)).[17/] In the case at hand, Plaintiffs contend that: (1) the State Complaint alleges that the State DHS has set certain solvency

_____

[17/] Conflict preemption may also occur "'where compliance with both federal and state regulations is a physical impossibility.'" Do Sung Uhm, 540 F.3d at 984 (quoting Gade, 505 U.S. at 98). However, that form of conflict preemption does not appear to be at issue here.

requirements through the RFP and that the QExA Contractors have

not met those standards, in contravention of 42 U.S.C.

§ 1396m(b)(1) (St. Compl. ¶¶ 55, 61–62); (2) at the time the QExA

RFP was issued, the State DHS lacked (and still lacks) the

information necessary to determine whether limiting the number of

managed-care contracts to two would substantially impair access

to services, as required by 42 U.S.C. § 1396u-2(a)(1)(ii) (St.

Compl. ¶¶ 25, 83); and (3) neither QExA Contractor has provided

the State DHS with adequate assurances that it has an appropriate

range of services and maintains a sufficient number, mix, and

geographic distribution of providers of services, as required by

42 U.S.C. § 1396u-2(b)(5) (St. Compl. ¶ 69).

While Plaintiffs plainly allege that the State DHS has

violated the Medicaid Act through its implementation of the

federally-approved QExA program, they do not identify any aspect

of "state law" that stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.

See Do Sung Uhm, 540 F.3d at 984.  Plaintiffs do not assert that

any state statutes or regulations implementing the QExA program

in any way conflict with the Medicaid Act.  See Nat'l Bank of

Commerce v. Dow Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999)

(observing that, for purposes of a preemption analysis, "state

action includes legislative enactments and executive

pronouncements (positive law) and also encompasses applicable

51

common law claims recognized by state courts"). This case is thus distinguishable from <u>California Pharmacists Ass'n v. Maxwell-Jolly</u>, No. 09-55365, 2009 U.S. App. LEXIS 7171 (9th Cir. Apr. 6, 2009), wherein the Ninth Circuit held that certain hospitals had shown a likelihood of success on the merits that a <u>legislative enactment</u> that reduced reimbursement rates to various healthcare providers was violative of a provision of the Medicaid Act, namely, 42 U.S.C. § 1396a(a)(30)(A). <u>Id.</u> at *4-*5.

Because Plaintiffs have not shown that a "state law" conflicts with the Medicaid Act, this Court will grant the State Defendants' motion to dismiss counts II, III, and V, and the joinders in the motion, to the extent that those counts assert that the State DHS has violated preemptive federal law, specifically, 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396b(m)(1), 1396u-2(a)(1)(A)(ii), and 1396u-2(b)(5).

**IV. Count I of the State Complaint:  Waiver of the Exemptions Under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) for Certain Children with Special Needs and Dual Eligibles**

The State Defendants argue that this Court should dismiss the claim asserted in count I of the State Complaint that Plaintiffs cannot be compelled to enroll with a QExA Contractor in light of 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B), as they are either dual eligibles or children with special needs. <u>See</u> (St. Mem. in Supp. 20); 42 U.S.C. §§ 1396u-2(a)(2)(A) & (B) (providing that "[a] State may not require under [42 U.S.C. § 1396u-2(a)(1)]

52

the enrollment in a managed care entity of" (A) "certain children with special needs" or (B) dual eligibles).  The State Defendants do not challenge Plaintiffs' statutory standing to assert that claim.  Rather, the State Defendants' argument is that the claim fails because the QExA terms and conditions contain a valid waiver of the "freedom of choice" provision from the Secretary, via the CMS, pursuant to the Secretary's waiver authority under 42 U.S.C. § 1315(a)(1).  (Id.)

        A state may require enrollment in a managed-care program by, inter alia, (1) obtaining a waiver of the "freedom of choice" provision from the Secretary pursuant to 42 U.S.C. § 1315(a)(1) or (2) utilizing the provisions of 42 U.S.C. § 1396u-2(a), which is an express exception to the "freedom of choice" provision.  In this case, it would seem that the State DHS has employed a hybrid approach in crafting the QExA program. For all ABD beneficiaries who do not fall within the exemptions under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B), the State DHS appears to be employing the provisions of 42 U.S.C. § 1396u-2(a) in order to require that those beneficiaries enroll with one of the QExA Contractors.  And, for all ABD beneficiaries who fall within one of the exemptions, the State DHS has obtained a 42 U.S.C. § 1315(a)(1) waiver of those beneficiaries' "freedom of choice" rights in order to compel their enrollment, as the waiver document only speaks to those populations.  Specifically, in the

53

terms and conditions of the QExA program, the Secretary, via the CMS, waived the "freedom of choice" provision "[t]o enable Hawaii to restrict the freedom of choice of providers to groups that could not otherwise be mandated into managed care under [42 U.S.C. § 1396u-2]."  (St. Mot., Ex. 1 at 8.)

Plaintiffs argue, in effect, that the waiver is invalid because the exemptions under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) circumscribe the Secretary's authority to waive the "freedom of choice" provision under 42 U.S.C. § 1315(a)(1).  "'Statutory interpretation begins with the plain language of the statute.'" Coos County Bd. of County Comm'rs v. Kempthorne, 531 F.3d 792, 803-04 (9th Cir. 2008) (quoting Ctr. for Biological Diversity v. Norton, 254 F.3d 833, 834 (9th Cir. 2001)).  This Court therefore begins with the language of 42 U.S.C. § 1315(a)(1), which directs that "the Secretary may waive compliance with any of the requirements of . . . [42 U.S.C. § 1396a] . . . to the extent and for the period he finds necessary to enable such State or States to carry out [any experimental, pilot, or demonstration] project."  The "freedom of choice" provision is set forth in paragraph (a)(23) of 42 U.S.C. § 1396a.  As such, under § 1315, the Secretary "may waive compliance with" the "freedom of choice" provision.  The question becomes whether the Secretary's authority under this  provision is circumscribed by the exemptions found in 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B).

42 U.S.C. § 1396u-2(a)(2) provides that "[a] State may not require under [42 U.S.C. § 1396u-2(a)(1)] the enrollment in a managed care entity of" (A) certain children with special needs or (B) dual eligibles. (Emphasis added.) This language speaks to the state's authority to require enrollment of those populations when the state mandates managed care "under [42 U.S.C. § 1396u-2(a)(1)]." It does not mention, much less restrict, the state's authority to require enrollment of those populations when the state mandates managed care under a 42 U.S.C. § 1315 waiver from the Secretary.

The only provision related to 42 U.S.C. § 1396u-2(a)(2) that specifically addresses the Secretary's 42 U.S.C. § 1315 waiver authority is an uncodified section of the Balanced Budget Act of 1997 ("Act"). 42 U.S.C. § 1396u-2(a)(2) was set forth in the Act, Title IV, Subtitle H, Chapter 1 ("Chapter 1"), Section 4701(a). Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4701(a), 111 Stat. at 489. Chapter 1 is entitled "Managed Care," and Section 4710 of Chapter 1 is entitled "Effective Dates." Id. § 4710, 111 Stat. at 506. Consistent with its title, this section provides the dates for when various provisions in Chapter 1 apply to Medicaid programs and contracts. Id. Subsection (c) ("Section 4710(c)") contains a provision that was not codified in the United States Code entitled

"Nonapplication to Waivers." _Id._ § 4710(c), 111 Stat. at 507.[18/]
It states that:  "Nothing in this chapter (or the amendments made
by this chapter) shall be construed as affecting the terms and
conditions of _any waiver_, or the _authority of the Secretary_ of
Health and Human Services _with respect to any such waiver_, _under
[42 U.S.C. § 1315_ or 1396n]." _Id._ (emphasis added).

     The State Defendants assert that Section 4710(c) serves
two functions:  "the grandfathering of existing waivers, and the
authorization to issue new waivers." (St. Reply 9.)  The
uncodified provision's reference to "any waiver" addresses
waivers in existence at the time that the Act was passed.  _See_
Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4710(c), 111
Stat. at 507.  Thus, the language regarding the Secretary's
authority "with respect to any such waiver" speaks to the
Secretary's authority regarding waivers in effect at that time.
_See id._  Hence, under Section 4710(c), nothing in Chapter 1 may
be construed as affecting the "terms and conditions" in effect at
the time the Act was passed or the Secretary's authority with
respect to such waivers.  _See id._  This Court therefore agrees

---

     [18/] Because Section 4710(c) appears in the Statutes at Large,
it has the force and effect of law.  _See_ _United States Nat'l Bank
v. Indep. Ins. Agents of Am._, 508 U.S. 439, 448 (1993) ("Though
the appearance of a provision in the current edition of the
United States Code is 'prima facie' evidence that the provision
has the force of law, 1 U.S.C. § 204(a), it is the Statutes at
Large that provides the 'legal evidence of laws,' §
112 . . . .").

with the State Defendants that the uncodified provision serves as a grandfather clause for existing waivers.  See also 67 Fed. Reg. 40,989 41,072 (explaining that the uncodified provision has been interpreted to be a "'grandfather' provision").[19]

However, the plain language of Section 4710(c) only addresses the Secretary's authority as to waivers in effect at the time that the Act was passed; it does not explicitly speak to the Secretary's authority to issue new waivers under 42 U.S.C. § 1315.  This reading is reinforced by the legislative history and the Secretary's interpretation of the provision.  See H.R. Conf. Rep. 105-217, at 867 (1997), as reprinted in 1997 U.S.C.C.A.N. at 488 (noting that the Act "makes allowances for States with . . . [42 U.S.C. § 1315] Medicaid waivers either approved or in effect" (emphasis added)); 67 Fed. Reg. at 41,072 (explaining that the uncodified provision "applies only to waivers or demonstration projects that were in effect, or already approved, as of August 5, 1997, the date of the enactment of the [Act]" (emphasis added)).  Accordingly, the uncodified provision

---

[19] This Court notes that the title of the uncodified provision, "Nonapplication to waivers," would suggest that the provisions in Chapter 1 do not affect the Secretary's § 1315 waiver authority as a general matter.  But the text of the provision demonstrates it was only intended to address the Secretary's § 1315 authority with respect to waivers in effect at the time that the Act was passed.  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4710(c), 111 Stat. at 507.

does not address the Secretary's authority to issue new waivers under 42 U.S.C. § 1315.[20]

If anything, the absence of any reference to the Secretary's authority to grant waivers prospectively suggests that provisions of "this chapter," Chapter 1, could potentially

---

[20] In discussing the issuance of new waivers under 42 U.S.C. § 1315, the Secretary has noted that, "for those [Act] provisions related to increased beneficiary protections and quality assurance standards, we anticipate that the [Act's] provision would apply unless a State can demonstrate that a waiver program beneficiary protection or quality standard would equal or exceed the [Act's] requirement." 67 Fed. Reg. at 41,073. Plaintiffs argue that the exemptions under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) for dual eligibles and certain children with special needs constitute "increased beneficiary protections," and that the Secretary's statement requires that a waiver program afford beneficiary protections that "equal or exceed" those provided by the Act. (Pl. Surreply 6.) Plaintiffs assert, in effect, that the waiver for the QExA program does not provide protections that "equal or exceed" the "increased beneficiary protections" afforded by the exemptions.

The "increased beneficiary protections" to which the Secretary was alluding are those found in section 4704 of the Act, which is codified in subsection (b) of 42 U.S.C. § 1396u-2. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4704, 111 Stat. at 496. Section 4704 is specifically entitled "Increased Beneficiary Protections." Id. (emphasis added). The exemptions for dual eligibles and children with special needs are located not under section 4704, but rather under section 4701 of the Act, which is codified in subsection (a) of 42 U.S.C. § 1396u-2. Id. § 4701, 111 Stat. at 490. As such, the Secretary was not referring to the exemptions when he mentioned "increased beneficiary protections." See 67 Fed. Reg. at 41,073. This conclusion is corroborated by the Secretary's observation that, "[w]hile State agencies are prohibited from enrolling[, inter alios, dual eligibles and certain children with special needs,] under the State plan option, a State agency may . . . use . . . [42 U.S.C. § 1315] demonstration authority to mandate enrollment for these individuals in a managed care system." 66 Fed. Reg. at 43,626. Accordingly, Plaintiffs' reliance on the Secretary's statement regarding "increased beneficiary protections" is misplaced.

be "construed as affecting . . . the authority of the Secretary . . . with respect to" granting waivers going forward "under [42 U.S.C. § 1315]."  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4710(c), 111 Stat. at 507.  The question is thus whether the provisions of Chapter 1 that are at issue here, namely, 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B), "affect[]" the Secretary's waiver authority under 42 U.S.C. § 1315.

As discussed above, the language of those provisions does not address the Secretary's continuing authority under 42 U.S.C. § 1315 to grant a waiver of the "freedom of choice" provision.  Hence, while the limitation set forth in 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) restricts a state's authority under § 1396u-2(a)(1), it does not speak to the Secretary's power to grant a waiver of the "freedom of choice" provision under § 1315. See HCH, 576 F. Supp. 2d at 1126 ("Nothing in § 1396u-2(a)—which permits states to implement managed care programs outside of a demonstration project—suggests that its [exemption for dual eligibles] is also applicable to a waiver of the freedom of choice provision as part of a § 1315 demonstration project.").

If there could be any doubt as to the meaning of 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B), the provisions would at worst be silent or ambiguous with regard to whether they limit the Secretary's power to grant 42 U.S.C. § 1315 waivers as to exempt populations.  See Maximum Comfort v. Sec'y of Health & Human

59

<u>Servs.</u>, 512 F.3d 1081, 1088 (9th Cir. 2007) (determining that the
Secretary had correctly interpreted Medicare provisions and
concluding that, if there could be any doubt as to the meaning of
the provisions, the Secretary's construction is entitled to
deference).   The Secretary has spoken to that very question.
Under <u>Chevron v. Natural Resources Defense Council</u>, 467 U.S. 837
(1984), a court will defer to an agency interpretation of a
statute where (1) Congress delegated authority to the agency to
make rules carrying the force of law; (2) the agency
interpretation claiming deference was promulgated in the exercise
of that authority; (3) the statute is ambiguous or silent as to a
question at issue; and (4) the agency's construction of the
statute is a permissible one.   <u>See</u> <u>Trout Unlimited v. Lohn</u>, 559
F.3d 946, 954 (9th Cir. 2009); <u>Maximum Comfort</u>, 512 F.3d at 1086;
<u>Gonzales v. Dep't of Homeland Sec.</u>, 508 F.3d 1227, 1235 (9th Cir.
2007).

    The Secretary has been entrusted with the
administration of the Medicaid Act and, in the exercise of that
authority, has passed 42 C.F.R. § 438.50(a)(1).   The regulation
states in relevant part that "[a] State plan that requires
Medicaid recipients to enroll in managed care entities must
comply with the provisions of this section, except when the State
imposes the requirement . . . [a]s part of a demonstration
project under [42 U.S.C. § 1315]."   42 C.F.R. § 438.50(a)(1).   In

promulgating this provision, the Secretary explained that,
"[w]hile State agencies are prohibited from enrolling[, inter
alios, dual eligibles and certain children with special needs,]
under the State plan option, a State agency may . . . use . . .
[42 U.S.C. § 1315] demonstration authority to mandate enrollment
for these individuals in a managed care system."  Medicaid
Program; Medicaid Managed Care, 66 Fed. Reg. 43,614, 43,626 (Aug.
20, 2001).  The Secretary noted that, when Congress enacted 42
U.S.C. § 1396u-2, it "did not modify or limit [his] authority"
under 42 U.S.C. § 1315.  Medicaid Program; Medicaid Managed Care:
New Provisions, 67 Fed. Reg. 40,989 41,073 (Jun. 14, 2002).
Hence, the Secretary does not read 42 U.S.C. §§ 1396u-2(a)(2)(A)
and (B) as limiting his authority to grant 42 U.S.C. § 1315
waivers of the "freedom of choice" provision as to the exempt
populations.

     The question therefore narrows to whether the
Secretary's construction is a permissible one.  See Gonzales, 508
F.3d at 1235.  Plaintiffs argue, in effect, that the Secretary's
interpretation is impermissible for the reason that he failed to
recognize the possibility that Congress did not amend 42 U.S.C.
§ 1315 to include the authority to waive the exemptions set forth
in 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) because Congress had no
intention of granting such authority.  (Pl. Opp'n 18.)
Plaintiffs maintain that Congress could hardly have contemplated

that 42 U.S.C. § 1315(a) waivers would have any affect on compliance concerning a separate section of the law to which those waivers do not apply.  (Id.)  They insist that it would be absurd to conclude that the Secretary may absolve the state from compliance with 42 U.S.C. § 1396u-2(a)'s requirements merely by waiving the "freedom of choice" rights of exempt populations. (Id.)

As noted earlier, 42 U.S.C. § 1315(a)(1) specifically grants the Secretary the authority to waive the "freedom of choice" provision and, upon obtaining such a waiver, a state may mandate beneficiaries' enrollment in managed care.  42 U.S.C. § 1315(a)(1) contains no exemptions for specific classes of beneficiaries, much less for dual eligibles or certain children with special needs.  Thus, under the plain language of 42 U.S.C. § 1315(a)(1), the Secretary has the authority to waive the "freedom of choice" provision as it applies to those populations.

To be sure, 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) include exemptions for dual eligibles and certain children with special needs.  But, as previously stated, those provisions are specifically directed at restricting the state's authority "under [42 U.S.C. § 1396u-2(a)(1)]" to mandate managed care for those populations, and make no mention of the Secretary's authority under 42 U.S.C. § 1315(a) to waive the "freedom of choice" provision as it applies to those classes of beneficiaries.

62

Because the Secretary already had the authority to waive the "freedom of choice" provision with respect to those populations, it was unnecessary for Congress to amend 42 U.S.C. § 1315(a)(1) when it enacted 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) in order to grant the Secretary the authority to waive those new provisions. An amendment to that effect would have been surplusage, insofar as a 42 U.S.C. § 1315 waiver of the "freedom of choice" provision as it applies to the exempt populations has the same effect of waiving 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B).[21/]

This Court finds the Secretary's construction of 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) to be a permissible one and therefore worthy of <u>Chevron</u> deference.  <u>See</u> <u>Maximum Comfort</u>, 512 F.3d at 1086.  His construction is indeed consistent with the legislative history underlying 42 U.S.C. § 1396u-2, which does not evidence an intent to restrict his authority to allow states to mandate managed care by granting a waiver of the "freedom of choice" provision via § 1315; rather, it demonstrates a clear objective of affording the states an avenue of mandating managed

---

[21/] By contrast, it was not surplusage to include Section 4710(c) because certain provisions in the Act could have been read as "affect[ing]" waivers in force at the time the Act was passed as well as the Secretary's authority with respect to such waivers.  <u>See</u> Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4710(c), 111 Stat. at 507.  The Secretary has illustrated how Section 4710(c) applies to the "terms and conditions" of a waiver by explaining that, "if the State's waiver program included enrollment and disenrollment rules, the enrollment and disenrollment rules in [42 U.S.C. § 1396u-2] would not apply while the waiver was still effect."   67 Fed. Reg. at 41,073.

care without obtaining a § 1315 waiver from the Secretary.  <u>See</u> <u>supra</u> Discussion Section II.A.2.a (quoting H.R. Conf. Rep. 105-217, at 846, <u>as reprinted in</u> 1997 U.S.C.C.A.N. at 467); <u>see also</u> H.R. Conf. Rep. 105-217, at 847, 848, <u>as reprinted in</u> 1997 U.S.C.C.A.N. at 468, 469.

In view of the statutory language, the Secretary's regulatory construction, and the legislative history, this Court concludes that the exemptions under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B) do not circumscribe the Secretary's authority to waive the "freedom of choice" provision under 42 U.S.C. § 1315b(a)(1).[22/]  Thus, the § 1315 waiver of the "freedom of choice" provision that the State DHS obtained from the Secretary is not invalid for the reason that the Secretary lacked the authority to grant it.

Because the State DHS has mandated that dual eligibles and certain children with special needs enroll in managed care by virtue of a § 1315 waiver that is, at least for purposes of

---

[22/] Plaintiffs' reliance on <u>Portland Adventist Medical Center v. Thompson</u>, 399 F.3d 1091 (9th Cir. 2005), is misplaced.  There, it was held that the Secretary did not have authority under 42 U.S.C. § 1315 to exclude certain classes of Medicaid beneficiaries from being factored into a statutorily prescribed formula that affected the compensation hospitals received for treating those beneficiaries.  Here, by contrast, the Secretary has authority under 42 U.S.C. § 1315(a)(1) to waive the "freedom of choice" provision as it applies to dual eligibles and certain children with special needs.  <u>Cf.</u> <u>HCH</u>, 576 F. Supp. 2d at 1127 n.12 (finding that <u>Portland Adventist Medical Center</u> did not address the issue of "how to construe the requirements of 42 U.S.C. § 1396u-2(a)(2)(A) with 42 U.S.C. § 1315").

ruling on this motion to dismiss, valid, the State DHS was not obliged to comply with the exemptions for those populations under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B).  Consequently, the State DHS did not violate those provisions.  This Court will therefore grant the motion, and the joinders therein, to dismiss count I of the State Complaint to the extent that it asserts a violation of 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B).  Having granted the Federal Defendants' substantive joinder, this Court will also dismiss count I of the Federal First Amended Complaint insofar as it asserts that the Secretary acted arbitrarily and capriciously in granting a waiver of the "freedom of choice" provision.[23/]

**V.   Count IV of the State Complaint:  Contract Claim**

In count IV of the State Complaint, Plaintiffs allege, _inter alia_, that Ohana and Evercare obtained their QExA Contracts by misrepresenting themselves as being qualified to receive them. (St. Compl. ¶ 39.)  Plaintiffs maintain that, under the terms of the contracts, federal law, state law, and caselaw, the QExA Contracts were void _ab initio_ and are therefore not legally in

---

[23/] Plaintiffs additionally argue that, even if § 1396u-2 protections could be vitiated through the § 1315 waiver, the waiver would still fail because there is no discussion in the waiver documents of the loss of § 1396u-2 protections, much less a justification for the loss that would satisfy standards for considering what a waiver will accomplish and why it is being done to properly implement the waiver authority.  (Pl. Opp'n 14.) However, Plaintiffs have not alleged this claim in the State Complaint or the Federal First Amended Complaint.  As such, this Court will not address the claim at this time and will instead grant Plaintiffs leave to amend to properly plead it.

effect.  (Id.)  The State Defendants argue that count IV only raises state contract law issues.  (St. Mem. in Supp. 27.)  They insist that Plaintiffs are not parties to the QExA Contracts and thus cannot sue to void them.  (Id. at 28.)  Plaintiffs counter that they have standing under the Supremacy Clause to raise the issue of whether the contracts are void because the State DHS failed to meet various requirements of federal law concerning Medicaid managed care and, therefore, the State DHS may not commit or spend federal dollars under those contracts. (Pl. Opp'n 24.)

In In re Vic Supply Co., 227 F.3d 928 (7th Cir. 2000), the Seventh Circuit explained that:  "Ordinarily, only a party (actual or alleged) to a contract can challenge its validity. . . . Obviously the fact that a third party would be better off if a contract were unenforceable does not give him standing to sue to void the contract."  Id. at 930-31.  However, the court issued this caveat:  "Of course there are illegal contracts that the government, or persons injured by the contract, can challenge . . . ."  Id.  "[A] contract which violates or contravenes a federal or state constitution, statute, or regulation is illegal, invalid, unenforceable, and void."  17A Am. Jur. 2d Contracts § 229 (2008) (footnotes omitted); see also Wilson v. Kealakekua Ranch, 57 Haw. 124, 127, 551 P.2d 525, 527 (1976) (suggesting that, if a bargain is "prohibited by statute,"

a party may not recover under the bargain (internal quotation marks omitted)).

In the present matter, the QExA Contracts allegedly provided that, "[a]s a necessary Condition to the formation of this Contract, the PROVIDER" represents that, as of the date of the contract, the provider: (1) "complies with all federal, state, and county laws, ordinances, codes, rules, and regulations, as the same may be amended from time to time, that in any way affect the PROVIDER's performance of this Contract"; and (2) "holds all licenses and accreditations required under applicable federal, state, and county laws, ordinances, codes, rules and regulations to provide the Required Services under this Contract." (St. Compl. ¶ 60 (emphasis omitted).) Plaintiffs allege that Ohana and Evercare misrepresented themselves as being qualified to receive these contracts and that the contracts are therefore void <u>ab inito</u>. (St. Compl. ¶ 84.) If these allegations are true, then the State DHS would likely have an actionable claim to void the QExA Contracts.

However, the question is not whether the State DHS has a claim, but rather whether Plaintiffs, as third parties to the QExA Contracts, have standing. In order to have standing to challenge the validity of the QExA Contracts, Plaintiffs must show that the contracts are themselves "illegal." <u>See</u> <u>Vic Supply Co.</u>, 227 F.3d at 930-31. Plaintiffs assert, in effect, that the

67

QExA Contracts are illegal based on violations of 42 U.S.C.

§ 1396b(m)(2)(A)'s requirements for managed-care contracts,

various provisions of 42 U.S.C. § 1396u-2 interwoven into those

requirements, and the implementing regulations.  (Pl. Opp'n 23.)

42 U.S.C. § 1396b(m)(2)(A) states in relevant part

that:

> [N]o payment shall be made under this title
> to a State with respect to expenditures
> incurred by it for payment (determined under
> a prepaid capitation basis or under any other
> risk basis) for services provided by any
> entity (including a health insuring
> organization) which is responsible for the
> provision (directly or through arrangements
> with providers of services) of inpatient
> hospital services and any other service
> described in paragraph (2), (3), (4), (5), or
> (7) of [42 U.S.C. § 1396d(a)] or for the
> provision of any three or more of the
> services described in such paragraphs
> unless--
>
> . . .
>
> (iii) such services are provided for
> the benefit of individuals eligible for
> benefits under this title in accordance with
> a contract between the State and the entity
> . . . ;
>
> . . .
>
> (xii) such contract, and the entity
> complies with the applicable requirements of
> [42 U.S.C. § 1396u-2].

42 U.S.C. § 1396b(m)(2)(A).  Thus, under this provision, if a

managed-care contract or entity fails to comply with the

applicable requirements of 42 U.S.C. § 1396u-2, the state cannot

receive payment from the federal government for services rendered by the entity.  See id. §§ 1396b(m)(2)(A)(i), (xii).  But this provision does not declare it illegal for the state to simply enter into a managed-care contract with an entity that fails to meet those requirements.  Rather, what is illegal under this provision is for a state to be paid for services rendered by such an entity.  See id. § 1396b(m)(2)(A) ("[N]o payment shall be made under this title to a State with respect to expenditures incurred by it for payment . . . .").

In summary, while it is clearly problematic when a state contracts with an entity that does not comply with the requirements of 42 U.S.C. § 1396u-2, 42 U.S.C. § 1396b(m)(2)(A) does not appear to declare it "illegal" for the state to do so. See Vic Supply Co., 227 F.3d at 930-31.  Accordingly, because Plaintiffs have not sufficiently established that the QExA Contracts are void ab inito, this Court will grant the State Defendants' motion to dismiss count IV of the State Complaint as well as the joinders in the motion.  Having granted the Federal Defendants' substantive joinder in this regard, this Court will also dismiss the Federal First Amended Complaint to the extent that it seeks a declaration that the QExA Contracts are null and void.  (See Fed. 1st Am. Compl. 49.)[24/]

_____

[24/] This Court notes that, even if it were to deny the motion to dismiss count IV on standing grounds, the count would
(continued...)

**CONCLUSION**

In light of the foregoing, this Court:

(1)    DENIES the Federal Defendants'
       substantive joinder, and the joinders
       therein, to dismiss the Federal First
       Amended Complaint on the ground that the
       Secretary's decisions to grant a 42
       U.S.C. § 1315 waiver and to approve the
       QExA Contracts are unreviewable under
       the Administrative Procedure Act;

(2)    DENIES the State Defendants' motion to
       dismiss counts I and V of the State
       Complaint, and the joinders in the
       motion, to the extent that those counts
       seek to enforce 42 U.S.C.
       §§ 1396u-2(a)(1)(A)(i), 1396u-2(b)(5),
       and 1396b(m)(1) via 42 U.S.C. § 1983;

(3)    GRANTS the State Defendants' motion to
       dismiss count III of the State
       Complaint, and the joinders in the
       motion, to the extent that the count
       seeks to enforce 42 U.S.C.
       § 1396u-2(a)(1)(A)(ii) via 42 U.S.C.
       § 1983;

(4)    GRANTS the State Defendants' motion to
       dismiss counts II, III, and V of the
       State Complaint, and the joinders in the
       motion, to the extent that those counts
       assert that the State DHS has violated
       preemptive federal law, namely 42 U.S.C.

---

24/(...continued)
necessarily fail if Plaintiffs were to ultimately lose on their
claims under the Medicaid Act.  On the other hand, if Plaintiffs
were to prevail on their claims, the count would be moot, as the
State DHS could not require Plaintiffs to enroll with the QExA
Contractors as a condition of receiving Medicaid benefits.
    This court further notes that, although Plaintiffs may not
challenge the validity of QExA Contracts, they may contest the
validity of the Secretary's approval of the contracts under the
APA.  See supra Discussion Section I.

§§ 1396u-2(a)(1)(A)(i), 1396b(m)(1),
1396u-2(a)(1)(A)(ii), and 1396u-2(b)(5);

(5)

    (a)   GRANTS the State Defendants' motion
        to dismiss count I of the State
        Complaint, and the joinders in the
        motion, to the extent that the
        count asserts violations of 42
        U.S.C. §§ 1396u-2(a)(2)(A) and (B);

    (b)   having GRANTED the Federal
        Defendants' substantive joinder,
        DISMISSES the Federal First Amended
        Complaint to the extent that it
        asserts that the Secretary acted
        arbitrarily and capriciously in
        granting a waiver of the "freedom
        of choice" provision;

(6)

    (a)   GRANTS the State Defendants' motion
        to dismiss count IV of the State
        Complaint, and the joinders in the
        motion;

    (b)   having GRANTED the Federal
        Defendants' substantive joinder,
        DISMISSES the Federal First Amended
        Complaint to the extent that it
        seeks a declaration that the QExA
        Contracts are null and void;

(7)   GRANTS Plaintiffs leave to amend the
       Federal First Amended Complaint and
       count I of the State Complaint to allege
       that the 42 U.S.C. § 1315 waiver is
       invalid on the ground that there is no
       discussion in the waiver documents as to
       the loss of protections afforded by 42
       U.S.C. § 1396u-2; and

(8)   ORDERS Plaintiffs to show cause within
       twenty days of the date of this Order
       why they should be granted leave to
       amend:  (a) their claims in count III of

the State Complaint that sought to enforce 42 U.S.C. § 1396u-2(a)(1)(A)(ii) via 42 U.S.C. § 1983; (b) their claims in counts II, III, and V of the State Complaint that the State DHS has violated preemptive federal law, namely 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396b(m)(1), 1396u-2(a)(1)(A)(ii), and 1396u-2(b)(5); (c) their claim in count IV of the State Complaint; and (d) their claim in the Federal First Amended Complaint that sought a declaration that the QExA Contracts are null and void. See Manzarek v. St. Paul Fire & Marine Ins. Co., 519 F.3d 1025, 1034-35 (9th Cir. 2008) (finding an abuse of discretion where the district court dismissed a complaint without leave to amend where it never gave the plaintiffs an opportunity to explain how they could amend if allowed to do so).  If Plaintiffs fail to file a response by that date, those claims will be dismissed WITH PREJUDICE.  Plaintiffs' response may be no longer than 15 pages or 4,500 words.  If Plaintiffs file a response, the State Defendants, the Federal Defendants, and Intervenors may file oppositions of equal length within twenty days of the date of Plaintiffs' response.

Assuming that Plaintiffs do not show cause why they should be granted leave to amend, what would remain of the State Complaint is Plaintiffs' claims in counts I and V that seek to enforce 42 U.S.C. §§ 1396u-2(a)(1)(A)(i), 1396u-2(b)(5), and 1396b(m)(1) via 42 U.S.C. § 1983.  And what would remain of the Federal First Amended Complaint is Plaintiffs' claim that the Secretary arbitrarily and capriciously approved the QExA Contracts.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, May 11, 2009.



_____
Alan C. Kay
Sr. United States District Judge

G. v. State of Hawaii, Department of Human Services, Civ. Nos.  08-00551
ACK-BMK & 09-00044 ACK-BMK:  Order Granting in Part and Denying in Part the
State Defendants' Motion to Dismiss, the Federal Defendants' Substantive
Joinder, and Intervenors' Joinders