IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) Civ. No. 08-00551 ACK-BMK<br>) Civ. No. 09-00044 ACK-BMK<br>) (Consolidated) |
| Plaintiffs, | ) |
| vs. | ) |
| STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, ET AL., | ) |
| Defendants. | ) |

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) |
| Plaintiffs, | ) |
| vs. | ) |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., | ) |
| Defendants. | ) |

ORDER (1) GRANTING THE FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND THE JOINDERS THEREIN, (2) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST THE FEDERAL DEFENDANTS BASED ON THE UNLAWFUL ISSUANCE OF A WAIVER AND APPROVALS OF MANAGED CARE CONTRACTS, AND (3) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AGAINST THE FEDERAL DEFENDANTS BASED ON UNLAWFUL PREMIUM TAX REIMBURSEMENT

**PROCEDURAL HISTORY**

I.   **Prior Proceedings**

On December 8, 2008, in Civil No. 08-00551 ACK-BMK, Plaintiffs filed a complaint against the State of Hawaii, Department of Human Services ("State DHS"), and Lillian B. Koller, in her official capacity as the Director of the State DHS (collectively, "State Defendants").  At that point, the Plaintiffs were comprised of Medicaid beneficiaries who were part of the aged, blind, and disabled ("ABD") population ("ABD Plaintiffs").  Their principal allegation is that the State Defendants have violated certain provisions of Title XIX of the Social Security Act, commonly known as the Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u>, by requiring them to enroll with one of two healthcare entities as a condition of receiving Medicaid benefits in connection with the agency's managed care program for ABD beneficiaries, the QUEST Expanded Access ("QExA") Program.

Those two entities were the only ones that received contracts to provide the medical care for ABD beneficiaries under the QExA Program ("QExA Contracts").  They are WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("WellCare of Arizona") and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors"), and they have intervened in this matter.

2

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS (collectively, "Federal Defendants").  On February 4, 2009, Plaintiffs filed a first amended complaint against the Federal Defendants.  "At the federal level, Congress has entrusted the Secretary of [the Federal DHHS] with administering Medicaid, and the Secretary, in turn, exercises that delegated authority through the [Centers for Medicare and Medicaid Services ('CMS')]." Wong v. Doar, 571 F.3d 247, 250 (2d Cir. 2009).  Plaintiffs contend that the CMS acted arbitrarily and capriciously by granting a waiver of the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), for the QExA Program pursuant to 42 U.S.C. § 1315(a), and by thereafter approving the QExA Contracts.

On February 19, 2009, Civil Nos. 08-00551 and 09-00044 were consolidated.  This is the third case brought in this Court challenging the QExA Program.  See AlohaCare v. Hawaii, Dep't of Human Servs., 567 F. Supp. 2d 1238 (D. Haw. 2008), aff'd, 572 F.3d 740 (9th Cir. 2009) (upholding the district court's decision that a disappointed bidder for a QExA Contract did not have statutory standing to enforce certain provisions of the Medicaid Act); Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008) (dismissing a health advocacy

organization's complaint because, among other things, the organization did not have statutory standing to enforce certain provisions of the Medicaid Act).

On May 11, 2009, the Court entered an order granting in part and denying in part a motion to dismiss filed by the State Defendants and joinders therein.  G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009).  The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects.  They subsequently filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

On June 2, 2009, Plaintiffs filed a motion for a preliminary injunction against the Federal Defendants.  On August 7, 2009, they filed a motion for a temporary restraining order against the Federal Defendants.  On August 10, 2009, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction against the State Defendants.  The Court denied Plaintiffs' motions for temporary restraining orders, and Plaintiffs subsequently withdrew their motions for preliminary injunctions.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended sixty-seven-page complaint against the State Defendants and, on September 1, 2009, they filed a third

4

amended fifty-eight-page complaint against the Federal Defendants ("Federal Third Amended Complaint" or "Fed. 3d Am. Compl."). Those complaints added claims on behalf of certain Medicaid healthcare providers ("Provider Plaintiffs") and new ABD beneficiaries.  The providers are physicians, pharmacists, and ancillary care providers who accepted ABD beneficiaries as patients and clients under the prior fee-for-service system and who have provided care and services to ABD beneficiaries under the QExA Program.  In the action against the State Defendants, Plaintiffs have added claims under the Americans With Disabilities Act ("ADA"), the Rehabilitation Act, 42 U.S.C. § 1396a(a)(30), and the Takings Clause of the Fifth Amendment.

On September 8, 2009, the Federal Defendants filed the administrative record ("AR"), which is roughly 5,200 pages in length.  At Plaintiffs' request, the administrative record includes documents from 2004 onwards.  7/18/09 Transcript of Proceedings 28:3-22.  Plaintiffs did not ask for any documents that were created prior to 2004.  Id.

## II. Motions for Summary Judgment in the Action Against the Federal Defendants

Presently before the Court are three motions for summary judgment in the action against the Federal Defendants. The motions concern Plaintiffs' claim that the CMS acted arbitrarily and capriciously in granting the 42 U.S.C. § 1315(a) waiver and approving the QExA Contracts.

**A.     The Federal Defendants' Motion for Summary Judgment**

On October 14, 2009, the Federal Defendants filed a motion for summary judgment ("Fed. Defs.' MSJ"), accompanied by a memorandum in support ("Fed. Defs.' MSJ Mem.") and a concise statement of facts ("Fed. Defs.' MSJ CSF").  This motion addresses both the waiver and contract-approval issues.  On October 28, 2009, WellCare of Arizona filed a joinder in the motion.  On November 3, 2009, Evercare filed a joinder in the motion.  On November 11, 2009, the State Defendants filed a joinder in the motion.

On November 19, 2009, Plaintiffs filed an opposition to the motion ("Pls.' Opp'n to Fed. Defs.' MSJ") and a concise statement of facts ("Pls.' Opp'n to Fed. Defs.' MSJ CSF").

On November 25, 2009, the Federal Defendants filed a reply ("Fed. Defs.' MSJ Reply").  On November 30, 2009, Evercare and WellCare of Arizona filed joinders in the reply.

On December 9, 2009, Plaintiffs filed a declaration of counsel.

**B.     Plaintiffs' General Motion for Summary Judgment**

On October 14, 2009, Plaintiffs filed a motion for summary judgment addressing both the waiver and contract approval issues ("Pls.' Gen. MSJ" or "Plaintiffs' general motion for summary judgment").  The motion was filed with a memorandum in support ("Pls.' Gen. MSJ Mem.") and a concise statement of facts

6

("Pls.' Gen. MSJ CSF").  On October 18, 2009, Plaintiffs filed an errata to their general motion for summary judgment.

On November 19, 2009, the Federal Defendants filed an opposition to the motion ("Fed. Defs.' Opp'n to Pls.' Gen. MSJ"), accompanied by a concise statement of facts ("Fed. Defs.' Opp'n to Pls.' Gen. MSJ CSF").  On November 20, 2009, WellCare of Arizona and the State Defendants filed joinders in the Federal Defendants' opposition.  On November 23, 2009, Evercare filed a joinder in the Federal Defendants' opposition.

On November 25, 2009, Plaintiffs filed a reply ("Pls.' Gen. MSJ Reply").

## C.  Plaintiffs' Tax Motion for Summary Judgment

On October 14, 2009, Plaintiffs filed a motion for summary judgment regarding an unlawful payment of premium tax ("Pls.' Tax MSJ" or "Plaintiffs' tax motion for summary judgment").  The motion was accompanied by a memorandum in support ("Pls.' Tax MSJ Mem.") and a concise statement of facts ("Pls.' Tax MSJ CSF").  On October 16, 2009, Plaintiffs filed an errata to their tax motion for summary judgment.  The motion appears to relate to the contract-approval issue.

On November 19, 2009, the State Defendants filed an opposition to the motion ("St. Defs.' Opp'n to Pls.' Tax MSJ"), along with a concise statement of facts ("St. Defs.' Opp'n to Pls.' Tax MSJ CSF").  The same day, the Federal Defendants filed

an opposition to the motion ("Fed. Defs.' Opp'n to Pls.' Tax MSJ") and a concise statement of facts ("Fed. Defs.' Opp'n to Pls.' Tax MSJ").  On November 20, 2009, WellCare of Arizona filed joinders in the State and Federal Defendants' oppositions.  The same day, the State Defendants filed a joinder in the Federal Defendants' opposition.  On November 23, 2009, Evercare filed joinders in the State and Federal Defendants' oppositions.

On November 25, 2009, Plaintiffs filed a reply ("Pls.' Tax MSJ Reply").

### D.  Hearing

On December 14, 2009, the Court held a hearing on the three motions for summary judgment in the action against the Federal Defendants.[1]  At the hearing, the Court granted Plaintiffs leave to file exhibits concerning the solvency issues. The QExA Contractors were also given permission to file responses to Plaintiffs' exhibits.  The same day, Plaintiffs filed a supplemental submission of preauthorization forms ("Pls.' Preauthorization Form Mem.").  On December 16, 2009, the QExA Contractors filed responsive declarations.

---

[1]  The Court also heard three motions for summary judgment in the action against the State Defendants.  Those motions are addressed in a separate order.

## FACTUAL BACKGROUND[2/]

### I.   The Medicaid Act

The Medicaid Act "provides federal funding to 'enabl[e] each State, as far as practicable . . . to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services.'"  AlohaCare, 572 F.3d at 742 (quoting 42 U.S.C. § 1396-1) (brackets in original).  The Medicaid program is "a jointly financed federal-state program that is administered by the States in accordance with federal guidelines."  Id.   Each state that elects to participate in the program must submit a plan to the CMS.  42 U.S.C. §§ 1396, 1396a.  If the plan is approved, the state is entitled to Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. Id. § 1396b(a)(1).

"The Act, among other things, outlines detailed requirements for [state] plan eligibility, [42 U.S.C.] § 1396a, erects a complex scheme for allocating and receiving federal funds, id. § 1396b, and imposes detailed requirements on States

_____

[2/] The facts in this Order are recited for the limited purpose of deciding the motions for summary judgment in the action against the Federal Defendants.  They shall not be construed as findings of fact upon which the parties may rely in future proceedings in this case.

that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), id. § 1396u-2." AlohaCare, 572 F.3d at 742–43.  "Medicaid generally requires a State to conform with federal guidelines prior to receiving federal funds; however, under 42 U.S.C. § 1315, CMS may waive compliance for certain 'experimental, pilot, or demonstration project[s].'"  Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

## II.  The QExA Program

Pursuant to 42 U.S.C. § 1315, in July of 1993, the CMS granted a waiver of various provisions of the Medicaid Act to the State of Hawai'i to allow the state to conduct a demonstration project that would transform its fee-for-service Medicaid program into a managed-care model for most Medicaid beneficiaries. AR 49.  The original demonstration project, called Hawaii Health QUEST ("QUEST Program"), excluded ABD beneficiaries.  Id. at 49–50.  ABD beneficiaries instead continued to receive benefits on a fee-for-service basis.  Id. at 22.

In a fee-for-service system, the traditional framework for state Medicaid programs, the state contracts directly with and pays health care providers, such as physicians, hospitals, and clinics, for services they provide to Medicaid beneficiaries. G., 2009 U.S. Dist. LEXIS 39851, at *6.  By contrast, under a managed care model, the state contracts with MCOs, which assume

the responsibility of providing Medicaid services through their own employees or by contracting with independent providers of such services.  Id. at *6-*7.   The state pays each MCO on a capitated or fixed-amount-per-enrollee basis.  Id.

In February of 1997, the State DHS submitted a waiver application to the CMS so that it could mandatorily enroll portions of the ABD populations into its managed care demonstration project, the QUEST Program, but the request was subsequently withdrawn.  Fed. Defs.' MSJ Mem. 8.  In January and August of 2005, the State DHS submitted respectively a second and third waiver request.  AR 1, 43.  The CMS asked the State DHS to withdraw its second request because there was a lack of detail to warrant further consideration at that time, and the CMS took no action on the third request.  Fed. Defs.' MSJ Mem. 8-9.

On February 21, 2007, the State DHS submitted its fourth request for a waiver under 42 U.S.C. § 1315(a), seeking approval from the CMS to implement the QExA Program.  AR 210. The QExA Program was intended to provide primary, acute, and long-term care services, including home- and community-based services ("HCBS"), to ABD beneficiaries, including certain children with special needs and dual eligibles (individuals eligible for Medicaid and Medicare), state-wide using a managed-care model.  Id.  The program would replace the fee-for-services system that was then in place for the ABD population.

11

On October 10, 2007, the State DHS issued a request for proposals ("RFP") to procure the services of two managed care organizations that would be responsible for providing all of the Medicaid care for ABD beneficiaries as part of the QExA Program. Id. at 3942.  On December 7, 2007, the State DHS submitted the RFP to the CMS for its review.  Id. at 1016.  On February 1, 2008, the State DHS awarded the QExA Contracts to Evercare and Ohana Health Plan, Inc. ("Ohana"), a subsidiary of WellCare Health Plans, Inc. ("WellCare Inc.").  Id. at 1558.  The RFP, with amendments, became part of the contracts.  Id. at 3953.

On February 7, 2008, the CMS approved the State DHS's fourth waiver application for the QExA Program.  Id. at 1565.  In doing so, the CMS granted the State DHS a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision.  Id. at 1570.  The waiver was subject to certain special terms and conditions ("STCs"), which provide many of the operational requirements of the QExA Program.  Id. at 1565.

On May 15, 2008, Ohana was merged into WellCare of Arizona, another subsidiary of WellCare Inc., and WellCare of Arizona assumed Ohana's QExA Contract.  See id. at 2059-68, 3060.

On January 30, 2009, the CMS approved the QExA Contracts.  Id. at 3925-26.

**STANDARDS OF REVIEW**

## I.   Arbitrary and Capricious Agency Action

An agency decision may be set aside "if the decision was 'arbitrary and capricious' within the meaning of the [Administrative Procedure Act ("APA"), 5 U.S.C. § 701 <u>et seq.</u>]" <u>Beno v. Shalala</u>, 30 F.3d 1057, 1073 (9th Cir. 1994) (quoting 5 U.S.C. § 706(2)(A)).  Such is the case where an agency

> "has relied on factors which Congress has not
> intended it to consider, entirely failed to
> consider an important aspect of the problem,
> offered an explanation for its decision that
> runs counter to the evidence before the
> agency, or is so implausible that it could
> not be ascribed to a difference in view or
> the product of agency expertise."

<u>Id.</u> (quoting <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 44 (1983)).

In examining whether an agency's decision is arbitrary and capricious, a court "may not consider reasons for agency action which were not before the agency."  <u>Id.</u>  While a court "may 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,'" it may not "infer an agency's reasoning from mere silence or where the agency failed to address significant objections and alternative proposals."  <u>Id.</u> (quoting <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 43).  "Rather, 'an agency's action must be upheld, if at all, on the basis articulated by the agency itself.'"  <u>Id.</u> at 1073–74 (quoting <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 50).  "Thus,

13

while formal findings are not required, the record must be sufficient to support the agency action, show that the agency has considered the relevant factors, and enable the court to review the agency's decision." <u>Id.</u> at 1074; <u>see also</u> <u>C.K. v. New Jersey Dep't of Health & Human Servs.</u>, 92 F.3d 171, 183 (3d Cir. 1996) ("[T]he mere absence of formal findings is not a sufficient basis for reversal because the Secretary was not required under the APA or [42 U.S.C. §] 1315(a) to make findings . . . .").[3/]

## II.  The Scope of Judicial Review in APA Cases

The district "court is not required to resolve any facts in a review of an administrative proceeding." <u>Occidental Eng'g Co. v. Immigration & Naturalization Serv.</u>, 753 F.2d 766, 769 (9th Cir. 1985).  "Certainly, there may be issues of fact before the administrative agency.  However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." <u>Id.</u>  Thus, "[i]n reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'"

---

[3/] Plaintiffs' pay lipservice to the proposition that formal findings by an agency are not required.  After acknowledging that principle, <u>see</u> Pls.' Gen. MSJ Mem. 12 (quoting <u>Beno</u>, 30 F.3d at 1074), they repeatedly argue that the CMS acted arbitrarily and capriciously for the reason that it failed to make certain findings, <u>see, e.g.</u>, <u>id.</u> at 17; Pls.' Opp'n to Fed. Defs.' MSJ 10.  Those arguments are not well made.

City & County of San Francisco v. United States, 130 F.3d 873, 877 (9th Cir. 1997) (quoting Occidental Eng'g, 753 F.2d at 770).

"'[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.'" Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am., 499 F.3d 1108, 1117 (9th Cir. 2007) (quoting Camp v. Pitts, 411 U.S. 138, 142 (1973)). The Ninth Circuit has explained that:

> At the district court level, extra-record evidence is admissible if it fits into one of four 'narrow' exceptions: (1) if admission is necessary to determine whether the agency has considered all relevant factors and has explained its decision, (2) if the agency has relied on documents not in the record, (3) when supplementing the record is necessary to explain technical terms or complex subject matter, or (4) when plaintiffs make a showing of agency bad faith.

Id.

## DISCUSSION

Plaintiffs and the Federal Defendants have sought summary judgment as to the claims that the CMS acted arbitrarily and capriciously in granting the 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision and in approving the QExA Contracts. The Court has previously concluded that those actions are reviewable under the APA. G., 2009 U.S. Dist. LEXIS 39851, at *24–*28. Each action will be evaluated in turn below.

I.  **The CMS's Decision to Issue a 42 U.S.C. § 1315(a) Waiver of the "Freedom of Choice" Provision**

In the Federal Third Amended Complaint, Plaintiffs contend that the CMS acted arbitrarily and capriciously when it granted the State DHS a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision for the QExA Program.  Fed. 3d Am. Compl. ¶¶ 105-06.  They contend that the CMS failed to make a number of determinations required by the Medicaid Act before granting the waiver.  See id. ¶¶ 8, 105.

A.  **Introduction**

The "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), provides in pertinent part that a state Medicaid plan must, subject to certain exceptions, provide that any recipient of Medicaid assistance "may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services."  42 U.S.C. § 1396a(a)(23)(A).  It essentially affords beneficiaries "the right to choose among a range of qualified providers[] without government interference." O'Bannon v. Town Court Nursing Ctr., 447 U.S. 773, 785 (1980). The State DHS obtained a waiver of the "freedom of choice" provision on February 7, 2008, so that it could require that ABD beneficiaries enroll in a managed care plan as a condition of receiving benefits.  AR 1570.

16

The reason that the State DHS requested a waiver from the CMS is that it could not have simply utilized 42 U.S.C. § 1396u-2(a) to mandate enrollment of the entire ABD population. That statute serves as an express exception to the "freedom of choice" provision and allows states to mandate such enrollment. See 42 U.S.C. §§ 1396a(a)(23), 1396u-2(a).  However, the statute exempts certain groups within the ABD population from mandatory managed care enrollment, including certain children with special needs and dual eligibles.  Id. §§ 1396u-2(a)(2)(A), (B).

Thus, because it could not utilize an exception to the "freedom of choice" provision set forth in 42 U.S.C. § 1396u-2(a) to mandate enrollment of dual eligibles and certain children with special needs, the State DHS obtained a waiver of the "freedom of choice" provision as it applies to those groups.  The waiver document specifically directs that the "freedom of choice" provision is waived so that the State DHS could "restrict the freedom of choice of providers to groups that could not otherwise be mandated into managed care under [42 U.S.C. § 1396u-2]." AR 1570.  By obtaining a waiver of the "freedom of choice" provision, the State DHS was able to mandate the enrollment of all ABD beneficiaries in managed care.

The Court previously determined that the CMS had the authority under 42 U.S.C. § 1315(a) to waive the "freedom of choice" provision as it applies to dual eligibles and certain

17

children with special needs.  G., 2009 U.S. Dist. LEXIS 39851, at *63-*80 (dismissing Plaintiffs' claim on that issue as a matter of law).  This time around, the question is whether the CMS acted arbitrarily and capriciously in doing so.

**B.  Statutory Background and the Beno Requirements for Issuing 42 U.S.C. § 1315(a) Waivers**

42 U.S.C. § 1315(a) provides in relevant part that, "[i]n the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of[, inter alia, the Medicaid Act,] in a State or States— . . . the Secretary may waive compliance with any of the requirements of[, inter alia, 42 U.S.C. § 1396a], as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project."  42 U.S.C. § 1315(a)(1).

In Beno, the Ninth Circuit explained that, when deciding whether to grant a waiver for an experimental, demonstration, or pilot project under 42 U.S.C. § 1315(a), the CMS must (1) make a judgment that "the project is likely to yield useful information or demonstrate a novel approach to program administration," (2) "determine that the proposed project is likely to further the objectives of the [Medicaid Act]," and (3) examine the project's "potential danger to participants' physical, mental and emotional well-being."  30 F.3d at 1069-70.

18

The CMS has "considerable discretion to decide which projects meet these criteria." Id. at 1069.

### C.  Experimental, Pilot, or Demonstration Project

With respect to the first Beno requirement, the Federal Third Amended Complaint asserts that nowhere in the waiver documents is there a description of the pilot or demonstration aspect of the QExA Project that necessitates or justifies a 42 U.S.C. § 1315(a) waiver.  Fed. 3d Am. Compl. ¶ 105.b.  Plaintiffs contend in their general motion for summary judgment that there is no explanation in the administrative record as to why dual eligibles and certain children with special needs were being compelled into managed care.  Pls.' Gen. MSJ Mem. 8.  They acknowledge that the QExA Program was intended to reduce the rate of uninsurance and improve quality and efficiency while stabilizing cost, but they assert that the program does not identify how those objectives are achieved by compelling dual eligibles and certain children with special needs into managed care.  Id. at 10; AR 1576.  In addition, Plaintiffs contend that the remaining objectives of the QExA Program—namely, reducing inappropriate utilization and providing a coordinated care management environment—are natural byproducts of managed care and thus have no demonstration or experimental value.  Pls.' Gen. MSJ Mem. 10; AR 1576.

It is the comprehensive nature of the QExA Program that makes it a demonstration or pilot project. See Fed. Defs.' Opp'n to Pls.' Gen. MSJ 7; Fed. Defs.' MSJ Reply 6. The program was intended to provide the full range of Medicaid benefits, including primary, acute, and long-term care services, to ABD beneficiaries state-wide using a managed-care model. AR 210, 232. That model would replace the piecemeal fee-for-service system and assure coordination and quality of care while reducing care fragmentation across the continuum of benefits for ABD beneficiaries, including certain children with special needs and dual eligibles, the latter of which make up the vast majority of the ABD population. Id. at 212, 325-26, 2734, 2754.

The program's inclusion of dual eligibles and certain children with special needs in a managed-care system is itself experimental in nature, given that those populations are generally statutorily exempt from mandatory enrollment under 42 U.S.C. §§ 1396u-2(a)(2)(A) and (B). The Federal Defendants note that, because of the exemptions, the effects of providing Medicaid services to those populations in a managed care setting have not been widely tested and indeed cannot be tested in the absence of a demonstration waiver. Fed. Defs.' Opp'n to Pls.' Gen. MSJ at 8. It is undisputed that only one other state (Arizona) has attempted to provide all Medicaid benefits to ABD beneficiaries throughout the state in a managed-care delivery

20

system.  Fed. Defs.' Opp'n to Pls.' Gen. MSJ 7; Pls.' Opp'n to Fed. Defs.' MSJ 2 & n.1; see also AR 77, 183, 384, 946, 1391, 1561 (indicating how Arizona's approach influenced the State DHS's design of the QExA Program).  If the QExA Program did not include the statutorily exempt populations, it would not be a comprehensive program for ABD beneficiaries and its value as a demonstration project would be diminished.

The results of the QExA Program will be measured in a plan that the State DHS must develop pursuant to the STCs. AR 1610-11.  In proposing the program, the State DHS expressed its intention to evaluate whether the managed-care system improves ABD beneficiaries' health and functional status and access to HCBS.  Id. at 95-96.  The agency also noted its plan to compare the QExA Program to the prior fee-for-service system, explaining that the plan would focus on changes over time for the ABD population.  Id. at 96.

The Court finds that the comprehensive and relatively-untested character of the QExA Program suggests that the program should demonstrate a novel approach to program administration and yield useful information about using managed care delivery systems for ABD beneficiaries, including dual eligibles and certain children with special needs.  The CMS did not act arbitrarily or capriciously in determining that the QExA Program was the proper subject of a demonstration or pilot project.  It

therefore met the first Beno requirement in granting the 42

U.S.C. § 1315(a) waiver.

### D.   Objectives of the Medicaid Act

The next Beno requirement asks whether the CMS

determined that the QExA Program would likely further the

objectives of the Medicaid Act.  See 30 F.3d at 1069.  One of the

primary purposes of the Medicaid Act is to "enabl[e] each State,

as far as practicable under the conditions in such State, to

furnish . . . medical assistance on behalf of families with

dependent children and of aged, blind, or disabled individuals,

whose income and resources are insufficient to meet the costs of

necessary medical services."  42 U.S.C. § 1396-1; see also Ball

v. Rodgers, 492 F.3d 1094, 1098 (9th Cir. 2007).  In this case,

the QExA Program's utilization of managed care as a delivery

model for ABD beneficiaries was intended to provide better

coordination of the wide variety of services utilized by ABD

beneficiaries and to enhance the quality of care received by ABD

beneficiaries by promoting more consistent utilization of

services, including preventative care.  AR 70, 72, 77-78, 112,

232, 1576.

Moreover, the QExA Program was designed to increase the

capacity for, and improve access to, HCBS, which enable ABD

beneficiaries being served in an institutional setting to receive

services in the community.  Id. at 80-81, 112, 232, 1576.  The

entities that the State DHS selected for the program, the QExA Contractors, are contractually required to increase HCBS by five percent annually.  Id. at 4037, 4100-03.  This approach is consistent not only with the objectives of the Medicaid Act generally, but also the specific objectives of the HCBS waiver program, which was enacted by Congress "'in response to the fact that a disproportionate percentage of Medicaid resources were being used for long-term institutional care and studies showing that many persons residing in Medicaid-funded institutions would be capable of living at home or in the community if additional support services were available.'"  Ball, 492 F.3d at 1098 (quoting Sanchez v. Johnson, 416 F.3d 1051, 1054 (9th Cir. 2005)).

In view of the foregoing, the Court concludes that the CMS did not act arbitrarily or capriciously in determining that the QExA Program would likely further the objectives of the Medicaid Act.  Hence, the CMS satisfied the second Beno requirement.

### E.    Potential Harm to Recipients

The final Beno requirement asks whether the CMS considered the potential harm to recipients in granting the waiver.  30 F.3d at 1070.  In the Federal Third Amended Complaint, Plaintiffs contend that the waiver documents do not

contain any findings or discussions of beneficiary protections. Fed. 3d Am. Compl. ¶ 105.b.

When the State DHS proposed the QExA Program, it emphasized that it had previously held public meetings to obtain feedback on the QExA Program's design and that it crafted the program with an extended transition period from the fee-for-service system to take account of the vulnerable and medically-complex ABD population.  AR 72, 80.  The State DHS worked extensively with the CMS to include a number of procedural safeguards for beneficiaries.  Id. at 376-377, 382-489, 958-1001, 1270-71, 1384-85.

The QExA Program's STCs, as approved by the CMS, require the State DHS to contract with an enrollment counselor for at least the first two years of the demonstration period. Id. at 1593.  The enrollment counselor is responsible for assisting ABD beneficiaries with selecting the plan and primary care provider ("PCP") that best meets their needs, educating ABD beneficiaries about how to use the managed-care delivery system, and informing beneficiaries of their rights and responsibilities, including access to care rights.  Id.  Once a beneficiary is enrolled in a plan, he is assigned a service coordinator who is tasked with coordinating services with all providers, facilitating and arranging access to services, and attempting to

resolve any concerns about care delivery or providers.  Id. at 1594-95.

In addition, the STCs require the State DHS to create an Ombudsman Program that is available to all QExA beneficiaries for at least one year.  Id. at 1595.  The program represents ABD beneficiaries in resolving any disputes with the QExA Contractors and is designed to ensure access to care, promote quality of care, and achieve beneficiary satisfaction.  Id.  The program serves as an additional layer of protection for ABD beneficiaries, who are also entitled to use internal grievance and appeals processes and, if necessary, the state's administrative and judicial review procedures.  Id. at 1596.

The CMS "exercises considerable discretion [in determining] what risks are necessary" to allow states to test new ideas and ways of dealing with the problems of Medicaid beneficiaries.  See Beno, 30 F.3d at 1071.  The Court finds that the CMS exercised that discretion in this case and determined that any potential risks to ABD beneficiaries were necessary to permit the State DHS to test a relatively-novel, integrated approach to the provision of healthcare for the ABD population. Consequently, the Court concludes that the CMS did not act arbitrarily or capriciously in considering the QExA Program's potential to harm ABD beneficiaries, including dual eligibles and

certain children with special needs.  <u>See</u> <u>id.</u> 30 F.3d at 1069-70.
The CMS thus met the third <u>Beno</u> requirement.

### F.   Decision Regarding the Waiver Issue

The Court has found that the CMS satisfied all three
<u>Beno</u> requirements.  It follows that the CMS did not act
arbitrarily or capriciously in granting the 42 U.S.C. § 1315(a)
waiver of the "freedom of choice" provision for the QExA Program.
Therefore, the Court will grant the Federal Defendants' motion
for summary judgment, and the joinders therein, as to the waiver
issue and deny Plaintiffs' general motion for summary judgment as
to that issue.  The Court will now move on to the contract-
approval issue.

## II.  The CMS's Decision to Approve the QExA Contracts

In the Federal Third Amended Complaint, Plaintiffs
allege that the CMS acted arbitrarily and capriciously in
approving the QExA Contracts.  Fed. 3d Am. Compl. ¶¶ 103, 106.
They claim that the CMS failed to determine that the QExA
Contractors met certain solvency standards and established
sufficient networks of healthcare providers.  <u>Id.</u> ¶ 103.
Plaintiffs and the Federal Defendants have moved for summary
judgment as to the contract-approval claim.

**A.    Statutory and Regulatory Background**

Before ultimately approving the QExA Contracts on January 30, 2009, the CMS reviewed the contracts pursuant to 42 U.S.C. § 1396b(m), which provides in relevant part that:

> [N]o payment shall be made under this title to a State with respect to expenditures incurred by it for payment . . . for services provided by any entity . . . unless—
>
>        (i) the Secretary has determined that the entity is a medicaid managed care organization as defined in [42 U.S.C. § 1396(m)(1)];
>
>        . . .
>
>        (iii) such services are provided for the benefit of individuals eligible for benefits under this title in accordance with a contract between the State and the entity under which prepaid payments to the entity are made on an actuarially sound basis and under which the Secretary must provide prior approval for contracts providing for expenditures in excess of $ 1,000,000 for 1998 and, for a subsequent year, the amount established under this clause for the previous year increased by the percentage increase in the consumer price index for all urban consumers over the previous year; [and]
>
>        . . .
>
>        (xii) such contract, and the entity complies with the applicable requirements of [42 U.S.C. § 1396u-2].

42 U.S.C. § 1396b(m)(2)(A).  The implementing regulations for this statute provide that "[t]he CMS Regional Office must review and approve all MCO . . . contracts."  42 C.F.R. § 438.6.

27

### B.    Provider Networks

Plaintiffs claim that, in reviewing the QExA Contracts, the CMS failed to determine whether Evercare and WellCare of Arizona had established sufficient networks of providers before approving the contracts, in contravention of 42 U.S.C. §§ 1396b(m) and 1396u-2.  Fed. 3d Am. Compl. ¶ 103.

### 1.    Statutory and Regulatory Background

42 U.S.C. § 1396b(m)(1)(A)(i) provides that, in order to qualify as an MCO, an organization must make "services it provides to individuals eligible for benefits under this title accessible to such individuals, within the area served by the organization, to the same extent as such services are made accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization."  42 U.S.C. § 1396b(m)(1)(A)(i).  In addition to the access requirement, which speaks to whether an organization qualifies as an MCO in the first instance, 42 U.S.C. § 1396u-2(b)(5) directs that an MCO must provide the state and the CMS with adequate assurances that the organization "has the capacity to serve the expected enrollment in [the] service area," including assurances that it "(A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area, and (B) maintains a

28

sufficient number, mix, and geographic distribution of providers of services."  42 U.S.C. § 1396u-2(b)(5).

The implementing regulations direct the state to ensure, through its contracts, that the MCOs provide assurances to the state, with supporting documentation specified by the state, that demonstrate that the MCOs have "the capacity to serve the expected enrollment in the service area in accordance with the State's standards for access to care."  42 C.F.R. §§ 438.207(a), (b).  After a state receives and reviews documentation regarding an MCO's capacity, the state "must certify to CMS that the MCO . . . has complied with the State's requirements for availability of services."  Id. § 438.207(d).

### 2.    The CMS's Review

In this case, Plaintiffs contend that the Federal Defendants failed to take a sufficiently "hard look" in comparing the existing provider networks in the fee-for-service system with the networks that the QExA Contractors had assembled before approving the QExA Contractors.  Pls.' Gen. MSJ Mem. 14.  They insist that the administrative record contains nothing to show that the Federal Defendants ever made a determination that the QExA Contractors met the network requirements or even considered whether those requirements had been met in deciding to approve the QExA Contracts.  Id. at 17.

29

As an initial matter, the Federal Defendants respond that the "hard look" standard applies under the National Environmental Policy Act ("NEPA"), but that it does not extend beyond the environmental context.  Fed. Defs.' Opp'n to Pls.' Gen. MSJ 19; see also Sierra Club v. Bosworth, 510 F.3d 1016, 1018 (9th Cir. 2007) ("NEPA is a procedural statute that does not 'mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'" (quoting Neighbors of Cuddy Mountain v. Alexander, 303 F.3d 1059, 1070 (9th Cir. 2002))).  The Court agrees.  The Ninth Circuit has declined to apply the "hard look" standard as a general matter in APA cases on the ground that "the Supreme Court has never explicitly embraced the 'hard look' approach to judicial review under the arbitrary and capricious standard of the APA."  Nw. Envtl. Def. Ctr. v. Bonneville Power Admin., 477 F.3d 668, 687 n.15 (9th Cir. 2007).  Instead, in APA cases, the Ninth Circuit generally adheres to the standards articulated by the Supreme Court in Motor Vehicles Manufacturers Ass'n, which are set forth above. See id.; supra Standards of Review Section I.

The Federal Defendants next explain that the CMS carefully reviewed the adequacy of provider networks in light of the RFP, which set forth specific access standards.  Fed. Defs.' MSJ Mem. 19-31, 58-61.  The RFP requires the plans to maintain at

least one PCP for every 600 members; physician specialists; six pharmacies; five hospitals on Oahu, one hospital on Maui, one hospital on Kauai, one hospital in East Hawai'i (Hilo), and one hospital in West Hawai'i (Waimea-Kona); behavioral health providers; and long-term-care providers.  AR 4032-36.  For all provider types except pharmacies, a provider must be located within a thirty-minute drive of members in urban areas and a sixty-minute drive in rural areas.  Id. at 4036.  A pharmacy must be within a fifteen-minute drive of members in urban areas and a sixty-minute drive in rural areas, including a twenty-four-hour pharmacy within a sixty-minute drive time.  Id. at 4036. Additionally, according to the terms of the RFP, the State DHS may require the QExA Contractors to add providers to their networks based on the needs of ABD beneficiaries or changes in the law.  Id. at 4032.

CMS devoted considerable time and resources to monitoring and assessing the QExA Contractors' development of provider networks beginning in November 2008.  See, e.g., id. 2762-65, 2768, 2776-77.  Upon receiving the State DHS's network certifications in December of 2008, the CMS required more detailed documentation, including maps showing an overlay of contracted providers and ABD beneficiaries and indicating whether a location contained a single provider or multiple providers, and a breakdown of the average time to travel to a single provider

31

and multiple providers.  See, e.g., id. at 3302–07, 3311,

3415–18.  The CMS then reviewed revised certifications and

supporting documentation, noted any deficiencies or

discrepancies, and went back to the State DHS for explanation or

further clarification.  Id. at 3100–01, 3203–04, 3208–09,

3510–11, 3545–49.  The CMS repeated this process a number of

times until it received adequate assurances that the standards in

the RFP were met or the State DHS explained any failure to meet

those standards by pointing to systematic provider-access

problems in Hawai'i or deficiencies in access that existed even

under the fee-for-service program.  See, e.g., id. at 3409,

3510–11, 3534, 3537, 3550–54, 3574, 3777.[4/]  The CMS ultimately

approved the networks on January 30, 2009.  Id. at 3925–26.

### 3.    The Transition Period

Plaintiffs assert that the fact that the Federal

Defendants authorized a 180-day "transition period," during which

ABD beneficiaries were permitted to continue to see their

existing providers, whether participating in the QExA Program or

not, proves that the CMS had determined that networks were

---

[4/] For example, in one of the State DHS's certifications, it
noted that requirements for behavioral health providers were not
met in the southern portion of the island of Hawai'i because the
nearest behavioral health provider to the town of Naalehu was a
63.6-minute drive instead of a 60-minute drive.  AR 3409.  The
State DHS explained that this part of the state has a systemic
problem, insofar as it does not have adequate behavioral health
providers.  Id.

inadequate at the time it approved the QExA Contracts or that the CMS had not determined that networks were adequate.  Pls.' Opp'n to Fed. Defs.' MSJ 22-23.

The transition period was first mentioned by the State DHS in its January 2005 waiver application.  AR 25.  The State DHS explained that, "[t]o ensure that members transition smoothly from the fee-for-service . . . system into the managed care system, health plans will be required to continue to reimburse existing providers for medically necessary services received by the member before a new treatment plan is developed and implemented."  Id.  The State DHS reiterated this point in its August 2005 application.  Id. at 80.  It also explained that, at that point, there were roughly forty thousand ABD beneficiaries in the fee-for-service system.   Id.

In addition, the transition period was included in the RFP, which was issued on October 10, 2007.  Under the RFP, the transition period was originally set to be ninety days in length. Id. at 764, 4136.  On December 28, 2007, the State DHS issued an amendment to the RFP, which modified the transition period such that it was

> the lesser of 1) ninety (90) days for all
> members receiving HCBS and all children under
> the age of twenty-one and 2) one-hundred and
> eighty (180) days for all members living in a
> nursing facility and all members without a
> care plan OR until members in these
> categories have had a [health and
> functionality assessment] from his or her

> service coordinator, had a care plan
> developed and has been seen by the assigned
> PCP who has authorized a course of treatment.

Id. at 1697.

On November 24, 2008, the CMS had a telephone call with the State DHS regarding the inadequacy of provider networks.  Id. at 3044.  The State DHS explained that, to address any provider-network issues, it would extend the transition period to 180 days across the board for all beneficiaries.  Id. at 3044, 3074.  In an internal CMS document, after noting the extended transition period, the CMS observed that it "cannot approve the MCO contracts until [the State DHS has] certified the provider networks as required by [42 C.F.R. §] 438.206-207."  Id. at 3044. In addition, in one of its certifications, the State DHS asserted that a number of nursing facilities "will sign" contracts before the QExA Program was to be fully implemented and that the extended transition period was part of a contingency plan.  Id. at 3585.  In response, the CMS stated that:  "CMS can not allow the State to certify a network based on assurances that the provider 'will' sign.  The State can only certify for those providers that have actually signed contracts."  Id.

The State DHS amended the QExA Contracts to reflect the extended transition period in January of 2009.  Id. at 3874, 3882, 4478, 4521.  The State DHS also announced the transition

period in a letter to QExA and fee-for-service providers,

explaining that:

> The program begins with a 180 day transition
> period during which out-of-network, i.e.
> non-contracted or non-participating,
> providers will be paid Medicaid rates by the
> health plans without any prior authorization
> for existing treatment plans while their QExA
> enrolled patients receive an assessment, get
> established with in-network providers and
> develop an updated care plan.  This period
> allows for noncontracted providers to
> contract with the QExA health plans, or for
> the coordinated transfer of care.

Id. at 3696.

After reviewing the administrative record, the Court is

convinced that the CMS did not rely on the transition period as a

means to allow Evercare and WellCare of Arizona to develop

adequate provider networks after the QExA Contracts were

approved.  The CMS consistently rejected the notion that the

transition period could function as a contingency plan in the

event that provider networks were inadequate.  See id. at 3044,

3585.  In addition, while the transition period's details may

have changed over time, its function did not.  Its purpose has

always been to ensure that all of the ABD beneficiaries are

smoothly transitioned over to a managed care system.  AR 25,

3906.  As noted earlier, the State DHS's August 2005 application

reflects that, at that point, there were roughly forty-thousand

ABD beneficiaries in the fee-for-service system.  Id. at 80.  It

was certainly no small task to ensure that all of the

35

beneficiaries, many of whom have complex medical conditions, passed seamlessly into the QExA Program.  In short, the Court finds that the existence of the transition period does not undermine the CMS's determination that the QExA Program had sufficient provider networks.

### 4.    Decision Regarding Provider Networks

The Court finds that the CMS engaged in a thorough analysis of the adequacy of the QExA Program's provider networks, rejecting the State DHS's certifications a number of times until problems were either corrected or sufficiently explained.  The Court therefore concludes that the CMS did not act arbitrarily or capriciously in approving the QExA Program's provider networks and determining that the QExA Contractors qualified as MCOs insofar as they met access requirements.[5]

---

[5] One provision that is raised in the Federal Third Amended Complaint, but not briefed in the motions for summary judgment, is 42 U.S.C. § 1396u-2(a)(1)(A)(ii), which permits a state to "restrict the number of provider agreements with managed care entities under the State plan if such restriction does not substantially impair access to services."  See 42 U.S.C. § 1396u-2(a)(1)(A)(ii); Fed. 3d Am Compl. ¶ 103.e.  Having found that the CMS did not act arbitrarily or capriciously in approving the provider networks and finding that the QExA Contractors met access requirements, the Court similarly finds that the CMS did not act arbitrarily or capriciously in determining that the restriction of MCO contracts to two (the statutory minimum, see 42 U.S.C. § 1396u-2(a)(3)(A)) did not substantially impair access to services.  42 U.S.C. § 1396u-2(a)(1)(A)(ii).

### C.    Reimbursement Rates for Providers

Plaintiffs contend that the CMS should not only have considered whether the provider networks were legally sufficient, but also whether the rates being offered to the providers were legally adequate, pursuant to 42 U.S.C. § 1396a(a)(30).  Pls.' Gen. MSJ Mem. 17-22.

The statute provides that:

> A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

42 U.S.C. § 1396a(a)(30)(A); see also 42 C.F.R. § 447.204 ("The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.").

The Federal Defendants maintain that, while this section discusses the necessary requirements of a state plan, it says nothing about managed care contracts.  Fed. Defs.' Opp'n to Pls.' Gen. MSJ 27.  A similar point is made by Kenneth Fink, M.D., the Administrator of the State DHS's Med-QUEST Division,

which administers the state's Medicaid program.  St. Defs.' Mot.

for Partial Summary J. CSF, filed 10/23/09, Decl. of Kenneth Fink

("Dr. Fink's Decl.") ¶ 1.  He states that 42 U.S.C.

§ 1396a(a)(30) sets standards for state plan payment rates, which

apply in a fee-for-service system.  Id. ¶ 27; see also Indep.

Living Ctr. of S. California, Inc. v. Maxwell-Jolly, 572 F.3d

644, 649, 652 (9th Cir. 2009) (holding California reduced

provider rates under its fee-for-service Medicaid program in

contravention of 42 U.S.C. § 1396a(a)(30)); Medicaid Program;

Medicaid Managed Care:  New Provisions, 67 Fed. Reg. 40,989,

41,036 (Jun. 14, 2002) ("[42 U.S.C. § 1396a](a)(30)(A) is a

requirement that applies to the State's fee-for-service program,

operated pursuant to the State plan.").  Dr. Fink asserts that

the statute does not apply in the managed care context, since

payments in that setting are not made to providers pursuant to

the state plan.  Dr. Fink's Decl. ¶ 27; see also Arizona Ass'n of

Providers for Persons with Disabilities v. State, 219 P.3d 216,

230 (Ariz. Ct. App. 2009) (per curiam) (noting that 42 U.S.C.

§ 1396a(30)(A)'s equal access provision is comparable to the

provider network provisions of 42 U.S.C. § 1396u-2 and that the

former is "applicable to state Medicaid plans that do not use

MCOs").  Instead, in a managed-care system, payment rates for

providers are negotiated between the MCOs and the providers.  St.

Defs.' Mot. for Partial Summary J. Mem. in Support, filed

38

10/23/09, at 4.   Thus, in managed-care programs such as the QExA Program, the state plan does not govern payment rates for providers.

But that is not to say there is no mechanism to monitor reimbursement rates for providers in managed care systems.   The Federal Defendants assert, and the Court agrees, that the adequacy of payment rates to providers in the managed-care context are assured by the Medicaid Act's requirements that capitation rates be actuarially sound, 42 U.S.C. § 1396b(m)(2)(A)(iii), and that MCOs have adequate provider networks, id. § 1396u-2(b)(5).  Fed. Defs.' Opp'n to Pls.' Gen. MSJ 30.  As noted earlier, in a managed-care program, the state contracts with MCOs and pays them on a capitated or fixed-amount-per-enrollee basis.  See G., 2009 U.S. Dist. LEXIS 39851, at *7. Capitation rates are actuarially sound when, among other things, they "[a]re appropriate for the populations to be covered, and the services to be furnished under the contract."  42 C.F.R. § 438.6(c)(1)(i)(B); see also infra Discussion Section II.C.1.

Apart from the requirement that capitations rates be actuarially sound, with one exception, "Congress has not established any standards for payments to subcontractors [under an MCO's contract with the state]."  Medicaid Program; Medicaid

Managed Care:  New Provisions, 67 Fed. Reg. at 40,998.[6]  "[T]his is because one of the efficiencies of managed care is premised on an MCO's ability to negotiate favorable payment rates with network providers."  Medicaid Program; Medicaid Managed Care: New Provisions, 67 Fed. Reg. at 40,998.  As a practical matter, "MCOs must pay sufficient rates to guarantee that their networks meet the access requirements," and it therefore follows that "payment rates are adequate to the extent that [an] MCO has documented the adequacy of its network."  Id.[7]

---

[6] The exception is that Congress has set forth standards for MCOs' payments to Federally qualified health centers. Medicaid Program; Medicaid Managed Care:  New Provisions, 67 Fed. Reg. at 40,998 ("Except in the case of payments to [Federally qualified health centers] that subcontract with MCOs, which are governed by [42 U.S.C. § 1396b(m)(2)(A)(ix)], [the CMS does] not regulate the payment rates between MCOs and subcontracting providers.").  42 U.S.C. § 1396b(m)(2)(A)(ix) requires that a contract between the state and an MCO provide, "in the case of an entity [(i.e., MCO)] that has entered into a contract for the provision of services with a Federally-qualified health center or a rural health clinic, that the entity shall provide payment that is not less than the level and amount of payment which the entity would make for the services if the services were furnished by a provider which is not a Federally-qualified health center or a rural health clinic."  RFP § 60.220 satisfies this requirement. It states that "[t]he health plan shall reimburse FQHCs and RHCs no less than the level and amount of payment which the health plan would make for like services if the services were furnished by a provider which is not an FQHC or RHC."  AR 4243.

[7] In this case, as explained below, the actuarial-soundness requirement is not properly before the Court and, in any event, Plaintiffs' argument as to that requirement is meritless.  See infra Discussion Section II.E.  Additionally, as explained above, the provider-network requirement was sufficiently considered by the CMS, see supra Discussion Section II.B.

In short, the Court concludes that 42 U.S.C. § 1396a(a)(30) does not govern the sufficiency of MCOs' payments to providers under managed care contracts.[8/]  The adequacy of such payments is instead assured by the Medicaid Act's requirements that capitation rates be actuarially sound and that MCOs have adequate provider networks.  Accordingly, Plaintiffs' reliance on 42 U.S.C. § 1396a(a)(30) is misplaced.  The CMS did not act arbitrarily or capriciously by declining to evaluate the payments rates to providers under the QExA Program pursuant to that provision.

### D. Solvency

Plaintiffs claim that the CMS failed to determine whether the QExA Contractors met solvency requirements under the Medicaid Act.  Fed. 3d Am. Compl. ¶ 103.b.  In order to qualify as an MCO, an organization must (1) make "adequate provision against the risk of insolvency, which provision is satisfactory to the State," (2) meet "solvency standards established by the State for private health maintenance organizations or [be]

---

[8/] While the statute does not govern provider payments in the managed care context, the State DHS decided to require that the QExA Contractors pay providers, at minimum, at rates comparable to the fee-for-service rates that were in place at the time the contracts were awarded.  AR 4242.  There was no evidence before the CMS that the services under the fee-for-service system were inadequate.  Plaintiffs seemed to acknowledge as much at the hearing.  12/14/09 p.m. 6:19-25 (draft transcript) (asserting that the provider networks under the QExA Program are inadequate and that, in the prior fee-for-service system, "the providers filled the gap").

licensed or certified by the State as a risk-bearing entity," and (3) assure "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency."  42 U.S.C. §§ 1396b(m)(1)(A)(ii), (C)(i); see also 42 C.F.R. §§ 438.106, 438.116.

### 1.   The RFP

To ensure that these solvency requirements were met, CMS carefully reviewed the terms of the RFP.  The CMS determined that the first requirement was satisfied by RFP § 71.800, which requires each plan to "warrant[] that it is of sufficient financial solvency to assure the DHS of its ability to perform the requirements of the contract," "provide sufficient financial data and information to prove its financial solvency," and "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii." AR 4271, 4541-42, 4576-77.  The CMS concluded that the second requirement was met by RFP § 40.100, which requires each plan to be "properly licensed as a health plan in the State of Hawaii" and "meet the requirements of [42 U.S.C. § 1396b(m)]."  Id. at 4027, 4541-42, 4576-77.  RFP § 51.600 required that proof of license be submitted by May 15, 2008.  Id. at 4234.

Lastly, the CMS determined the third requirement was satisfied by RFP § 72.130, which provides that "[m]embers shall not be liable for the debts of the health plan," and that, "in the event of insolvency of the health plan, members may not be held liable for the covered services provided to the member, for which the State does not pay the health plan." Id. at 4274, 4541–42, 4576–77. Furthermore, the CMS relied on RFP § 40.500, which provides that the contractors' written subcontracts with providers must "[p]rohibit the provider from seeking payment from the member for any covered services provided to the member within the terms of the contract and require the provider to look solely to the health plan for compensation for services rendered, with the exception of cost sharing pursuant to the Hawaii Medicaid State Plan." Id. at 4045, 4537. The CMS also relied on RFP § 60.220, which states that "the health plan shall ensure that the State and health plan members shall bear no liability for services provided to a member . . . for which the health plan or State does not pay the individual or provider that furnishes the services under a contractual, referral, or other arrangement." Id. at 4245, 4537.[9]

---

[9] Plaintiffs point out that the QExA Contractors' prior-authorization forms for out-of-network providers who render services to QExA enrollees do not include a provision prohibiting those providers from seeking payment from the enrollees. Pls.' Preauthorization Form Mem. 3. The absence of such a provision would, at most, be a shortcoming on the part of the QExA

(continued...)

In short, the CMS reviewed the RFP in light of the Medicaid Act's solvency standards in connection with the contractors' activities under the QExA Contracts.  The State DHS's RFP assured the CMS that the entities with which it contracted would meet the solvency standards prescribed therein. The CMS was entitled to rely on this assurance.

### 2. Complaints Regarding the QExA Contractors' Licensure

When questions were raised by concerned parties about whether the QExA Contracts held proper licenses under state law, the CMS requested additional assurances from the State.  Id. at 2222, 3085-86, 3738.  On June 13, 2008, James Feldesman, counsel for AlohaCare, a Hawai'i-based Medicaid managed care plan that submitted an unsuccessful bid for a QExA Contract, sent the first of three letters to the CMS expressing his concern that Evercare and WellCare of Arizona were not properly licensed under Hawai'i state law to perform the QExA Contracts.  Id. at 2194-95; see also id. at 3285-87 (Dec. 17, 2008, letter), 3687-89 (Jan.

---

[9]/(...continued)
Contractors under the RFP, because RFP § 60.220 plainly requires the contractors to ensure that enrollees not be held liable for such services.  It was not arbitrary or capricious for the CMS to rely on RFP § 60.220 in determining that the QExA Contractors had assured "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency."  See 42 U.S.C. § 1396b(m)(1)(A)(ii); AR 4537.

22, 2009, letter).[10]   The CMS responded to each of Feldesman's three letters, assuring him that CMS was carefully monitoring the State DHS's compliance with the Medicaid Act and implementing regulations.  AR 2311, 3726, 3940-41.

     The CMS discussed the issues raised in the Feldesman letters internally and requested additional information from the State DHS to make certain that the CMS had received adequate assurances from the State DHS that the QExA Contractors were properly licensed under state law.  Id. at 2222, 3085-86, 3738. In response, the State DHS confirmed that Evercare and WellCare of Arizona were properly licensed and provided the CMS with documentation showing that both plans held licenses for accident and health insurance under Hawai'i law.  Id. at 3039-41.  Such licenses indicated that the QExA Contractors had made provision against insolvency, as certain solvency requirements must be met in order to be licensed in the first instance.  See Hawai'i Revised Statutes ("HRS") §§ 431:3-205, 431:3-209, 431:5-301.

     Plaintiffs contend that the CMS should not have simply relied on the State DHS's representation that the accident and health insurance licenses held by the QExA Contractors were sufficient to perform as a matter of state law under the QExA

_____

     [10] Apart from raising the issue of solvency, Feldesman asserted that the QExA Contractors lacked adequate provider networks.  As discussed above, the CMS addressed this concern in reviewing the State DHS's network certifications.  See supra Discussion Section II.A.

Contracts because (1) the representation was not made by the State Insurance Commissioner, and (2) the State DHS had previously advised QExA Contract bidders, through a question-and-answer document, that they should consult with the State Insurance Commissioner regarding licensure questions.  Pls.' Opp'n to Fed. Defs.' MSJ 12-16.[11/]  While the State DHS was unwilling to provide legal advice to entities wishing to submit bids for the QExA Contracts, that fact does not preclude the CMS from relying on assurances from the State DHS to ensure that the entities the State DHS contracted with for Medicaid services complied with 42 U.S.C. § 1396b(m)(1).  The Medicaid Act requires a state to "designat[e] . . . a single State agency to administer or to supervise the administration of the plan."  42 U.S.C. § 1396a(a)(5).  In Hawai'i, that agency is the State DHS.  See AlohaCare, 572 F.3d at 743 (citing HRS § 26-14; 42 U.S.C. § 1396a(a)(5)).  It was thus not arbitrary or capricious for the CMS, the agency that oversees the Medicaid program at the federal level, to rely on the State DHS, the single state agency responsible for administering the program in the State of Hawai'i, for assurances that the entities chosen by the State DHS

_____

[11/] The State DHS's correspondence with bidders regarding proper licensure during the procurement process was discussed in court filings challenging the QExA Program.  The CMS received copies of the filings and they are thus included in the administrative record.  See AR 2030, 2960, 3028.

to perform the QExA Contracts satisfied the state's licensure and solvency standards.[12/]

Finally, the Federal Defendants explain that, apart from relying on the State DHS's assurances, the CMS verified with the Division of Medicare Health Plans, a component of CMS, that the licenses held by both Evercare and WellCare of Arizona, and relied on by the State for the QExA Contracts, were the same licenses that Evercare and WellCare of Arizona used to operate their Medicare Advantage Plan in Hawai'i.  AR 2061-64 (WellCare of Arizona's Medicare Advantage licensure documents); Fed. Defs.' Additional Exs. to their Opp'n to Pls.' Mot. for Temporary Restraining Order, filed 8/11/09, Declaration of Gloria Nagle ¶ 6.j; Fed. Defs.' MSJ Mem. 16, 53-54.[13/]

---

[12/] Plaintiffs contend that the CMS should not have relied on the State DHS's assurances as to the QExA Contractors' proper licensure because those assurances were based on informal interpretations of the State Insurance Division and those interpretations included disclaimers, as required by applicable state regulations.  See Pls.' Opp'n to Fed. Defs.' MSJ 14-16; Hawai'i Administrative Rules § 16-201-90.  While it is true that the Insurance Division's informal interpretations included disclaimers, the State DHS's assurances did not.  The State DHS relied upon, agreed with, and adopted the Insurance Division's interpretation of state law and, in its capacity as the single state agency responsible for administering Hawaii's Medicaid program, provided assurances to the CMS that the accident and health insurance licenses held by Evercare and WellCare of Arizona were sufficient to perform the services required under the two Medicaid managed-care contracts.  See AR 3086 (CMS e-mail regarding discussions with the State DHS).  The CMS did not act arbitrarily or capriciously in relying on those assurances.

[13/] On November 17, 2009, Plaintiffs filed a motion for
(continued...)

### 3.    Allegations of Medicaid Fraud and Financial Instability Regarding Subsidiaries of WellCare of Arizona's Parent Company

Plaintiffs next contend that the CMS knew that WellCare of Arizona was a wholly-owned subsidiary of a company that (1) had subsidiaries that had committed Medicaid fraud in Florida, (2) was under investigation in Connecticut, (3) had one or more pending qui tam lawsuits, (4) was in the process of restating several years of past financial statements, and (5) was incapable of filing accurate financial statements with the Securities and Exchange Commission.  Pls.' Gen. MSJ Mem. 25-26.  According to

------

[13]/(...continued)
summary judgment based on WellCare of Arizona making a misrepresentation in a Medicare Advantage application.  Pls.' Mem. in Support of their Mot. for Summary J. Based on WellCare Filing Unapproved Licensure, filed 11/17/09 ("Pls.' WellCare MSJ Mem."), at 15-23.  The application, which is included in the administrative record, reflects that WellCare of Arizona has an accident and health insurance license and a health maintenance organization ("HMO") license.  AR 2063.  Plaintiffs argued in their motion that the CMS must have relied on this representation that WellCare of Arizona had a HMO license in evaluating its solvency.  Pls.' WellCare MSJ Mem. 22-23.

On November 24, 2009, the Court granted the Federal Defendants' motion to strike the motion for summary judgment as untimely under the Rule 16 Scheduling Order.  Nevertheless, even if Plaintiffs' motion for summary judgment were to be considered on the merits, it would not carry the day.  This is because, in addition to examining WellCare of Arizona's Medicare Advantage application, the CMS reviewed Evercare's Medicare Advantage application, which reflects that Evercare only had an accident and health insurance license.  Pls.' WellCare MSJ CSF, Ex. 18. Despite the fact that Evercare only had an accident and health insurance license, the CMS approved its QExA Contract.  Thus, the fact that WellCare of Arizona allegedly represented that it had an HMO license, in addition to its accident and health insurance license, could not have materially affected the CMS's determination as to its solvency.

Plaintiffs, the CMS did not consider what safeguards would be necessary to prevent Wellcare of Arizona from carrying out fraud in Hawai'i. Id. at 26. In addition, Plaintiffs and their proffered expert, Vernon E. Leverty, contend that WellCare of Arizona failed to meet a number of quantitative standards for reviewing financial integrity. Id. at 25. For example, Leverty asserts that the CMS should have evaluated WellCare of Arizona's changes in the ratio of assets to liabilities over time. Pls.' Gen. MSJ CSF, Ex. 33.

The Federal Defendants argue, and the Court agrees, that Plaintiffs have not identified a particular provision of the Medicaid Act or its implementing regulations that was violated by WellCare of Arizona or the State DHS's contract with WellCare of Arizona. Fed. Defs.' Opp'n to Pls.' MSJ 19. The quantitative standards that Plaintiffs' proffered expert has cited are not prescribed by those provisions. The Medicaid Act does not require the CMS to second-guess a state's procurement choices in the absence of a violation of the Act. Congress left the assessment of an entity's fitness to perform a managed-care contract largely to the states. The CMS's role in approving managed-care contracts is principally to ascertain whether a contractor's solvency is satisfactory to the state in light of state law standards. See 42 U.S.C. §§ 1396b(m)(1)(A)(ii), (C)(i); see also 42 C.F.R. §§ 438.106, 438.116. Consequently,

the CMS did not act arbitrarily or capriciously by declining to utilize Plaintiffs' financial standards to independently appraise WellCare of Arizona's financial condition before approving its contract.

There were allegations of fraud on the part of subsidiaries of WellCare of Arizona's parent company in Florida. The Medicaid Act does prohibit states from contracting with entities that are affiliated with individuals who are debarred by federal agencies, see 42 U.S.C. § 1396u-2(d)(1), but Plaintiffs have not shown that WellCare of Arizona or its parent company was such an entity. Again, in the absence of a statutory violation, the CMS was not required to conduct an independent investigation of the activities, in another state, of the other subsidiaries of the parent company of an organization chosen by the State DHS to perform under a managed care contract in Hawai'i.

Furthermore, even assuming arguendo that the CMS should have considered the fraud allegations as to the Florida subsidiaries, the administrative record demonstrates that the CMS evaluated the issue. The CMS recognized that the Hawai'i legislature was holding hearings in December 2008 that were meant to evaluate, among other things, the fraud allegations regarding the subsidiaries in Florida, and that the CMS would be briefed by the State DHS during a teleconference regarding the results of the hearing. AR 3048-51 (CMS e-mail correspondence from November

50

of 2008) (noting an upcoming state legislative hearing on, among other things, WellCare of Arizona and the fraud allegations), 3143-45 (fax regarding the legislative hearing), 3138-39 (CMS e-mail correspondence from December 2008) (noting that the results of the legislative hearing would be discussed in a teleconference on December 12, 2008).  The allegations were also mentioned in Feldesman's second letter, which was dated December 17, 2008, <u>id.</u> at 3285, and reported in an online article dated December 31, 2008, <u>id.</u> at 3560.

Notably, Dr. Fink, the Administrator of the State DHS's Medicaid program, discussed the fraud allegations in an e-mail dated January 6, 2009.  He responded to concerns from a healthcare provider regarding the fraud allegations, stating that:

> I believe this is related to the original
> investigation with additional parties
> joining, and it sure looks like some
> wrong-doing may have occurred.  It's
> important to remember that there is a parent
> company with many subsidiaries, and that
> there has been a turn over of parent company
> leadership as a result.  The subsidiary in
> Hawaii is separate from the one in Florida,
> so even if the subsidiary loses their license
> there, I don't believe it would have any
> effect on the subsidiary here.
>
> I suspect that people will look at this
> through the perspective they want to see.
> Perhaps some may see a corrupt corporation
> that should be banned from ever doing
> business again anywhere; others may see it as
> an insurer that is now under a microscope so
> they may be in fact less likely to have

51

> problems in Hawaii than others.  I
> consistently try to avoid any endorsement of
> the non-Med-QUEST plans that may be offered
> by the insurers, but we at Med-QUEST will do
> our very best to ensure that all of our plans
> abide by our contracts and act responsibly.

Id. at 3595-96.

In sum, the CMS was aware that the fraud allegations were being investigated by the Hawaiʻi legislature and evaluated by the State DHS, which would have immediate oversight of WellCare of Arizona's activities in Hawaiʻi.  In the event of any irregularities or other concerns, RFP § 51.110 would allow the State DHS or the CMS to audit and investigate WellCare of Arizona's activities.  AR 4195 ("The health plan and all subcontractors shall cooperate fully with federal and state agencies in investigations and subsequent legal actions.  Such cooperation shall include providing, upon request, information, access to records, and access to interview health plan employees and consultants, including but not limited to those with expertise in the administration of the program and/or medical or pharmaceutical questions or in any matter related to an investigation.").

Accordingly, even if the CMS had been required to evaluate the fraud allegations, it cannot be said that the CMS entirely failed to consider the issue.  See Beno, 30 F.3d at 1073 (explaining that an agency acts arbitrarily and capriciously when it "ʻentirely fail[s] to consider an important aspect of the

52

problem'" (quoting <u>Motor Vehicle Mfrs. Ass'n</u>, 463 U.S. at 44)).

The CMS did not act arbitrarily or capriciously on that score.

### 4.   Decision Regarding Solvency

In view of the foregoing, the Court finds that the CMS did not act arbitrarily or capriciously in determining that the QExA Contractors met Medicaid solvency (including licensure) standards and, in that respect, qualified as MCOs.

### E.   Payments on an Actuarially Sound Basis

In their tax motion for summary judgment, Plaintiffs raise the issue of whether the QExA Contracts' capitation rates were actuarially sound when the CMS issued its approval.  Before considering the motion, it may be helpful to review the relevant statutory and regulatory provisions.

### 1.   Statutory and Regulatory Background

42 U.S.C. § 1396b(m)(2)(A)(iii) requires that contract payments to MCOs be made "on an actuarially sound basis."  42 C.F.R. § 438.6(c)(1)(i) defines "actuarially sound capitation rates" as rates that:

> (A) Have been developed in accordance with generally accepted actuarial principles and practices;
>
> (B) Are appropriate for the populations to be covered, and the services to be furnished under the contract; and
>
> (C) Have been certified, as meeting the requirements of this paragraph (c), by actuaries who meet the qualification

53

> standards established by the American Academy of Actuaries and follow the practice standards established by the Actuarial Standards Board.

42 C.F.R. § 438.6(c)(1)(i).

42 C.F.R. § 438.6(c)(4) requires that a state provide the CMS with the following documentation:

> (i) The actuarial certification of the capitation rates.
>
> (ii) An assurance (in accordance with paragraph (c)(3) of this section) that all payment rates are—
>
> (A) Based only upon services covered under the State plan (or costs directly related to providing these services, for example, MCO . . . administration).
>
> (B) Provided under the contract to Medicaid-eligible individuals.
>
> (iii) The State's projection of expenditures under its previous year's contract (or under its [fee-for-service] program if it did not have a contract in the previous year) compared to those projected under the proposed contract.
>
> (iv) An explanation of any incentive arrangements, or stop-loss, reinsurance, or any other risk-sharing methodologies under the contract.

Id. § 438.6(c)(4).

### 2. Whether Plaintiffs' Tax Motion for Summary Judgment is Properly Before the Court

Turning to Plaintiffs' tax motion for summary judgment, they essentially maintain therein that the CMS acted arbitrarily and capriciously in approving the State DHS's actuarial

certification for the QExA Program's capitation rates because the rates involve an unconstitutional tax on the federal government. Pls.' Tax MSJ Mem. 2-24.

In their opposition, the Federal Defendants assert, among other things, that the Court should not consider Plaintiffs' argument because they did not plead the issue of actuarial soundness or unconstitutional tax in the Federal Third Amended Complaint.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 5-7.  They note that, on October 2, 2009, Magistrate Judge Barry M. Kurren denied Plaintiffs' motion to extend the deadline for amending pleadings (and other scheduling order deadlines) in this case. See id. at 5-6; Order Granting in Part & Denying in Part Pls.' Mot. to Amend Rule 16 Scheduling Order in Civil No. 08-00551 ACK-BMK, filed 10/14/09.  The Federal Defendants posit that, because Plaintiffs failed to receive an extension of the deadline or otherwise receive permission to amend their complaint through the proper channels, they instead chose to effectively amend their complaint by filing the tax motion for summary judgment.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 6.  The Federal Defendants contend that Plaintiffs' flaunting of the scheduling order deadlines, and Judge Kurren's order denying an extension of those deadlines, should be rejected.  Id.

In their reply, Plaintiffs argue that their actuarial-soundness claim was sufficiently raised in their Federal Third

Amended Complaint.  Pls.' Tax MSJ Reply 11.  They point to the
paragraphs in the complaint wherein they challenge the CMS's
approval of the QExA Contracts pursuant to 42 U.S.C.
§ 1396b(m)(2)(A) and note that the requirement that the CMS
determine that capitation rates are actuarially sound is set
forth in 42 U.S.C. § 1396b(m)(2)(A)(iii).  Id. at 12-13.
However, they do not dispute the Federal Defendants' observation
that the terms "tax" and "actuarial soundness" are never
mentioned in the complaint's fifty-eight pages.  See id.
at 11-13; Fed. Defs.' Opp'n to Pls.' Tax MSJ 7.

### a.   Fed. R. Civ. P. 8(a)(2)

"Federal Rule of Civil Procedure 8(a)(2) requires that
the allegations in the complaint 'give the defendant fair notice
of what the plaintiff's claim is and the grounds upon which it
rests.'"  Pickern v. Pier 1 Imports (U.S.), Inc., 457 F.3d 963,
968 (9th Cir. 2006) (quoting Swierkiewicz v. Sorema N.A., 534
U.S. 506, 512 (2002)).  Consistent with this requirement, where
"the complaint does not include the necessary factual allegations
to state a claim, raising such claim in a summary judgment motion
is insufficient to present the claim to the district court."
Navajo Nation v. United States Forest Serv., 535 F.3d 1058, 1080
(9th Cir. 2008) (en banc); 389 Orange St. Partners v. Arnold, 179
F.3d 656, 665 (9th Cir. 1999) (observing that "the district court
[does] not commit error by refusing to award relief on an

unpleaded cause of action," and holding that, "[b]ecause [the plaintiff] never pleaded breach of express and implied trust, the district court did not err in failing to consider [the issues in its summary judgment order]" (citing <u>Ins. Co. of N. Am. v. Moore</u>, 783 F.2d 1326, 1328 (9th Cir. 1986) (per curiam))); <u>Ins. Corp. of N. Am.</u>, 783 F.2d at 1328 (holding that "[t]he district court did not err in refusing to award [attorneys' fees] on [the] unpleaded cause of action [of bad faith] even if summary judgment against [the defendant] on the basis of fraud necessarily implied that [the defendant] had also breached its duty of good faith"). "'Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.'" <u>Wasco Prods., Inc. v. Southwall Techs., Inc.</u>, 435 F.3d 989, 992 (9th Cir. 2006) (quoting <u>Fleming v. Lind-Waldock & Co.</u>, 922 F.2d 20, 24 (1st Cir. 1990)).

In <u>Pickern</u>, the plaintiff, a disabled person, filed a complaint against the defendants, a store and the store's landlord.  457 F.3d at 965.  The complaint asserted that the defendants violated the ADA by failing to build an access ramp directly to the store across a grassy stip of property that was owned by the city.  <u>Id.</u>  There were, however, several other access ramps that led into the mall where the store was located. <u>Id.</u>  Apart from complaining of the absence of a ramp, the complaint asserted that the defendants had violated the ADA by

failing to remove architectural barriers.  <u>Id.</u>  Although the complaint included a long list of possible architectural barriers, such as the failure to widen doors, remove obstructing furniture, and provide certain signage, it did not actually allege that any of those specific barriers existed.  <u>Id.</u> Instead, the complaint claimed that the defendants' failure to remove the architectural barriers "may include, but is not limited to," those specific barriers.  <u>Id.</u>

The parties filed cross-motions for summary judgment and the district court entered judgment in favor of the defendants as to the plaintiff's claim regarding the absence of an access ramp across the grassy strip.  <u>Id.</u> at 966.  In response to the defendants' motion, the plaintiff asserted new allegations of accessibility violations unrelated to that particular ramp. <u>Id.</u>  The new violations related to the slope of existing ramps, the cross-slope of sidewalks, emergency fire exists, and emergency landings.  <u>Id.</u>  The district court disallowed the plaintiff's new assertions of alleged accessibility violations that she raised before the district court for the first time following the defendants' motion.  <u>Id.</u>  The district court reasoned that the allegations were not contained in the complaint and that the plaintiff had not amended or sought to amend the complaint to include those allegations.  <u>Id.</u>

The Ninth Circuit affirmed.  Id. at 969.  After concluding that the district court properly ruled that the defendants were not required to build an access ramp across the grassy strip, the Ninth Circuit addressed the district court's decision to disallow the new allegations.  Id. at 968.  The Ninth Circuit rejected the plaintiff's contention that the new factual allegations fell within the original complaint under Fed. R. Civ. P. 8's liberal notice pleading standard.  Id.  The appellate court reasoned that, although the plaintiff made it clear what her claim was when she alleged that the store contains architectural barriers that make it inaccessible, she did not provide any notice concerning the grounds upon which she based her claim.  Id.  The appellate court noted that the complaint included lists of barriers that a disabled person may confront, but that the complaint did not allege that any of the barriers actually existed at the store.  Id. at 968-69.  The Ninth Circuit emphasized that providing a list of hypothetical possible barriers is no substitute for investigating and alleging the grounds for a claim.  Id.

### b.  Analysis

In the case at bar, the Federal Third Amended Complaint alleges that the CMS acted arbitrarily and capriciously in approving the QExA Contracts pursuant to 42 U.S.C. § 1396b(m)(2)(A), because the CMS failed to determine that the

59

QExA Contractors did not meet solvency standards or have sufficient provider networks.  Fed. 3d Am. Compl. ¶¶ 6-7, 21, 23, 103.  The requirement that the CMS make those solvency and network determinations is set forth in 42 U.S.C. §§ 1396b(m)(2)(A)(i) and (xii).  The provision requiring the CMS to determine that capitation rates are actuarially sound is found in 42 U.S.C. § 1396b(m)(2)(A)(iii).

The Federal Third Amended Complaint nowhere cites that provision.  Of course, such a citation was not required by Fed. R. Civ. P. 8(a)(2).  What was required was for the complaint to include the factual basis for the alleged violation of 42 U.S.C. § 1396b(m)(2)(A)(iii).  See Wynder v. McMahon, 360 F.3d 73, 71 (2d Cir. 2004) ("Rule 8's 'liberal pleading principles' do not permit dismissal for 'failure in a complaint to cite a statute, or to cite the correct one.  Factual allegations alone are what matters.'" (quoting Northrop v. Hoffman of Simsbury, Inc., 134 F.3d 41, 46 (2d Cir. 1997))).  This is where the complaint falls short.  At no point does it allege that the CMS's approval of the QExA Contracts is invalid on the ground that the QExA Program's capitation rates were not actuarially sound, much less that the rates were unsound because they involved an unconstitutional tax on the federal government.  As the Federal Defendants correctly observe, the Federal Third Amended Complaint, which spans fifty-

eight pages in length, nowhere uses the word "tax" or the term

"actuarial soundness."  Fed. Defs.' Opp'n to Pls.' Tax MSJ 7.

The situation presented in this case would seem to be

similar to the one in Pickern, where the plaintiff had "made it

clear what her claim was when she alleged that the [s]tore

'contains architectural barriers that make it inaccessible,'" in

violation of the ADA, but she did not "provide any notice

concerning the grounds upon which she based this claim," as

required by Fed. R. Civ. P. 8(a)(2).  457 F.3d at 968.  Although

the Plaintiffs here have asserted in the Federal Third Amended

Complaint that the CMS acted arbitrarily and capriciously in

approving the QExA Contracts pursuant to 42 U.S.C.

§ 1396b(m)(2)(A), they did not provide any notice therein that

they intended to premise that claim on the CMS's alleged failure

to recognize that the QExA Program's capitation rates were

actuarially unsound or involved an unconstitutional tax.  Rather,

the grounds for their contract-approval claim were that the QExA

Contractors did not meet solvency requirements or establish

adequate provider networks.

Consequently, the Court finds that Plaintiffs failed to

plead their claim in the Federal Third Amended Complaint that the

CMS acted arbitrarily and capriciously in approving the QExA

Contracts on the ground that the capitation rates under the

contracts were not actuarially sound because they involved an

unconstitutional tax on the federal government.  See Pickern, 458 F.3d at 968-69.  Thus, the actuarial soundness of the capitation rates is not, consistent with Fed. R. Civ. P. 8(a)(2), properly before the Court and, as such, it is not at this time a proper basis upon which to find that the CMS acted arbitrarily or capriciously in approving the QExA Contracts.  See 389 Orange St. Partners, 179 F.3d at 665.[14/]

### 3.   Whether Plaintiffs' Tax Claim is Valid

The Federal Defendants argue that the actuarial-soundness claim fails for the additional reason that it lacks merit.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 13.[15/]  As noted

_____

[14/] The Court notes that, in their August 7, 2009, motion for a temporary restraining order against the Federal Defendants, Plaintiffs asserted that the administrative record contains no evidence that the CMS ever confirmed the actuarial soundness of capitation rates.  Pls.' Mem. in Support of their Mot. for Temporary Restraining Order & to Expedite Hearing on their Preliminary Injunction Against the Fed. Defs., filed 8/7/09, at 22-24.  The Court did not reach that issue at that point because it denied the motion on the basis that Plaintiffs had failed to show a likelihood of irreparable harm in the absence of injunctive relief.  The actuarial-soundness issue is no more appropriately before the Court now than it was then.

[15/] The Federal Defendants also argue that Plaintiffs lack standing to assert the actuarial-soundness claim because (1) Plaintiffs have not shown injury in fact, (2) their alleged injury is not fairly traceable to the CMS's actions, and (3) the relief they request would not redress their injury.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 7; Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The CMS's approval of the QExA Program's capitation rates as actuarially sound was a precondition for the State DHS to fully implement the program and thereby restrict the ABD Plaintiffs' "freedom of choice" rights. Without the approval, the program would have been ineligible for
(continued...)

earlier, in a managed-care program, the state pays contractors on a capitated or fix-amount-per-enrollee basis.  See G., 2009 U.S. Dist. LEXIS 39851, at *6-*7.  Here, the capitation rates paid by the state to the QExA Contractors include payment of the state insurance premium tax that the contractors are assessed under HRS § 431:7-202.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 5; AR 1326-27, 1334-36.  The statute imposes a tax "on the gross premiums written from all risks or property resident, situated, or located within th[e] State."  HRS § 431:7-202(a).  For its part, the federal government reimburses the state, through payment of federal financial participation, for a percentage of the state's total payment to the contractors, including the payment for state insurance premium tax.  Fed. Defs.' Opp'n to Pls.' Tax MSJ 3-5; 42 U.S.C. § 1396b(a)(1).  Plaintiffs claim that the federal government's reimbursement for the payment of the state insurance premium tax is unconstitutional under the Supremacy Clause because the legal incidence of the tax falls on the federal government.  Pls.' Tax MSJ Mem. 7-8; see also Fed. Defs.' Opp'n

---

[15]/(...continued)
federal financial participation.  See 42 U.S.C. § 1396b(m)(2)(A)(iii).  If the Court were to invalidate the CMS's approval of the capitation rates, the QExA Program would likely cease (at least temporarily, as it would not receive federal funding until the rates were reapproved) and what would remain would be the prior fee-for-service system.  The ABD Plaintiffs' "freedom of choice" rights would be fully reinstated.  Thus, if the actuarial soundness claim were properly before the Court, the Court would be inclined to conclude that at least the ABD Plaintiffs have standing to assert it.

to Pls.' Tax MSJ 5.  Plaintiffs insist that the CMS should have realized this when approving the actuarial soundness of capitation rates for the QExA Contracts pursuant to 42 U.S.C. § 1396b(m)(2)(A)(iii).  Pls.' Tax MSJ Mem. 22-24.

In <u>United States v. New Mexico</u>, 455 U.S. 720 (1982), the Supreme Court explained that, under the Supremacy Clause, "'a State may not lay a tax directly upon the United States.'" <u>United States v. County of San Diego</u>, 965 F.2d 691, 697 (9th Cir. 1992) (quoting <u>New Mexico</u>, 455 U.S. at 733) (ellipsis omitted). When a state imposes taxes on contractors that conduct business with the federal government, tax "immunity may not be conferred simply because the tax has an effect on the United States, or even because the Federal Government shoulders the entire burden of the levy." <u>Id.</u> at 697 (quoting <u>New Mexico</u>, 455 U.S. at 734). Tax immunity "'is appropriate in only one circumstance:  when the levy falls on the United States itself, or on an agency or instrumentality so closely connected to the Government that the two cannot realistically be viewed as separate entities, at least insofar as the activity being taxed is concerned.'"  <u>Id.</u> (quoting <u>New Mexico</u>, 455 U.S. at 735).[16]

---

[16] In addition, "state taxes on [federal] contractors are constitutionally invalid if they discriminate against the Federal Government, or substantially interfere with its activities."  <u>New Mexico</u>, 455 U.S. at 735 n.11.  There has been no suggestion that this rule applies here.

In this case, pursuant to HRS § 431:7-202(a), the state insurance premium tax is squarely assessed against the QExA Contractors, as it provides that "[e]ach authorized insurer . . . shall pay . . . a tax of 4.265 per cent on the gross premiums . . . ."  See HRS § 431:7-202(a).  It is true, as Plaintiffs point out, that the federal government is in a sense a "purchaser" of the contractors' services.  See Pls.' Tax MSJ Reply 5-6.  Yet, under the statute, the tax is assessed against the insurers, and not against the "purchasers" of the insurers' services.  See HRS § 431:7-202(a); cf. Alabama v. King & Boozer, 314 U.S. 1, 6, 13-15 (1941) (evaluating a state statute that required the seller of certain goods, including building materials, "to add to the sales price and collect from the purchaser the amount due by the [seller] on account of [a sales] tax," and that imposed "a legal obligation on the purchaser to pay the tax," but concluding that the purchasers in the case, government contractors who bought lumber to build an army camp, were not immune from state taxation (internal quotation marks omitted)).  Thus, the levy cannot be said to fall directly on the United States itself.  See New Mexico, 455 U.S. at 735.  As such, the first situation described by the Supreme Court in the New Mexico case is not found here.  See id.

Nor is the second.  The mere fact that the federal government reimburses the QExA Contractors for insurance premium

taxes does not offend the federal government's immunity from
state taxation, as "immunity cannot be conferred simply because
the state tax falls on the earnings of a contractor providing
services to the Government."  See id. at 733 (citing James v.
Dravo Contracting Co., 302 U.S. 134 (1937)); id. at 741 (holding
that federal government contractors were independent entities
from the government and that their gross income was thus
taxable); King & Boozer, 314 U.S. at 10, 14 (holding that the
federal government's payment of a contractors' cost of purchasing
lumber for the construction of an army camp, including the state
taxes associated therewith, pursuant to a contract that
specifically required the reimbursement of state taxes, did not
result in an infringement of federal immunity from state
taxation).  Rather, what must be shown is that the QExA
Contractors are "so closely connected to the Government that
[they] cannot realistically be viewed as separate entities, at
least insofar as the activity being taxed is concerned."  See New
Mexico, 455 U.S. at 735.  That is simply not the case here.  The
QExA Contractors are distinct entities from the federal
government "pursuing 'private ends,' and their actions remain[]
'commercial activities carried on for profit.'"  See id. at 739
(quoting United States v. Boyd, 378 U.S. 39, 44 (1964)).

        Accordingly, the federal government's reimbursement of
the QExA Contractors' state insurance premium taxes does not

66

violate its immunity from state taxation.[17/]   The CMS did not act arbitrarily or capriciously in declining to reach a contrary conclusion when it reviewed the actuarial soundness of the capitation rates for the QExA Contracts.   Thus, even if the actuarial-soundness claim were properly before the Court, the claim would still fail as a matter of law.

**F.   Decision Regarding the CMS's Approval of the QExA Contracts**

To summarize, the Court has found that the CMS did not act arbitrarily or capriciously in determining that the QExA Contractors met solvency standards or approving their provider networks.   The Court has also found that Plaintiffs' actuarial soundness claim is not properly before the Court and that, even if it were, it would be without merit.   Accordingly, the Court will (1) grant the Federal Defendants' motion for summary judgment, and the joinders therein, as to Plaintiffs' contract-

---

[17/] Plaintiffs additionally argue that, because the premium tax reimbursement places the legal incidence of the tax on the federal government, the federal government can constitutionally share in the premium tax reimbursement only if an applicable federal statute authorizes such sharing. Pls.' Tax MSJ Mem. 12. In other words, Plaintiffs contend that, since the premium tax reimbursement violates the federal government's immunity from taxation, the only way the reimbursement can be upheld is if Congress has waived such immunity. See Federal Reserve Bank of St. Louis v. Metrocentre Improvement Dist. #1, 657 F.2d 183, 186 (8th Cir. 1981) ("Where there is federal immunity from taxation, Congress must express a clear, express, and affirmative desire to waive that exemption."). Having found that the premium tax reimbursement does not infringe upon the federal government's immunity, the Court need not address the question of waiver.

approval claim, (2) deny Plaintiffs' general motion for summary judgment as to that claim, and (3) deny Plaintiffs' tax motion for summary judgment.

## **CONCLUSION**

In accordance with the foregoing, the Court:

(1) GRANTS the Federal Defendants' motion for summary judgment, and the joinders therein, as to Plaintiffs' claim that the CMS acted arbitrarily and capriciously in issuing a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision for the QExA Program;

(2) DENIES Plaintiffs' general motion for summary judgment as to their claim that the CMS acted arbitrarily and capriciously in issuing a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision for the QExA Program;

(3) GRANTS the Federal Defendants' motion for summary judgment, and the joinders therein, as to Plaintiffs' claim that the CMS acted arbitrarily and capriciously in approving the QExA Contracts;

(4) DENIES Plaintiffs' general motion for summary judgment as to their claim that the CMS acted arbitrarily and capriciously in approving the QExA Contracts;

(5) DENIES Plaintiffs' tax motion for summary judgment; and

(6) DIRECTS the Clerk of Court to enter judgment in favor of the Federal Defendants on all of Plaintiffs' claims in the action against the Federal Defendants.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, December 23, 2009.



_____

Alan C. Kay

Sr. United States District Judge

G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK:  Order (1) Granting the Federal Defendants' Motion for Summary Judgment and the Joinders Therein, (2) Denying Plaintiffs' Motion for Summary Judgment Against the Federal Defendants Based on the Unlawful Issuance of a Waiver and Approvals of Managed Care Contracts, and (3) Denying Plaintiffs' Motion for Summary Judgment Against the Federal Defendants Based on Unlawful Premium Tax Reimbursement