IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF ) | Civ. No. 08-00551 ACK-BMK |
| K., A DISABLED CHILD, ET AL., ) | Civ. No. 09-00044 ACK-BMK |
| ) | (Consolidated) |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| STATE OF HAWAII, DEPARTMENT OF ) | |
| HUMAN SERVICES, ET AL., ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |
| ) | |
| G., PARENT AND NEXT FRIEND OF ) | |
| K., A DISABLED CHILD, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HEALTH AND HUMAN SERVICES, ET ) | |
| AL., ) | |
| ) | |
| Defendants. ) | |
| ————————————————————) | |

ORDER (1) GRANTING IN PART AND DENYING IN PART THE STATE
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND THE JOINDERS
THEREIN, AS TO COUNTS VI, VII, VIII, AND IX, (2) GRANTING THE
STATE DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT, AND THE
JOINDERS THEREIN, REGARDING THE LICENSE QUESTION, AND (3) DENYING
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LICENSURE AND SOLVENCY

## PROCEDURAL HISTORY

### I.   Prior Proceedings

On December 8, 2008, in Civil No. 08-00551 ACK-BMK, Plaintiffs filed a complaint against Defendants the State of Hawaii, Department of Human Services ("State DHS"), and Lillian B. Koller, in her official capacity as the Director of the State DHS (collectively, "State Defendants").  At that point, the Plaintiffs were comprised of Medicaid beneficiaries who were part of the aged, blind, and disabled ("ABD") population ("ABD Plaintiffs").  Their principal allegation is that the State Defendants have violated certain provisions of Title XIX of the Social Security Act, commonly known as the Medicaid Act, 42 U.S.C. § 1396 et seq., by requiring ABD beneficiaries to enroll with one of two healthcare entities as a condition of receiving Medicaid benefits in connection with the agency's managed care program for ABD beneficiaries, the QUEST Expanded Access ("QExA") Program.

Those two entities were the only ones awarded contracts to provide the care for ABD beneficiaries under the QExA Program ("QExA Contracts").  They are WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("WellCare of Arizona")[1]

---

[1] Throughout these proceedings, the Court has referred to WellCare of Arizona as Ohana.  However, for purposes of clarity, the Court will refer to the company as WellCare of Arizona in order to explain how a separate entity called Ohana Health Plan,
(continued...)

2

and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors"), and they have intervened in this matter.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS ("Secretary") (collectively, "Federal Defendants").  On February 4, 2009, Plaintiffs filed a first amended complaint against the Federal Defendants.  "At the federal level, Congress has entrusted the Secretary of [the Federal DHHS] with administering Medicaid, and the Secretary, in turn, exercises that delegated authority through the [Centers for Medicare and Medicaid Services ('CMS')]." Wong v. Doar, 571 F.3d 247, 250 (2d Cir. 2009).  Plaintiffs contend that the CMS acted arbitrarily and capriciously by granting a waiver of the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), for the QExA Program pursuant to 42 U.S.C. § 1315(a), and by thereafter approving the QExA Contracts.

On February 19, 2009, Civil Nos. 08-00551 and 09-00044 were consolidated.  This is the third case brought in this Court challenging the QExA Program.  See AlohaCare v. Hawaii, Dep't of Human Servs., 567 F. Supp. 2d 1238 (D. Haw. 2008), aff'd, 572

---

[1]/(...continued)
Inc., was merged into WellCare of Arizona.

F.3d 740 (9th Cir. 2009) (upholding the district court's decision that a disappointed bidder for a QExA Contract did not have statutory standing to enforce certain provisions of the Medicaid Act); Hawaii Coalition for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008) (dismissing a health advocacy organization's complaint because, among other things, the organization did not have statutory standing to enforce certain provisions of the Medicaid Act).

On May 11, 2009, the Court entered an order granting in part and denying in part a motion to dismiss filed by the State Defendants and joinders therein. See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009). The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects. They subsequently filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

On June 2, 2009, Plaintiffs filed a motion for a preliminary injunction against the Federal Defendants. On August 7, 2009, Plaintiffs filed a motion for a temporary restraining order against the Federal Defendants. On August 10, 2009, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction against the State Defendants. The Court denied Plaintiffs' motions for temporary restraining orders.

4

Plaintiffs subsequently withdrew their motions for preliminary injunctions.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended sixty-seven-page complaint against the State Defendants ("State Second Amended Complaint") and, on September 1, 2009, they filed a third amended fifty-eight-page complaint against the Federal Defendants.  Those complaints added claims on behalf of certain Medicaid healthcare providers ("Provider Plaintiffs") and new ABD beneficiaries.  The Provider Plaintiffs are physicians, pharmacists, and ancillary care providers who accepted ABD beneficiaries as patients and clients under the prior fee-for-service program and who have provided care and services to ABD beneficiaries under the QExA Program. The State Second Amended Complaint asserts the following nine counts:  (I) deprivation of rights under federal law and 42 U.S.C. § 1983; (II) violations of preemptive federal law by virtue of the Supremacy Clause; (III) further specific violations of preemptive federal law and regulations; (IV) insufficient assurances of solvency and evidence of poor performance in other states; (V) insufficient range of services and provider networks; (VI) violation of the Americans with Disabilities Act ("ADA"); (VII) violation of the Rehabilitation Act of 1973; (VIII) violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204; and (IX) unlawful taking.

On September 8, 2009, the Federal Defendants filed the administrative record ("AR"), which is roughly 5,200 pages in length.  At Plaintiffs' request, the administrative record includes documents from 2004 onwards.  7/18/09 Transcript of Proceedings ("Tr.") 28:3-22.  Plaintiffs did not ask for any documents that were created prior to 2004.  Id.

## II. Motions for Summary Judgment in the Action Against the State Defendants

Presently before the Court are three motions for summary judgment in the action against the State Defendants.

### A. The State Defendants' Multi-count Motion for Summary Judgment

On October 23, 2009, the State Defendants filed a motion for summary judgment as to Counts VI, VII, VIII, and IX of the State Second Amended Complaint ("St. Defs.' Multi-count MSJ" or "State Defendants' multi-count motion for summary judgment").  The motion was accompanied by a memorandum in support ("St. Defs.' Multi-count MSJ Mem.") and a concise statement of facts ("St. Defs.' Multi-count MSJ CSF").  On October 26, 2009, WellCare of Arizona filed a joinder in the motion.  On November 3, 2009, Evercare filed a joinder in the motion.

On November 25, 2009, Plaintiffs filed an opposition ("Pls.' Opp'n to St. Defs.' Multi-count MSJ") and a concise statement of facts ("Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF").  The same day, they filed an errata to their opposition.

On November 29, 2009, Plaintiffs filed an errata to their concise statement of facts ("Pls.' Errata to their Opp'n to St. Defs.' Multi-count MSJ CSF").

On December 3, 2009, the State Defendants filed a reply ("St. Defs.' Multi-count MSJ Reply").  On December 7, 2009, Wellcare of Arizona filed a joinder in the reply.

On December 10, 2009, Plaintiffs filed a declaration of counsel.

On December 11, 2009, Evercare filed a joinder in the State Defendants' reply.

**B.   The State Defendants' Licensure Motion for Summary Judgment**

On November 13, 2009, the State Defendants filed a motion for summary judgment on the issue of whether the QExA Contractors are properly licensed to qualify as managed care organizations under the Medicaid Act ("St. Defs.' Licensure MSJ" or "State Defendants' licensure motion for summary judgment"). The motion was filed along with a memorandum in support ("St. Defs.' Licensure MSJ Mem.") and a concise statement of facts ("St. Defs.' Licensure MSJ CSF").  The licensure issue is raised in Counts I through IV of the State Second Amended Complaint. On November 13, 2009, Evercare and WellCare of Arizona filed joinders in the motion.

Plaintiffs did not file an opposition to the motion, apparently because they previously filed a cross-motion, which is

7

discussed in the following subsection.  However, on November 25, 2009, Plaintiffs did file an opposition to the State Defendants' motion for a stay ("Pls.' Opp'n to St. Defs.' Mot. for a Stay"), despite the fact that the motion for a stay was withdrawn by the State Defendants on November 13, 2009.

The State Defendants construed certain arguments in Plaintiffs' opposition to the withdrawn motion for a stay as opposing their licensure motion for summary judgment.  Therefore, on December 2, 2009, the State Defendants filed a reply in support of their licensure motion for summary judgment to address those contentions ("St. Defs.' Licensure MSJ Reply").  The same day, Evercare and WellCare of Arizona filed joinders in the State Defendants' reply.

## C.   Plaintiffs' Solvency Motion for Summary Judgment

On November 17, 2009, Plaintiffs filed a motion for summary judgment on issues pertaining to the QExA Contractors' licensure and solvency ("Pls.' Solvency MSJ" or "Plaintiffs' solvency motion for summary judgment"), along with a memorandum in support ("Pls.' Solvency MSJ Mem.") and a concise statement of facts ("Pls.' Solvency MSJ CSF").[2/]  This motion is, to a certain

---

[2/] Portions of Plaintiffs' solvency motion are directed towards the Federal Defendants.  On November 24, 2009, the Court granted the Federal Defendants' motion to strike those aspects of the motion as untimely under the Rule 16 Scheduling Order, which set a dispositive motions deadline in the action against the Federal Defendants for October 14, 2009.  The aspects of the
(continued...)

extent, a cross-motion to the State Defendants licensure motion for summary judgment.

On December 1, 2009, the State Defendants filed an opposition to the motion ("St. Defs.' Opp'n to Pls.' Solvency MSJ") and a concise statement of facts ("St. Defs.' Opp'n to Pls.' Solvency MSJ CSF").  The same day, they filed an errata to their concise statement of facts.  In addition, Evercare filed a substantive joinder in the opposition ("Evercare's Substantive Joinder in St. Defs.' Opp'n"), and WellCare of Arizona filed a joinder in the State Defendants' opposition and Evercare's substantive joinder.

On December 7, 2009, Plaintiffs filed a reply.  On December 9, 2009, Plaintiffs filed a declaration of counsel.

**D.    Hearing**

On December 14, 2009, the Court held a hearing on the motions for summary judgment in the action against the State Defendants.[3]

_____

[2]/(...continued)
motion that applied to the State Defendants remained, however, because the dispositive motions deadline in the action against the State Defendants was extended to December 15, 2009.

[3] The Court also heard three motions for summary judgment in the action against the Federal Defendants.  Those motions are addressed in a separate order.

## FACTUAL BACKGROUND[4/]

### I.   The Medicaid Act

The Medicaid Act "provides federal funding to 'enabl[e] each State, as far as practicable . . . to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services.'" AlohaCare, 572 F.3d at 742 (quoting 42 U.S.C. § 1396-1) (brackets in original).  The Medicaid program is "a jointly financed federal-state program that is administered by the States in accordance with federal guidelines." Id.   Each state that elects to participate in the program must submit a plan to the CMS.  42 U.S.C. §§ 1396, 1396a.  If the plan is approved, the state is entitled to Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. Id. § 1396b(a)(1).

"The Act, among other things, outlines detailed requirements for [state] plan eligibility, [42 U.S.C.] § 1396a, erects a complex scheme for allocating and receiving federal funds, id. § 1396b, and imposes detailed requirements on States

---

[4/] The facts in this Order are recited for the limited purpose of deciding the three motions for summary judgment in the action against the Federal Defendants.  The facts shall not be construed as findings of fact upon which the parties may rely in future proceedings in this case.

that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), id. § 1396u-2." AlohaCare, 572 F.3d at 742-43.  "Medicaid generally requires a State to conform with federal guidelines prior to receiving federal funds; however, under 42 U.S.C. § 1315, CMS may waive compliance for certain 'experimental, pilot, or demonstration project[s].'" Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

## II.  The QExA Program

Pursuant to 42 U.S.C. § 1315, in July of 1993, the CMS granted a waiver of various provisions of the Medicaid Act to the State of Hawai'i to allow the state to conduct a demonstration project that would transform its fee-for-service Medicaid program into a managed care model for most Medicaid beneficiaries. AR 49.  The demonstration project, called Hawaii Health QUEST ("QUEST Program"), excluded ABD beneficiaries.  Id. at 49-50. ABD beneficiaries instead continued to receive benefits on a fee-for-service basis.  Id. at 22.

In a fee-for-service system, the traditional framework for state Medicaid programs, the state contracts directly with and pays healthcare providers, such as physicians, hospitals, and clinics, for services they provide to Medicaid beneficiaries. G., 2009 U.S. Dist. LEXIS 39851, at *6.  By contrast, under a managed care model, the state contracts with MCOs, which assume

11

the responsibility of providing Medicaid services through their own employees or by contracting with independent providers of such services.  Id. at *6-*7.   The state pays each MCO on a capitated or fixed-amount-per-enrollee basis.  Id.

In February of 1997, the State DHS submitted a waiver application to the CMS so that it could mandatorily enroll portions of the ABD populations into its managed care demonstration project, the QUEST Program, but the request was subsequently withdrawn.  Fed. Defs.' Mem. in Support of their Mot. for Summ. J. ("Fed. Defs.' MSJ Mem."), filed 10/14/09, at 8. In January and August of 2005, the State DHS submitted respectively a second and third waiver request.  AR 1, 43.  The CMS asked the State DHS to withdraw its second request because there was a lack of detail to warrant further consideration at that time, and the CMS took no action on the third request.  Fed. Defs.' MSJ Mem. 8-9.

On February 21, 2007, the State DHS submitted its fourth request for a waiver under 42 U.S.C. § 1315(a), seeking approval from the CMS to implement the QExA Program.  AR 210. The QExA Program was intended to provide primary, acute, and long-term care services, including home- and community-based services ("HCBS"), to ABD beneficiaries state-wide using a managed care model.  Id.  The program would replace the fee-for-services system that was then in place for the ABD population.

12

On October 10, 2007, the State DHS issued a request for proposals ("RFP") to procure the services of two managed care organizations that would be responsible for providing all of the Medicaid care for ABD beneficiaries as part of the QExA Program. Id. at 3942.  On December 7, 2007, the State DHS submitted the RFP to the CMS for its review.  Id. at 1016.  On February 1, 2008, the State DHS awarded the QExA Contracts to Evercare and Ohana Health Plan, Inc. ("Ohana"), a subsidiary of WellCare Health Plans, Inc. ("WellCare Inc.").  Id. at 1558.  The RFP, with amendments, became part of the contracts.  Id. at 3953.

On February 7, 2008, the CMS approved the State DHS's fourth waiver application for the QExA Program.  Id. at 1565.  In doing so, the CMS granted the State DHS a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision.  Id. at 1570.

On May 15, 2008, Ohana was merged into WellCare of Arizona, another subsidiary of WellCare Inc., and WellCare of Arizona assumed Ohana's QExA Contract.  See id. at 2059–68; St. Defs.' Licensure MSJ CSF, Decl. of Patricia M. Bazin ("Bazin's Decl.") ¶ 8.

On January 30, 2009, the CMS approved the QExA Contracts.  AR at 3925–26.

On February, 1, 2009, the QExA Program went into full effect.  Since then, ABD beneficiaries have had to enroll with one of the QExA Contractors as a condition of receiving Medicaid

13

benefits.  However, the State DHS provided a transition period so
that some 40,000 ABD beneficiaries could smoothly transition from
the fee-for-service system to the managed care program.  Id.
at 3696.  During the transition period, beneficiaries could
receive services from healthcare providers even if the providers
had not participated in the QExA Contractors' plans.  The
transition period came to a close on July 31, 2009.  In order to
maintain the status quo for purposes of this litigation, the QExA
Contractors have essentially extended the transition period for
the ABD Plaintiffs in this case until the time of trial, such
that they may continue to see healthcare providers even if those
providers have not decided to participate in the program.  9/4/09
Tr. 17:2-6, 25:3-6 (Evercare's counsel).

## LEGAL STANDARD

     The purpose of summary judgment is to identify and
dispose of factually unsupported claims and defenses.  See
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary
judgment is therefore appropriate if the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the
governing substantive law, it could affect the outcome of the
case.  A 'genuine issue' of material fact arises if 'the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.'" Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation omitted).[5/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Only admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[6/]

_____

[5/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

[6/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court
(continued...)

Once the moving party satisfies its burden, the nonmoving party
cannot simply rest on the pleadings or argue that any
disagreement or "metaphysical doubt" about a material issue of
fact precludes summary judgment.  See id. at 323; Matsushita
Elec., 475 U.S. at 586; California Arch. Bldg. Prods., Inc. v.
Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[7/]
The nonmoving party must instead set forth "significant probative
evidence" in support of its position.  T.W. Elec. Serv. v. Pac.
Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).
Summary judgment will thus be granted against a party who fails
to demonstrate facts sufficient to establish an element essential
to his case when that party will ultimately bear the burden of
proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the
court must construe all evidence and reasonable inferences drawn
therefrom in the light most favorable to the nonmoving party.
See T.W. Elec. Serv., 809 F.2d at 630-31.[8/]  Accordingly, if

_____

[6/](...continued)
an absence of evidence from the nonmoving party.  Id.

[7/] Nor will uncorroborated allegations and "self-serving
testimony" create a genuine issue of material fact.  Villiarimo
v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002);
see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809
F.2d 626, 630 (9th Cir. 1987).

[8/] At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.  Anderson,
477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
(continued...)

16

"reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  <u>Anderson</u>, 477 U.S. at 250-51.

<u>**DISCUSSION**</u>

The State Defendants seek summary judgment as to Counts VI, VII, VIII, and IX of the State Second Amended Complaint.  In addition, the State Defendants and Plaintiffs have filed motions for summary judgment as to Plaintiffs' claim that the QExA Contractors do not meet the Medicaid Act's solvency requirements.  This claim is asserted throughout Counts I through IV of the State Second Amended Complaint.  The Court will consider these matters in turn.

**I.   Counts VI and VII of the State Second Amended Complaint: Violation of the ADA and the Rehabilitation Act**

In Counts VI and VII of the State Second Amended Complaint, Plaintiffs allege that the State Defendants' conduct in connection with the QExA Program violates the ADA and the Rehabilitation Act.  St. 2d Am. Compl. ¶¶ 105, 113.  The ADA claim is asserted on behalf of all of the ABD Plaintiffs, and the Rehabilitation Act claim is advanced on behalf of ABD Plaintiffs K., J., and L.P.[9]  The State Defendants seek summary judgment as to Counts VI and VII.

_____

[8] (...continued) 1994).

[9] The Rehabilitation Act claim was also asserted on behalf of Plaintiff B., but that Plaintiff withdrew from this case on September 22, 2009.

**A.     Introduction**

Title II of the ADA declares that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  This title was "expressly modeled after § 504 of the Rehabilitation Act . . . and essentially extends coverage to state and local government entities that do not receive federal funds."  Pierce v. County of Orange, 526 F.3d 1190, 1216 n.27 (9th Cir. 2008).  Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States, as defined in [29 U.S.C. § 705(20)], shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Consequently, "'[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act.'"  Pierce, 526 F.3d at 1216 n.27 (quoting Zukle v. Regents of Univ. of California, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)).

In order to establish a violation of Title II of the ADA, a plaintiff  must show that:

> "(1) he is an individual with a disability;
> (2) he is otherwise qualified to participate

18

> in or receive the benefit of some public
> entity's services, programs, or activities;
> (3) he was either excluded from participation
> in or denied the benefits of the public
> entity's services, programs, or activities,
> or was otherwise discriminated against by the
> public entity; and (4) such exclusion, denial
> of benefits, or discrimination was by reason
> of his disability."

O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004)).  The elements of a claim under Section 504 of the Rehabilitation Act are essentially the same, except that the plaintiff must also show that "the program receives federal financial assistance."  Id. (quoting Duvall v. County of Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001)).

Once the basic elements have been established, the question is generally whether the plaintiff can identify reasonable modifications to avoid discrimination on the basis of his disability.  Vinson v. Thomas, 288 F.3d 1145, 1154 (9th Cir. 2002) ("[The plaintiff] bore the initial burden of producing evidence that a reasonable accommodation was possible."); Martin v. Taft, 222 F. Supp. 2d 940, 972 n.26 (S.D. Ohio 2002) ("The plaintiff in an ADA Title II action bears the burden of showing that a reasonable modification is available.").  As the Ninth Circuit has explained,

> when a state's policies, practices or
> procedures discriminate against the disabled
> in violation of the ADA, Department of
> Justice regulations require reasonable

19

> modifications in such policies, practices or
> procedures "when the modifications are
> necessary to avoid discrimination on the
> basis of disability, unless the public entity
> can demonstrate that making the modifications
> would fundamentally alter the nature of the
> service, program, or activity."

Crowder v. Kitagawa, 81 F.3d 1480, 1054 (9th Cir. 1996) (quoting

28 C.F.R. § 35.130(b)(7)).  The "fundamental alteration" defense

is, however, limited to instances of disparate impact

discrimination; it "has no application to cases of facial

discrimination."  Lovell v. Chandler, 303 F.3d 1039, 1054 (9th

Cir. 2002); see also Townsend v. Quasim, 328 F.3d 511, 518 n.2

(9th Cir. 2005) (noting "the fundamental alteration defense does

not apply to cases of facial discrimination").

In the case at bar, Plaintiffs advance two basic

theories of liability.  The first is that the QExA Program puts

ABD beneficiaries at a greater risk of institutionalization than

did the prior fee-for-service system that the program replaced.

St. 2d Am. Compl. ¶¶ 105-09.  On that basis, Plaintiffs claim

that the QExA Program violates the integration mandate set forth

in the ADA and the Rehabilitation Act.  Their second theory of

liability is that the QExA Program is providing disabled

recipients with less access to Medicaid benefits than the QUEST

Program provides to non-disabled recipients.  See Pls.' Opp'n to

St. Defs.' Multi-count MSJ 22; St. 2d Am. Comp. ¶¶ 94, 103, 111.

Plaintiffs assert that they are being denied equal access to

Medicaid benefits on the basis of their disability.  The Court will consider each theory in turn.

### B.   The Integration Mandate

#### 1.   <u>Olmstead</u>

Plaintiffs' first theory of liability is based on the Supreme Court's decision in <u>Olmstead v. L.C.</u>, 527 U.S. 581 (1999).  There, "the Supreme Court interpreted the failure to provide Medicaid services in a community-based setting as a form of discrimination on the basis of disability," in contravention of Title II of the ADA.  <u>Townsend v. Quasim</u>, 328 F.3d 511, 517 (9th Cir. 2003); <u>accord</u> <u>McGary</u>, 386 F.3d at 1266 (observing that "the [<u>Olmstead</u>] Court held that undue institutionalization of persons with mental disabilities qualifies as discrimination 'by reason of disability' under the ADA").  "'Unjustified isolation,' the Court held, 'is properly regarded as discrimination based on disability.'"  <u>Sanchez v. Johnson</u>, 416 F.3d 1051, 1063 (9th Cir. 2005) (quoting <u>Olmstead</u>, 527 U.S. at 597).  Specifically, the Court explained that:

> "States are required to provide community-based treatment for persons with mental disabilities when the State's treatment professionals determine that such placement is appropriate, the affected persons do not oppose such treatment, and the placement can be reasonably accommodated, taking into account the resources available to the state and the needs of others with mental disabilities."

Townsend v. Quasim, 328 F.3d at 519 (quoting Olmstead, 527 U.S. at 607).

The Olmstead Court relied in part on the ADA's regulations, which direct that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d), quoted in Olmstead, 527 U.S. at 592. The Rehabilitation Act's regulations similarly provide that "[r]ecipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). In this respect, the ADA and the Rehabilitation Act have been read to contain an "integration mandate." Arc of Washington State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005); Pennsylvania Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005).

A state's reduction in services may violate the integration mandate where it unjustifiably forces or will likely force beneficiaries from an integrated environment into institutional care. See Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1184 (3d Cir. 2003) (holding that Medicaid participants not currently institutionalized, but at "high risk for premature entry into a nursing home," could bring claims for

violation of the integration mandate); <u>Gaines v. Hadi</u>, No. 06-60129-CIV., 2006 WL 6035742, at *28 (S.D. Fla. Jan. 30, 2006) (observing that a plaintiff may state an integration claim by asserting that a "reduction in services will force [him] into an institutional setting against their will"); <u>Brantley v. Maxwell-Jolly</u>, Case No.: C 09-3798 SBA, 2009 U.S. Dist. LEXIS 91454, at *1-*2, *22  (N.D. Cal. Sept. 10, 2009) (noting that "cases involving ADA integration claims have recognized that the risk of institutionalization is sufficient to demonstrate a violation of Title II," and enjoining the implementation and enforcement of a law that would reduce the number of Adult Day Health Care days available to certain Medicaid beneficiaries from five to three days per week because the reduction would place the plaintiffs at serious risk of institutionalization); <u>Mental Disability Law Clinic v. Hogan</u>, CV-06-6320 (CPS)(JO), 2008 U.S. Dist. LEXIS 70684, at *50 (E.D.N.Y. Aug. 29, 2008) ("[E]ven the risk of unjustified segregation may be sufficient under <u>Olmstead</u>.").

At the same time, the integration mandate must be balanced against "the States' need to maintain a range of facilities for the care and treatment of persons with diverse mental disabilities, and the States' obligation to administer services with an even hand." <u>Olmstead</u>, 527 U.S. at 597.  "'[T]he State's responsibility, once it provides community-based treatment to qualified persons with disabilities, is not

boundless.'"  <u>Sanchez</u>, 416 F.3d at 1063 (quoting <u>Olmstead</u>, 527 U.S. at 603).  If the fundamental alteration defense is available,[10] the state may show that it "has in place a comprehensive deinstitutionalization scheme, which, in light of existing budgetary constraints and the competing demands of other services that the State provides, including the maintenance of institutional care facilities, is 'effectively working.'"  <u>Sanchez</u>, 416 F.3d at 1067-68 (quoting <u>Olmstead</u>, 527 U.S. at 605) (citation omitted); <u>Arc of Washington State Inc.</u>, 427 F.3d at 618-20 (illustrating that this showing is a type of fundamental alteration defense).  Courts "will not tinker with" such a plan.  <u>Sanchez</u>, 416 F.3d at 1067-68.  "<u>Olmstead</u> does not require the immediate, state-wide deinstutionalization of all eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful."  <u>Id.</u> at 1068.  This type of plan is commonly referred to as an "<u>Olmstead</u> plan."  <u>Id.</u>

---

[10] In <u>Townsend</u>, a case involving an alleged violation of the integration mandate, the Ninth Circuit noted that "the fundamental alteration defense does not apply to cases of facial discrimination," that <u>Olmstead</u> did not involve facial discrimination, and that the provision at issue in the case at hand could be read to facially discriminate against disabled persons.  328 F.3d at 518 n.2.  Nevertheless, the court assumed without deciding that the defense applied because the plaintiff did not challenge its applicability in the case.  <u>Id.</u> at 518.  In the end, the court remanded the case to the district court and noted that, on remand, the parties could present their arguments for and against the applicability of the defense.  <u>Id.</u> at 520.

at 1064; AR 25 (noting that the State of Hawai'i has an "Olmstead Plan").

### 2.    The State Second Amended Complaint

The ADA and Rehabilitation Act claims assert that the State Defendants have failed to provide for the ABD Plaintiffs, who have physical or mental impairments that substantially limit one or more of their major life activities, medical and ancillary care they must have to be maintained in the most integrated setting appropriate to their needs.  St. 2d Am. Compl. ¶ 105. The ABD Plaintiffs assert that, under the prior fee-for-service system, the State DHS placed qualified individuals with disabilities in the community, including the ABD Plaintiffs, with medical, attendant, and other services supplied, furnished, and paid for or arranged for by that system, so as to enable them to be integrated into their respective communities.  Id. ¶ 109.

The ABD Plaintiffs maintain that, by replacing the fee-for-service system with the QExA Program, the State DHS must now justify and show reasonable grounds why the level, kinds, and quality of supporting services, assistance, and framework for independent living may be withdrawn.  Id.  Plaintiffs assert that the QExA Program has reduced access to services and reimbursements to healthcare providers, thereby discouraging them from providing care to ABD beneficiaries with disabilities.  Id. ¶ 109.  The ABD Plaintiffs claim that, as a result, they have

been forced into institutions or are at a greater risk of being
forced into institutions.  See id. ¶¶ 105-09, 113.  Plaintiffs
contend that the QExA Program does not constitute a
comprehensive, effective state program ensuring that the Medicaid
Act's standards will be met and that the program is therefore
discriminatory.  Id. ¶ 106.

            3.  **Analysis**

        In their multi-count motion for summary judgment, the
State Defendants point out as an initial matter that, contrary to
the allegations in the State Second Amended Complaint, they do
not carry the burden of justifying changes to services provided
to qualified individuals in the community.  See St. Defs.' Multi-
count MSJ Mem. 11; St. 2d Am. Compl. ¶ 109.  They contend that
the ABD Plaintiffs are the ones who carry the burden of
demonstrating that such changes violate the integration mandate.
St. Defs.' Multi-count MSJ Mem. 11.  The Court agrees with the
State Defendants and therefore concludes that the ABD Plaintiffs,
and not the State Defendants, bear the burden of proving that the
administration of the QExA Program has forced them into
institutions or is likely to do so.  See Summer H. v. Fukino,
Civ. No. 09-00047 SOM/BMK, 2009 U.S. Dist. LEXIS 38924, at *25
(D. Haw. May 6, 2009) (questioning the plaintiffs' integration
claims under the ADA and the Rehabilitation Act because they had
"not shown that any actual benefit cut increases the risk of

institutionalization"); <u>Gaines</u>, 2006 WL 6035742, at *28 (noting that, in order to prevail on an integration claim, the plaintiffs must show that "reductions will afford such inadequate services that it will likely force [them] to drop from the community-based program in order to seek proper care in an institutional setting").

Turning to the elements of the Plaintiffs' claims under the ADA and Rehabilitation Act, the State Defendants acknowledge that the ABD Plaintiffs are qualified to receive Medicaid benefits and that they therefore satisfy the first element of their ADA and Rehabilitation Act claims.  St. Defs.' Multi-count MSJ 8.  The State Defendants also recognize that they receive federal funding for the QExA Program and, as such, the federal funding element of the Rehabilitation Act claims is met.  <u>Id.</u> at 8. n.2.

They do, however, assert that the ABD Plaintiffs cannot raise a question of material fact as to whether the operation of the QExA Program actually increases their risk of institutionalization.  St. Defs.' Multi-count MSJ Mem. 12.  The State Defendants argue, and the Plaintiffs concede, that none of the ABD Plaintiffs is currently institutionalized.  <u>See id.</u> at 12; Pls.' Opp'n to St. Defs.' Multi-count MSJ 28 (conceding that "Plaintiffs are currently receiving Medicaid services in the community and none are institutionalized").  The question is

whether there is any factual basis for a claim that the ABD Plaintiffs have suffered or are likely to suffer a reduction in their services as a result of the transition from the prior fee-for-service system to the QExA Program's managed care delivery system that would likely lead to their institutionalization.

### a.   Harrison's Declaration

In support of their integration claim, the ABD Plaintiffs cite to a declaration by Summer Harrison.  Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF ¶ h.  Harrison states that she has an adopted daughter whose name is Hannah.  Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Decl. of Summer Harrison ("Harrison's Decl.") ¶¶ 4-7.  Hannah is an ABD beneficiary who is enrolled with Evercare.  Id.  She suffers from a serious seizure disorder, which, according to Harrison, necessitates skilled nursing care 24 hours a day.  Id. ¶ 4.  Harrison claims that, shortly after the commencement of the QExA Program, the State DHS imposed a 15% budget cut on Hannah's services.  Id. ¶ 7.  Harrison also asserts that Evercare then challenged the medical necessity of Hannah's 24/7 nursing care and denied coverage for other medically-necessary supplies and equipment.  Id.

Harrison asserts that Hannah and other disabled children have been discriminated against by the State DHS and Evercare.  Id. ¶ 8.  According to Harrison, the State DHS and Evercare are using a "secret new assessment tool to determine

28

home nursing services for children (under age 21)." Id. ¶ 8.a. The assessment tool, says Harrison, "has an institutional bias compared to the assessment tools used since at least 2002," as it "has eliminated all points that used to be awarded for social and family considerations, leaving only the points related to institutionalization." Id. (emphasis omitted).

Additionally, Harrison contends that "people with developmental disabilities have been targeted for two sets of budget cuts, based solely on their participation in the [42 U.S.C. § 1396n(c)] HCBS DD waiver program." Id. She claims that "[a]ll cuts have been made only to the home and community-based services that allow people with developmental disabilities to remain at home rather than be institutionalized." Id. ¶ 8.b. Harrison explains that "[c]uts to home based services for children are being made on a budget basis and not in relation to the medical needs of the individual child." Id. ¶ 8.e. She asserts that the "first set of cuts targeted children with developmental disabilities under the age of 13 and receiving more than 29 hours of services per week," and that the "second set of cuts was a uniform 15%, and parents/caregivers were forced to appear to acquiesce to the cuts because they were instructed to fill the forms out themselves or risk having the new schedule set for them by the state." Id.

In their reply, the State Defendants address the budget cuts by explaining that the cuts related to services provided on a fee-for-service basis by the Hawaii Department of Health under a 42 U.S.C. § 1396n(c) waiver, which is not incorporated into the QExA Program. St. Defs.' Multi-count MSJ Reply 13 n.6. The State Defendants cite paragraph 28(e) of the Special Terms and Conditions for the QExA Program, which provides that:

> **Benefits Provided to the MR/DD [(i.e., Mentally Retarded/Developmentally Disabled)] Population.** Medicaid eligibles with developmental disabilities will receive the full Medicaid State Plan primary and acute health care benefit package through QExA managed care plans. Case management, [42 U.S.C. § 1396n(c)] HCBS and ICF/MR [(i.e., intermediate care facility for mentally retarded)] benefits for this group will remain carved out of the capitated benefit package. All QExA health plans will be required to coordinate the primary and acute health care benefits received by the DD/MR [sic] population with the HCBS that are provided on a fee-for-service basis from the Department of Health's (DOH) Developmental Disabilities Division.

AR 1590-91. The Court agrees with the State Defendants that the alleged budget cuts cited by Harrison relate to a 42 U.S.C. § 1396n(c) waiver program that is provided in a fee-for-service program operated by the Hawai'i Department of Health, and not by the State DHS through the QExA Program. Thus, the alleged budget cuts, even if true, do not demonstrate that the QExA Program has reduced the ABD Plaintiffs' services in a manner that would likely force them into institutions.

30

What remains is Harrison's testimony regarding the State DHS's "secret new assessment tool to determine home nursing services for children (under age 21)." Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Harrison's Decl. ¶ 8. The State Defendants assert that Harrison's testimony regarding "institutional bias" is not properly raised in this case because neither she nor her daughter is a party to this lawsuit. St. Defs.' Multi-count MSJ Reply 13 n.6. They contend that Plaintiffs are not proceeding as representatives of a class and that Plaintiffs' allegations as to anonymous non-parties are irrelevant. Id. at 2 n.1. The Court notes that the ABD Plaintiffs in this case are comprised in part by disabled children who are beneficiaries under the QExA Program. See St. 2d Am. Compl. ¶¶ 4, 8-9. In addition, the State Defendants have stated that "[a]ll of the ABD Plaintiffs are currently receiving Medicaid services in the community." St. Defs.' Multi-count MSJ Mem. 12. However, there has been no showing that the ABD Plaintiffs who are disabled children are currently receiving "home nursing services" or that they are being subjected to the "secret new assessment tool." See id. ¶¶ 8-8.a. While it is asserted that this assessment tool has allegedly been applied to Harrison's daughter in connection with her home nursing services and that she is thus at a greater risk of institutionalization, she is not a Plaintiff in this action. The ABD Plaintiffs have not shown that any reduction in benefits

under the QExA Program has resulted in an increased risk that the disabled children among them will be forced into institutions.

### b.   Dr. Meyers' Declaration

Apart from relying on Harrison's declaration, Plaintiffs have also submitted a declaration by Arlene Meyers, M.D.  Dr. Meyers explains that one of the ABD Plaintiffs in this case, L.P., is a dual-eligible who suffers from cancer and other conditions.   Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Decl. of Arlene Meyers, M.D. ("Dr. Meyers' Decl."), ¶ 23.  She asserts that L.P. "has experienced long-running problems with securing payment from Evercare or [WellCare of Arizona[11/]] for community aides his doctors have ordered."  Id.  Dr. Meyers maintains that, "[w]ithout the community aids, L.P. would have to be institutionalized," and that L.P. "has been repeatedly approached to agree to institutionalization, which he declined." Id.

Dr. Meyers seems to suggest that L.P. is at risk of institutionalization for two reasons.  One is that he has been repeatedly approached to agree to institutionalization, which he has declined.  See id.  There is no violation of the ADA or Rehabilitation Act in merely approaching an individual to see if he wishes to be institutionalized.  Cf. Olmstead, 527 U.S. at 602

---

[11/] Dr. Meyers' reference to both Evercare and WellCare of Arizona suggests that she is unaware of which contractor L.P. is enrolled with.

(noting that there is no "federal requirement that community-based treatment be imposed on patients who do not desire it").  L.P. has decided that he does not want to enter an institution, and that is his prerogative, assuming, of course, that he "'meets the essential eligibility requirements' for habilitation in a community-based program," which appears to be the case since his doctors have ordered that he receive community aids.  See id. (quoting 42 U.S.C. § 12131(2)) ("[T]he State generally may rely on the reasonable assessments of its own professionals in determining whether an individual 'meets the essential eligibility requirements' for habilitation in a community-based program.  Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting." (quoting 42 U.S.C. § 12131(2))); Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Dr. Meyers' Decl. ¶ 23.  There is no suggestion that one of the QExA Contractors has applied undue pressure to coerce L.P. into "agreeing" to institutionalization.

The second basis for Dr. Meyers' assertion that L.P. is at risk of institutionalization is that he has encountered "long-running problems with securing payment from Evercare or [WellCare of Arizona] for community aides his doctors have ordered," and that if he loses those services, he "would have to be institutionalized."  Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Dr. Meyers' Decl. ¶ 23.  In view of this testimony, the

Court finds that, while L.P. has not yet experienced a loss of community-based services, there is a question of fact as to whether he is at risk of suffering an imminent reduction in those services and having to be institutionalized as a result thereof. See O'Shea v. Littleton, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury.").

The State Defendants invoke the fundamental alteration defense by asserting that the QExA Program qualifies as an Olmstead plan, that is, a comprehensive, effectively-working deinstitutionalization scheme. See St. Defs.' Multi-count MSJ 15; Sanchez, 416 F.3d at 1067-68. They note that all individuals who were previously on a waiting list for HCBS under the prior fee-for-service system are now receiving services in the community, that there is currently no waiting list for HCBS, and that, under the QExA Contracts, Evercare and WellCare of Arizona are contractually obligated to increase HCBS services by five percent annually. St. Defs.' Multi-count MSJ CSF, Decl. of Patricia Bazin ¶¶ 25, 27-28; AR 4037, 4100-03. While it is abundantly clear that the QExA Program is a comprehensive deinstitutionalization scheme, and that it is working to some extent, Dr. Meyers' testimony regarding the potential denial of community-aide services to L.P. raises a question of fact as to

whether the plan is working "effectively" as it applies to him.[12/]
This issue is better left for trial.

### 4.    Decision Regarding the Integration Claim

In short, taking the evidence in light most favorable
to Plaintiffs, the Court finds that there are genuine issues of
material fact surrounding L.P.'s integration claim set forth in
Counts VI and VII of the State Second Amended Complaint.  The
remaining ABD Plaintiffs have not, however, identified a genuine
issue of material as to whether they are at risk of
institutionalization as a result of the QExA Program.
Consequently, the Court will deny the State Defendants' general
motion for summary judgment as to Counts VI and VII insofar as
those counts assert an integration claim on behalf of L.P., but
grant the motion for summary judgment as to those counts to the
extent that they advance integration claims on behalf of all
other ABD Plaintiffs, namely:  (1) G., parent and next friend of
K.; (2) D., parent and next friend of E.; (3) C., parent and next
friend of M.; (4) M., parent and next friend of I.; (5) V.,
parent an guardian of R.; (6) T. parent and next friend of E.S.;
(7) A., parent and next friend of C.; (8) J., parent and next
friend of R.J.; (9) T.I.; and (10) H., parent and next friend of

---

[12/] The State Defendants have not cited, and the Court has
not found, any cases in which the <u>Olmstead</u>-plan defense has been
applied where the state has allegedly taken steps to reduce only
one plaintiff's services such that the plaintiff is at a greater
risk of institutionalization.

K.  The Court will now turn its attention to the ABD Plaintiffs'
second theory of liability in Counts VI and VII.

### C.  Equal Access

In their opposition to the State Defendants' multi-
count motion for summary judgment, the Plaintiffs note that the
integration mandate is not "the sole basis for their [ADA and
Rehabilitation Act] claims."  Pls.' Opp'n to St. Defs.' Multi-
count MSJ Mem. 22.  They explain that their claim is premised on
the equal access requirement of those statutes, citing <u>Alexander</u>
<u>v. Choate</u>, 469 U.S. 287 (1985).  <u>See</u> Pls.' Opp'n to St. Defs.'
Multi-count MSJ Mem. 27.

### 1.  <u>Choate</u>

In <u>Choate</u>,  the Supreme Court assumed without deciding
that Section 504 of the Rehabilitation Act reaches at least some
conduct that has an unjustifiable disparate impact upon the
handicapped.  469 U.S. at 299.  In discussing such conduct, the
Supreme Court observed that a state participating in the Medicaid
program has substantial discretion to choose the proper mix of
amount, scope, and durational limitations on the benefits it will
provide, so long as otherwise qualified disabled individuals are
afforded meaningful and equal access to the benefits offered.
<u>Id.</u> at 299–301.  The Supreme Court observed that, "to assure
meaningful access, reasonable accommodations in the grantee's
program or benefit may have to be made."  <u>Id.</u> at 301.

36

However, no such accommodations were necessary in the case before the Supreme Court.  <u>Id.</u> at 306.  The state had proposed reducing the number of annual days of inpatient hospital care covered by its Medicaid program from twenty days to fourteen days.  <u>Id.</u> at 289.  The Court reasoned that, because the disabled plaintiffs in the case had "meaningful and equal access to that benefit, [the state was] not obligated to reinstate its 20-day rule or to provide the handicapped with more than 14 days of inpatient coverage."  <u>Id.</u> at 306.  The Court emphasized that "[t]he State has made the same benefit—14 days of coverage—equally accessible to both handicapped and nonhandicapped persons, and the State is not required to assure the handicapped 'adequate health care' by providing them with more coverage than the nonhandicapped."  <u>Id.</u> at 309.

"Following <u>Choate</u>, several courts of appeals have adopted the view that the Rehabilitation Act requires public entities to modify federally assisted programs if such a modification is necessary to ensure that the disabled have equal access to the benefits of that program."  <u>Wisconsin Cmty. Servs. v. City of Milwaukee</u>, 465 F.3d 737, 748 (7th Cir. 2006) (collecting cases); <u>see also</u> <u>Vaughn v. Sullivan</u>, 906 F. Supp. 466, 474 (S.D. Ind. 1995) (explaining that, under Section 504 of the Rehabilitation Act, "a participating state may define the Medicaid benefits it will provide, so long as otherwise qualified

disabled individuals are afforded meaningful and equal access to the benefits offered"); Wolford by Mackey v. Lewis, 860 F. Supp. 1123, 1134-35 (S.D.W. Va. 1994) ("[S]ection 504 ensures only that disabled individuals receive the same treatment as those who are not disabled. . . . The state . . . must afford individuals with a disability meaningful and equal access to the Medicaid benefits or services offered to those without a disability and may be required to adjust its programs to achieve that result." (citation omitted)).

### 2.  Whether the Equal Access Claim was Properly Pled

As a preliminary matter, the State Defendants question whether the equal access component of Plaintiffs' claim was properly raised in the State Second Amended Complaint.  St. Defs.' Multi-count MSJ Reply 8.  "Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'"  Pickern v. Pier 1 Imps. (U.S.), Inc., 457 F.3d 963, 968 (9th Cir. 2006) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).  Consistent with this requirement, "the district court [does] not commit error by refusing to award relief on an unpleaded cause of action."  389 Orange St. Partners v. Arnold, 179 F.3d 656, 665 (9th Cir. 1999),

In their opposition to the State Defendants' multi-count motion for summary judgment, the ABD Plaintiffs contend

that the QExA Program is providing disabled recipients with less access to Medicaid benefits than the QUEST Program provides to non-disabled recipients. See Pls.' Opp'n to St. Defs.' Multi-count MSJ 22. This claim is not clear from the factual allegations in the ADA and Rehabilitation Act Counts in the State Second Amended Complaint. See St. 2d Am. Compl. ¶¶ 103–14. Those counts do, however, incorporate Count II's allegations, one of which is that the State Defendants failed to ensure that the QExA Contractors were ready to administer the QExA Program on February 1, 2009, in a manner in which existing QUEST plans have demonstrated skill and commitment. Id. ¶¶ 94, 103, 111; see also id. ¶¶ 118–20 (suggesting that reimbursement rates for providers under the QExA Program are not sufficient to enlist enough providers so that services are available at least to the extent that they are available under the QUEST Program).

Additionally, the ABD Plaintiffs contend that the State Defendants violated Section 504 of the Rehabilitation Act in light of the State Defendants' conduct and policy of contracting with the QExA Contractors such that providers are financially discouraged from participating in the QExA Program and accepting as patients and clients Medicaid-eligible disabled individuals. Id. ¶ 107. In support of this assertion, the ABD Plaintiffs cite Zamora-Quezada v. HealthTexas Med. Group of San Antonio, 34 F. Supp. 2d 433 (W.D. Tex. 1998). See St. 2d Am. Compl. ¶ 107.

While a case citation is by no means a substitute for factual allegations, it does provide at least some insight into the plaintiff's legal theory.  In <u>Zamora-Quezada</u>, the court held that the plaintiffs, disabled enrollees of HMOs, had sufficiently stated a claim under the ADA and Rehabilitation Act against the HMOs by alleging, <u>inter alia</u>, that they had, on numerous occasions, been forced to wait for long periods of time and delayed or denied medical care while, at the same time, there were specific instances of non-disabled patients not having to wait for hours and receiving better treatment.  34 F. Supp. 2d at 442.  The State Defendants note this holding in their multi-count motion for summary judgment.  St. Defs.' Multi-count MSJ Mem. 13 n.4.

In view of the allegations in the State Second Amended Complaint and the citation to <u>Zamora-Quezada</u>, the Court finds that the equal access component of Plaintiffs' claim was sufficiently raised in the complaint.  The Court will therefore consider Plaintiffs' equal access claim on the merits.[13]

---

[13] Plaintiffs also assert that they are advancing a claim based on 42 U.S.C. § 1396a(a)(10)(B).  Pls.' Opp'n to St. Defs.' Multi-count MSJ 22, 26-28.  The Second Circuit has explained the statute as follows:

When Congress passed the Medicaid Act in 1965, it sought to ensure that "the primary concern of the states in providing financial assistance should be those persons who lack sufficient income to meet their basic needs—termed the categorically needy."  This group—i.e., those listed in [42 U.S.C.

(continued...)

[13]/(...continued)
§ 1396a(a)(10)](A)—were contrasted with the medically
needy, those who have resources to meet most of their
basic needs but not their medical ones.  Section
1396a(a)(10)(B) guarantees that if a state elects to
provide Medicaid to the medically needy, it must also
provide it to the categorically needy and that it may
not provide more [medical] assistance to the former
group than to the latter.  Moreover, states may not
provide benefits to some categorically needy
individuals but not to others. . . . . Section
1396a(a)(10)(B) thus precludes states from
discriminating against or among the categorically
needy.

Rodriguez by Rodriguez v. City of New York, 197 F.3d 611, 615 (2d
Cir. 1999) (quoting Camacho v. Perales, 786 F.2d 32, 38 (2d Cir.
1986)) (citations omitted).  "Medical assistance," as defined by
the Medicaid Act, is "'payment of part or all of the cost of the
[enumerated] care and services.'"  Id. at 613 (quoting 42 U.S.C.
§ 1396d(a)) (brackets in original).

        A claim under 42 U.S.C. § 1396a(a)(10)(B) has two elements.
"First, a plaintiff must allege to be categorically needy, as
defined by subparagraph 10(A).  Second, a plaintiff must allege
that the state is providing more favorable medical assistance to
other recipients, as Congress defines medical assistance in the
statute."  Equal Access for El Paso, Inc. v. Hawkins, 428 F.
Supp. 2d 585, 618 (W.D. Tex. 2006), rev'd on other grounds, 509
F.3d 697 (5th Cir. 2007) (reversing the district court's finding
that 42 U.S.C. § 1396a(a)(30) created a federally-enforceable
right under 42 U.S.C. § 1983).  In Equal Access for El Paso,
Inc., the district court dismissed a claim under 42 U.S.C.
§ 1396a(a)(10)(B) because the plaintiffs did not allege that the
state was making payments on behalf of other categorically needy
or medically needy recipients which were greater in amount,
duration, or scope than payments made on behalf of the
plaintiffs.  428 F. Supp. 2d at 618.

        Here, the State Defendants argue that the Court should
disregard Plaintiffs' 42 U.S.C. § 1396a(a)(10)(B) claim because
it was not asserted in the State Second Amended Complaint.  St.
Defs.' Multi-count MSJ Reply 15 n.7.  The Court agrees.  In the
managed care context, the State does not make payments for
medical services on an item-by-item basis, as it does in a
fee-for-service system, but instead makes payments on a capitated
basis under MCO contracts, which delineate the services to which
beneficiaries are entitled.  Thus, through MCO contracts, the
                                            (continued...)

[13]/(...continued)
state provides payment, and thus medical assistance, for those
enumerated services.  Hence, the issue in the managed care
context under 42 U.S.C. § 1396a(a)(10)(B) is whether the state
has contracted to provide categorically needy individuals with
less services than other categorically or medically needy
beneficiaries.  In this respect, a claim under the statute
differs from a claim under the ADA and the Rehabilitation Act,
insofar as the former claim, at least in the managed care
setting, only looks to the services to which beneficiaries are
entitled under an MCO contract, whereas the latter claim examines
whether disabled beneficiaries have less access to those services
than non-disabled beneficiaries.

        In this case, there is no allegation in the State Second
Amended Complaint that the State DHS has contracted to provide
less benefits for QExA enrollees in amount, duration, or scope
than QUEST enrollees.  As such, the complaint does not assert the
factual basis for a claim under 42 U.S.C. § 1396a(a)(10)(B).
Plaintiffs' claim under the statute is thus not properly before
the Court at this time.  Furthermore, even if a claim under 42
U.S.C. § 1396a(a)(10)(B) had been properly raised, as the State
Defendants observe, the statute has been waived for the QUEST and
QExA Programs.  12/14/09 Tr. a.m. 54:6-23 (rough draft of
transcript); AR 1569.  Thus, the provision simply does not apply
in this case.

42

### 3.  Whether the Equal Access Claim Should Proceed to Trial

The State Defendants contend that it would be improper to compare the ABD Plaintiffs in the QExA Program to the non-disabled beneficiaries enrolled in the QUEST Program.  St. Defs.' Multi-count MSJ Reply 8.  The State Defendants note that the QExA Program and the QUEST Program are fundamentally different because the disabled beneficiaries in the QExA Program have greater access to Medicaid services than the non-disabled beneficiaries in the QUEST Program.  Id. at 9.  The State Defendants note that disabled beneficiaries in the QExA Program have access to certain benefits, including specialized and long-term care services, that the beneficiaries in the QUEST Program do not.  Id.; see also AR 1589-90 (delineating benefits under the QUEST and QExA Programs).

Of course, Plaintiffs are not complaining about how they have access to more services under the QExA Program than non-disabled beneficiaries enrolled in the QUEST Program. Rather, their quarrel is with how the State DHS has provided certain Medicaid services to both disabled and non-disabled beneficiaries, such as primary care, and how the disabled beneficiaries in the QExA Program have less access to those benefits than non-disabled beneficiaries in the QUEST Program. In other words, Plaintiffs' claim is that they have less, and thus unequal, access to benefits that are common to both

43

programs.  Cf. Choate, 469 U.S. at 309 (rejecting a claim under

Section 504 of the Rehabilitation Act because the state had "made

the same benefit—14 days of [inpatient hospital] coverage—equally

accessible to both handicapped and nonhandicapped persons").  The

fact that the State DHS has decided to utilize separate programs

to provide benefits to disabled and non-disabled beneficiaries

does not relieve it of its obligation to provide disabled

beneficiaries with equal access to the benefits that it grants to

non-disabled beneficiaries.  Accordingly, the Court rejects the

State Defendants' contention that it is improper to compare the

ABD Plaintiffs' access to certain Medicaid benefits under the

QExA Program with non-disabled beneficiaries' access to the same

types of Medicaid benefits under the QUEST Program.[14/]

        The State Defendants next assert that, to the extent

that a necessary service is not available through a contractor's

network, the QExA Contracts require that it be provided out-of-

_____

        [14/] The State Defendants note that the QExA Program itself
serves both disabled beneficiaries and non-disabled
beneficiaries.  St. Defs. Multi-count MSJ Reply 5.  They observe
that the majority of participants in the QExA Program are aged,
non-disabled Medicaid beneficiaries.  Id.  The State Defendants
contend that the QExA Program does not discriminate between
disabled and non-disabled beneficiaries.  Id. at 4-8.  The Court
does not read Plaintiffs' opposition or complaint as asserting
discrimination within the QExA Program.  Rather, Plaintiffs'
argument is that the State DHS is unlawfully discriminating
between disabled beneficiaries in the QExA Program and non-
disabled beneficiaries in the QUEST Program, because the former
have less access to certain Medicaid benefits than the latter.
As discussed herein, that type of discrimination is not
permissible under the ADA and Rehabilitation Act.

network.  St. Defs.' Multi-count MSJ Reply 11.  The availability
of out-of-network providers would seem to undermine the
significance of the alleged disparities between the provider
networks of QExA and QUEST Programs.

On the other hand, the ABD Plaintiffs, many of whom
have been shown to have complex medical conditions, point to
differences in access between the QExA and QUEST Programs
regarding the availability of specialists.  Pls.' Opp'n to St.
Defs.' Multi-count MSJ CSF ¶¶ 5a, 3f; Pls.' Opp'n to St. Defs.'
Multi-count MSJ CSF, Dr. Meyers' Decl. ¶¶ 15-23.  They explain
that the disparities stem from the fact that specialists are paid
less in the QExA Program than they are paid in the QUEST
Program.[15]  Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF ¶ 3b.
Physicians in particular are paid ten to twenty percent less in
the QExA Program than they are paid in the QUEST Program.  See
id. ¶ 2b.[16]  According to Plaintiffs, it takes twelve to thirty

_____

[15] While the disparities in payment rates may be a cause for
why disabled beneficiaries allegedly have less access to certain
Medicaid services than non-disabled beneficiaries, the
disparities in rates do not constitute a violation of the ADA.
Choate guarantees that disabled beneficiaries have meaningful and
equal access to Medicaid services, not that disabled
beneficiaries' healthcare providers have the same rates of pay as
non-disabled beneficiaries' providers.  The difference in rates
of pay may be a reason for the difference in access, but it is
not itself a violation of the ADA or Rehabilitation Act.

[16] The State Defendants note that the disparity in payment
rates results from the fact that QUEST Program has been in place
for over fifteen years and that, over that time period, providers
(continued...)

times as long to secure a referral to a specialist for a QExA
enrollee than for a non-disabled person in the QUEST Program.
Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF ¶ 3f & Decl. of
Richard C. Custodio, M.D. ("Dr. Custodio's Decl."), ¶ 25.  Apart
from complaining about their access to specialists, Plaintiffs
assert that certain prescription drugs are not covered under the
QExA Program that are covered under the QUEST Program, which
means that prior-approvals must be obtained for those drugs in
the QExA Program, but not in the QUEST Program.  Pls.' Opp'n to
St. Defs.' Multi-count MSJ CSF ¶ 1c.  Plaintiffs maintain that
the preauthorization process for certain services and items,
including non-covered prescription drugs, under the QExA Program
is onerous and lengthy compared to the process utilized in the
QUEST Program.  Id. ¶¶ 3d, 4e-5e.

        In addition, the ABD Plaintiffs claim that they have
been denied transportation.  Pls.' Opp'n to St. Defs.' Multi-
count MSJ 16.  They assert that, with inadequate provider
networks, the denials of transportation increase the risks of
adverse consequences because QExA patients cannot travel to the
doctor's office or the pharmacy.  Id.  It is claimed that ABD
Plaintiff L.P., a cancer patient, has repeatedly been denied

_____

[16]/(...continued)
have been able to negotiate reimbursement rates that are higher
than those set forth in the fee-for-service reimbursement
schedules.  St. Defs.' Multi-count MSJ Reply 10.

transportation to the pharmacy and doctors' offices. Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF ¶ 1g. According to Plaintiffs, riding the bus is debilitating and increases his risk of infection. Id. Plaintiffs maintain that non-disabled patients in the QUEST Program do not face the transportation problems because they have adequate provider networks. Pls.' Opp'n to St. Defs.' Multi-count MSJ 16.[17/]

Viewing the evidence in the light most favorable to the ABD Plaintiffs, the Court finds that there are genuine issues of material fact as to whether the ABD Plaintiffs have equal access to Medicaid benefits as compared to non-disabled beneficiaries enrolled in the QUEST Program. See Choate, 469 U.S. at 306. That question is better left for trial. As such, the Court will deny the State Defendants' multi-count motion for summary judgment as to Counts VI and VII, insofar as those counts assert an equal access claim.

---

[17/] At the hearing on the motions for summary judgment, Evercare's counsel explained that two of the ABD Plaintiffs have sought to utilize the internal grievance process and external review process through the Insurance Division. See 12/14/09 p.m. Tr. 51:6-10 (rough draft of transcript); AR 4179-81 (setting forth the grievance process). The Court notes that the ABD Plaintiffs who have encountered any access problems have available grievance and review processes to remedy any such difficulties.

## II.   Count VIII of the State Second Amended Complaint:  Violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204

In Count VIII of the State Second Amended Complaint, Plaintiffs contend that, since July 1, 2009, the State DHS has rolled back reimbursement rates for providers to 2006 levels. St. 2d Am. Compl. ¶ 88.  These rates are lower than those in effect on January 31, 2009.  Id.  Plaintiffs claim that the reduction is not supported by any systematic analysis assuring that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general public in the state.  Id.  On that basis, Plaintiffs claim that the reduction violates 42 U.S.C. § 1396a(a)(30) and its corresponding regulation, 42 C.F.R. § 447.204.  Id. ¶ 118. The State Defendants seek summary judgment as to Count VIII.

The statute provides that:

A State plan for medical assistance must . . . provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area . . . .

48

42 U.S.C. § 1396a(a)(30)(A).  The regulation similarly states

that:  "The agency's payments must be sufficient to enlist enough

providers so that services under the plan are available to

recipients at least to the extent that those services are

available to the general population."  42 C.F.R. § 447.204.

In their multi-count motion for summary judgment, the

State Defendants point out that 42 U.S.C. § 1396a(a)(30) and 42

C.F.R. § 447.204 govern reimbursement rates under the state plan,

which applies in a fee-for-service system, and not in a managed

care program.  St. Defs.' Multi-count MSJ Mem. 3-4, 20.  The

Court has previously concluded that 42 U.S.C. § 1396a(a)(30) does

not govern the sufficiency of MCOs' payments to providers under

managed care contracts.  See Order (1) Granting the Fed. Defs.'

Mot. for Summ. J. and the Joinders Therein, (2) Denying Pls.'

Mot. for Summ. J. Against the Fed. Defs. Based on the Unlawful

Issuance of a Waiver and Approvals of Managed Care Contracts, and

(3) Denying Pls.' Mot. for Summ. J. Against the Fed. Defs. Based

on Unlawful Premium Tax Reimbursement, filed 12/23/09, at

37-41.[18/]  The Court explained that the adequacy of payment levels

in the managed care context is instead assured by the Medicaid

Act's requirements that capitation rates be actuarially sound and

_____

[18/] While the statute does not govern provider payments in
the managed care context, the State DHS has decided to require
that the QExA Contractors pay providers, at minimum, at rates
comparable to the fee-for-service rates that were in place at the
time the contracts were awarded.  AR 4242.

that MCOs have sufficient provider networks.  Id.  Accordingly, the Court will grant the State Defendants' motion for summary judgment, and the joinders therein, as to the claim that the QExA Contractors' payment rates to providers violate 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204 set forth in Count VIII of the State Second Amended Complaint.

## III. Count IX of the State Second Amended Complaint:  Unlawful Taking

In Count IX of the State Second Amended Complaint, the Provider Plaintiffs contend that the State Defendants effected a taking in violation of the Fifth Amendment.  Their theory is that, by reducing the reimbursement rates and by failing to pay pharmacists' claims on the basis that the claims were untimely, the State Defendants have taken property (in the form of losses) from the Provider Plaintiffs and transferred it to the QExA Contractors without a public use or public purpose.  St. 2d Am. Compl. ¶¶ 88, 130.  The Provider Plaintiffs request declaratory and injunctive relief.  Id. ¶ 134.  In their prayer for relief, the Provider Plaintiffs ask for compensatory damages.  St. 2d Am. Compl. Prayer ¶ G.

## A.    Eleventh Amendment Immunity

In their multi-count motion for summary judgment, the State Defendants first argue that just compensation would be the relief for Plaintiffs' Takings Clause claim and that such relief is necessarily monetary.   St. Defs.' Multi-count MSJ Mem. 26. On that basis, they contend that the Eleventh Amendment bars the takings claim.   Id.   In their opposition, the Provider Plaintiffs contend that their takings claims are not barred by the Eleventh Amendment because they have no adequate remedy at state law to recover property that was taken from them "clearly for public use, without just compensation."   Pls.' Opp'n to St. Defs.' Multi-count MSJ 37.

"The Eleventh Amendment has been authoritatively construed to deprive federal courts of jurisdiction over suits by private parties against unconsenting States."   Seven Up Pete Venture v. Schweitzer, 523 F.3d 948, 952 (9th Cir. 2008).   "This jurisdictional bar remains effective, if a bit less absolute, in cases like this where state officials, instead of the State itself, are the subjects of suit."   Id.   Under Ex Parte Young, 209 U.S. 123 (1908), if "the plaintiffs seek prospective injunctive relief against the state official for a violation of federal law, the Eleventh Amendment does not bar the action." Seven Up Pete Venture, 523 F.3d at 953.   "'The doctrine of Ex parte Young is based on the idea that the power of federal courts

to enjoin continuing violations of federal law is necessary to vindicate the federal interest in assuring the supremacy of that law.'" Fond du Lac Band of Chippewa Indians v. Carlson, 68 F.3d 253, 255 (8th Cir. 1995).

"'In determining whether the doctrine of Ex parte Young avoids an Eleventh Amendment bar to suit, a court need conduct only a straightforward inquiry into whether the complaint 1) alleges an ongoing violation of federal law and 2) seeks relief properly characterized as prospective.'" Seven Up Pete Venture, 523 F.3d at 956 (quoting Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002)) (brackets omitted); see also Fond du Lac Band of Chippewa Indians, 68 F.3d at 255 ("Ex parte Young recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law."). Traditional monetary damages are the "quintessential form of retrospective relief." Seven Up Pete Venture, 532 F.3d at 956; see also Nelson v. Miller, 170 F.3d 641, 646 (6th Cir. 1999) ("When the relief sought is 'retroactive,' it usually takes the form of money damages . . . .").

The Fifth and Fourteenth Amendments prohibit states from taking private property for "public use" without "just compensation." U.S. Const. amend. V; Macri v. King County, 126 F.3d 1125, 1129 (9th Cir. 1997) (noting that "the Fifth

52

Amendment's Takings Clause applies to the states through the
Fourteenth Amendment").  "[A] claim for damages for the
unconstitutional denial of just compensation under the Fifth
Amendment cannot qualify as available prospective relief under <u>Ex
parte Young</u>, and is therefore barred by the Eleventh Amendment."
<u>Suever v. Connell</u>, 579 F.3d 1047, 1059 (9th Cir. 2009)
(discussing the holding in <u>Seven Up Pete Venture</u>); <u>see also</u> <u>Seven
Up Pete Venture</u>, 523 F.3d at 956 (holding that "the Eleventh
Amendment bars reverse condemnation actions brought in federal
court against state officials in their official capacities").  "A
remedy for past injury, even if it purports to be an injunction
against state officers requiring the future payment of money, is
barred because relief 'inevitably comes from the general revenues
of the State, and thus resembles far more closely a monetary
award against the State itself,' which is forbidden under the
Eleventh Amendment."  <u>Seven Up Pete Venture</u>, 523 F.3d at 956
(quoting <u>Edelman v. Jordan</u>, 415 U.S. 651, 665 (1974)) (brackets
and ellipses omitted).  The proper forum for such a claim is in
state court.  <u>See</u> <u>id.</u> at 954-55 (observing that "state courts
must . . . be available to adjudicate claims brought under the
federal Takings Clause," and that "this constitutionally enforced
remedy against the States in state courts can comfortably
co-exist with the Eleventh Amendment immunity of the States from
similar actions in federal court"); <u>DLX, Inc. v. Kentucky</u>, 381

53

F.3d 511, 527 (6th Cir. 2004) (noting that "the Fifth Amendment's requirement of just compensation forces the states to provide a judicial remedy in their own courts").

In this case, the Provider Plaintiffs' takings claims in connection with the State DHS's alleged reduction of reimbursement rates and failure to pay pharmacists are not phrased in Count IX in terms of "just compensation." However, in their prayer for relief, they explicitly ask for compensatory damages. See St. 2d Am. Compl. Prayer ¶ G.  Moreover, they expressly make a request for just compensation in their opposition to the State Defendants multi-count motion for summary judgment.  Pls.' Opp'n to St. Defs.' Multi-count MSJ 37-38.  "The applicability of the Ex parte Young exception turns on whether federal takings actions are properly characterized as seeking prospective or retrospective relief."  Seven Up Pete Venture, 523 F.3d at 956.  The Provider Plaintiffs do not explain what injunctive relief they request in connection with their takings claims, much less how such relief would be prospective in character.  See St. 2d Am. Compl. ¶ 134; see also St. 2d Am. Compl. Prayer ¶¶ A-I.  In view of the arguments they make in their opposition to the State Defendants' multi-count motion for summary judgment, the Provider Plaintiffs are likely seeking an injunction requiring the State DHS to increase providers' reimbursement rates and pay for the pharmacists' claims.  See

54

Pls.' Opp'n to St. Defs.' Multi-count MSJ 37-38.  As noted earlier, such a remedy "is barred because relief 'inevitably comes from the general revenues of the State, and thus resembles far more closely a monetary award against the State itself,' which is forbidden under the Eleventh Amendment."  See Seven Up Pete Venture, 523 F.3d at 956 (quoting Edelman, 415 U.S. at 665) (brackets and ellipses omitted).  The proper forum for the Provider Plaintiffs' takings claim is in state court.  See id. at 954-55.

### B.    Reduction in Rates and Voluntary Participation

In addition, even if the Provider Plaintiffs' takings claim as to the reduction in reimbursement rates could be characterized as seeking prospective injunctive relief, the claim would fail as a matter of law because the Provider Plaintiffs' participation in the QExA Program is voluntary.  "A property owner must be legally compelled to engaged in price-regulated activity for regulations to give rise to a taking."  Garelick v. Sullivan, 987 F.2d 913, 916 (2d Cir. 1993).  "[W]here a service provider voluntarily participates in a price-regulated program or activity, there is no legal compulsion to provide service and thus there can be no taking."  Id.; see also Franklin Mem'l Hosp. v. Harvey, 575 F.3d 121, 129 (1st Cir. 2009) ("[W]here a property owner voluntarily participates in a regulated activity, there can be no unconstitutional taking.").

55

Here, the Provider Plaintiffs' are not compelled to participate in the QExA Program.  Their decision to contract with the QExA Contractors and participate in their plans is voluntary.  As such, the reduction in reimbursement rates did not effect a taking.  See Garelick, 987 F.2d at 917 (finding that no taking resulted from Medicare price regulations applicable to anesthesiologists because, while the regulations limited how much the anesthesiologists could charge, provider participation in Medicare is voluntary); Franklin Mem'l Hosp., 575 F.3d at 130 (holding that the hospital's "participation in [the state Medicaid program] is voluntary and reject[ing] its takings challenge on that basis").[19]

---

[19] In addition, Plaintiffs have suggested that, by reducing reimbursement rates, the State Defendants have taken property (in the form of losses) from the Provider Plaintiffs and transferred it to the QExA Contractors.  St. 2d Am. Compl. ¶¶ 88, 130. However, the State Defendants have explained that the rate reduction resulted from the fact that a one-time legislative appropriation of funds to raise Medicaid rates across the board, for both the fee-for-service and managed care systems, was exhausted.  St. Defs.' Multi-count MSJ Mem. CSF, Decl. of Kenneth Fink, M.D., ¶¶ 17-24.  The State Defendants note that, when reimbursement rates were reduced, the amount that the QExA Contractors were paid through capitation rates were similarly reduced.  Id.  Thus, as a factual matter, there was no transfer of property by virtue of the reduction in provider rates.

### C.   Decision Regarding Takings Claims

Accordingly, the Court will grant the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count IX of the State Second Amended Complaint.

## IV.   Counts I through IV of the State Second Amended Complaint: Solvency Claims

42 U.S.C. § 1396u-2(a)(3) provides that "[a] State must permit an individual to choose a managed care entity from not less than two such entities that meet the applicable requirements of this section, and of [42 U.S.C. § 1396b](m)."  In order to qualify as an MCO, an organization must (1) make "adequate provision against the risk of insolvency, which provision is satisfactory to the State," (2) meet "solvency standards established by the State for private health maintenance organizations or [be] licensed or certified by the State as a risk-bearing entity," and (3) assure "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency."  42 U.S.C. §§ 1396b(m)(1)(A)(ii), (C)(i); see also 42 C.F.R. §§ 438.106, 438.116.

In Counts I through IV of the State Second Amended Complaint, Plaintiffs contend that the QExA Contractors failed to meet these requirements and thus do not qualify as MCOs.  See St. 2d Am. Compl. ¶¶ 92, 98, 102.  The State Defendants and

Plaintiffs seek summary judgment as to these claims.[20/]  Before addressing the motions, the Court will first examine the facts underlying the solvency claims.

### A.    Factual Background on the Solvency Claims

#### 1.    The RFP

On October 10, 2007, the State DHS issued an RFP to procure the services of two managed care organizations that would be responsible for providing all of the Medicaid care for ABD beneficiaries as part of the QExA Program.  AR 3942.  The RFP, which was as amended incorporated into the QExA Contracts, includes a number of requirements regarding solvency and provider networks that are pertinent to the solvency claims.  Id. at 3953.

##### a.    Networks

With respect to the basic framework of the QExA Program, RFP § 40.100 provides that "QExA is a managed care program and, as such, all acute, pharmacy and long-term care services to members shall be provided in a managed care system." Id. at 4027.  It further directs that "[t]he health plan shall develop and maintain a provider network capable of providing the required individualized health services needed by the members." Id.

---

[20/] In the State Second Amended Complaint, Plaintiffs also challenge the CMS's determinations as to solvency issues.  The Court will address the CMS's role in determining the QExA Contractors' solvency in a separate order on the motions for summary judgment in the action against the Federal Defendants.

RFP § 40.210 provides in relevant part that:

The health plan shall develop and maintain a provider network that is sufficient to ensure that all medically necessary covered services are accessible and available. . . .

If the health plan's network is unable to provide medically necessary covered services to a particular member within its network or on the island of residence, the health plan shall adequately and timely provide these services out-of-network or transport the member to another island to access the service(s) for as long as it is unable to provide them on the island of residence.

Id. at 4028.  The RFP does not require the health plan to furnish the required care directly to members through its own facilities or employees.  In addition, the RFP directs that QExA members must have the ability to select their primary care providers within the contracted networks of providers.  Id. at 4037, 4039–40, 4054–55, 4140.

### b.   Solvency

On the issue of solvency, RFP § 71.800 requires each plan to "warrant[] that it is of sufficient financial solvency to assure the DHS of its ability to perform the requirements of the contract," "provide sufficient financial data and information to prove its financial solvency," and "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii."  Id. at 4271.  In addition, RFP § 40.100 requires each plan to be "properly licensed as a health plan in

the State of Hawaii (See Chapters 431, and 432, and 432D, HRS),"
and "meet the requirements of [42 U.S.C. § 1396b(m)]."  Id.
at 4027.

Apart from meeting licensing requirements, a health
plan must post a performance bond.  Specifically, RFP § 71.500
provides that:

> The health plan shall obtain a performance
> bond issued by a reputable surety company
> authorized to do business in the State of
> Hawaii in the amount of one-million dollars
> ($1,000,000) or more, conditioned upon the
> prompt, proper, and efficient performance of
> the contract, and shall submit same to the
> DHS prior to or at the time of the execution
> of the contract.  The performance bond shall
> be liable to forfeit by the health plan in
> the event the health plan is unable to
> properly, promptly and efficiently perform
> the contract terms and conditions or the
> contract is terminated by default or
> bankruptcy of the health plan.
>
> The amount of the performance bond shall be
> adjusted at the time members begin enrolling
> in the plan.  At that time, the amount of the
> performance bond shall approximate eighty
> percent (80%) of one month's capitation
> payments.

Id. at 4269.

Lastly, RFP § 72.130 provides that "[m]embers shall not
be liable for the debts of the health plan," and that, "in the
event of insolvency of the health plan, members may not be held
liable for the covered services provided to the member, for which
the State does not pay the health plan."  Id. at 4274, 4541–42,
4576–77.

RFP § 80.230 requires that an applicant for a QExA

Contract must submit:

> Proof of its license to serve as health plan
> in the State of Hawaii.  A letter from the
> Insurance Division notifying the health plan
> of its license will be acceptable "proof."
> If the applicant does not have a Hawaii
> license, the applicant shall (1) include a
> copy of its filed application to operate as a
> health plan in the State of Hawaii, (2)
> include an update of the status of its
> application, (3) provide monthly status
> reports on the status of its application (if
> awarded a contract) on the dates identified
> in Section 51.600 and (4) provide proof of
> its license to serve as a health plan [(]if
> awarded a contract) in the State of Hawaii by
> the date identified in Section 51.600.

Id. at 4286.  Applications for a contract under the RFP were due

by December 7, 2007.  Id. at 3957.  RFP § 51.600 required that

proof of license be submitted by May 15, 2008.  Id. at 4234.

During the procurement process, on November 15, 2007,

the State DHS indicated, in a question-and-answer statement, that

it was asked whether the QExA Program could be operated under an

indemnity license issued pursuant to HRS ch. 431.  Pls.' Solvency

MSJ CSF, Ex. 1.  The State DHS responded that:

> The DHS cannot advise a health plan as to the
> legal requirements for operating as a health
> plan in the state of Hawaii.  It is the
> responsibility of the health plan to comply
> with applicable legal requirements related to
> the provision of health plan services in the
> State of Hawaii, including applicable
> provisions of HRS chapters 431, 432 and/or
> 432D, and ensuring that it is appropriately
> established and structured to provide the
> specific services identified in the RFP.

> Licensure of health plans in the State of
> Hawaii is administered by the State of
> Hawaii, Department of Commerce and Consumer
> Affairs, Insurance Division.

Id.

### 2. Evercare's Correspondence with the Insurance Division Regarding its Indemnity License

Evercare has at all relevant times had an accident and health insurance license issued pursuant to HRS § 431:10A. Pls.' Solvency MSJ CSF, Ex. 3. In October and November of 2007, Evercare corresponded with the Insurance Division as to whether the accident and health insurance license that it held was sufficient to perform under a QExA Contract, which requires that the contractor utilize a "closed panel" model of care, under which enrollee's care must be obtained from a contracted network of providers if it is available within the network. See Pls.' Solvency MSJ CSF, Exs. 2-5. The Insurance Division initially interpreted HRS § 431:10A-205(b) as prohibiting an accident and health insurer from operating a closed panel plan. Pls.' Solvency MSJ CSF, Ex. 3. The statute provides that:

> Any group or blanket disability policy may
> provide that all or any portion of any
> indemnities provided by the policy on account
> of hospital, nursing, medical, or surgical
> services may, at the insurer's option, be
> paid directly to the hospital or person
> rendering such services, but the policy may
> not require that the service be rendered by a
> particular hospital or person. Payment so
> made shall discharge the insurer's obligation
> with respect to the amount so paid.

HRS § 431:10A-205(b).

However, by letter dated November 13, 2007, the
Insurance Division reversed its interpretation of the statute,
concluding that "the statute does not prohibit offering a closed
panel HMO product for Medicaid-Quest under the accident and
health insurance license." Pls.' Solvency MSJ CSF, Ex. 5.  By
letter dated November 16, 2007, the Insurance Division issued a
disclaimer as to its interpretation, apparently pursuant to
Hawai'i Administrative Rules ("HAR") § 16-201-90, which requires
disclaimers when informal interpretations are issued.  See HAR
§ 16-201-90 ("The board or commission or executive secretary
shall notify the requester of the informal interpretation in
writing and shall state that the interpretation is for
informational and explanatory purposes only and is not an
official opinion or decision, and that it therefore is not to be
viewed as binding on the board, commission, or department.").
The disclaimer read that:

> The response in the November 13, 2007 letter
> is based upon the information and/or
> documentation provided by you and is
> informational in nature.  Nothing contained
> therein may be construed by you, your
> organization or company, or your client as an
> opinion, endorsement, or recommendation by
> the Insurance Division of your
> organization's, company's, or client's
> position, performance, or action.  The
> response is limited to the applicability of
> Hawaii insurance laws and rules upon the
> information and/or documentation provided by

63

you and does not address the applicability of
other Hawaii laws and rules.

Pls.' Solvency MSJ CSF, Ex. 6.

> **3.    WellCare Inc.'s Correspondence with the Insurance
> Division Regarding WellCare of Arizona's Accident
> and Health Insurance License**

During the procurement process, Ohana was a separate
entity from WellCare of Arizona.  However, both were subsidiaries
of WellCare Inc.  Pls.' Solvency MSJ CSF, Exs. 9, 12.  WellCare
of Arizona held an accident and health insurance license under
HRS ch. 431A.  <u>Id.</u>

By e-mail dated November 13, 2007, the Insurance
Division informed WellCare Inc. that, pursuant to the directive
of the Insurance Commissioner, the division had "decided to
change [its] interpretation to allow the writing of a closed
panel HMO product under the accident and health license."  Pls.'
Solvency MSJ CSF, Ex. 7.

By e-mail dated November 14, 2007, WellCare Inc. stated
that:

> As I indicated previously, the Department of
> Human Services RFP requires that each
> applicant "be properly licensed as a health
> plan in the State of Hawaii (See Chapters
> 431, 432, and 432D, HRS)."
>
> Just to confirm, is it your understanding
> that: (a) our life & health company . . .
> would qualify under this requirement, and (b)
> pursuant to your 10A interpretation . . . ,
> be able to offer closed-network managed care
> services under the license?

Pls.' Solvency MSJ CSF, Ex. 8.

> The same day, the Insurance Division responded that:

>> Your life and health licensed company would
>> be a properly licensed health plan under
>> chapter 431, HRS.  Our interpretation is that
>> closed network managed care services can be
>> offered under this license.  Now, the fact
>> that we make this interpretation does not
>> mean that a court could not reach a different
>> result if someone challenged it.  However, we
>> believe that HRS section 431:10A-205(b) was
>> not originally enacted to prohibit closed
>> panel plans because the statute predates
>> those types of plans.  That said, I cannot
>> say that there is no question about the
>> statute, so the decision whether to form an
>> HMO has to rest with you.

Pls.' Solvency MSJ CSF, Ex. 8.

### 4.    Ohana's HMO License Application

On or about November 30, 2007, Ohana applied for an HMO license, apparently in light of the uncertainty surrounding whether an accident and health insurance license would enable an entity to write a closed panel plan.  Pls.' Solvency MSJ CSF, Ex. 9.  In the application, Ohana noted it had a $0 net worth because it was a newly-formed entity.  Id.

### 5.    QExA Contracts

On February 1, 2008, the State DHS awarded the QExA Contracts to Evercare and Ohana.  St. Defs.' Licensure MSJ CSF ¶ 9.  The State DHS signed the contracts with them on February 4, 2008.  Id.

65

6.   **The Denial of Ohana's HMO License Application and Ohana's Merger into WellCare of Arizona**

On April 7, 2008, the State Insurance Commissioner informed Ohana that its HMO license application was denied, explaining that:

> [O]ur financial examiner has come out negatively on the Ohana financial projections and this form [sic] the basis for the denial. Although we appreciated your willingness to consider providing a parent guarantee and additional cash, the fact that you are not able to submit 2007 parent financial statements leaves us with significant uncertainty regarding the level of assurance that a parent guarantee would provide or what deposit amounts would be appropriate.  Even that aside, our basic diligence would normally include a review of the parent company's financial statements.

Pls.' Solvency MSJ CSF, Ex. 11.

In response, by letter dated April 23, 2008, Ohana's parent company, WellCare Inc., stated that:

> This letter is a follow-up to our phone conversation of April 22, 2008.  During that call, you indicated that Hawaii Revised Statutes section 431:10a-205(b) has been interpreted by the Insurance Commissioner to allow the writing of a closed panel HMO product under an indemnity license.

> As you know, 'Ohana Health Plan, Inc., a subsidiary of WellCare [Inc.], was awarded a contract to provide coverage to QExA beneficiaries.  Although 'Ohana has applied for an HMO Certificate of Authority, you indicated that the interpretation above would allow WellCare [Inc.] to write the QExA business through one of its currently-licensed indemnity companies.

> WellCare [Inc.] has two indemnity
> insurance companies licensed in the State of
> Hawaii—WellCare Health Insurance of Arizona,
> Inc. (COA # 106401) and WellCare Health
> Insurance of Illinois, Inc. (COA # 100477).
> See attached copies of Certificates of
> Authority.
>
> In order to move forward implementing
> the QExA business, can you confirm in writing
> that, based on the interpretation of HRS §
> 431:10a-205(b), WellCare [Inc.] can write the
> QExA business through an indemnity company?
> Also, based on the attached licenses, can
> either WellCare subsidiary write the QExA
> business or is one or the other required?

Pls.' Solvency MSJ CSF, Ex. 12 at 1.  The licenses attached to

the letter reflected that WellCare of Arizona had an accident and

health insurance license and that WellCare Health Insurance of

Illinois, Inc., held a life insurance license.  Id. at 2-3.

By letter dated April 24, 2008, the Insurance Division

responded that:

> Insurance Commissioner J.P. Schmidt has taken
> the position that an accident and health or
> sickness insurer under HRS article 431:10A or
> a mutual benefit society under HRS chapter
> 432 can write an HMO product.  Therefore, it
> is our position that WellCare Health
> Insurance of Arizona, Inc. could write QUEST
> HMO product business under its existing
> license.  WellCare Health Insurance of
> Illinois, Inc. is a different story because
> it appears to be authorized only to write
> life.
>
> The matter is not free from doubt,
> however, due to language contained in HRS
> section 431:10A-205(b) and HRS section
> 432D-2(a).  We think there are good arguments
> that the language in these sections does not
> prohibit the writing of an HMO product under

67

another type of license. That said, you
should undertake your own evaluation of the
issues and risks.

This response is based upon the
information and/or documentation provided by
you and is informational in nature.  Nothing
contained herein may be construed by you,
your organization or company, or your client
as an opinion, endorsement, or recommendation
by the Insurance Division of your
organization's, company's, or client's
position, performance, or action.  The
response is limited to the applicability of
Hawaii insurance laws and rules upon the
information and/or documentation provided by
you and does not address the applicability of
other Hawaii laws and rules.

Pls.' Solvency MSJ CSF, Ex. 13.

On May 15, 2008, Ohana was merged into WellCare of

Arizona.  AR 2065-68; St. Defs.' Licensure MSJ CSF ¶ 9.  At that

point, the QExA Contract that was held by Ohana was assumed by

WellCare of Arizona.  St. Defs.' Licensure MSJ CSF ¶ 9.

### 7.    The QExA Contractors' Performance Bonds

On January 16, 2009, a performance bond was issued in

the amount of $14,000,000, naming Evercare as the principal and

State DHS as the obligee.  St. Defs.' Licensure MSJ CSF ¶ 20.  On

February 21, 2009, a performance bond was issued in the amount of

$14,600,000, naming WellCare of Arizona as the principal and the

State DHS as the obligee.  Id. ¶ 21.  These bonds were obtained

pursuant to RFP § 71.500.

**B.   Whether the QExA Contractors Meet the Three Solvency Standards Under the Medicaid Act**

Against this backdrop, the Court will now consider the parties' contentions as to whether the QExA Contractors meet the three solvency standards under the Medicaid Act.  In Plaintiffs' solvency motion for summary judgment, they assert that WellCare of Arizona fails to meet the first solvency standard and that both contractors do not meet the second and third standards.  In the State Defendants' licensure motion for summary judgment, they only seek summary judgment as to the second standard (licensure).

**1.   Adequate Provision Against the Risk of Insolvency, Which Provision is Satisfactory to the State**

The first solvency standard is that an organization must make "adequate provision against the risk of insolvency, which provision is satisfactory to the State."  42 U.S.C. § 1396b(m)(1)(A)(ii).  This standard is implemented in the QExA Program through RFP § 71.800, which requires each QExA Contractor to "warrant[] that it is of sufficient financial solvency to assure the DHS of its ability to perform the requirements of the contract," "provide sufficient financial data and information to prove its financial solvency," and "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii."  AR 4271.

69

In their solvency motion for summary judgment,
Plaintiffs contend that, when Ohana was awarded a QExA Contract,
it did not meet the first solvency requirement because, at the
time, it had a $0 net worth, as reflected on its HMO application,
and that its provision against insolvency was not satisfactory to
the state.  Pls.' Solvency MSJ Mem. 9.[21/]  However, the question

---

[21/] Plaintiffs also argue that, because of its $0 net worth,
Ohana's application for a QExA Contract should have been rejected
by the State DHS pursuant to RFP § 21.400.  AR 3969 (RFP
§ 21.400) ("An application shall be disqualified and the proposal
automatically rejected for any one or more of the following
reasons:  . . . An application's lack of financial stability and
viability . . . .").  That issue perhaps at one point presented a
question under state law.  See id. at 3973 (RFP § 22.200)
(setting forth the procedure for protesting a contract award);
HRS § 103F-501(a) ("A person who is aggrieved by an award of a
contract may protest a purchasing agency's failure to follow
procedures established by this chapter, rules adopted by the
policy board, or a request for proposals in selecting a provider
and awarding a purchase of health and human services contract,
provided the contract was awarded under section 103F-402 or
103F-403.").

However, Plaintiffs have not shown that the issue gives rise
to a violation of the Medicaid Act.  Their argument is similar to
one they made before.  The Court previously dismissed Plaintiffs'
claim that the QExA Contracts are void ab inito because the QExA
Contractors did not qualify as MCOs at the time the contracts
were entered into.  G., 2009 U.S. Dist. LEXIS 39851, at *80-*86.
The Medicaid provision that Plaintiffs relied upon, 42 U.S.C.
§ 1396b(m)(2)(A), directs that, if a managed-care contract or
entity fails to meet, among other things, solvency standards, the
state cannot receive payment from the federal government for
services rendered by the entity.  See G., 2009 U.S. Dist. LEXIS
39851, at *84-*85 (citing 42 U.S.C. §§ 1396b(m)(2)(A)(i), (xii)).
The Court found that the provision does not declare it illegal
for the state to simply enter into a managed-care contract with
an entity that fails to meet those standards.  Id. at *85.  The
Court noted that the provision instead prohibits the payment of
federal financial participation to a state for services rendered
by such an entity, unless and until the entity meets the solvency
(continued...)

of whether Ohana met the first solvency standard is irrelevant. After Ohana was awarded a QExA Contract, but before the contract was approved by the CMS, in May of 2008, Ohana was merged into WellCare of Arizona, which assumed the contract.  AR 2059-68; St. Defs.' Licensure MSJ CSF ¶ 9.  Thus, WellCare of Arizona is the entity that should be analyzed in considering the first solvency standard.  WellCare of Arizona held, and still holds, an accident and health insurance license under HRS ch. 431A.

The financial condition of accident and health insurers is highly regulated under Hawai'i statutory law.  Accident and health insurers are required to maintain $450,000 on deposit at all times, which is greater than the $300,000 deposit required of HMOs.  HRS §§ 431:3-205, 432D-8(b).  Accident and health insurers incorporated outside the State of Hawai'i (such as WellCare of Arizona and Evercare) are required to maintain additional deposits in an amount not less than $500,000.  Id. § 431:3-209. In addition, HRS § 431:5-201 provides specific requirements with respect to the assets and liabilities of an insurer.  Accident and health insurers are also required to maintain an "unearned premium reserve on all policies in force."  Id. § 431:5-301(a). The "unearned premium reserve" means the portion of the gross

---

[21]/(...continued)
standards (and, of course, otherwise meets the requirements for MCOs).  Id.  Thus, what matters is that the entity meets solvency standards before the CMS approves the entity's contract with the state.

premiums in force, less authorized reinsurance.  <u>Id.</u>

§ 431:5-301(b).  Moreover,

> [i]f the commissioner determines that an
> insurer's unearned premium reserves, however
> computed, are inadequate, the commissioner
> may require the insurer to compute such
> reserves or any part thereof according to
> such other method or methods as are
> prescribed in this code.

<u>Id.</u> § 431:5-305(a).[22/]  Apart from being required to meet these

state solvency provisions in connection with its accident and

health insurance license, WellCare of Arizona has posted a

performance bond of $14.6 million pursuant to RFP § 71.500.  St.

Defs.' Licensure MSJ CSF ¶ 21.  This bond provides security

against the risk of insolvency.[23/]

---

[22/] At the hearing on the motions for summary judgment, the
Court asked Plaintiffs if there is any factual dispute as to
whether the QExA Contractors meet the state-law solvency
standards for accident and health insurers.  12/14/09 p.m. Tr.
18:24–19:4 (rough draft of transcript).  They initially conceded
that they had no basis to dispute whether the contractors meet
state solvency standards for accident and health insurers.  <u>Id.</u>
at 19:5–14.  However, they later argued that, according to their
proffered expert, Vernon E. Leverty, the "Insurance Commissioner,
looking at WellCare [of Arizona], should say or should be saying
that it doesn't meet the solvency requirements, for the fact that
it hasn't—its financial condition has been declining over the
last several years, and, in particular, since it started into the
Quest program."  <u>Id.</u> at 59:12–16.  In his report, Leverty
indicates that WellCare of Arizona has failed to file audited
financial statements with the State Insurance Commissioner, as
required by HRS § 431:3-302.5.  Pls.' Mot. for Summ. J. Against
Fed. Defs. Based on the Unlawful issuance of a Waiver and
Approvals of Managed Care Contracts CSF, Ex. 33 at 15.  The Court
expresses no opinion as to that matter at this time.

[23/] Plaintiffs do not contend that Evercare failed to make an
(continued...)

Viewing the evidence in the light most favorable to the State Defendants, the Court finds that there are genuine issues of material fact as to whether WellCare of Arizona meets state solvency standards for accident and health insurers and thus whether it has made an adequate provision against insolvency, which provision is satisfactory to the state, as required by 42 U.S.C. § 1396b(m)(1)(A).  The Court will therefore deny Plaintiffs' solvency motion for summary judgment as to the first solvency standard.

### 2. Licensed or Certified by the State as a Risk-Bearing Entity

The second solvency standard is that an organization must meet "solvency standards established by the State for private health maintenance organizations or [be] licensed or certified by the State as a risk-bearing entity."  42 U.S.C.

---

[23]/(...continued)
adequate provision against insolvency that is satisfactory to the state in their solvency motion for summary judgment.  See Pls.' Solvency MSJ Mem. 7-10.  Like WellCare of Arizona, Evercare has an accident and health insurance license and has obtained a performance bond of $14 million pursuant to RFP § 71.500.  St. Defs.' Licensure MSJ CSF ¶¶ 10, 20.

At a September 4, 2009, status conference, Evercare's counsel represented that the company's net worth is "millions of dollars," and that the company is "extraordinarily well-capitalized."  9/4/09 Tr. 25:14-21 (Evercare's counsel). Similarly, WellCare of Arizona's counsel represented that WellCare of Arizona's net worth "is in the millions," and that the company is "very solvent" and "very well-capitalized."  Id. at 27:14-22 (WellCare of Arizona's counsel).  The Court notes that it has yet to receive any financial documentation supporting these representations.

§ 1396b(m)(1)(C)(i).  With respect to this requirement, RFP § 40.100 requires each QExA Contractor to be "properly licensed as a health plan in the State of Hawaii (See Chapters 431, and 432, and 432D, HRS)."  AR 4027.

Throughout this case, the State Defendants have not claimed that the QExA Contractors meet Hawaii's solvency requirements for private health maintenance organizations, which are set forth in HRS § 432D-8.  Thus, the issue in the State Defendants' licensure motion for summary judgment and Plaintiffs' solvency motion for summary judgment narrows to whether the QExA Contractors are "licensed or certified by the State as a risk-bearing entity," such that they may perform the services required under the QExA Contracts.  See 42 U.S.C. § 1396b(m)(1)(C)(i). The contractors have accident and health insurance licenses.  The question is accordingly whether those licenses are sufficient to perform the services called for by the QExA Contracts.

### a. The Insurance Commissioner's Administrative Decision

The State Insurance Commissioner answered this question in the affirmative in a recent administrative ruling, which is presently on appeal in state circuit court.  In re AlohaCare, No. IC-08-142, Insurance Commissioner's Decision, Findings of Fact, Conclusions of Law and Order ("IC's Decision") 2 (Jun. 2, 2009).  The case was brought by AlohaCare, an unsuccessful applicant for a QExA Contract.  Id. at 6.  AlohaCare sought a

74

declaration that neither Evercare nor WellCare of Arizona are properly licensed to perform the services required under the QExA Contracts. Id. at 2. It also requested that the Insurance Commissioner invalidate the contracts between the State DHS and the QExA Contractors. Id. at 7. The Insurance Commissioner denied this request because he concluded that the validity of the contracts was beyond his jurisdiction, as they were not contracts of insurance. Id.

With respect to AlohaCare's first request for declaratory relief as to the propriety of the QExA Contractors' licensure, the Insurance Commissioner observed that both contractors were licensed as risk-bearing entities by the State of Hawai'i, insofar as they both hold accident and health insurance licenses, but that they did not hold HMO licenses. Id. at 4, 8. He explained that the question was whether the accident and health insurance licenses were sufficient to perform the services required under the QExA Contracts or whether HMO licenses under HRS ch. 432D were required. Id. at 8, 11. In reviewing the contracts, the Insurance Commissioner observed that they contemplate the use of a "closed panel" plan, "meaning that care must be obtained from the contracted network of providers if it is available within the network." Id. at 4. However, he also observed that the QExA RFP does not require the managed care

75

program to furnish the required care "directly to members or by a network of providers employed by the health plan." Id. at 6.

After ascertaining the nature of the services required by the QExA Contracts, the Insurance Commissioner reviewed the relevant insurance statutes, namely, HRS chs. 431, 432D, and 432E, all of which were within his jurisdiction. Id. at 8. The Insurance Commissioner discussed these statutes as follows: HRS ch. 431 defines insurance as "a contract whereby one party undertakes to indemnify another or pay a specified amount upon determinable contingencies." HRS § 431:1-201. Under this general definition, there are several classes of insurance, one of which is accident and health and sickness insurance. Accident and health insurance, as defined in HRS § 431:1-205, is "insurance against bodily injury, disablement, or death by accident, or accidental means, or the expense thereof; against disablement or expense resulting from sickness; and every insurance appertaining thereto, including health and medical insurance."

> HRS § 432E-l defines a "managed care plan" to mean
>
> any plan, regardless of form, offered or administered by any person or entity, including but not limited to an insurer governed by chapter 431, a mutual benefit society governed by chapter 432, a health maintenance organization governed by chapter 432D, a preferred provider organization, a point of service organization, a health insurance issuer, a fiscal intermediary, a payor, a prepaid health care plan, and any

other mixed model, that provides for the
financing or delivery of health care services
or benefits to enrollees through:

   (1) Arrangements with selected providers or
provider networks to furnish health care
services or benefits; and

   (2) Financial incentives for enrollees to
use participating providers and procedures
provided by a plan;

provided, that for the purposes of this
chapter, an employee benefit plan shall not
be deemed a managed care plan with respect to
any provision of this chapter or to any
requirement or rule imposed or permitted by
this chapter which is superseded or preempted
by federal law.

Id. § 432E-1.

     HRS § 432D-1 defines a "health maintenance

organization" to mean "any person that undertakes to provide or

arrange for the delivery of basic health care services to

enrollees on a prepaid basis, except for enrollee responsibility

for copayments, deductibles, or both."  HRS § 432D-2(a) provides

that "[n]o person shall establish or operate a health maintenance

organization in this State without obtaining a certificate of

authority under this chapter."  There is no definition of what it

means to "operate a health maintenance organization" in HRS

ch. 432D.  Nor is there any definition of "HMO activities" or

"HMO product."

     The Insurance Commissioner interpreted the phrase

"operate a health maintenance organization," as it is used in HRS

§ 432D-2(a), to mean "engaging in activities which only an HMO is authorized to do." <u>AlohaCare</u>, IC's Decision 9.   He reasoned that, "[i]f a risk bearing entity licensed by the Insurance Division under a statute other than HRS Chapter 432D is authorized to engage in the activities it has undertaken by the statute pursuant to which it is licensed, it is not by virtue of its engaging in permitted activities, 'operat[ing] a health maintenance organization' within the prohibition of HRS § 432D-2(a)." <u>Id.</u>   In addition, the Insurance Commissioner emphasized that "[t]he definition of a 'managed care plan' in HRS § 432E-1 encompasses all types of plans that provide for the financing or delivery of health care services that meet the criteria of that section, including HMOs licensed under HRS Chapter 432D and risk bearing entities licensed under HRS Chapter 431:10A." <u>Id.</u>

> The Insurance Commissioner further explained that:
>
> There is substantial overlap between the powers granted to health maintenance organizations under HRS Chapter 432D and entities licensed under HRS Chapter 431:10A. The key distinction is that HMOs are the only licensed entities that may furnish health care directly to their members through facilities that it owns or operates and utilizing the services of physicians employed by the HMO and require that coverage is only provided when a member either utilizes its facilities and providers or is specifically authorized by its providers to utilize outside facilities or providers.  An entity licensed as an HMO is not limited to furnishing care directly to its members

> through its owned facilities and employed
> providers, but it is authorized to do so.
> That authorization distinguishes entities
> licensed as HMOs from other risk-bearing
> entities licensed by the Insurance
> Commissioner in the State of Hawaii.
> Conversely, risk bearing entities licensed
> under HRS Chapter 431:10A are prohibited from
> requiring that "service[s] be rendered by a
> particular hospital or person."  HRS
> § 431:10A-205(b).

Id. at 9.

The Insurance Commissioner then turned his attention to

whether HRS § 431:10A-205(b) prohibits an accident and health

insurer from offering a closed panel product, ultimately

concluding that it does not.  Id. at 10.  As noted earlier, the

statute provides that:

> Any group or blanket disability policy may
> provide that all or any portion of any
> indemnities provided by the policy on account
> of hospital, nursing, medical, or surgical
> services may, at the insurer's option, be
> paid directly to the hospital or person
> rendering such services, but the policy may
> not require that the service be rendered by a
> particular hospital or person.

HRS § 431:10A-205(b).  In the Insurance Commissioner's view,

"[t]he plain meaning of the statute prohibits a restriction that

limits insureds to receiving care from 'a particular,' or a

single, designated hospital or person."  AlohaCare, IC's

Decision 10.  He observed that, "if the Legislature had intended

to prohibit insurers from requiring that services be obtained

from a defined network of providers, the statutory language would

have used the plural form instead of the singular ('particular hospitals or persons')." Id. at 11.[24/]  Apart from looking to the text, the Insurance Commissioner also consulted the legislative history, noting that "[t]here is nothing in the legislative history of HRS § 431: 10A-205(b) to support an interpretation of the provision as precluding the offering of a closed panel product such as that required by the QExA program." Id. at 10.

In view of the statutory text and the legislative history, the Insurance Commissioner determined that "there is no

---

[24/] The Court previously suggested that an argument could be made that the phrase "particular hospital or person," as it appears in HRS § 431:10A-205(b), might be read as "particular hospitals or persons," in light of the rule of statutory construction set forth in HRS § 1-17 that "[w]ords . . . in the singular or plural number signify both the singular and plural number."

The State Defendants argue that HRS § 1-17 should not be applied to HRS § 431:10A-205(b), because such a construction would be inconsistent with the legislative intent expressed in a later-enacted statute, HRS § 432E-1.  As noted earlier, HRS § 432E-1 indicates that a "managed care plan" may be offered by an "insurer governed by chapter 431," and that such an insurer may thus provide "for the financing or delivery of health care services or benefits to enrollees through . . . [a]rrangements with selected providers or provider networks to furnish health care services or benefits."  HRS § 432E-1.  Applying HRS § 1-17 to HRS § 431:10A-205(b) would mean that an accident and health insurer, which is governed by HRS ch. 431, would not be able to require that its insureds' services be rendered by "particular hospitals or persons."  Such a construction would clearly undermine that type of insurer's authority under HRS 432E-1 to provide "for the financing or delivery of health care services or benefits to enrollees through . . . [a]rrangements with selected providers or provider networks to furnish health care services or benefits."  Consequently, the Court agrees with the State Defendants that HRS § 431:10A-205(b) should not be read in light of HRS § 1-17.

reason to conclude that [HRS § 431:10A-205(b)] was intended to prohibit insurers from offering a closed panel product with the choice of providers required by the QExA." <u>Id.</u> at 11.  He found that "insurers licensed under HRS Chapter 431:10A are not prohibited from offering a closed panel or limited physician group model of care by HRS § 431:10A-205(b) as long as there is a choice of providers and hospitals for its members." <u>Id.</u> at 10.

In the end, the Insurance Commissioner concluded that: "An HMO license is not required to offer the QExA managed care plan.  The QExA managed care plan may be offered by any risk-bearing entity licensed by the Insurance Division . . . ." <u>Id.</u> at 11.[25/]  On that basis, the Insurance Commissioner denied AlohaCare's petition for a declaration that neither Evercare nor WellCare of Arizona is properly licensed to perform the services required under the QExA Contracts.  <u>Id.</u> at 2, 12.

### b.    Contracts of Insurance

Plaintiffs rely heavily on the Insurance Commissioner's initial conclusion that the QExA Contracts are not contracts of insurance.  Specifically, he stated that:

---

[25/] The Insurance Commissioner noted that Evercare and WellCare of Arizona were not the only accident and health insurance companies licensed under HRS ch. 431:10A to offer a Medicaid managed care plan in Hawai'i.  <u>AlohaCare</u>, IC's Decision 5.  He observed that Summerlin Life and Health Insurance Company has offered a QUEST plan under its license issued pursuant to HRS ch. 431:10A.  <u>Id.</u>

> The QExA contracts entered into by DHS with Wellcare [of Arizona] and Evercare are not contracts of insurance.  HRS § 431:1-201(a) provides that "[i]nsurance is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies."  Accordingly, determining the validity of the QExA contracts is not the business of insurance and is outside the jurisdiction of the Commissioner.  Except for relief in the form of a declaration that neither Evercare nor Wellcare are properly licensed to perform the services required under the QExA contracts, all allegations of the Petition regarding the validity of the contracts entered into by DHS with Wellcare and Evercare are denied as beyond the jurisdiction of the authority.  HAR § 16-201-50(1)(C).

AlohaCare, IC's Decision 7.  The Insurance Commissioner went on to conclude that Evercare and WellCare of Arizona were in fact properly licensed to perform the services required under the QExA Contracts, insofar as they held accident and health insurance licenses.  Id. at 11.

Plaintiffs contend that:  (1) because the QExA Contracts are not contracts of insurance, the services (particularly utilizing a closed panel plan) that the contracts require are not insurance; and (2) because the services are not insurance, the QExA Contractors' accident and health insurance licenses are not sufficient to perform the services.  Pls.' Solvency MSJ Mem. 19-20.  In Plaintiffs' view, because the activities are not insurance, the only entity that may perform

the activities is an HMO, because HMO-type activities are not insurance.  Id. at 19-21.

The Court disagrees.  As the State Defendants and Evercare correctly observe, insurance companies that operate Medicaid managed care plans insure enrollees, not the State DHS. The risk that the companies bear is associated with the coverage they provide to their enrollees—insurance coverage.  The State DHS facilitates that insurance by contracting with the plans and paying them for the risks they assume.  Thus, while the contracts between the State and the QExA Contractors are not insurance contracts, the contractors are risk-bearing entities, and the relationship between the contractors and their enrollees is insurance.  See St. Defs.' Opp'n to Pls.' Solvency MSJ 8; Evercare's Substantive Joinder in St. Defs.' Opp'n 3; St. Defs.' Licensure MSJ Reply 9.

Furthermore, contrary to Plaintiffs' contention, Evercare's and WellCare of Arizona's managed care or HMO-type activities plainly constitute insurance and, as such, it is appropriate for them to perform the services required under the QExA Contracts pursuant to their accident and health insurance licenses.  See Washington Physicians Serv. Ass'n v. Gregoire, 147 F.3d 1039, 1046 (9th Cir. 1998) ("HMOs function the same way as a traditional health insurer:  The policyholder pays a fee for a promise of medical services in the event that he should need

them.  It follows that HMOs . . . are in the business of insurance."); see also Express Scripts, Inc. v. Wenzel, 262 F.3d 829, 835 (8th Cir. 2001) ("HMOs both spread and underwrite risk, and we agree with other circuit courts which have concluded that HMOs are insurers.");[26/] Hawaii Mgmt. Alliance Ass'n v. Ins. Comm'r, 106 Hawai'i 21, 29, 100 P.3d 952, 960 (2004) (noting that the United States Supreme Court has observed that "an HMO is both a health care provider and an insurer"); 31 Appleman on Insurance § 186.01[A], at 41 (2d ed. 2007) ("HMOs function in the same way as traditional health insurers, and thus they are in the business of insurance.").  But see O'Reilly v. Ceuleers, 912 F.2d 1383, 1389 (11th Cir. 1990) (concluding that an HMO is not an insurance company).

     The short of it is that Plaintiffs' place undue reliance on the Insurance Commissioner's conclusion that the QExA Contracts are not contracts of insurance.  That conclusion does not alter his principal determination, with which this Court

---

     [26/] Plaintiffs attempt to distinguish Washington Physicians Serv. Ass'n and Express Scripts, Inc. on the ground that they addressed whether HMOs are insurers in the context of ERISA's savings' clause, 29 U.S.C. § 1144(b)(2)(A), which prevents certain state laws, including laws which regulate insurance, from being preempted.  See Pls.' Solvency MSJ Reply 7–9.  While it is true that those cases considered whether HMOs are insurers in that particular context, the cases did not employ an analysis that was specific to ERISA.  Rather, the question of whether HMOs are insurers was addressed by reference to general insurance law principles.  See Washington Physicians Serv. Ass'n, 147 F.3d at 1045–46; Express Scripts, Inc., 262 F.3d at 835.

concurs:  Evercare and WellCare of Arizona are properly licensed

as risk-bearing entities, insofar as they have accident and

health insurance licenses, and, based on those licenses, they may

perform the services required under the QExA Contracts, including

the utilization of "closed panel" plans.  See AlohaCare, IC's

Decision 2, 12; Carlisle v. One (1) Boat, 119 Hawai'i 245, 253,

195 P.3d 1177, 1185  (2008) ("[The Hawai'i Supreme Court] has

accorded persuasive weight to the construction of statutes by

administrative agencies charged with overseeing and implementing

a particular statutory scheme.'" (quoting Capua v. Weyerhaeuser,

117 Hawai'i 439, 444, 184 P.3d 191, 196 (2008))).   HMO licenses

are simply not required because, as the Insurance Commissioner

observed, the QExA Contracts do not direct the contractors to

furnish care directly to enrollees through their own facilities

and employed providers.   See AlohaCare, IC's Decision 9.

### c.   Decision regarding the second solvency standard

In view of the foregoing, the Court finds that Evercare

and WellCare of Arizona are "licensed or certified by the State

as a risk-bearing entit[ies]," such that they may perform the

services required by the QExA Contracts.   See 42 U.S.C. §

1396b(m)(1)(C)(i).   They thus meet the second solvency

requirement.   Consequently, the Court will grant the State

Defendants' licensure motion for summary judgment, and the

joinders therein, as to the second solvency standard and deny

Plaintiffs' solvency motion for summary judgment as to that standard.[27]

### 3.  Liability for Debts

The third and final solvency standard that must be met to qualify as an MCO is that the organization assure "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency."  42 U.S.C. § 1396b(m)(1)(A)(ii).

Plaintiffs contend that, without licenses that apply to the activities being performed, the Insurance Commissioner has no authority to regulate the solvency of the QExA Contractors relating to the QExA Program.  Pls.' Solvency MSJ Mem. 24. However, as noted in the preceding subsection, the Court has found that the accident and health insurance licenses held by

---

[27] The Court notes that it previously submitted the following certified question to the Hawai'i Supreme Court with respect to the second solvency standard:

> Whether the QExA Contractors, who have accident and health insurance licenses under HRS ch. 431:10A, but who do not have health maintenance organization licenses under HRS ch. 432D, may perform under the QExA Contracts, which utilize "closed panel" plans.

Order Submitting a Certified Question of State Law to the Hawai'i S. Ct. from the United States Dist. Ct. for the Dist. of Hawaii, filed 10/2/09, at 12.  The Hawai'i Supreme Court declined to consider the certified question, noting that "the question was answered by the June 2, 2009, Insurance Commissioner's Decision in In re AlohaCare, No. IC-08-142," and that "the decision is on appeal in the Circuit Court of the First Circuit, State of Hawai'i."  Order on Certified Question, filed 10/28/09.  On December 23, 2009, the circuit court heard oral argument in the appeal and affirmed the Insurance Commissioner's decision at the hearing.

Evercare and WellCare of Arizona apply to their activities under the QExA Contracts.  As such, they must comply with the applicable statutory solvency standards in carrying out those activities.  See supra Discussion Section IV.B.1 (setting forth state statutory solvency standards).  In addition, RFP § 72.130 provides that "[m]embers shall not be liable for the debts of the health plan," and that, "in the event of insolvency of the health plan, members may not be held liable for the covered services provided to the member, for which the State does not pay the health plan."  AR 4274.  Furthermore, as noted earlier, pursuant to RFP § 71.500, the QExA Contractors have posted substantial performance bonds as security in the event of insolvency.  St. Defs.' Licensure MSJ CSF ¶¶ 20-21.

Plaintiffs argue that, in the event that one of the QExA Contractors becomes insolvent, there will be providers it has not paid for services that beneficiaries have received. Pls.' Solvency MSJ Reply 5.  They maintain that the providers would be unsecured creditors of the contractor in an unfavorable position to collect on their claims.  Id.  Plaintiffs note that, unless the providers are bound by contract to look only to the contractor for payment, there is nothing to prevent them from pursuing ABD beneficiaries to whom they provided services.  Id.

RFP § 40.500 provides that:

All of the health plan's written provider contracts shall:  . . . Prohibit the provider

87

> from seeking payment from the member for any
> covered services provided to the member
> within the terms of the contract and require
> the provider to look solely to the health
> plan for compensation for services rendered,
> with the exception of cost sharing pursuant
> to the Hawaii Medicaid State Plan . . . .

Id. at 4045.  Similarly, RFP § 60.220 states that "the health

plan shall ensure that the State and health plan members shall

bear no liability for services provided to a member . . . for

which the health plan or State does not pay the individual or

provider that furnishes the services under a contractual,

referral, or other arrangement."  Id. at 4245.

Plaintiffs seemed to concede at the hearing that RFP

§ 40.500 was effective against providers who participate in the

QExA Program and sign contracts with the QExA Contractors.

12/14/09 a.m. Tr. 36:5-7 (rough draft of transcript) ("The only

providers against which and the only subcontractors against which

that [provision] is effective are those that are under contract

to the plans.").[28]  However, they did take issue with whether a

---

[28] A participating provider agreement, which Evercare
submitted in opposition to Plaintiffs' motion for a temporary
restraining order against the State Defendants, includes a
provision stating that:
> Facility agrees that in no event, including but not
> limited to, non-payment by United or an intermediary,
> insolvency of [Evercare] or an intermediary, or breach
> by [Evercare] of the Agreement, shall Facility bill,
> charge, collect a deposit from, seek compensation,
> remuneration or reimbursement from, or have any
> recourse against any Customer or person (other than
> United or an intermediary) acting on behalf of the
> (continued...)

provision prohibiting providers from seeking payment from enrollees was being included in agreements with non-participating providers.  Id. at 36:7-37:7.  Following the hearing, with the permission of the Court, Plaintiffs submitted preauthorization forms that the QExA Contractors require non-participating providers to use when providing services to QExA enrollees.  Pls.' Supplemental Submission of Preauthorization Forms on Pls.' Mot. for Summ. J. Against Fed. Defs., filed 12/14/09, Exs. 1-2.  The forms do not include a provision prohibiting providers from seeking payment from enrollees.

In response, also with permission of the Court, Evercare and WellCare of Arizona submitted a number of forms they utilize when approving preauthorization requests from non-participating providers.  The forms include provisions indicating that the payments providers receive from the contractors constitute payment in full and that the providers may not seek any unpaid balance from the QExA enrollees.  See Decl. of David W. Heywood, filed 12/16/09, Ex. A (Evercare's non-participating provider form) ("Payment by the plan is payment in full; the provider cannot balance bill the member."), Ex. B at 2 (CMS 1500

---

28/(...continued)
Customer for Covered Services provided pursuant to the Agreement.
Decl. of David W. Heywood, filed 8/18/09, Ex. A at 26.  The Court has not received a similar form from WellCare of Arizona.

form) ("I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under the program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge."); Decl. of Erhardt Preitauer, filed 12/16/09, Ex. A (WellCare of Arizona's preauthorization approval form) ("Provider agrees that payment by the plan is considered payment in full for covered services rendered and provider cannot balance bill members for these services."), Ex. B (WellCare of Arizona's special case agreement form) ("If payment is received in accordance with this Agreement, Physician/Provider will hereby agree to accept as payment in full (less any applicable co-payments, deductible(s) or patient responsible amounts) 'Ohana Health Plan payment."), Ex. C (CMS 1500 form).  These provisions do not, however, address the situation in which a provider receives no payment from the contractors in the event that the contractors become insolvent.

One of Evercare's forms includes a separate provision that addresses that situation, stating that the "Provider agrees to look solely to the plan for payment of amounts due hereunder." Decl. of David W. Heywood, filed 12/16/09, Ex. A.  This provision plainly satisfies the RFP's requirement that providers be prohibited from seeking payment from enrollees.  However, the forms that WellCare of Arizona has submitted do not include a

similar provision.  Decl. of Erhardt Preitauer, filed 12/16/09, Exs. A-C.  Although WellCare of Arizona's non-participating provider forms do not appear to be in compliance with the RFP's requirements, it has posted a substantial performance bond pursuant to RFP § 71.500.  Furthermore, there are factual issues surrounding whether WellCare of Arizona has complied with state statutory solvency standards for accident and health insurance companies, which might assure that its QExA enrollees would not be held liable for its debts.[29/]

Taking the evidence in the light most favorable to the State Defendants, the Court finds that there are genuine issues of material fact as to whether WellCare of Arizona has provided sufficient assurances that the ABD beneficiaries are in no case held liable for the its debts in the case of its insolvency.  See 42 U.S.C. § 1396b(m)(1)(A)(ii).  The Court also finds that Plaintiffs are not entitled to judgment as a matter of law on the third solvency standard as it applies to Evercare.  Plaintiffs' solvency motion for summary judgment as to the third solvency standard will be denied accordingly.

---

[29/] See supra Discussion Section IV.B.1 (setting forth state statutory solvency standards).

C.    **Decision Regarding Solvency Claims**

In summary, the Court will deny Plaintiffs' solvency motion for summary judgment as to all three solvency standards and grant the State Defendants' licensure motion for summary judgment, and the joinders therein, as to the second solvency standard.

**CONCLUSION**

In light of the foregoing, the Court:

(1)  DENIES the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count VI (ADA) and Count VII (Rehabilitation Act), insofar as those counts assert an integration claim on behalf of ABD Plaintiff L.P.;

(2)  GRANTS the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count VI (ADA) and Count VII (Rehabilitation Act), insofar as those counts assert an integration claim on behalf of the following ABD Plaintiffs:  (a) G., parent and next friend of K.; (b) D., parent and next friend of E.; (c) C., parent and next friend of M.; (d) M., parent and next friend of I.; (e) V., parent an guardian of R.; (f) T. parent and next friend of E.S.; (g) A., parent and next friend of C.; (h) J., parent and next friend of R.J.; (i) T.I.; and (j) H., parent and next friend of K.;

(3)  DENIES the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count VI (ADA) and Count VII (Rehabilitation Act), insofar as those counts assert equal access claims on behalf of the ABD Plaintiffs;

(4)   GRANTS the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count VIII (42 U.S.C. § 1396a(a)(30)(A));

(5)   GRANTS the State Defendants' multi-count motion for summary judgment, and the joinders therein, as to Count IX (taking);

(6)   DENIES Plaintiffs' solvency motion for summary judgment as to Counts I through IV, insofar as those counts assert that Evercare and WellCare of Arizona do not meet the three solvency standards for MCOs set forth in 42 U.S.C. §§ 1396b(m)(1)(A)(ii) and (C)(i); and

(7)   GRANTS the State Defendants' licensure motion for summary judgment, and the joinders therein, as to Counts I through IV, insofar as those counts assert that Evercare and WellCare of Arizona do not meet the second solvency standard for MCOs set forth in 42 U.S.C. §§ 1396b(m)(1)(A)(ii) and (C)(i), under which an organization must meet "solvency standards established by the State for private health maintenance organizations or [be] licensed or certified by the State as a risk-bearing entity."

What remains of the State Second Amended Complaint is: (1) the claim set forth in Counts I, II, III, and V that the QExA Contractors have inadequate provider networks; (2) the claim set forth in Counts I through IV that the QExA Contractors failed to meet the first and third solvency standards set forth in 42 U.S.C. § 1396b(m)(1)(A)(ii); (3) the claim by L.P. set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that the State Defendants have violated the integration mandate; (4) the claim

93

by the ABD Plaintiffs set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that they have less access to Medicaid benefits through the QExA Program than non-disabled beneficiaries enrolled in the QUEST Program.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, December 24, 2009.



_____

Alan C. Kay

Sr. United States District Judge


G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK:  Order (1) Granting in Part and Denying in Part the State Defendants' Motion for Summary Judgment, and the Joinders Therein, as to Counts VI, VII, VIII, and IX, (2) Granting the State Defendants' Motion for Partial Summary Judgment, and the Joinders Therein, Regarding the License Question, and (3) Denying Plaintiffs' Motion for Summary Judgment on Licensure and Solvency