IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) ) ) | Civ. No. 08-00551 ACK-BMK Civ. No. 09-00044 ACK-BMK (Consolidated) |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, ET AL., | ) ) ) | |
| Defendants. | ) ) | |
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., | ) ) ) ) | |
| Defendants. | ) ) | |

ORDER GRANTING IN PART, AND DENYING IN PART, EVERCARE'S MOTION
FOR PARTIAL SUMMARY JUDGMENT, AND THE JOINDERS THEREIN, AS TO
PLAINTIFFS' CLAIMS THAT THE QExA PROVIDER NETWORKS ARE INADEQUATE

PROCEDURAL HISTORY

I.      Prior Proceedings

        On December 8, 2008, in Civil No. 08-00551 ACK-BMK,

Plaintiffs filed a complaint against Defendants the State of

Hawaii, Department of Human Services ("State DHS"), and Lillian

B. Koller, in her official capacity as the Director of the State

DHS (collectively, "State Defendants" or "State").  At that point, the Plaintiffs were comprised of aged, blind, and disabled ("ABD") Medicaid beneficiaries ("ABD Plaintiffs").  Their principal allegation is that the State Defendants have violated certain provisions of Title XIX of the Social Security Act, commonly known as the Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u>, by requiring ABD beneficiaries to enroll with one of two healthcare entities as a condition of receiving Medicaid benefits in connection with the agency's managed care program for ABD beneficiaries, the QUEST Expanded Access ("QExA") Program.  Those two entities were the only ones awarded contracts to provide the care for ABD beneficiaries under the QExA Program ("QExA Contracts").  They are WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("WellCare of Arizona") and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors"), and they have intervened in this matter.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS ("Secretary") (collectively, "Federal Defendants").

On February 4, 2009, Plaintiffs filed a first amended complaint against the Federal Defendants.  "At the federal level,

Congress has entrusted the Secretary of [the Federal DHHS] with administering Medicaid, and the Secretary, in turn, exercises that delegated authority through the [Centers for Medicare and Medicaid Services ('CMS')]." Wong v. Doar, 571 F.3d 247, 250 (2d Cir. 2009).  Plaintiffs contended that the CMS acted arbitrarily and capriciously by granting a waiver of the "freedom of choice" provision, 42 U.S.C. § 1396a(a)(23), for the QExA Program pursuant to 42 U.S.C. § 1315(a), and by thereafter approving the QExA Contracts.  On February 19, 2009, Civil Nos. 08-00551 and 09-00044 were consolidated.

This is the third case brought in this Court challenging the QExA Program.  See AlohaCare v. Hawaii, Dep't of Human Servs., 567 F. Supp. 2d 1238 (D. Haw. 2008), aff'd, 572 F.3d 740 (9th Cir. 2009) (upholding the district court's decision that a disappointed bidder for a QExA Contract did not have statutory standing to enforce certain provisions of the Medicaid Act); Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008), aff'd No. 08-17343, 2010 U.S. App. LEXIS 3471 (9th Cir. Feb. 19, 2010) (dismissing a health advocacy organization's complaint because, among other things, the organization did not have statutory standing to enforce certain provisions of the Medicaid Act).[1]

---

[1] As discussed below, the unpublished opinion issued by the Ninth Circuit affirming Judge Seabright's decision in Hawaii
(continued...)

On May 11, 2009, the Court entered an order granting in part and denying in part a motion to dismiss filed by the State Defendants and joinders therein.  See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009) ("5/11/09 Order"). The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects.  See Order Granting in Part, and Denying in Part Plaintiffs' Leave to Amend Their Complaints, Docket no. 138 (July, 14 2009) ("7/14/09 Order").  They therefore filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

On June 2, 2009, Plaintiffs filed a motion for a preliminary injunction against the Federal Defendants.  On August 7, 2009, Plaintiffs filed a motion for a temporary restraining order against the Federal Defendants.  On August 10, 2009, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction against the State Defendants.  The Court denied Plaintiffs' motions for temporary restraining orders. Plaintiffs subsequently withdrew their motions for preliminary injunctions.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended complaint against the State Defendants

---

[1]/(...continued)
Coal. for Health directly addresses many of the issues presented in Evercare's MSJ regarding the adequacy of the QExA RFP.

("State Second Amended Complaint") and, on September 1, 2009, they filed a third amended complaint against the Federal Defendants.  Those complaints added claims on behalf of certain Medicaid healthcare providers ("Provider Plaintiffs") and new ABD beneficiaries.  The Provider Plaintiffs are physicians, pharmacists, and ancillary care providers who accepted ABD beneficiaries as patients and clients under the fee-for-service program, which preceded the QExA Program, and who have provided care and services to ABD beneficiaries under the QExA Program. The State Second Amended Complaint asserts the following nine counts:  (I) deprivation of rights under federal law and 42 U.S.C. § 1983; (II) violations of preemptive federal law by virtue of the Supremacy Clause; (III) further specific violations of preemptive federal law and regulations; (IV) insufficient assurances of solvency and evidence of poor performance in other states; (V) insufficient range of services and provider networks; (VI) violation of the Americans with Disabilities Act ("ADA"); (VII) violation of the Rehabilitation Act of 1973; (VIII) violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204; and (IX) unlawful taking.

On September 8, 2009, the Federal Defendants filed the administrative record ("AR"), which is roughly 5,200 pages in length.  At Plaintiffs' request, the administrative record includes documents from 2004 onwards.  7/18/09 Transcript of

Proceedings 28:3-22.  Plaintiffs did not ask for any documents
that were created prior to 2004.  Id.

In October and November of 2009, three motions for
summary judgment were filed in the action against the State
Defendants and three motions for summary judgment were filed in
the action against the Federal Defendants.  With respect to the
motions in the action against the Federal Defendants, on December
23, 2009, the Court granted summary judgment in favor of the
Federal Defendants as to all claims asserted in the third amended
complaint against them.  See G. v. Hawaii, Dep't of Human Servs.,
Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist.
LEXIS 119670 (D. Haw. Dec. 23, 2009) ("12/23/09 Order").  The
Court determined that the CMS did not act arbitrarily or
capriciously in granting the 42 U.S.C. § 1315(a) waiver of the
"freedom of choice" provision or approving the QExA Contracts.
Id.

As for the motions for summary judgment in the action
against the State Defendants, on December 24, 2009, the Court
granted summary judgment in favor of the State Defendants as to:
(1) Counts VI (ADA) and VII (Rehabilitation Act) insofar as those
counts assert integration claims on behalf of all ABD Plaintiffs,
except for ABD Plaintiff L.P.; (2) Count VIII (42 U.S.C.
§ 1396a(a)(30)(A)); (3) Count IX (taking); and (4) Plaintiffs'
claim that the QExA Contractors fail to meet the second solvency

standard set forth in 42 U.S.C. § 1396b(m)(1)(A). However, the Court denied the State Defendants' motion for summary judgment as to Counts VI (ADA) and VII (Rehabilitation Act) insofar as those counts assert equal access claims (in relation to QUEST) on behalf of the ABD Plaintiffs and an integration claim on behalf of ABD Plaintiff L.P. <u>G. v. Hawaii, Dep't of Human Servs.</u>, Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09 Order"). In addition, the Court denied Plaintiffs' motion for summary judgment as to whether the QExA Contractors meet the first and third solvency requirements for MCOs prescribed by 42 U.S.C. § 1396b(m)(1)(A). <u>Id.</u>

## II.        Evercare's Motion for Summary Judgment

        On November 20, 2009, Evercare filed a motion for partial summary judgment regarding Plaintiffs' claims that assert the State Defendants violated the requirements of the Medicaid statute relating to provider networks and access to services by requiring enrollment in the QExA plans offered by Evercare and WellCare of Arizona as a condition of receiving Medicaid benefits ("Evercare's MSJ" or "Evercare's motion for summary judgment"). These claims are asserted in Counts I, II, III, and V of the State Second Amended Complaint. The motion was accompanied by a memorandum ("Evercare's MSJ Mem.") in support and a concise statement of facts ("Evercare's MSJ CSF"). On November 23, 2009,

the State Defendants and WellCare of Arizona filed joinders in

Evercare's motion.[2/]

On January 21, 2010, Plaintiffs filed a memorandum in

opposition to Evercare's MSJ ("Pls.' Opp'n"), and a concise

statement of facts in opposition ("Pls.' Opp'n CSF").

On January 28, 2010, Evercare filed a reply to

Plaintiffs' Opp'n ("Evercare's Reply").  On the same day,

WellCare of Arizona filed a reply to Plaintiffs Opp'n ("WellCare

---

[2/] In their opposition, Plaintiffs assert that the State
Defendants' and WellCare of Arizona's joinders were "joinders of
simple agreement because neither joinder complies with Local Rule
7.9." Pls.' Opp'n at 1 n.1. D. Haw. Local Rule 7.9 states: "If
a party seeks the same relief sought by the movant for himself,
herself, or itself, the joinder shall clearly state that it seeks
such relief so that it is clear the joinder does not simply seek
relief for the original movant." D. Haw. Local Rule 7.9. As
noted in WellCare of Arizona's reply, however, the relief
requested by Evercare applies equally to the State Defendants and
WellCare of Arizona, as Evercare requested the Court to "enter
judgment in favor of the State Defendants and Intervenors on all
of Plaintiffs' claims in the [State Second Amended Complaint]
which assert that the State Defendants violated the requirements
of the Medicaid statute relating to provider networks and access
to services by requiring enrollment in the QExA plans offered by
Evercare and [WellCare of Arizona] as a condition of receiving
Medicaid benefits, including but not limited to Counts I, II,
III, and V." WellCare of Arizona Reply at 3 (citing Evercare's
MSJ Mem. at 36). The Court agrees that WellCare of Arizona's
joinder, along with the State Defendants' joinder, were adequate.
The Court further observes that, in its reply WellCare of Arizona
indicated that it sought the same relief requested by Evercare.
Id. In addition, on February 22, 2010, the State Defendants
filed a second joinder which asserts that the State Defendants
"request[] the same relief [as Evercare seeks] for themselves."
See Docket no. 550, Joinder in Evercare's MSJ filed by the State
Defendants (Feb. 22, 2010).

of Arizona's Reply").[3/]  WellCare of Arizona's reply responded to two issues unique to WellCare of Arizona: (1) the suggestion that WellCare of Arizona's joinder was procedurally insufficient; and (2) Plaintiffs' claim that WellCare of Arizona has decided to reduce reimbursement rates for case management providers, which will purportedly reduce members' access to case management services.  See WellCare of Arizona Reply at 2-3.  WellCare of Arizona's reply was accompanied by the declaration of Erhardt Preitauer, addressing the alleged reduction in case management reimbursement rates.[4/]

On January 19, 2010, Magistrate Judge Barry M. Kurren issued an amended scheduling order extending Plaintiffs' expert witness reports deadline to February 15, 2010.  As a result, Plaintiffs' expert reports were due four days after the Court was originally scheduled to hear Evercare's instant MSJ as well as Evercare's motion in limine to exclude the Preliminary Report of Dr. Meyers.  Because the amended scheduling order issued by Judge Kurren set the due date of Plaintiffs' expert witness reports for February 15, 2010, and Plaintiffs relied on the Preliminary Report of Dr. Meyers in opposition to Evercare's MSJ, the Court

---

[3/] Pursuant to D. Haw. Local Rule 7.9 a party who has filed a joinder may file its own reply if the opposition addressed matters unique to the joining party.

[4/] On February 1, 2010, pursuant to D. Haw. Local Rule 56.1(h), the Court granted WellCare of Arizona leave to file the supplemental declaration of Erhardt Preitauer.

rescheduled the hearing on Evercare's MSJ to March 8, 2010. Further, the Court requested that the parties submit supplemental briefing discussing the impact, if any, that the filing of Dr. Meyers' final expert report may have on Evercare's instant MSJ.

On February 22, 2010, Evercare filed supplemental briefing addressing the impact that Dr. Meyers' final expert report has on Evercare's MSJ ("Evercare's Supp. Br.").

Also on February 22, 2010, the State Defendants filed supplemental briefing addressing the impact that Dr. Meyers' final expert report has on Evercare's MSJ ("State Defs.' Supp. Br.").[5]

On February 25, 2010, Plaintiffs submitted a response to Evercare's and the State Defendants' supplemental briefing addressing the impact that Meyers' final expert report has on Evercare's Provider Networks MSJ ("Pls.' Resp. Br.").

On March 8, 2010, the Court held a hearing on

---

[5] Although the supplemental briefing was meant to address Dr. Meyers' final report, the State Defendants took the opportunity to call the Court's attention to a recently decided Ninth Circuit decision, Hawaii Coal. for Health v. Hawaii, No. 08-17343, 2010 U.S. App. LEXIS 3741 (9th Cir. Feb. 19, 2010). See also Evercare's Supplemental Listing of Uncited Authority in Support of its Motion, Docket no. 549 (Feb. 22, 2010) (informing the Court that it intended to rely on the Ninth Circuit's decision in Hawaii Coal. for Health at the hearing on its motion). The import of this decision is discussed infra, Section I(A)-(B).

Evercare's MSJ.[6/]

## FACTUAL BACKGROUND[7/]

I.        The Medicaid Act

The Medicaid Act "provides federal funding to 'enabl[e] each State, as far as practicable . . . to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services.'" AlohaCare, 572 F.3d at 742 (quoting 42 U.S.C. § 1396-1) (brackets in original).  The Medicaid program is "a jointly financed federal-state program that is administered by the States in accordance with federal guidelines." Id.  Each state that elects to participate in the program must submit a plan to the CMS.  42 U.S.C. §§ 1396, 1396a.  If the plan is approved, the state is entitled to Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. Id. § 1396b(a)(1).

_____

[6/] The Court also held a hearing on Evercare's Motion in Limine to Exclude the Preliminary Report of Dr. Arleen Meyers, along with the opinions set forth in the report, which is addressed in a separate order.

[7/] The facts in this Order are recited for the limited purpose of deciding the instant motion for partial summary judgment.  The facts shall not be construed as findings of fact upon which the parties may rely upon in future proceedings in this case.

"The Act, among other things, outlines detailed requirements for [state] plan eligibility, [42 U.S.C.] § 1396a, erects a complex scheme for allocating and receiving federal funds, id. § 1396b, and imposes detailed requirements on States that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), id. § 1396u-2." AlohaCare, 572 F.3d at 742-43. "Medicaid generally requires a State to conform with federal guidelines prior to receiving federal funds; however, under 42 U.S.C. § 1315, CMS may waive compliance for certain 'experimental, pilot, or demonstration project[s].'" Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

## II.      The QExA Program

Pursuant to 42 U.S.C. § 1315, in July of 1993, the CMS granted a waiver of various provisions of the Medicaid Act to the State of Hawai'i to allow the state to conduct a demonstration project that would transform its fee-for-service Medicaid program into a managed care model for most Medicaid beneficiaries. AR 49.  The demonstration project, called Hawaii Health QUEST ("QUEST Program"), excluded ABD beneficiaries.[8/]  Id. at 49-50. ABD beneficiaries instead continued to receive benefits on a fee-for-service basis ("Medicaid FFS program" or "fee-for-service

---

[8/] Three MCOs currently administer the QUEST Program: Hawaii Medical Services Association (HMSA QUEST), Kaiser Permanente, and AlohaCare.

12

system"). Id. at 22.

In a fee-for-service system, the traditional framework for state Medicaid programs, the state contracts directly with and pays healthcare providers, such as physicians, hospitals, and clinics, for services they provide to Medicaid beneficiaries. 5/11/09 Order at *6. By contrast, under a managed care model, the state contracts with MCOs, which assume the responsibility of providing Medicaid services through their own employees or by contracting with independent providers of such services. Id. at *6-*7. The state pays each MCO on a capitated or fixed-amount-per-enrollee basis. Id.

In February of 1997, the State DHS submitted a waiver application to the CMS so that it could mandatorily enroll portions of the ABD population into its managed care demonstration project, the QUEST Program, but the request was subsequently withdrawn. Fed. Defs.' Mem. in Support of their Mot. for Summ. J. ("Fed. Defs.' MSJ Mem."), filed 10/14/09, at 8. In January and August of 2005, the State DHS submitted respectively a second and third waiver request. AR 1, 43. The CMS asked the State DHS to withdraw its second request because there was a lack of detail to warrant further consideration at that time, and the CMS took no action on the third request. Fed. Defs.' MSJ Mem. 8-9.

On February 21, 2007, the State DHS submitted its

13

fourth request for a waiver under 42 U.S.C. § 1315(a), seeking approval from the CMS to implement the QExA Program.  AR 210. The QExA Program was intended to provide primary, acute, and long-term care services, including home- and community-based services ("HCBS"), to ABD beneficiaries state-wide using a managed care model.  Id.  The program would replace the fee-for-services system that was then in place for the ABD population. The ABD beneficiaries that were eligible for both Medicaid and Medicare ("dual eligibles"), however, would still be permitted to see their providers under the Medicare program.  See Evercare's Reply at 12.  Importantly, two-thirds of the ABD population is dual eligible.  See id.; see also Evercare's MSJ CSF, Ex. Evercare3.

## A.   The QExA RFP's Requirements for Provider Networks and Access to Services

On October 10, 2007, the State DHS issued a request for proposals ("RFP") to procure the services of two managed care organizations that would be responsible for providing all of the Medicaid care for ABD beneficiaries as part of the QExA Program. AR at 3942.  The RFP required: "The health plan shall develop and maintain a provider network that is sufficient to ensure that all medically necessary covered services are accessible and available."  Id.  at 4027-28.  The RFP states that the MCO is "solely responsible for ensuring it (1) has the network capacity to serve the expected enrollment in the service area, (2) offers

14

an appropriate range of services and access to preventive, primary and long-term care services, and (3) maintains a sufficient number, mix, and geographic distribution of providers and services." Id. at 4032. Moreover, the RFP requires that the MCO (1) provide adequate capacity and service to ensure member's timely access to appropriate needs, services, and care, (2) ensure coordination and continuity of care, and (3) ensure members receive the services they need to maintain their highest functional level. Id. at 4160. The RFP specified the minimum requirements for the provider networks in terms of hospitals, primary care providers ("PCPs"), specialists, and ancillary care providers (optometrists, pharmacies, etc.), and mandated that:

> If the [MCO's] network is unable to provide medically necessary covered services to a particular member within its network or on the island of residence, the [MCO] shall adequately and timely provide these services out-of-network or transport the member to another island to access the service(s) for as long as it is unable to provide them on the island of residence. The [MCO] shall notify the out-of-network providers providing services to its members that payment by the plan is considered as "payment-in-full" and that it cannot "balance bill" the members for these services. The [MCO] is prohibited from charging the member more than it would have if the services were furnished within the network.

Id. at 4028, 4032-35. In addition, the RFP required that the MCOs provide the State with a Provider Network Development and Management Plan on a periodic basis. Id. at 4029-31.

The RFP also established specific requirements with

regard to availability of providers to ensure timely access to

covered services:

> The [MCO] shall monitor the number of members
> cared for by its providers and shall adjust PCP
> assignments as necessary to ensure timely access
> to medical care and to maintain quality of care.
> The [MCO] shall have a sufficient network to
> ensure members can obtain needed health services
> within the acceptable wait times.  The acceptable
> wait times are:
>
> • Immediate care (twenty-four (24) hours a
>   day, seven (7) days a week) and without
>   prior authorization for emergency
>   medical situations;
> • Appointments within twenty-four (24)
>   hours for urgent care and for PCP
>   pediatric sick visits;
> • Appointments within seventy-two (72)
>   hours for PCP adult sick visits;
> • Appointments within twenty-one (21) days
>   for PCP visits (routine visits for
>   adults and children); and
> • Appointments within four (4) weeks for
>   visits with a specialist for non-
>   emergency hospital stays.

Id. at 4035.  Evercare asserts that the standards themselves,

disregarding whether the QExA Contractors actually comply with

the terms of the RFP, are more stringent than the standards

applicable to the QUEST program.  Evercare's MSJ CSF, Declaration

of Patricia M. Bazin ¶ 6 ("Bazin Decl.").  Further, the RFP

requires that "[m]edically necessary services shall be furnished

in an amount, duration, and scope that is no less than the

amount, duration, and scope for the same services furnished to

recipients under Medicaid fee-for-service."  AR 4060.

The RFP also establishes a grievance and appeals

process which allows QExA members to obtain adjudication of complaints regarding inadequate access to services under the QExA Program. Id. at 4179-92. If the member receives an adverse decision in the internal grievance system, the member may seek external review of the QExA Contractor's final decision through the State Administrative Hearing Process or by the Insurance Commissioner for the State of Hawai'i. Id.

**B.    The QExA RFP Requirements Regarding Adequate Assurances**

As part of the Mandatory and Technical Proposal portion of the RFP, applicants for the QExA Contracts were required to provide "a narrative describing how [the applicant] will develop and maintain a network in order to assure that all services are available to members." Id. at 4289. As part of the narrative, applicants were required to describe:

> A. In detail, how it will build and maintain a network that meets all required access standards to include capacity standards (for acute care, behavioral health, and long-term care services), including but not limited [to] the geographic access requirements;
>
> B. A description of how it will approach the current FFS provider community to meet network adequacy requirements;
>
> C. The areas it foresees as problems in developing a network in the State of Hawaii and the steps it will take to build network capacity in those areas;
>
> D. How it monitors the provider network to ensure that access and availability standards are being met. . . . [Specifically,] how the applicant ensures that acceptable appointment wait times are

17

met and steps taken, if any, in the past to
address deficiencies in this area; and

E. The activities it will undertake to increase
home and community based service capacity.

Id. 4290-91.

In addition, the State requested that applicants for
the QExA Contracts submit Letters of Intent ("LOIs") from
providers.  Id. at 4290-93.  The RFP specified the number, mix
(of specialties), and geographic distribution of providers from
whom applicants must obtain LOIs.  Id.  According to the State
DHS Health Care Services Branch Administrator, the State
established the provider network and access to care requirements
in the RFP based upon its experience administering the Medicaid
FFS program.  Bazin Decl. ¶ 7.

**C.   The Award of the QExA Contracts to Evercare and
WellCare of Arizona**

Evercare and WellCare of Arizona timely submitted their
proposals in response to the RFP on December 7, 2007, which
included the Provider Network Narratives required by the RFP.
Id. ¶ 11.  Evercare submitted 774 LOIs covering 1,736 providers
with its proposal.  Evercare's MSJ CSF, Declaration of David W.
Heywood ¶¶ 2-4 ("Heywood Decl.").  WellCare of Arizona submitted
158 LOIs with its proposal.  Evercare's MSJ CSF, Declaration of
Erhardt Preitauer ¶¶ 2-3 ("Preitauer Decl.").  Also on December
7, 2007, the State DHS submitted the RFP to the CMS for its
review.  Id. at 1016.

18

On February 1, 2008, the State DHS awarded the QExA Contracts to Evercare and WellCare of Arizona.[9/]  Id. at 1558. The RFP, with amendments, became part of the QExA Contracts.  Id. at 3953.  On February 4, 2008, Evercare and WellCare of Arizona began the process of contracting with the providers necessary to meet their obligations under the QExA Contracts.  Heywood Decl. ¶ 5; Preitauer Decl. ¶ 4.

On February 7, 2008, the CMS approved the State DHS's fourth waiver application for the QExA Program.  Id. at 1565.  In doing so, the CMS granted the State DHS a 42 U.S.C. § 1315(a) waiver of the "freedom of choice" provision.  Id. at 1570.

### D.   Delay in Commencement of the QExA Program

The commencement of the QExA program was delayed from November 1, 2008, until February 1, 2009.  Bazin Decl. ¶ 12.  The State Defendants submitted provider network adequacy information to the CMS on December 22, 2008.  Heywood Decl. ¶ 11; Preitauer Decl. ¶ 8.  At that time, neither Evercare nor WellCare of Arizona had contracted with a sufficient number of hospitals to meet the RFP requirements.  Id.  The State therefore reserved the right to have acute inpatient hospital services provided in a managed fee-for-service arrangement.  Id.  That would have

---

[9/] Ohana was originally awarded the QExA Contract.  On May 15, 2008, Ohana was merged into WellCare of Arizona, another subsidiary of WellCare Inc., and WellCare of Arizona assumed Ohana's QExA Contract.  See id. at 2059-68; St. Defs.' Licensure MSJ CSF, Decl. of Patricia M. Bazin ¶ 8.

effectively "carved out" the hospital services from the QExA Contracts. Id. With the exception of acute inpatient hospital services, the State certified the adequacy of the provider networks for both Evercare and WellCare of Arizona on December 22, 2008. Bazin Decl. ¶ 14.

In response to questions from the CMS, the State provided a revised provider network certification on December 29, 2008. Bazin Decl. ¶ 15. At this time, with the exception of some nursing facilities whose contracts were not yet in place, the State otherwise certified the adequacy of the provider networks for both Evercare and WellCare of Arizona. AR 3536-3540.[10]

On January 13, 2009, the State forwarded another provider network certification to the CMS, confirming that Evercare and WellCare of Arizona had executed contracts with the hospitals required by the RFP. Id. at 3747-3778. Accordingly, it was no longer necessary for the State to carve out acute inpatient hospital care from the services covered by the QExA

_____

[10] The CMS observed that its approval of the State plan took into account the status of the health care system in Hawai'i. See AR 3537 (In evaluating the approval, the CMS considered that "Hawaii is one of the most medically underserved states in the nation. The state is primarily rural; the only urban area is defined as the Honolulu metropolitan statistical area. Primary care physicians in the more rural and remote parts of the State are rare; Specialists are even rarer. This fact is underscored by the vastly larger numbers of PCPs and Specialists on Oahu than on any of the other islands in the State").

Contracts.  Id.

However, the CMS remained concerned regarding the number of QExA members who remained in non-contracted nursing facilities.  Bazin Decl. ¶ 19.  On January 16, 2009, the State submitted a proposed amendment to require that the QExA Contractors pay for services provided by non-contracting nursing facilities indefinitely, as long as they had a member residing in the non-contracted facility.  Id.  The amendment was subsequently made a part of the QExA Contracts.  Id.

On January 30, 2009, the CMS approved the QExA Contracts.  AR 3925-26.  On February, 1, 2009, the QExA Program went into full effect.  Since then, ABD beneficiaries have had to enroll with one of the two QExA Contractors as a condition of receiving Medicaid benefits.[11]

**E.   After the Commencement of the QExA Program**

---

[11] Of note, the State DHS provided a transition period so that the approximately 40,000 ABD beneficiaries could smoothly transition from the fee-for-service system to the managed care program.  Id. at 3696.  Of the approximately 40,000 ABD beneficiaries, 2/3 were dual eligible such that they could continue to see their providers under the Medicare program.  See Evercare's Reply at 12.  During the transition period, beneficiaries could receive services from healthcare providers even if the providers had not participated in the QExA Contractors' plans.  The transition period came to a close on July 31, 2009.  In order to maintain the status quo for purposes of this litigation, the QExA Contractors have essentially extended the transition period for the ABD Plaintiffs in this case until the time of trial, such that they may continue to see healthcare providers even if those providers have not decided to participate in the program.  9/4/09 Tr. 17:2-6, 25:3-6.

Evercare and WellCare of Arizona continue to report to the State regarding the status of their provider networks. Heywood Decl. ¶ 6, Ex. 3.  When the QExA program commenced on February 1, 2009, Evercare asserts it had a total of 2,695 contracted providers, while WellCare of Arizona asserts it had a total of 2,563 contracted providers.  Heywood Decl. ¶ 7; Preitauer Decl. ¶ 5.  As of October of 2009, Evercare asserts it had a total of 4,389 contracted providers, and WellCare of Arizona asserts it had 3,536 contracted providers.  Heywood Decl. Ex. 3; Preitauer Decl. ¶ 6.[12/]

---

[12/] Plaintiffs dispute that accuracy of Evercare and WellCare of Arizona purported number of providers.  Specifically, Plaintiffs argue that Evercare's claim that it had 4,389 contracted providers in October 2009:

> [I]n addition to being materially false, is not probative evidence of the size of Evercare's network, and is in dispute based on the admission by [Evercare's] counsel on January 14, 2010, that the assertion '4,389 contracted providers' really means 4,389 provider locations, not 4,389 contracts with 4,389 providers.

Pls.' Opp'n at 2.  Plaintiffs' reference to Evercare's purported admission appears to have been made at the hearing before Magistrate Judge Kurren on Plaintiffs' Motion to Compel.  See Docket 509 (hearing held on Plaintiffs' Motion to Compel on January 14, 2010).  In reply, Evercare notes that the practice of listing the same provider multiple times on the provider network reports is both necessary and beneficial because, in submitting its LOIs, Evercare and WellCare of Arizona were required to identify each location where a provider practiced.  See Evercare's Reply at 7.  Thus, in order to determine compliance with the RFP standards for geographic accessibility, it was important to know if providers maintained multiple offices in different geographic areas.  Id.

## LEGAL STANDARD

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation omitted).[13/]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Only admissible evidence may be considered in deciding a motion for summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).

---

[13/] Disputes as to immaterial issues of fact do "not preclude summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323; <u>Miller</u>, 454 F.3d at 987. The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.[14/] Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. See <u>id.</u> at 323; <u>Matsushita Elec.</u>, 475 U.S. at 586; <u>California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).[15/] The nonmoving party must instead set forth "significant probative evidence" in support of its position. <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987). Summary judgment will thus be granted against a party who fails

---

[14/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial. <u>Miller</u>, 454 F.3d at 987. When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. <u>Id.</u>

[15/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact. <u>Villiarimo v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002); <u>see also</u> <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

to demonstrate facts sufficient to establish an element essential
to his case when that party will ultimately bear the burden of
proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the
court must construe all evidence and reasonable inferences drawn
therefrom in the light most favorable to the nonmoving party.
See T.W. Elec. Serv., 809 F.2d at 630-31.[16/]  Accordingly, if
"reasonable minds could differ as to the import of the evidence,"
summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

## DISCUSSION

The Medicaid Act permits a state to require that
beneficiaries enroll in managed care as a condition of receiving
benefits if certain requirements are met.  42 U.S.C. §
1396u-2(a).  One such requirement is that the organizations have
sufficient networks of providers to serve the beneficiaries.  Id.
§§ 1396b(m)(1)(A)(i), 1396u-2(b)(5).  Here, in Counts I, II, III,
and V of the State Second Amended Complaint, Plaintiffs assert
that the State DHS has violated the Medicaid Act by requiring
that they enroll with one of the two QExA Contractors, Evercare
and WellCare of Arizona, despite the fact that the QExA
Contractors do not have sufficient networks of healthcare

---

[16/] At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.  Anderson,
477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
1994).

providers to serve ABD beneficiaries.  St. 2d Am. Compl. ¶¶ 92, 94, 97-98, 102.[17/]  Evercare seeks summary judgment as to this claim.  In making their claim that the QExA Contractors have insufficient provider networks, Plaintiffs appear to rely on three provisions of the Medicaid Act.  The Court will evaluate each provision in turn below.

**I.      42 U.S.C. 1396u-2(b)(5):  Assurances Regarding Provider Networks**

The first and principal provision upon which Plaintiffs

---

[17/] In its motion, Evercare asserts that "this motion [is] for partial summary judgment to obtain judgment on the merits with respect to the sole issue not addressed by the motions for summary judgment and partial summary judgment [heard by the Court on December 14, 2009]."  Evercare's MSJ Mem. at 1.  In opposition, Plaintiffs dispute Evercare's contention that its motion addresses the only remaining issue.  For sake of clarity, in its 12/24/09 Order, the Court observed:

> What remains of the State Second Amended Complaint is:  (1) the claim set forth in Counts I, II, III, and V that the QExA Contractors have inadequate provider networks; (2) the claim set forth in Counts I through IV that the QExA Contractors failed to meet the first and third solvency standards set forth in 42 U.S.C. § 1396b(m)(1)(A)(ii); (3) the claim by L.P. set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that the State Defendants have violated the integration mandate; (4) the claim by the ABD Plaintiffs set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that they have less access to Medicaid benefits through the QExA Program than non-disabled beneficiaries enrolled in the QUEST Program.

See 12/24/09 Order at *117-*18.  This order addresses the first remaining claim.  Claims (2)-(4) remain at issue and are not addressed by this order.

rely in asserting that the QExA Contractors' provider networks are inadequate is 42 U.S.C. § 1396u-2(b)(5).  St. 2d Am. Compl. ¶ 71.  The statute provides that:

> Each medicaid managed care organization shall provide the State and the Secretary with adequate assurances (in a time and manner determined by the Secretary) that the organization, with respect to a service area, has the capacity to serve the expected enrollment in such service area, including assurances that the organization—
>
> (A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area, and
>
> (B) maintains a sufficient number, mix, and geographic distribution of providers of services.

42 U.S.C. § 1396u-2(b)(5).

In this case, Plaintiffs appear to make two claims under 42 U.S.C. § 1396u-2(b)(5).  The first is that, when the QExA Contracts were awarded, the QExA Contractors failed to provide the State DHS with adequate assurances of their provider networks.  St. 2d Am. Compl. ¶¶ 71, 97.  The second is that, at present, the QExA Contractors have still failed to provide sufficient assurances because their provider networks are inadequate.  Id. ¶¶ 90, 92, 94, 97, 102.  The Court will consider each claim in turn.

**A.   Timing of Assurances**

Plaintiffs' first claim concerns the timing of when

27

MCOs must provide assurances to the state under 42 U.S.C.
§ 1396u-2(b)(5).  See 2d Am. Compl. ¶¶ 71, 97.  They
specifically contend that neither Evercare nor WellCare of
Arizona, at the time their contracts were signed by the State
DHS, met the coverage and provider-network requirements under the
statute.  Id.  As noted, the statute states that the assurances
are to be provided "in a time and manner determined by the
Secretary."  42 U.S.C. § 1396u-2(b)(5).  The Secretary has made
that determination in 42 C.F.R. § 438.207, which provides in
relevant part:

> (a) Basic rule.  The State must ensure,
> through its contracts, that each MCO
> . . . gives assurances to the State and
> provides supporting documentation that
> demonstrates that it has the capacity to
> serve the expected enrollment in its service
> area in accordance with the State's standards
> for access to care under this subpart.
>
> (b) Nature of supporting documentation.  Each
> MCO . . . must submit documentation to the
> State, in a format specified by the State to
> demonstrate that it complies with the
> following requirements:
>
>    (1) Offers an appropriate range of
> preventive, primary care, and specialty
> services that is adequate for the anticipated
> number of enrollees for the service area.
>
>    (2) Maintains a network of providers that
> is sufficient in number, mix, and geographic
> distribution to meet the needs of the
> anticipated number of enrollees in the
> service area.
>
> (c) Timing of documentation.  Each MCO . . .
> must submit the documentation described in

paragraph (b) of this section as specified by
the State, but no less frequently than the
following:

(1) At the time it enters into a contract
with the State.

(2) At any time there has been a
significant change (as defined by the State)
in the MCO's . . . operations that would
affect adequate capacity and services,
including–

(i) Changes in MCO . . . benefits,
geographic service area or payments; or

(ii) Enrollment of a new population in
the MCO . . . .

42 C.F.R. § 438.207.

In the case at bar, Evercare explains in its motion for

summary judgment that the State DHS required that proposals for

the QExA Contracts include LOIs from providers meeting the

requirements of the RFP for number and types of providers.

Evercare's MSJ Mem. 27; see also AR 4290-93.  According to

Evercare, the State DHS chose to require documentation in that

format prior to contract award, rather than requiring executed

contracts, because it feared that requiring potential QExA

providers to enter into contracts with a MCO that submitted a

proposal would cause substantial confusion in the health care

system.[18/]  Evercare's MSJ Mem. at 27-28.  Evercare contends that

---

[18/] Specifically, Evercare asserts that:

Many of the providers, such as home and community
(continued...)

29

both it and WellCare of Arizona submitted LOIs which met the requirements of the RFP. Id. at 28.

Plaintiffs assert that because Evercare and WellCare of Arizona did not begin contracting with providers until after the State awarded them the QExA Contracts, the QExA Contractors could not have properly established that they had the capacity to serve the expected enrollment in its service area in accordance with the State's standards for access to care. See Pls.' Opp'n at 2, 16-17. In other words, Plaintiffs argue that "[t]he regulation does not permit non-binding LOIs to be substituted for written contracts or for the MCOs to be relieved of the requirement that they negotiate provider contracts prior to being awarded

---

[18]/(...continued)
based service providers, are small businesses and signing contracts with all bidders would have caused much confusion.  Rather than require applicants to negotiate contracts with all the necessary providers prior to application, which the State feared would cause confusion in the health care system, the State imposed the requirements in Section 80.315 of the RFP regarding their provider networks.  The State felt that the Provider Network Narrative and LOI submissions requirements of the RFP provided adequate assurances to the State that the applicant: "(A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area"; and "(B) maintains a sufficient number, mix, and geographic distribution of providers of services."

Evercare's MSJ Mem. at 10-11 (internal citations omitted).

contracts.  Requiring negotiated contracts is clearly the regulation's intent."  Id. at 16-17.

On February 19, 2010, after most of the briefing in the instant motion for summary judgment was due, the Ninth Circuit issued an unpublished opinion that directly addresses several of the issues presently before the Court.  See Hawaii Coal. for Health v. Hawaii, No. 08-17343, 2010 U.S. App. LEXIS 3471 (9th Cir. Feb. 19, 2010).[19]

The Ninth Circuit's recent opinion involved an appeal from this Court's decision dismissing a health advocacy organization's complaint against the DHS regarding the QExA Program because, among other things, the organization did not have statutory standing to enforce 42 U.S.C. §§ 1396u-2(a)(1)(A)(ii) & (b)(5) of the Medicaid Act.  See Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008) (Seabright, J.) ("HCH").

In HCH, the Hawaii Coalition for Health filed a complaint pursuant to 42 U.S.C. § 1983 against DHS seeking to enjoin the implementation of the QExA Program.  Hawaii Coal. for Health, 2010 U.S. Ap p. LEXIS at *2.  The complaint alleged, inter alia, that i) DHS violated 42 U.S.C. § 1396u-2(b)(5) and 42

---

[19] Pursuant to U.S. Ct. of App. 9th Cir. Rule 36-3, this Court does not rely on Hawaii Coal. for Health as precedent, but it does find the opinion illustrative.  Notably, Hawaii Coal. for Health involved the adequacy of the QExA RFP and therefore speaks directly to issues presently before the Court.

C.F.R. 438.207 when it failed to obtain adequate assurances that the two selected plans had the capacity to provide appropriate services, and ii) the QExA would substantially impair access to services in violation of 42 U.S.C. 1396u-2(a)(1)(A)(ii).  Id. The district court dismissed the complaint for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), and, in part, as unripe pursuant to Fed. R. Civ. P. 12(b)(1).  Id.  Specifically, the district court held that Medicaid beneficiaries did not have enforceable rights under 42 U.S.C. § 1396(a)(1)(A)(i) or 1396u-2(b)(5), because those provisions were not intended to benefit Medicaid recipients. HCH, 576 F. Supp. 2d at 1121-24.[20/]  On appeal, the Ninth Circuit assumed without deciding that 42 U.S.C. § 1983 creates a private right of action for the Hawaii Coalition for Health's claims.[21/] See Hawaii Coal. for Health, 2010 U.S. App. LEXIS at *2-*3.

     The Ninth Circuit affirmed the district court's

---

[20/] In contrast, in this matter the Court held that ABD beneficiaries have a right to enforce 42 U.S.C. § 1396u-2(b)(5) via 42 U.S.C. § 1983.  5/11/09 Order at *57-*58.  The Court distinguished HCH by noting that, in HCH, the court was not presented with the question of whether Medicaid beneficiaries have enforceable rights under the "freedom of choice" provision or 42 U.S.C. § 1396u-2(a)(3)(A).  Id. at *48.  The Court concluded that, when those provisions are factored into the analysis, 42 U.S.C. §§ 1396(a)(1)(A)(i) and 1396u-2(b)(5) were intended to benefit Medicaid recipients.  Id.

[21/] Hawaii Coalition for Health is a non-profit corporation formed to advocate for the rights of Hawaii's healthcare consumers.

dismissal of the Hawaii Coalition for Health's claim that DHS

violated 42 U.S.C. § 1396u-2(b)(5) and 42 C.F.R. 438.207 for

failure to state a claim upon which relief can be granted.  Id.

at *3.  Specifically, the Ninth Circuit held that "DHS included

requirements in the QExA RFP that satisfied DHS' statutory and

regulatory obligations under 42 U.S.C. § 1396u-2(b)(5) and 42

C.F.R. § 438.207."  Id.  The Ninth Circuit explained that, "it is

the existence of assurances of future performance, and not the

present status of provider networks, that is mandated by 42

U.S.C. § 1396u-2(b)(5)."  Id. at *3-*4.  Thus, the Ninth Circuit

held the Hawaii Coalition for Health's claim that neither

WellCare of Arizona nor Evercare had an established network of

providers at contract signing failed to state a claim upon which

relief could be granted.  Id.

     The Ninth Circuit's opinion in Hawaii Coalition for

Health directly rejects Plaintiffs' first claim under 42 U.S.C.

§ 1396u-2(b)(5) because the Ninth Circuit was presented with the

exact claim Plaintiffs now assert: that neither Evercare nor

WellCare of Arizona, at the time their contracts were signed by

the State DHS, met the coverage and provider network requirements

under the statute.  Id.  In response to the State Defendants'

supplemental briefing regarding the Ninth Circuit's decision in

Hawaii Coalition for Health, Plaintiffs attempt to distinguish

the Ninth Circuit's opinion on temporal grounds, by emphasizing

Ninth Circuit's statement: "it is the existence of assurances of future performance . . . that is mandated by 42 U.S.C. § 1396u-2(b)(5) and 42 C.F.R. § 438.207." Pls.' Resp. Br. at 4.  In other words, although the Ninth Circuit's opinion directly rejects Plaintiffs' first claim under 42 U.S.C. § 1396u-2(b)(5), Plaintiffs assert that their second claim under 42 U.S.C. § 1396u-2(b)(5) is still viable.

Accordingly, the Court will now turn to Plaintiffs' second claim under 42 U.S.C. § 1396u-2(b)(5).

## B. Whether Evercare and WellCare of Arizona meet the State DHS's Access Standards

Plaintiffs' second claim under 42 U.S.C. § 1396u-2(b)(5) is that, at present, the QExA Contractors have failed to provide sufficient assurances because their provider networks are inadequate.  St. 2d Am. Compl. ¶¶ 90, 92, 94, 97, 102.  To review, the statute requires that each MCO provide the state and the Secretary with assurances (in a time and manner determined by the Secretary) that, "with respect to a service area," it "has the capacity to serve the expected enrollment in such service area," including assurances that the organization "(A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area," and "(B) maintains a sufficient number, mix, and geographic distribution of providers of services."  42 U.S.C. § 1396u-2(b)(5).  As to the timing of

34

the assurances, the Secretary has directed that assurances be given no less frequently than (1) at the time the MCO enters into a contract with the State, and (2) at any time there has been a significant change (as defined by the State) in the MCO's operations that would affect adequate capacity and services.   <u>See</u> 42 C.F.R. § 438.207(c).

Further, the Secretary has directed the state to "ensure, through its contracts, that each MCO . . . gives assurances . . . <u>in accordance with the State's standards for access to care</u> under [42 C.F.R. subpart D]."   42 C.F.R. § 438.207(a) (emphasis added).   The Secretary has thus directed the states to set standards for access to care.   <u>See</u> <u>id.</u> Evercare notes that the fact that the Secretary has placed responsibility on the states to establish standards for access to care is not surprising.   Evercare's MSJ Mem. 23.   It explains that, in this case, the State, having administered the Medicaid FFS program for the ABD population for many years prior to the development of the QExA Program, is familiar with the anticipated enrollment in the program and the number and types of providers required to furnish the services provided under the program.   <u>Id.</u>

Evercare correctly observes that the Secretary has provided guidance to the state as to what it must consider in setting standards for provider networks.   Evercare's MSJ Mem. at 23-25.   42 C.F.R. § 438.206 states in relevant part:

(b) Delivery network.  The State must ensure, through its contracts, that each MCO . . . meets the following requirements:

(1) Maintains and monitors a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract. In establishing and maintaining the network, each MCO . . . must consider the following:

(i) The anticipated Medicaid enrollment.

(ii) The expected utilization of services, taking into consideration the characteristics and health care needs of specific Medicaid populations represented in the particular MCO . . . .

(iii) The numbers and types (in terms of training, experience, and specialization) of providers required to furnish the contracted Medicaid services.

(iv) The numbers of network providers who are not accepting new Medicaid patients.

(v) The geographic location of providers and Medicaid enrollees, considering distance, travel time, the means of transportation ordinarily used by Medicaid enrollees, and whether the location provides physical access for Medicaid enrollees with disabilities.

(2) Provides female enrollees with direct access to a women's health specialist within the network for covered care necessary to provide women's routine and preventive health care services. This is in addition to the enrollee's designated source of primary care if that source is not a women's health specialist.

(3) Provides for a second opinion from a qualified health care professional within the network, or arranges for the enrollee to obtain one outside the network, at no cost to

36

the enrollee.

(4) If the network is unable to provide necessary services, covered under the contract, to a particular enrollee, the MCO . . . must adequately and timely cover these services out of network for the enrollee, for as long as the MCO . . . is unable to provide them.

(5) Requires out-of-network providers to coordinate with the MCO . . . with respect to payment and ensures that cost to the enrollee is no greater than it would be if the services were furnished within the network.

(6) Demonstrates that its providers are credentialed as required by [42 C.F.R. §] 438.214.

Id. § 438.206.  The Court has previously observed that this detailed list of factors speaks to whether an entity has provided at least "adequate" assurances pursuant to 42 U.S.C. § 1396u-2(b)(5) when they are considered in light of "'a state's Medicaid plan, agency records and documents, and the testimony of Medicaid recipients and providers.'"  5/11/09 Order at *54 (quoting Ball v. Rodgers, 492 F.3d 1094, 1115 (9th Cir. 2007)).[22/]

_____

[22/] At the hearing on this motion, Plaintiffs called the Court's attention to this particular language in its 5/11/09 Order.  See Tr. 31:20-24.  The language suggesting that the Court could look to the testimony of Medicaid recipients and providers was premised on the Court's previous view that 42 U.S.C. § 1396u-2(b)(5) imposes a continuing obligation on the MCOs to comply with the access standards set forth in the regulations implementing 42 U.S.C. § 1396u-2(b)(5).  However, as discussed below, as a result of the Ninth Circuit's recent decision in Hawaii Coalition for Health, and upon reviewing 42 U.S.C. § 1396u-2(b)(5) and its implementing regulations, the Court concludes that 42 U.S.C. § 1396u-2(b)(5) does not require the

(continued...)

Thus, 42 C.F.R. § 438.207 establishes when an MCO must provide a state with assurances of adequate capacity, and 42 C.F.R. § 438.206 establishes what assurances must be made with regard to access to services.  See 42 C.F.R. § 438.207 (section titled "Assurances of adequate capacity and service"); 42 C.F.R. § 438.206 (section titled "Availability of services").

        Evercare suggests that 42 U.S.C. § 1396u-2(b)(5) and its corresponding regulations only require that states provide for adequate access to care in its contracts with the MCOs. Evercare's MSJ Mem. at 22-27.  Evercare's interpretation focuses on the use of the phrase "through its contracts" in 42 C.F.R. §§ 438.206-07.  See 42 C.F.R. § 438.206(b)("[T]he State must ensure, through its contracts, that each MCO [meets the requirements set out in 42 C.F.R. § 438.206(b)(1)-(6)]") (emphasis added)); see also 42 C.F.R. § 438.207 ("The State must ensure, through its contracts, that each MCO . . . gives assurances to the State and provides supporting documentation that demonstrates it has the capacity to serve the expected enrollment in its service area . . .

---

        [22]/(...continued)
Court to examine the testimony of Medicaid recipients and providers to determine whether the State and MCOs are in compliance with 42 U.S.C. § 1396u-2(b)(5).  The reasoning in Hawaii Coal. for Health suggests that a Court can determine whether the State and MCOs are in compliance with 42 U.S.C. § 1396u-2(b)(5) by examining "[the] state's Medicaid plan [and] agency records and documents . . . ." 5/11/09 Order at *54.  The Court does not rely on Hawaii Coal. for Health as precedent.  See U.S. Ct. of App. 9th Cir. Rule 36-3.  The Court does, however, find the opinion illustrative and concurs with its reasoning.

. .").  Consequently, Evercare argues that the QExA Contracts

contain provisions addressing all of the requirements set forth

in 42 C.F.R. § 438.206.  Evercare's MSJ Mem. at 2.

　　　　　Evercare explains that by including the required

provisions in its contract with the State, the QExA Contractors

have provided the State with adequate assurances that ABD

beneficiaries will have appropriate access to services.  Id.  The

terms of the RFP address all of the factors listed in 42 C.F.R. §

438.206.  See Evercare's Reply at 3 ("Plaintiffs have come

forward with no relevant, admissible evidence that the [RFP] for

the [QExA] program failed to incorporate the requirements imposed

by 42 U.S.C. § 1396u-2(b)(5) and 42 C.F.R. § 438.206 . . . .")[23]

For instance, the RFP requires that if covered services are

unavailable within the plan's network, the QExA Contractors must

pay for out-of-network services at no additional cost to the QExA

member.  Evercare's MSJ CSF Ex. A at AR 4028 (as required by §

438.206(b)(4)-(5)).  Further, the RFP requires that the MCOs

contract with credentialed providers.  Id. at 4029-31 (as

required by § 438.206(b)(6)).  The RFP also requires that the

QExA Contractors provide female enrollees with direct access to a

women's health specialist within the network, and that members be

_____

　　　[23] At the hearing, Plaintiffs conceded that the RFP includes
all of the requirements listed in 42 C.F.R. § 438.206.  See Tr.
35:24-25 ("[T]he RFP tracks the statute and the regulations as
far as [Plaintiffs] can see . . . .").

39

able to obtain a second opinion if requested.  Id. at 4031, 4140

(as required by § 438.206(b)(2)-(3)).

The State and MCOs also considered the five factors set

forth in 42 C.F.R. 438.206(b)(1)(i)-(v).  For instance, as

required by sub-paragraphs 1(i)-(iii), the RFP requirements for

provider networks and access to care were established by the

State taking into consideration its prior experience with the ABD

population under the FFS program.  See Bazin Decl. ¶ 7.  Both

Evercare and WellCare of Arizona performed their own assessment

of the expected utilization of services (considering the

characteristics and health care needs of the population to be

served by the QExA plans), and the numbers and types of providers

needed to provide those services.  Heywood Decl. ¶¶ 10, 12;

Preitauer Decl. ¶¶ 7, 9.  With respect to sub-paragraph (1)(iv),

in contracting with providers, Evercare and WellCare of Arizona

sought to determine whether the providers were willing to accept

new Medicaid patients under the QExA Program.  Heywood Decl. ¶

11, Preitauer Decl. ¶ 8.  Finally, with respect to sub-paragraph

1(v), the RFP establishes requirements for geographic access to

providers stated in drive times.  Id. at 4036.  Furthermore, the

RFP requires that the MCOs maintain a network sufficient to serve

the expected enrollment in its service area.  Id. at 4032-35

("The [MCO] is solely responsible for ensuring it (1) has the

network capacity to serve the expected enrollment in the service

area, (2) offers an appropriate range of services and access to preventive, primary and long-term care services, and (3) maintains a sufficient number, mix, and geographic distribution of providers of services.").

As stated above, Plaintiffs do not dispute that the terms of the RFP address all of the requirements set forth in 42 C.F.R. § 438.206.  Instead, Plaintiffs assert that the QExA Program, as implemented, violates 42 U.S.C. § 1396u-2(b)(5) and its corresponding regulations.  <u>See</u> Pls.' Opp'n at 4 ("[Evercare] has not attempted to provide proof of adequacy-in-fact, and thus its motion must be denied.").  Consequently, "Plaintiffs' claims are based on their supported allegations that there were and are insufficient numbers, types, and proximately located real, live providers, ready and willing to accept ABD beneficiaries as patients and provide them with the services they need, regardless of whatever documentation Intervenors have created."  <u>Id.</u> at 5.

Plaintiffs assert that Evercare's CSF concerns "only theoretical network adequacy, rather than the actual, factual adequacy required for the Court to hold that the networks comply with the regulations and § 1396u-2(b)(5)."  <u>Id.</u> at 6.[24/]  This

_____

[24/] To this end, at the hearing on this motion, Plaintiffs asserted that "somewhere it seems to be lost, at least from [Plaintiffs] perspective, the fact that this is a motion for summary judgment brought by [Evercare] and supported by the defendants; and, therefore, they are the ones who have the burden."  Tr. 31:14-19.  Evercare has satisfied its burden with
(continued...)

assertion, however, conflicts with the Ninth Circuit's recent decision in <u>Hawaii Coalition for Health</u>.  2010 U.S. App. LEXIS at *2-*3.  The Ninth Circuit concluded that "DHS included requirements in the QExA RFP that <u>satisfied</u> DHS' statutory and regulatory obligations under 42 U.S.C. § 1396u-2(b)(5) and 42 C.F.R. § 438.207."  <u>Id.</u> *3 (emphasis added).  Thus, the Ninth Circuit has unequivocally stated that the QExA Contracts satisfy the requirements of 42 U.S.C. § 1396u-2(b)(5).

As indicated above, Plaintiffs attempt to distinguish the present case on temporal grounds.  Plaintiffs observe that, in reaching its conclusion, the Ninth Circuit explained that "it is the existence of assurances of future performance, and not the present status of provider networks, that is mandated by 42 U.S.C. § 1396u-2(b)(5)."  <u>Id.</u> at *3-*4.  From this, Plaintiffs appear to suggest 42 U.S.C. § 1396u-2(b)(5)'s mandate is twofold.  First, at the time a state enters into a contract with an MCO, the state must include the requisite assurances in the terms of the contract.  Second, once the MCO begins to provide services to Medicaid beneficiaries, the MCOs must continually provide the state with assurances of provider network adequacy.  This position, however, ignores the fact that the Ninth Circuit

---

[24]/(...continued)
respect to Plaintiffs' claim under 42 U.S.C. § 1396u-2(b)5), however, as Evercare has come forward with evidence that the RFP is in compliance with 42 U.S.C. § 1396u-2(b)5) and its implementing regulations.

affirmed the district court's decision to dismiss the Hawaii Coalition for Health's claims based on failure to state a claim upon which relief could be granted.  If the requirements of 42 U.S.C. § 1396u-2(b)(5) are ongoing as Plaintiffs suggest, the Ninth Circuit would have dismissed the plaintiffs' claim on ripeness grounds, not failure to state a claim.  Id.  Indeed, the Ninth Circuit's opinion proceeds to affirm the dismissal of a separate claim made by the Hawaii Coalition for Health on ripeness grounds.  Id. at *4-*7 (dismissing the claim made under 42 U.S.C. § 1396u-2(a)(1)(A)(ii) because it was not ripe for judicial review).

In sum, although the Ninth Circuit's opinion dealt specifically with the timing of the assurances, the Court finds that the decision in Hawaii Coal. for Health also addresses Plaintiffs' second claim under 42 U.S.C. § 1396u-2(b)(5) because (1) the Ninth Circuit stated that the QExA RFP satisfied DHS' statutory and regulatory obligations under 42 U.S.C. § 1396u-2(b)(5), and (2) the Ninth Circuit affirmed the district court's decision to dismiss the Hawaii Coalition for Health's claim under 42 U.S.C. § 1396u-2(b)(5) for failure to state a claim upon which relief could be granted.

Further, 42 C.F.R. 438.207 does not suggest that the adequate assurances provision imposes a continuing obligation on states.  To the contrary, 42 C.F.R. 438.207 mandates that

43

adequate assurances must be given at the time the MCO enters into the contract with the state, and any time there is a substantial change in the scope of the MCO's services.  Specifically, 42 C.F.R. 438.207 provides that adequate assurances be given no less frequently than:

>  (1) At the time it enters into a contract with the State.
>
>  (2) At any time there has been a significant change (as defined by the State) in the MCO's . . . operations that would affect adequate capacity and services, including–
>
>    (i) Changes in MCO . . . benefits, geographic service area or payments; or
>
>    (ii) Enrollment of a new population in the MCO . . . .

42 C.F.R. § 438.207.  Had the Secretary intended that 42 U.S.C. § 1396u-2(b)(5) require MCOs to continually provide assurances of network adequacy, it would be unnecessary to require that adequate assurances be given when there is a significant change in the MCO's operations that would affect capacity and services. Moreover, Plaintiffs do not allege that there has been a significant change in the QExA Contractors' services since the QExA Program began on February 1, 2009.  Instead, Plaintiffs assert that the QExA Contractors have failed to give adequate assurances at the time they entered into the QExA Contracts with the State, or at anytime thereafter.  See Pls.' Opp'n at 3 ("Given the substantial record of complaints, investigations by

the State Legislature, and declarations of witnesses previously filed herein, a genuine dispute exists whether Intervenors' networks were sufficient to guarantee the capacity to serve the expected enrollment on February 1, 2009, the first day of QExA, or on any day thereafter."). Thus, 42 U.S.C. § 1396u(b)(5) mandates that the Court need only look to the language of the QExA Contracts to determine whether the MCOs have provided the State with adequate assurance of the network capacity. As observed by the Ninth Circuit, "DHS included requirements in the QExA RFP that satisfied DHS' statutory and regulatory obligations under 42 U.S.C. § 1396u-2(b)(5) . . . . ." 2010 U.S. App. LEXIS at *2.[25/]

_____

[25/] Even if 42 U.S.C. § 1396u-2(b)(5) were to impose a continuing obligation on MCOs to comply with the terms of the RFP, the Court would grant summary judgment in favor of the State Defendants and Intervenors as to Plaintiffs' claim under 42 U.S.C. § 1396u-2(b)(5). In an attempt to establish that the QExA Contractors have breached the terms of the RFP, Plaintiffs rely heavily on the testimony of Dr. Meyers. For reasons discussed in a separate order, however, the Court has excluded Dr. Meyers' expert testimony because her Preliminary and Final reports are inadmissible pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). These reasons, which are more fully set forth in the Meyers MIL Order, include (1) that Dr. Meyers did not take into account that 2/3 of ABD beneficiaries are dual eligible and consequently may continue to see their Medicare providers, (2) Dr. Meyers' opinions are based on her own self-imposed standard that most ABD beneficiaries require an internist as their PCP, (3) the survey Dr. Meyers caused to be conducted was not conducted according to accepted principles, (4) Dr. Meyers offered legal opinions which were not a proper topic for expert testimony, and (5) Dr. Meyers' opinions regarding the alleged inaccuracies in the provider listings did not involve scientific, technical, or otherwise specialized
(continued...)

Finally, Plaintiffs argue that if "the Court must accept whatever the State says is adequate . . . the State could trample on the ABD beneficiaries' Federal law rights whenever it pleased, leaving them without even the courts to enforce those rights." Pls.' Resp. Br. at 3. This assertion is incorrect for several reasons.

---

[25]/(...continued)
knowledge, and instead Dr. Meyers' proposed testimony on this issue would only serve to enable her to act as a conduit for hearsay evidence. Without considering the testimony of Dr. Meyers or the abundance of other inadmissible hearsay submitted by Plaintiffs, the Court is left with declarations submitted by a handful of providers and beneficiaries, most of which relate to coverage disputes, not problems relating to provider availability. Even considering these declarations, however, Plaintiffs have not come forward with sufficient evidence to establish that the terms of the RFP have been breached. For example, the RFP requires plans to contract with enough PCPs to ensure that the ratio of PCPs to beneficiaries does not exceed 600:1. See AR 4033. The QExA Dashboard Report Health Plan Comparison Monthly Trend Analysis submitted by Evercare ("Dashboard Report"), reflects that in October 2009, the number of Evercare members per PCP ranged from a low of 17:1 to a high of 47:1 in East Hawai'i on the Big Island. Evercare's Reply at 9-10; Evercare's MSJ CSF, Ex. Evercare3. The number of WellCare of Arizona members per PCP as of the October 2009 Dashboard Report ranged from a low of 17:1 on Lanai to 66:1 on Molokai. Evercare's Reply at 10; Evercare's MSJ CSF, Ex. Evercare3. Thus, "[e]ven if the number of PCPs stated on the provider networks report is overstated, as Plaintiffs claim, there is no basis for concluding that any inaccuracies would cause the ratio of members to PCPs to violate the RFP requirements." Evercare's Reply at 10. Therefore, even if the Court were to examine the testimony of Medicaid recipients and providers that Plaintiffs have submitted, the Court would conclude that the State Defendants and Intervenors are entitled to summary judgment as to Plaintiffs' claim based on 42 U.S.C. § 1396u-2(b)(5). As Evercare aptly put it, "[t]his was the time for Plaintiffs to establish they could support their allegations with relevant, admissible evidence, and they have failed to do so." Evercare's Reply at 17.

First, the State is not solely responsible for determining what is adequate. As discussed above, 42 C.F.R. § 438.206 provides guidance to the State as to what it must consider in setting standards for provider networks.

Second, having established that the State provided adequate assurances in its QExA Contracts, if the MCOs do not comply with the terms of the QExA Contracts, the Plaintiffs' remedy is a breach of contract action in state court. See Clayworth v. Bonta, 295 F. Supp. 2d 1110, 1126 (E.D. Cal. 2003) (holding that Medicaid beneficiaries had a cause of action under 42 U.S.C. § 1983 to enforce quality and access provisions under the fee-for-service system but that there was no similar private right of action to enforce § 1396n(b)(4), a managed care provision, because the appropriate remedy was breach of contract) rev'd on other grounds, 140 Fed. Appx. 677 (9th Cir. 2005). In Clayworth, the Court observed:

> [T]he managed care plan's relationship with the State is contractual. If the State has breached its contract by lowering the payment to the plan, then the plan's remedy is a breach of contract action in state court. If the contract allows the State to reduce rates in this manner, then that is a risk assumed by the plan.

Id. Although Clayworth spoke of a breach of contract action between the MCO and the state, the Court is unaware of any reason that would prohibit QExA members from bringing a breach of contract action against the MCOs or the State as a third-party

47

beneficiary.[26/]

Third, although the grievance process established by the QExA Contracts is unlikely to remedy large scale systemic problems in network adequacy, the process is useful in addressing the individual complaints of QExA members.  Indeed, many of the declarations submitted by Plaintiffs involve QExA member disputes that can be, or were, resolved in the grievance process.  See, e.g., Pls.' Opp'n to Evercare's MSJ CSF, Declaration of Shana Metsch ¶ 15 (example of a QExA beneficiary utilizing the grievance process in attempt to resolve a coverage dispute).

Fourth, and finally, as the State Defendants observed at the hearing, "if none of these protections prevail, or work, this - - the Federal Government can pull the plug on this program

---

[26/] At the hearing, the Court inquired as to whether ABD beneficiaries could sue the MCOs or the State Defendants as a third party-beneficiary for breach of contract:

> THE COURT: Do you agree that the beneficiaries could sue the MCOs or the State Defendants under State laws as third-party beneficiaries to enforce the provisions of the RFP?
>
> [Evercare's Counsel:] I have not specifically looked at whether the ABD beneficiaries would have a claim as a third-party beneficiary under the contracts . . . I do know that plan beneficiaries frequently will sue for breach of contract.  I just have not applied it specifically to the QUEST Expanded Access program.  [Plaintiffs' counsel] represented a client under the QUEST program that did bring a lawsuit in State court alleging breach of contract, so it's been done.

Tr. 21:1-6, 15-20.

. . . ." Tr. 30:13-16.  The State Defendants further explained that, "[t]his is a project that proceeds under a waiver which can be, at any time, withdrawn by the Federal Government if it believes that the State is no longer acting in compliance with its terms and conditions, and needs to be renewed periodically . . . ." Tr. 30:17-23.

Accordingly, for the reasons stated above, the Court grants Evercare's MSJ, and the joinders therein, with respect to Plaintiffs claim that the QExA Contractors' provider networks are inadequate in contravention of 42 U.S.C. § 1396u-2(b)(5) and its corresponding regulations.[27]

---

[27] As stated above, Plaintiffs seek to offer the expert testimony of Dr. Meyers to establish that the QExA provider networks are inadequate.  Her proposed testimony goes to whether the QExA Contractors' provider networks are adequate-in-fact. See Pls.' Resp. Br. Ex 4 at 8 ("Evercare's and [WellCare of Arizona's] physician provider networks have been and are substantially inadequate system-wide . . . .").  However, as discussed above, 42 U.S.C. § 1396u-2(b)(5) does not require adequacy-in-fact, but rather that the QExA RFP contain adequate assurances, and that these assurances comply with 42 U.S.C. § 1396u-2(b)(5) and its implementing regulations.  See Hawaii Coal. for Health, 2010 U.S. App. LEXIS at *2-*3.  Accordingly, the Court need not address the impact that Dr. Meyers' Final Report has on Evercare's MSJ.  Further, at the hearing on this motion, the parties agreed that the Court should rule on the admissibility of Dr. Meyers' Final Expert Report served on February 15, 2010.  Tr. 2:21-25, 3:1-21.  For reasons discussed in a separate order, the Court has excluded Dr. Meyers' expert testimony because her Preliminary and Final reports are inadmissible pursuant to Fed. R. Evid. 702 and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993).

## II.    42 U.S.C. § 1396u-2(a)(1)(A)(ii):  Restricting the Number of MCO Contracts to Two

The second provision that Plaintiffs premise their provider-network claim upon is 42 U.S.C. § 1396u-2(a)(1)(A)(ii), which directs that a state "may restrict the number of provider agreements with managed care entities under the State plan [to not less than two] if such restriction does not substantially impair access to services."  42 U.S.C. § 1396u-2(a)(1)(A)(ii).

In the State Second Amended Complaint, Plaintiffs contend that, at the time the QExA RFP was issued (and to the present day), the State DHS lacked (and still lacks) the information necessary to determine whether restricting the number of MCO contracts to two does not substantially impair access to services.  St. 2d Am. Compl. ¶¶ 27, 97–98.

In its motion for summary judgment, Evercare asserts that the undisputed facts confirm that the State Defendants determined that limiting the number of MCO contracts to two would not substantially impair access to services at the time of contracting in light of the LOIs.  Evercare's MSJ Mem. 29. According to Evercare, the State DHS had detailed knowledge and years of experience in meeting the needs of the ABD population under the Medicaid fee-for-service system.  Id. at 29.  In considering whether restricting the number of MCO contracts to two would substantially impair access to services, the State DHS considered the anticipated Medicaid enrollment, the expected

50

utilization of services by the ABD population to be served by the
QExA plans, the numbers and types of providers required to
furnish the contracted services, and the number of contracted
providers not accepting new patients.  Id. at 29-30; Bazin. Decl.
¶ 10.  Thus, the State DHS took into account that 2/3 of ABD
beneficiaries are dual eligible such that they could continue to
see their providers under Medicare.  See Evercare's Reply at 12;
see also Evercare's MSJ CSF, Ex. Evercare3.  Upon review of the
LOIs and provider network narratives submitted by Evercare and
WellCare of Arizona pursuant to RFP § 80.315, the State DHS
determined that, if the QExA Contractors could assemble the
networks promised by the LOIs submitted, restricting the number
of QExA Contracts to two would not substantially impair access to
services.  Evercare's MSJ Mem. at 30; Bazin. Decl. ¶ 10.

Evercare further notes that the State DHS closely
monitored the development of the QExA Contractors' provider
networks to ensure that access to services would not be
substantially impaired once the QExA Program commenced services
on February 1, 2009.  Evercare's MSJ Mem. at 30.  In certifying
the adequacy of the provider networks in December 2008 and
January 2009, the State DHS determined that the two QExA
Contractors had assembled provider networks that met the
requirements of the RFP.  Id. at 30-31.  According to Evercare,
"the State also considered the fact that the majority of QExA

members were previously served under the Medicaid FFS program -
such that they are the existing patients of the providers
limiting their practice." Evercare's MSJ Mem. at 30.[28]

The adequate provider network provision located in
§ 1396u-2(b)(5) and the substantial impairment provision located
in § 1396u-2(a)(1)(A)(ii) are closely related because both
mandate that states ensure that MCOs provide adequate access to

---

[28] Plaintiffs argue that Evercare "abused the facts" of Ms.
Bazin's declaration in asserting that the a majority of the QExA
members are the existing patients of the providers limiting their
practice. Pls.' Opp'n at 13. Paragraph 10 of Ms. Bazin's
Declaration, which Evercare uses to support this contention,
states, in its entirety:

> The majority of the patients now enrolled in the
> QExA program were previously receiving care under
> the Medicaid FFS program. The Department
> determined that limiting ABD beneficiaries to
> enrollment in one of two QExA plans would not
> substantially impair access to covered services,
> provided the plans were able to development the
> provider networks required by the RFP.

Bazin. Decl. ¶ 10. Plaintiffs' concern that Evercare's assertion
is not supported by Ms. Bazin's declaration is well grounded. In
reply, Evercare argues that "[w]hile Plaintiffs purport to
dispute Evercare's conclusion that those patients continue to be
served by their prior FFS providers, they offer no evidence to
the contrary." Evercare Reply at 10. Nevertheless, the Court
need not rule on the veracity of Evercare's assertion that a
majority of the QExA members are the existing patients of the
providers limiting their practice because it is immaterial to the
resolution of the issues in this matter. What is important,
however, is Ms. Bazin's statement that the State decided that
limiting the ABD beneficiaries to enrollment in one of the two
QExA plans would not substantially impair access to covered
services. This decision took into account that 2/3 of ABD
beneficiaries are dual eligible such that they could continue to
see their providers under Medicare. See Evercare's Reply at 12;
see also Evercare's MSJ CSF, Ex. Evercare3.

services.  See 42 U.S.C. § 1396u-2(a)(1)(A)(ii) ("[States] may restrict the number of provider agreements with managed care entities under the State plan if such restriction does not substantially impair access to services."); 42 U.S.C. § 1396u-2(b)(5) (requiring that states ensure that the MCO "(A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area," and "(B) maintains a sufficient number, mix, and geographic distribution of providers of services").

These provisions differ, however, in that 42 U.S.C. § 1396u-2(b)(5) looks to whether states ensure, through their contracts, that the MCOs maintain adequate provider networks, and 42 U.S.C. § 1396u-2(a)(1)(A)(ii) looks to whether the decision to restrict the number of MCOs substantially impairs access to services.  The Ninth Circuit's decision in Hawaii Coalition for Health illustrates this point.  There, the Ninth Circuit affirmed the dismissal of the Hawaii Coalition for Health's 42 U.S.C. § 1396u-2(b)(5) claim based on failure to state a claim upon which relief could be granted, but affirmed the dismissal of the Hawaii Coalition for Health's 42 U.S.C. § 1396u-2(a)(1)(A)(ii) claim on ripeness grounds.  Hawaii Coalition for Health, 2010 U.S. App. LEXIS at *2-*7.  In dismissing the Hawaii Coalition for Health's 42 U.S.C. § 1396u-2(a)(1)(A)(ii) claim on ripeness

grounds, the Ninth Circuit observed:

> i) DHS did not make a definitive statement that it would require ABD individuals to receive services from Evercare and [WellCare of Arizona] if their programs substantially impaired access, but instead provided that DHS could terminate Evercare and [WellCare of Arizona]'s contract if they could not comply with the RFP's provider network requirements, ii) DHS's mere decision to enter into contracts with Evercare and [WellCare of Arizona] had no direct and immediate effect on ABD individuals or on [the Hawaii Coalition for Health], iii) DHS' decision to enter into contracts with Evercare and [WellCare of Arizona] does not have the status of law, and iv) the contracts with Evercare and [WellCare of Arizona] were signed in February of 2008, but compliance with all terms of the contracts was not required until QExA commenced service much later.

Id. at *6.

In essence, the Ninth Circuit held that the Hawaii Coalition for Health's substantial impairment claim was not ripe because it was based on when the State entered into the QExA Contracts, and not when the QExA Contractors began providing services.[29/]  In this matter, Plaintiffs' claim based on 42 U.S.C. § 1396u-2(a)(1)(A)(ii) is properly before the Court because, as of February 1, 2009, the managed care program was implemented and

---

[29/] At the hearing, Evercare explained "the Ninth Circuit, at that point, said [the plaintiff's substantial impairment claim] wasn't ripe because the program hasn't gone live.  The State had not committed any violation at that point.  There was no evidence that the State would require that the ABD beneficiaries receive services from two plans if . . . doing so would substantially impair access to services . . . ."  Tr. 10:7-12.  In this case, however, as of February 1, 2009, the QExA Contractors have provided services to the ABD beneficiaries.

the QExA Contractors were required to provide services to ABD beneficiaries and to comply with the terms of the QExA Contracts. Plaintiffs' Second Amended Complaint contends that, at the time the QExA RFP was issued (<u>and to the present day</u>), the State DHS lacked (<u>and still lacks</u>) the information necessary to determine whether restricting the number of MCO contracts to two does not substantially impair access to services. St. 2d Am. Compl. ¶¶ 27, 97–98 (emphasis added). Accordingly, because the Ninth Circuit's concerns regarding ripeness do not apply to this matter, the Court will now examine whether the State Defendants and Intervenors are entitled to summary judgment as to Plaintiffs' claim based on 42 U.S.C. § 1396u-2(a)(1)(A)(ii).[30/]

---

[30/] The Court rejects Plaintiffs' claim that the State Defendants did not make a determination that restricting the number of MCOs to two would not substantially impair access to services. Evercare has come forward with evidence that the State DHS determined that restricting the number of QExA Contracts to two would not substantially impair access to services. Bazin Decl. ¶ 10. Although Plaintiffs challenged the veracity of Ms. Bazin's declaration at the hearing, Plaintiffs have provided no evidence to counter the assertion by Ms. Bazin in her Declaration that such a determination was, in fact, made. <u>See</u> Tr. 45:22-25 ("[Ms. Bazin's declaration is] a retrospective look at things. [Her] declaration isn't documented by any documentation that they actually made that determination at the time."). Further, in response to Plaintiffs' claim that, if the Court were to hold that the State Defendants made a decision that restricting the number of MCOs would not substantially impair access to services, this ruling would preclude the State from revisiting its decision, Evercare correctly observes that "[t]he State holds all the cards in terms of contract terminations, and if they decide that the two plans are not doing the job that they were hired to do, there is nothing preventing them from reverting this program to fee-for-service, other than the tremendous upheaval and
(continued...)

Plaintiffs do not appear to argue that the Medicaid statute requires that states <u>must</u> select more than two MCOs, nor could they. <u>See</u> 42 § 1396u-2(a)(3) ("A State must permit an individual to choose a managed care entity from <u>not less than two</u> such entities that meet the applicable requirements of [42 U.S.C. § 1396u-2], and of [42 U.S.C. § 1396b(m)].")[31/]  Instead, Plaintiffs' claim appears to be that the State <u>should</u> have selected more than two MCOs.  St. 2d Am. Compl. ¶¶ 27, 97-98.[32/]

To review, 42 U.S.C. § 1396u-2(a)(1)(A)(ii) mandates

---

[30/] (...continued)
disruption in care that would occasion for the Medicaid beneficiaries . . . ."  Tr. 53:15-20.

[31/] In addition, 42 C.F.R. § 438.52(a) provides: "[A] state that requires Medicaid recipients to enroll in an MCO . . . must give those recipients a choice of at least two entities."  42 C.F.R. § 438.52(a).

[32/] Plaintiffs assert that Evercare concedes in its motion that access to covered services would be substantially impaired by limiting the ABD beneficiaries to enrollment in one of the two QExA plans <u>unless</u> the requirements of the RFP were met.  Pls.' Opp'n at 4 (emphasis in original).  Presumably, Plaintiffs are referring to Evercare's statement that:

> Upon review of the LOIs and Provider Networks Narratives submitted by Evercare and [WellCare of Arizona] pursuant to RFP Section 80.315, the State determined that - if the plans could assemble the contracted network promised by the LOIs submitted - restricting the number of QExA Contracts to two would not substantially impair access to services.

Evercare's MSJ Mem. at 30.  The Court does not view Evercare's statement as a concession, but rather as a statement that the State decided access to services would not be impaired by its decision to restrict the QExA beneficiaries' choice of MCOs to Evercare and WellCare of Arizona.

56

that the decision to restrict the number of MCOs may not

substantially impair access to services.  See 42 U.S.C.

§ 1396u-2(a)(1)(A)(ii).  As Plaintiffs acknowledged at the

hearing on this matter, their claim under this provision is

essentially that three QExA MCOs would be better than two.[33/]

          Plaintiffs additionally argue that the State Defendants

should have contracted with all QExA bidders, as it had done with

the QUEST Program.  See Pls.' Opp'n at 23-24.  Plaintiffs,

however, have not come forward with any evidence to establish

that the QUEST Program contracted with all of the QUEST bidders.

Instead, Plaintiffs refer to comments made by AlohaCare, a

disappointed QExA bidder, and assert that AlohaCare's comments

"reflect[] the history of QUEST wherein the State Defendants

contracted with all bidders, ensuring the maximum benefit for

enrollees from choice and competition."  Id.  The Court cannot

consider AlohaCare's comments, however, as these comments

_____

     [33/] At the hearing, Plaintiffs asserted:

          THE COURT: There are only three [MCOs in QUEST] at
          this point, aren't there?

          [Plaintiffs' Counsel:] There are only three
          survivors.

          THE COURT: Three is better than two; is that what
          you are saying?

          [Plaintiffs' Counsel:] Definitely three is better
          than two.

Tr. 48:23-25, 49:1-4.

constitute inadmissible hearsay.  <u>Miller</u>, 454 F.3d at 988 ("Only

admissible evidence may be considered in deciding a motion for

summary judgment.").  In any event, the Court views Plaintiffs'

claim that the State Defendants should have contracted with all

QExA bidders as a restatement of its claim that the State should

have selected more than two MCOs.

To support their claim under the substantial impairment

provision, Plaintiffs assert that they have requested discovery

"from [other] managed care organizations [such as AlohaCare] that

the State Defendants asked to comment on the program and the

RFP."  <u>Id.</u> at 32.  Plaintiffs suggest that such discovery will

raise substantial questions about restricting the contracts to

two MCOs.  <u>Id.</u>  Specifically, Plaintiffs argue:

> Plaintiffs . . . collected, and are still
> collecting, from the managed care organizations
> the State Defendants asked to comment on the
> program and the RFP, probative evidence that the
> MCOs raised substantial questions based upon their
> experience operating managed care plans in Hawaii
> for Medicaid beneficiaries about restricting the
> contracts to two plans (per island).  The comments
> of AlohaCare demonstrate that it raised concerns
> that the State Defendants were undervaluing the
> importance of provider network assurances, that
> access to care by this very fragile population was
> being put at substantial risk by the rush to enter
> into contracts before requiring the plans to have
> provider networks in place.

<u>Id.</u>  As stated above, the comments made by AlohaCare that

Plaintiffs argue create genuine issues of material fact are

inadmissible hearsay.  <u>See</u> <u>Miller</u>, 454 F.3d at 988 ("Only

admissible evidence may be considered in deciding a motion for summary judgment."). Although Plaintiffs suggest that, through discovery, they will receive more comments from unsuccessful bidders, the Court observes that these comments would also be inadmissible hearsay.[34/]   Moreover, Plaintiffs have not shown what reasons, if any, the other MCOs presented to the State that support Plaintiffs' position that the State should have contracted with more than two MCOs.

Evercare has come forward with evidence that the State DHS' decision to limit the number of MCOs would not substantially impair access to services.  The State DHS reviewed the LOIs and provider network narratives and determined that, if the QExA Contractors could assemble the networks promised by the LOIs submitted, restricting the number of QExA Contracts to two would not substantially impair access to services.  Evercare's MSJ Mem. at 30; Bazin. Decl. ¶ 10.  Subsequently, in certifying the adequacy of the provider networks in December 2008 and January 2009, the State DHS determined that the two QExA Contractors had assembled provider networks that met the requirements of the RFP. Evercare's MSJ Mem. at 30-31.  The State DHS' decision to restrict the number of provider networks took into consideration the fact that 2/3 of ABD beneficiaries are dual eligible such

---

[34/] Plaintiffs have not made a sufficient request for a continuance pursuant to Fed. R. Civ. P. 56(f), nor have they even suggested that they desire that this motion be continued.

that they could continue to see their providers under Medicare. See Evercare's Reply at 12. This means that, of the approximately 40,000 ABD beneficiaries, approximately 26,000 of the beneficiaries could continue to see their providers under Medicare.

In response, Plaintiffs have not offered any admissible evidence suggesting that the ABD beneficiaries' access to services was substantially impaired by the State's decision to limit the number of MCOs to two (in this case, Evercare and WellCare of Arizona). To the contrary, most of the evidence submitted by Plaintiffs suggests that their perceived problems with the QExA Program are symptomatic of the rates the MCOs pay providers for services, and not because of the decision to require ABD beneficiaries to enroll with one of two QExA Contractors. See Evercare's Reply at 23 ("Plaintiffs have presented much inadmissible hearsay testimony regarding alleged problems accessing care under the QExA, but there is nothing to link those 'problems' to the limitation to two contracts."). For instance, although Plaintiffs argue that providers are switching from QExA to QUEST because QUEST allegedly pays 10-20% more to providers, Plaintiffs have offered no evidence to substantiate their claim that the State's decision to restrict the number of MCOs to two caused any providers to switch from the QExA Program to the QUEST Program. Pls.' Opp'n at 19.

60

Here, Plaintiffs acknowledge that the QExA Contractors
must, at a minimum, pay providers the rates providers received
under the FFS program.  See Tr. 47:17-24 (noting that the State
mandated that MCOs pay providers no less than the rates in the
prior fee-for-service program).  However, Plaintiffs' main
argument appears to be that more MCOs would result in more
competition and higher pay for providers, and thus better access
to services for QExA beneficiaries.

Although Plaintiffs have offered no evidence regarding
the number of MCOs that administer the QUEST Program, at the
hearing on this motion Plaintiffs asserted that the QUEST Program
currently consists of three MCOs which serve approximately
200,000 Medicaid beneficiaries.  See Tr. 52:24-25, 53:1.  This
means that the average number of members enrolled in each MCO in
the QUEST Program is approximately 67,000 members.  In contrast,
there are approximately 40,000 ABD beneficiaries in the QExA
Program, 2/3 of whom are dual eligible such that they continue to
see their providers under the Medicare program.  See Evercare's
Reply at 12.  Accordingly, there are approximately 20,000 members
enrolled with each QExA Contractor.  See Evercare's MSJ CSF, Ex.
Evercare3 (noting that in October 2009, Evercare had 19,217
members and WellCare of Arizona had 22,523).  Thus, the QExA MCOs
have fewer members to serve.

Notably, because ABD beneficiaries that are dual

61

eligible enroll with the QExA MCOs for their Medicaid services, they are counted for purposes of determining how many members are enrolled with each QExA Contractor.  Thus, the number of members the QExA Contractors provide services for is even less when taking into account the number of dual eligibles in the QExA Program that are permitted to continue to see their Medicare providers.  See Evercare's MSJ CSF, Ex. Evercare3 (observing that in October 2009, 12,985 of Evercare's members were dual eligible and 13,404 of WellCare of Arizona's members were dual eligible).

Also at the hearing on this motion, Plaintiffs asserted that MCOs must have a certain number of members in order to be financially stable.  See Tr. 46:21-23.  Although Plaintiffs have offered no evidence to substantiate this claim, it makes logical sense.  It also follows that the fewer the MCOs the State contracts with, the more members each MCO will have thus making them more financially stable.  According to Plaintiffs' counsel, when the QUEST Program started there were eight MCOs in the QUEST Program.  Tr. 48:15-24.  Currently, according to Plaintiffs' counsel, there are only three MCOs that administer the QUEST Program.  Id.  Thus, contrary to Plaintiffs' assertion, contracting with more MCOs is not always beneficial as only three of original eight MCOs have "survived" in the QUEST Program.  See Tr. 48:25 ("There are only three survivors [in the QUEST Program].")

62

Further, Plaintiffs have not come forward with any evidence of how many providers there are under QUEST.  Instead, Plaintiffs' claim under the substantial impairment provision amounts to sheer speculation based on hearsay comments made by AlohaCare.  To defeat summary judgment, Plaintiffs cannot simply rest on their assertion that three MCOs would be better than two, but instead are required to come forward with admissible evidence suggesting that the decision to restrict the number of MCOs to two substantially impaired access to services.  Plaintiffs have failed to do so in this case.

In sum, Plaintiffs have not come forward with any admissible evidence suggesting that the State DHS' decision to restrict the number of MCOs to two substantially impaired access to services.  See Evercare's Reply at 24 ("There is simply no evidence that, had there been other plans willing, qualified and able to provide the broad range of QExA services, the alleged problems complained of would not exist.").  Accordingly, the Court grants Evercare's MSJ, and the joinders therein, with regard to Plaintiffs' claim under 42 U.S.C. § 1396u-2(a)(1)(A)(ii), as Plaintiffs have failed to come forward with admissible evidence to establish a genuine issue of material fact with respect to this claim, and the State Defendants and Intervenors are entitled to judgment as a matter of law.

III.     **42 U.S.C. § 1396b(m)(1)(A)(i):  Making Services Available to the Same Extent That They are Available to Individuals Not Enrolled with the Organization**

The third and final provision that Plaintiffs rely upon in asserting that the QExA Contractors' networks are inadequate is 42 U.S.C. § 1396b(m)(1)(A)(i).  St. 2d Am. Compl. ¶ 66.  42 U.S.C. § 1396u-2(a)(3) provides that "[a] State must permit an individual to choose a managed care entity from not less than two such entities that meet the applicable requirements of [42 U.S.C. § 1396u-2], and of [42 U.S.C. § 1396b(m)]."[35/]  In its 12/24/09 Order, the Court found that there are genuine issues of material fact as to whether the QExA Contractors are in compliance with the first and third solvency requirements mandated by 42 U.S.C. § 1396b(m)(1)(A)(ii).  See 12/24/09 Order at *116-*17.  Consequently, there are genuine issues of material fact as to whether the State has permitted QExA members to choose from two MCOs that meet the requirements of 42 U.S.C. § 1396b(m), as mandated by 42 U.S.C. § 1396u-2(a)(3).

In addition to establishing solvency standards, 42 U.S.C. § 1396b(m) requires that MCOs make services available to its members to the same extent as services are made available to

---

[35/] Similarly, 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I) mandates that in order for a state to require individuals to enroll with an MCO as a condition of receiving Medicaid assistance, "the [MCO] and the contract with the State must meet the applicable requirements of [section 1396u-2] and of section 1396b(m) . . . ."

Medicaid beneficiaries not enrolled with the MCO.  <u>See</u> 42 U.S.C.

§ 1396b(m)(1)(A)(i).  Specifically, subdivision (i) provides

that, in order to qualify as an MCO, an organization must:

> make[] services it provides to individuals
> eligible for benefits under this title
> accessible to such individuals, within the
> area served by the organization, to the same
> extent as such services are made accessible
> to individuals (eligible for medical
> assistance under the State plan) not enrolled
> with the organization.

<u>Id.</u>

In its motion for summary judgment, Evercare contends

that this requirement is met by it and WellCare of Arizona.

Evercare's MSJ Mem. at 32.  Evercare asserts that the QExA RFP

established standards for availability of providers and

acceptable wait times under the QExA Program.  <u>Id.</u>  Those

standards, according to Evercare, are more stringent than the

standards applicable to the QUEST Program.  <u>Id.</u> at 33; <u>see also</u>

Bazin Decl. ¶ 6.  In addition, Evercare maintains that the QExA

RFP requires it and WellCare of Arizona to provide medically

necessary services to their enrollees "in an amount, duration,

and scope that is no less than the amount, duration, and scope

for the same services furnished to recipients under Medicaid fee-

for-service."  Evercare's MSJ Mem. at 32 (citing AR 4060).  On

this basis, Evercare asserts that the services provided under the

QExA Program are made accessible to QExA enrollees "to the same

extent as such services are made accessible to individuals

65

(eligible for medical assistance under the State plan) not enrolled with the organization." Id. (quoting 42 U.S.C. § 1396b(m)(1)(A)(i)).

In opposition, Plaintiffs argue that this provision requires that the QExA Contractors make services available to the same extent that care and services are made available to the general population in the same geographic area. Pls. Opp'n at 29 (emphasis added). In making this argument, Plaintiffs rely on 42 U.S.C. § 1396a(a)(30), which governs reimbursement rates under state plans that utilize a fee-for-service system.[36] Thus, Plaintiffs disagree with Evercare regarding what is required by 42 U.S.C. § 1396b(m)(1)(A)(i).

42 U.S.C. § 1396b(m)(1)(A)(i) mandates that services be made available "to the same extent as such services are made accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization." 42 U.S.C. § 1396b(m)(1)(A)(i). However, the statute does not explain what is meant by individuals not enrolled with the organization. But an examination of the legislative history of the provision clarifies its meaning. The Conference Agreement states that the

---

[36] In its 12/24/09 Order, the Court granted summary judgment in favor of the State Defendants and Intervenors with respect to Plaintiffs' claim under 42 U.S.C. § 1396a(a)(30). 12/24/09 Order at *59-*62. The Court explained that 42 U.S.C. § 1396a(a)(30) does not govern the sufficiency of MCOs' payments to providers under managed care contracts. Id.

purpose of 42 U.S.C. § 1396b(m)(1)(A)(i) "is to permit States to enter prepaid arrangement with [non-federally qualified HMOs] provided that such entity: (a) make covered services to Medicaid enrollees accessible on the same basis as other Medicaid eligibles in the area . . . ." Omnibus Budget Reconciliation Act of 1981, S. Rep. No. 97-139, at 968 (1981) (Conf. Rep.). Thus, 42 U.S.C. § 1396b(m)(1)(A)(i) is, in effect, a non-discrimination provision requiring that each MCO make services available to the same extent as services are made available to other Medicaid beneficiaries in the area.[37/]

Under the QExA program, ABD beneficiaries must enroll with one of the two QExA Contractors as a condition of receiving Medicaid benefits. As such, ABD beneficiaries are no longer offered services under a fee-for-service arrangement. Similarly, non-ABD Medicaid beneficiaries receive services in a managed care

---

[37/] Because 42 U.S.C. § 1396b(m)(1)(A)(i) is, in effect, a non-discrimination provision, there is a great deal of overlap between Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i) and Plaintiffs' claims under the ADA and Rehabilitation Act. The Court previously held that there are genuine issues of material fact regarding Plaintiffs' equal access claims under the ADA and Rehabilitation Act. See 12/24/09 Order at *53-*59. The remedy Plaintiffs seek with respect to these claims differ, however. Under the ADA and Rehabilitation Act, Plaintiffs seek damages. See St. 2d Am. Compl. Prayer for Relief. Although injunctive relief may be available under the ADA and Rehabilitation Act, upon reviewing the State Second Amended Complaint and based on statements made by Plaintiffs' counsel at the hearing, it does not appear that Plaintiffs are seeking injunctive relief under the ADA or Rehabilitation Act in this case. Tr. 2:14-17. As to the State Defendants' and Intervenors' alleged violations of the Medicaid Act, Plaintiffs can only seek injunctive relief. Id.

arrangement under the QUEST program.[38/]   AR 49-50.   Therefore, the

State no longer offers Medicaid services on a fee-for-service

basis, as all of the Medicaid beneficiaries in Hawai'i are

required to enroll with an MCO as a condition of receiving

Medicaid benefits.[39/]

        As stated above, 42 U.S.C. § 1396b(m)(1)(A)(i) mandates

that each MCO make covered services accessible to its members to

the same extent they are accessible to other Medicaid

---

        [38/] At the hearing on this motion, Evercare explained that
"the QUEST program includes QUEST, and QUEST Net, and various
subsets, which [Evercare] tend[s] to think of all under the QUEST
umbrella . . . ."   Tr. 11:16-18.   Accordingly, the Court's
reference to QUEST includes QUEST-Net and the various subsets of
QUEST.

        [39/] In its motion, Evercare states that "[a]s of February 1,
2009, most of the Medicaid eligible residents of the State of
Hawaii are being served in a Medicaid managed care context."
Evercare's MSJ Mem. at 33 (citing Bazin Decl. ¶ 5).   At the
hearing, Evercare explained that "the fee-for-service program, as
it previously existed, no longer exists.   All of the waivers have
been rolled into the QUEST Expanded Access with the exception of
the DDMR, developmentally disabled mentally retarded waiver.
Those services, which are largely provided by the Department of
Health, rather than the Department of Human Services, are still
being provided in a fee-for-service environment."   Tr. 10:18-25.
However, "DDMR waiver patients are also enrolled in managed care
for their primary and acute care services . . . [and so] the
majority of their services are also provided by the QUEST
Expanded Access."   Tr. 11:24-25, 12:1-3.   In this case,
Plaintiffs have not come forward with any evidence that DD/MR
patients have greater access to services, much less mentioned
that the DD/MR waiver was not rolled into the QExA Program.
Accordingly, the Court finds that Plaintiffs' equal access claim
under 42 U.S.C. § 1396b(m)(1)(A) is limited to whether the QExA
Contractors make services accessible to the same extent as
services are made accessible to QUEST beneficiaries.

beneficiaries in the area.[40/]   Thus, in this case, Evercare and WellCare of Arizona are required to make covered services accessible to its enrollees to the same extent as such services are made accessible to QUEST enrollees.[41/]

Evercare argues that it and WellCare of Arizona have satisfied the requirements of 42 U.S.C. § 1396b(m) because the QExA Contracts include standards that are more stringent than the standards applicable to the QUEST Program.  Evercare's MSJ Mem.

---

[40/] In its motion for summary judgment, Evercare acknowledges that 42 U.S.C. § 1396b(m)(1)(A) requires that QExA Contractors make services available to QExA beneficiaries to the same extent as services are made available to non-ABD beneficiaries under the QUEST program.  See Evercare's MSJ Mem. at 33.

[41/] The State Defendants have previously contended that it would be improper to compare the ABD Plaintiffs in the QExA Program to the non-disabled beneficiaries enrolled in the QUEST Program.  See 12/24/09 Order at *53.  The State Defendants noted that the QExA Program and the QUEST Program are fundamentally different because the disabled beneficiaries in the QExA Program have greater access to Medicaid services than the non-disabled beneficiaries in the QUEST Program.  Id.  In its 12/24/09 Order, however, the Court observed that Plaintiffs' "quarrel is with how the State DHS has provided certain Medicaid services to both disabled and non-disabled beneficiaries, such as primary care, and how the disabled beneficiaries in the QExA Program have less access to those benefits than non-disabled beneficiaries in the QUEST Program."  12/24/09 Order at *53-*54.  In other words, "[t]he fact that the State DHS has decided to utilize separate programs to provide benefits to disabled and non-disabled beneficiaries does not relieve it of its obligation to provide disabled beneficiaries with equal access to the benefits that it grants to non-disabled beneficiaries."  Id. at *54.  Similarly, with respect to 42 U.S.C. § 1396b(m)(1)(A)(i), the fact that the State DHS has decided to utilize separate programs to provide benefits to ABD and non-ABD beneficiaries does not relieve the MCOs of their obligation to make services accessible to QExA beneficiaries to the same extent as non-ABD beneficiaries are provided services under the QUEST Program.

69

at 33.  Unlike 42 U.S.C. § 1396u-2(b)(5), however, § 1396b(m)
does not simply require that MCOs provide the State with
assurances.  Instead, § 1396b(m) mandates that in order to
qualify as an MCO, an organization must make accessible services
to its members to the same extent as services are made accessible
to other Medicaid recipients eligible under the State plan.  See
42 U.S.C. § 1396b(m)(1)(A)(i).  Accordingly, the Court finds that
the QExA Contracts cannot, in and of themselves, satisfy the
requirements of 42 U.S.C. § 1396b(m)(1)(A)(i).  Instead, in order
to comply with 42 U.S.C. § 1396b(m)(1)(A)(i), MCOs must actually
make services accessible to its members to the same extent that
services are made accessible to other Medicaid beneficiaries not
enrolled with the MCO.

Plaintiffs have come forward with sufficient evidence
to establish genuine issues of material fact as to whether the
QExA members' services are being made accessible to the same
extent as services are made accessible to QUEST members.  In
their opposition, Plaintiffs have come forward with the same
evidence that the Court previously held created genuine issues of
material fact with respect to Plaintiffs' claims under the ADA
and Rehabilitation Act.[42/]  In its 12/24/09 Order, the Court held

_____

[42/] In its 12/24/09 Order, the Court observed:

> [T]he ABD Plaintiffs, many of whom have been shown
> to have complex medical conditions, point to
>                                        (continued...)

[42]/(...continued)
> differences in access between the QExA and QUEST
> Programs regarding the availability of
> specialists.  They explain that the disparities
> stem from the fact that specialists are paid less
> in the QExA Program than they are paid in the
> QUEST Program.  Physicians in particular are paid
> ten to twenty percent less in the QExA Program
> than they are paid in the QUEST Program.
> According to Plaintiffs, it takes twelve to thirty
> times as long to secure a referral to a specialist
> for a QExA enrollee than for a non-disabled person
> in the QUEST Program.  Apart from complaining
> about their access to specialists, Plaintiffs
> assert that certain prescription drugs are not
> covered under the QExA Program that are covered
> under the QUEST Program, which means that prior-
> approvals must be obtained for those drugs in the
> QExA Program, but not in the QUEST Program.
> Plaintiffs maintain that the preauthorization
> process for certain services and items, including
> non-covered prescription drugs, under the QExA
> Program is onerous and lengthy compared to the
> process utilized in the QUEST Program.

12/24/09 Order at *56-*57 (citations omitted).  In its 12/24/09
Order, the Court cited for the most part to the declarations of
Dr. Custodio and various other providers who made these
assertions based on personal knowledge.  See id. (relying on
declarations from Dr. Custodio, Dr. Graham, Dr. Ing, Dr. Krenk,
Dr. Yim, Dr. Ayon, and HOPE).  Plaintiffs have submitted the same
evidence in opposition to Evercare's motion for summary judgment
presently before the Court.  In particular, Plaintiffs have
included the declaration of Dr. Ricardo Custodio, who is
currently the Medical Director at Waianae Coast Comprehensive
Health Center.  Pls.' Opp'n to Evercare's MSJ CSF, Declaration of
Ricardo C. Custodio, M.D. ¶ 2.  Evercare is correct in observing
that many of the declarations submitted by Plaintiffs in
opposition to Evercare's MSJ "are rife with inadmissible hearsay
statements regarding what the declarants were allegedly told by
others."  Evercare's Reply at 14-15.  However, the declarations
submitted by Dr. Custodio and other providers who are familiar
with both the QExA and QUEST services, which the Court referred
to in its 12/24/09 Order, contain statements made from personal
knowledge.  As such, Plaintiffs have come forward with enough
(continued...)

71

that there were genuine issues of material fact as to whether the ABD Plaintiffs have equal access to Medicaid benefits as compared to non-disabled beneficiaries enrolled in the QUEST Program.  See 12/24/09 Order at *59.[43/]  Because the Court must decide whether the QExA members have equal access to services as compared to QUEST members to determine whether the QExA Contractors are in

---

[42/](...continued)
admissible evidence to create genuine issues of material fact with respect to its claim under 42 U.S.C. § 1396b(m)(1)(A)(i).

[43/] When asked whether the Court's 12/24/09 Order precludes entering judgment in favor of the Intervenors and State Defendants as to Plaintiffs' claims based on 42 U.S.C. § 1396b(m)(1)(A)(i), Evercare conceded that it was "fighting an uphill battle . . . ." Tr. 20:6.  Nevertheless, Evercare argues that a different ruling with respect to the entire QExA Program, as opposed to the eleven Plaintiffs' claims based on the ADA and Rehabilitation Act, is warranted.  The material facts in dispute discussed by the Court in its 12/24/09 Order, however, appear to be true of the entire QExA Program.  For instance, Plaintiffs' evidence suggests that physicians are paid ten to twenty percent less in the QExA Program than they are paid in the QUEST Program. 12/24/09 Order at *56-*57.  In addition, the evidence presented by Plaintiffs suggests that it takes twelve to thirty times as long to secure a referral to a specialist for a QExA enrollee than for an enrollee in the QUEST Program.  Id.  Further, Plaintiffs assert that certain prescription drugs are not covered under the QExA Program that are covered under the QUEST Program, which means that prior-approvals must be obtained for those drugs in the QExA Program, but not in the QUEST Program.  Id. at *57-*58.  To this end, Plaintiffs maintain that the preauthorization process for certain services and items, including non-covered prescription drugs, under the QExA Program is onerous and lengthy compared to the process utilized in the QUEST Program.  Id. Moreover, with regard to transportation services, Plaintiffs maintain that QUEST beneficiaries have better access to transportation services.  Id. at *58.  Accordingly, because all of these allegations suggest flaws with the entire QExA Program, the Court rejects Evercare's argument that a different ruling as to the entire QExA Program is warranted.

72

compliance with 42 U.S.C. § 1396b(m)(1)(A)(i), the same genuine issues of material fact prevent the entry of summary judgment with respect to Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i).[44/]

Accordingly, the Court denies Evercare's MSJ, and the joinders therein, as it relates to Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i).[45/]

---

[44/] In opposition to Evercare's MSJ, Plaintiffs assert that "[s]etting [QExA] rates 10-20% below the rates the QUEST contractors [receive]. . . virtually assured the Intervenors' capacity would be insufficient to serve their expected enrollment." Pls.' Opp'n at 29. In other words, Plaintiffs assert that because QExA providers are paid lower rates than QUEST providers, QExA beneficiaries have less access to services that QUEST beneficiaries. In its 12/24/09 Order, the Court cautioned that while it is plausible that the alleged difference in rates of pay may be a reason for any difference in access to services, the alleged difference in rates does not necessarily establish that QExA beneficiaries have less access to services than QUEST beneficiaries. See 12/24/09 Order at *57. The Court again emphasizes that the difference in rates paid to providers under the QUEST and QExA program does not, in and of itself, establish that QExA beneficiaries have less access to services.

[45/] Although 42 U.S.C. § 1396b(m)(1)(A)(i) focuses on Medicaid beneficiaries' access to services, in its 7/14/09 Order the Court previously held that Plaintiffs have standing under the Supremacy Clause to challenge the QExA Program's compliance with federal law. See 7/14/09 Order at 25. Once a party establishes Article III standing, "[a] party may seek injunctive relief under the Supremacy Clause regardless of whether the federal statute at issue confers any substantive rights on would-be plaintiffs." See Indep. Living Center of S. Cal., Inc. v. Shewry, 543 F.3d 1050, 1062 (9th Cir. 2008). "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

(continued...)

## CONCLUSION

In light of the foregoing, the Court:

(1)    GRANTS Evercare's motion for summary judgment, and the joinders therein, with respect to Plaintiffs' claim that the QExA Contractors' provider networks are inadequate in contravention of 42 U.S.C. § 1396u-2(b)(5) and its corresponding regulations;

(2)    GRANTS Evercare's motion for summary judgment, and the joinders therein, with regard to Plaintiffs' claim that the State Defendants' decision to restrict the number of MCOs to two substantially impaired access to services, in contravention of 42 U.S.C. § 1396u-2(a)(1)(A)(ii); and

(3)    DENIES Evercare's motion for summary judgment, and the joinders therein, with respect to Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i) requiring that the MCOs make services available to the same extent as services are made available to other Medicaid eligible beneficiaries.

As a result of this order, the following issues remain to be resolved at trial: (1) the claim set forth in Counts I, II, III, and V that the QExA Contractors do not make services accessible to QExA beneficiaries to the same extent that services are made accessible to QUEST beneficiaries under the QUEST

---

[45]/(...continued)
speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 179 (2000).  In the State Second Amended Complaint, Provider Plaintiffs assert that they "have standing to challenge the QExA program because the State Defendants' conduct is preempted by federal law, and because they have been injured in their property as set forth [in the Second Amended Complaint]." St. 2d Am. Compl. ¶ 2.  Accordingly, assuming the Provider Plaintiffs have Article III standing, the Provider Plaintiffs have a claim under the Supremacy Clause that the MCOs are not in compliance with 42 U.S.C. § 1396b(m)(1).

program, as required by 42 U.S.C. § 1396b(m)(1)(A)(i); (2) the

claim set forth in Counts I through IV that the QExA Contractors

failed to meet the first and third solvency standards set forth

in 42 U.S.C. § 1396b(m)(1)(A)(ii)[46/]; (3) the claim by L.P. set

---

[46/] Specifically, with respect to the first solvency requirement there are genuine issues of material fact as to whether WellCare of Arizona meets state solvency standards for accident and health insurers. In its 12/24/09 Order, the Court observed that there appeared to be two separate issues with regard to the first solvency requirement. The first issue relates to Mr. Leverty's assertion that the "'Insurance Commissioner, looking at WellCare [of Arizona], should say or should be saying that it doesn't meet the solvency requirements, for the fact that it hasn't--its financial condition has been declining over the last several years, and, in particular, since it started into the Quest program.'" 12/24/09 Order at *90 (internal citation omitted). In a separate order granting the State Defendants' motion in limine to exclude the expert testimony and report of Mr. Leverty ("Leverty Order"), however, the Court has explained that this opinion relates to standards Mr. Leverty believes should be considered but are not state solvency standards, and therefore are not relevant to the issue of whether WellCare of Arizona is actually in compliance with state solvency standards for accident and health insurers. The second issue relates to Mr. Leverty's assertion that WellCare of Arizona has failed to file audited financial statements with the State Insurance Commissioner, as required by HRS § 431:3-302.5. 12/24/09 Order at *90. Mr. Leverty is correct in observing that state solvency standards require that insurers make annual and quarterly filings with the State Insurance Commissioner. See HRS §§ 431:3-301 & 302.5. Also in the Leverty Order, however, the Court has explained that this assertion appears to relate to WellCare of Arizona's parent company, WellCare Health, and not to WellCare of Arizona. According to WellCare of Arizona's counsel, WellCare of Arizona's filings "are current and complete and have always been so." Tr. 73:15-16. However, WellCare of Arizona has not yet produced evidence to support this assertion. With respect to the third solvency requirement, there are genuine issues of material fact as to whether non-participating providers could seek to recover from QExA patients in the event WellCare of Arizona does not make any payment to the provider due to insolvency. As explained in the Leverty Order, the forms

(continued...)

forth in Count VI (ADA) and Count VII (Rehabilitation Act) that

the State Defendants have violated the integration mandate; (4)

the claim by the ABD Plaintiffs set forth in Count VI (ADA) and

Count VII (Rehabilitation Act) that they have less access to

Medicaid benefits through the QExA Program than non-disabled

beneficiaries enrolled in the QUEST Program.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, March 19, 2010.



_Alan C. Kay_

Alan C. Kay
Sr. United States District Judge

G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044
ACK-BMK: Order Granting in Part, and Denying in Part, Evercare's Motion for
Partial Summary Judgment as to Plaintiffs' Claims that the QExA Provider
Networks are Inadequate

---

[46]/(...continued)
WellCare of Arizona submitted to the Court on March 9, 2010, were
insufficient as they did not fully address the concerns the Court
expressed in its 12/24/09 Order. See Decl. of Erhardt Preitauer,
filed 3/9/19, Exs. A & B.

76