IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., ) | Civ. No. 08-00551 ACK-BMK Civ. No. 09-00044 ACK-BMK |
| Plaintiffs, ) | (Consolidated) |
| vs. ) | |
| STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, ET AL., ) | |
| Defendants. ) | |
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., ) | |
| Plaintiffs, ) | |
| vs. ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., ) | |
| Defendants. ) | |

**ORDER GRANTING EVERCARE'S MOTION IN LIMINE, AND THE JOINDERS THEREIN, TO EXCLUDE THE EXPERT TESTIMONY AND REPORTS OF DR. MEYERS**

**PROCEDURAL BACKGROUND**

As the parties and the Court are extensively familiar with the facts and background of this case, the Court will only present the procedural background relating to the instant motion in limine.  For a detailed description of the factual background in this case, see the order granting in part, and denying in

part, the State Defendants' motion for summary judgment issued on December 24, 2009.  See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09 Order").

On January 7, 2010, United Healthcare Insurance Company d/b/a Evercare ("Evercare") filed a motion in limine to exclude Arleen D. Meyers, M.D., J.D., M.P.H., from offering any of the purported expert opinions contained in her "Preliminary Report on the Adequacy of Evercare and [WellCare of Arizona] Provider Networks in the QUEST Expanded Access Managed Care Program (QExA)." ("Evercare's Meyers MIL").  On January 13, 2010, Intervenor WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("WellCare of Arizona") filed a joinder in Evercare's Meyers MIL.

The hearing on the Evercare's Meyers MIL was originally scheduled for February 11, 2010, at 10 a.m., the same day Evercare's motion for partial summary judgment regarding Plaintiffs' claims that the QExA Contractors' provider networks are inadequate ("Evercare's Provider Networks MSJ") was originally scheduled to be heard.

On January 19, 2010, Magistrate Judge Barry M. Kurren issued an amended scheduling order requiring that Plaintiffs' expert witness reports be filed by February 15, 2010.  Because the amended scheduling order issued by Judge Kurren set the due

date of Plaintiffs' expert witness reports for February 15, 2010,
four days after Evercare's Meyers MIL was scheduled to be heard,
the Court rescheduled the hearing on Evercare's Meyers MIL and
Evercare's Provider Networks MSJ to March 8, 2010.[1]

On February 16, 2010, Plaintiffs filed an opposition to
Evercare's Meyers MIL ("Pls.' Opp'n").[2]

On February 22, 2010, Evercare filed a reply to
Plaintiffs' opposition ("Evercare's Reply").[3]

On February 25, 2010, Plaintiffs submitted a response
to Evercare's supplemental briefing which addressed claims made
by Evercare that related to the admissibility of Dr. Meyers'
expert testimony ("Pls.' Resp. Br.").

## FACTUAL BACKGROUND

Evercare's Meyers MIL requests that the Court issue an
"[o]rder excluding Arleen D. Meyers from offering any of the
purported opinions in her [Preliminary Report] or any similar

---

[1] In addition, the Court ordered that Intervenors Evercare
and WellCare of Arizona, along with the State Defendants, submit
supplemental briefing addressing any impact that Dr. Meyers'
final expert report may have on Evercare's Provider Networks MSJ
by February 22, 2010.  Similarly, the Court ordered that
Plaintiffs may file a supplemental brief in response by February
25, 2010.

[2] By Court order, Plaintiffs were granted leave to file
their opposition to Evercare's Meyers MIL after the originally
scheduled deadline.  See Docket No. 533.

[3] Evercare's Reply also included supplemental briefing
addressing the impact that Dr. Meyers' final expert report had on
Evercare's Provider Networks MSJ.

opinions for any purpose, including but not limited to trial or opposing summary judgment." Evercare's Meyers MIL at 1. At the hearing on this motion, the parties agreed that the Court should also rule on the admissibility of Dr. Meyers' Final Expert Report served on February 15, 2010. 3/8/10 Tr. 2:21-25, 3:1-21 (rough draft of transcript) ("Tr.").

### A. The Preliminary Report of Dr. Meyers

In her Preliminary Report, Dr. Meyers reaches the following five conclusions:

> (1) The number of providers participating in QExA is materially less than the numbers Evercare and [WellCare of Arizona] have listed on their websites.
>
> (2) The numbers of providers accepting new QExA patients is materially less than the numbers Evercare and [WellCare of Arizona] have listed on their websites.
>
> (3) The number of providers accepting new QExA patients is of concern because a very large percentage of ABD beneficiaries lost their primary care providers and specialists because those providers decided not to participate with QExA.
>
> (4) The Oahu networks of both Evercare and [WellCare of Arizona] are very substantially inadequate to ensure that every enrollee has an appropriate primary care provider in the enrollee's geographic vicinity, or that every enrollee has access to specialists necessary to meet the enrollee's medical needs.
>
> (5) Evercare, at least, cannot meet the regulatory requirements of demonstrating that it has written participation agreements or has appropriately credentialed QExA providers.

Id., Ex. A at 1 ("Preliminary Report").

4

Dr. Meyers' Preliminary Report begins by referencing the factors set forth in 42 C.F.R. § 438.206(b). Preliminary Report at 2. Dr. Meyers then explains that the conclusions in her report are primarily based on a partial survey that Dr. Meyers caused to be conducted. Id. at 4-6. Specifically,

> 1. [Dr. Meyers] caused a spreadsheet to be created with names and other identifying information about the participating providers from Evercare and [WellCare of Arizona]'s websites;
>
> 2. [Dr. Meyers] caused a "random" selection of these providers to be surveyed by telephone as to whether they were actually participating providers and, if so, whether they were accepting new patients and how many patients they would accept; and
>
> 3. [Dr. Meyers] caused the results of these surveys to be recorded in another spreadsheet and sorted the resulting data in various ways.

Evercare's MIL at 4-5 (referencing Preliminary Report 4-6). In addition, Dr. Meyers explains that:

> The information [from the QExA Contractors' websites] will be cross-checked against any documents and information produced in discovery. The final tabulated results of the study, to the extent they are based on samples, will be subjected to sample validity analysis by Professor Doumas.

Preliminary Report at 1.[4/]

---

[4/] The Final Expert Report of Professor Doumas was included in Plaintiffs' February 15, 2010, disclosure of experts report. Professor Doumas concludes that "[t]he survey results strongly indicate that the [Evercare] and [WellCare of Arizona] records do not accurately reflect whether the listed PCPs are actually accepting new patients." Evercare's Reply, Ex. C at 5, Final
(continued...)

Notably, although not specifically required by 42 U.S.C. § 1396u-2(b)(5) and its implementing regulations, Dr. Meyers focused her survey on the availability of internal medicine physicians ("IM Providers").  Dr. Meyers explains her reasons for focusing on IM Providers as follows:

> A majority of enrollees suffer from complex medical problems which require primary care to be delivered by an internal medicine specialist, rather than a general practitioner, family practitioner, nurse practitioner, or pediatrician. It is my belief that the State Defendants have data from which the percentage of ABD adults which fall into the complex medical problems category may be ascertained.  Based upon my medical knowledge generally and my knowledge and experience with the population, the fact that they are aged or disabled or both would place a high percentage of them in the complex medical problems category.  For purposes of evaluating the PCP network on Oahu, I have therefore assumed that at least 50% of the adults fall into this more complex category.

Id. at 4.  In her Preliminary Report, with respect to IM Providers, Dr. Meyers concludes that:

> Assuming only half the Oahu ABD population require assignment to an IM PCP, even if it turns out that all of the IM providers yet to be surveyed are

---

[4]/(...continued)
Expert Report of Leonidas Adam Alexander Doumas, PhD ("Doumas Report").  In addition, when asked what number of QExA patients each physician is willing to accept Professor Doumas concluded "[t]he standard, one PCP per 600 QExA patients is not a valid standard from the perspective of physicians willing to participate and accept new patients, as no physicians would accept as many as 600 patients.  The number of patients the participating PCPs accepting new patients are willing to accept will most likely range from 15 to 89, with an average of 52 patients per PCP."  Doumas Report at 6.

accepting new patients, every one of the [WellCare of Arizona] IM PCPs would have to accept 240 patients and every one of the Evercare IM PCPs would have to accept 90 patients. The existing networks of IM PCPs are thus demonstrably inadequate as the survey has found no providers willing to accept more than 20-50 patients.

Id. at 6.[5/]

### B. The Final Report of Dr. Meyers

On February 15, 2010, Plaintiffs served the State Defendants and Intervenors with Dr. Meyers' final expert report. Pls.' Opp'n at 2; see also Evercare's Reply Ex. B, Final Expert Report of Arleen D. Meyers, M.D., M.P.H., J.D. ("Final Report").

In preparing the Final Report, Dr. Meyers was asked to:

[P]rovide data and opinions that will assist the Court in determining the adequacy of Evercare's and [WellCare of Arizona's] physician networks to meet the medical needs of their members on February 1, 2009, this moment, and in the foreseeable future given how the presently existing facts will affect the services available and access [sic] to them, using the factors in 42 C.F.R. § 438.206(b). The adequacy of the physician networks is affected by other factors, including reimbursement rates, geographic location (time and distance), and the adequacy of the network of certain other non-physician providers who directly support access to physician care . . . .

Final Report at 3.

_____

[5/] However, as discussed below, her calculations do not take into account the fact that two-thirds of QExA members are dual eligible, and thus are permitted to continue to see their Medicare providers. See Evercare's Reply at 2-3.

Although Dr. Meyers' Final Report expands on the opinions she expresses in her Preliminary Report, Dr. Meyers' Final Report continues to rely on her Preliminary Report and the survey used in connection with that report.  Id. ("Data contained in the aforementioned preliminary reports and testimony have informed this report and are specifically referenced where relevant.").[6]

Unlike her Preliminary Report, Dr. Meyers' Final Report does not list her conclusions in bullet point fashion.  Instead, she summarizes her opinions as follows:

> Taking into account the number of QExA enrollees, their utilization of medical services, the community standard for the QExA patient-PCP ration, the numbers of providers not accepting new QExA patients, the geographic locations of the providers and the time-and-distance requirements and means of transportation available to the aged, blind, and disabled poor, based on statistically-valid sampling techniques, Evercare's and [WellCare of Arizona's] physician provider networks have been and are substantially inadequate system-wide; and Evercare and [WellCare of Arizona] are failing to properly maintain the lists of network providers who are accepting new patients, which they are required to publish for QExA members and their providers to find services. In fact, only 32% of the physicians Evercare and [WellCare of Arizona] list as accepting new patients, are actually accepting new patients. The discrepancy is attributable to readily

_____

[6] Dr. Meyers refers to two preliminary reports in her Final Report.  Final Report at 3.  This reference is to her Preliminary Report and the First Supplement to her Preliminary Report.  See Docket. No 428-4 (First Supplement to Preliminary Report on the Adequacy of Evercare and Ohana Provider Networks in the Quest Expanded Access Managed Care Program (QExA)).

> understood causes, chief among which are breach of
> trust, inadequacy of reimbursement rates for the
> resources required to provide the services, and
> complexity/difficulty in the medical needs of the
> population.  Of the primary care physicians
> participating and not accepting new patients, all
> responding had participated only to continue
> seeing their existing patients.  In other words,
> none responded that they were providing services
> to the maximum number of patients they could
> handle.  Thus, the physicians participating and
> not accepting new patients were participating only
> to provide services to the patients they had cared
> for under the fee-for-service system.

Id. at 8.  Dr. Meyers asserts that the number of physicians accepting new patients is important for four reasons: (1) a large number of patients were displaced from their fee-for-service physician relationships by QExA due to the fact that a large majority of the physicians who participated in the fee-for-service program declined to participate in QExA, (2) new enrollees, either newly eligible patients or those who have switched plans, must be able to find a new PCP, (3) the QExA patients are entitled to change providers within their plan for their safety and satisfaction, and (4) the QExA plans are not providing patients with the requisite freedom of choice if they do not have access to alternate PCPs in their communities.  See id. at 8-9.  Based on this information, Dr. Meyers concludes that many of the Oahu regions are substantially underserved.  See id. at 9.

## **DISCUSSION**

The district court has been tasked with the gate keeping function to determine the admissibility of an expert witness' testimony.  See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999) (stating that the trial judge must ensure that all scientific testimony is both relevant and reliable).  An expert's testimony "is, therefore, subject to the Daubert-Kumho criteria.  The testimony must be both reliable and relevant." Sullivan v. U.S. Dep't of Navy, 365 F.3d 827, 833 (9th Cir. 2004).

Fed. R. Evid. 702 provides the threshold test for expert witness testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  The proffered expert testimony therefore must be helpful to the trier of fact as well as reliable and relevant. "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591 (citations omitted); see also United States v. Cantrell, 999

F.2d 1290, 1292 (8th Cir. 1993) (an expert's testimony is not
helpful if it does not address a matter essential to the case).

In Daubert, the United States Supreme Court set forth a
nonexclusive list of factors with which to assess an expert's
reliability. 509 U.S. at 593-94. This list includes (1) whether
the expert's theory or technique can be reliably tested, (2)
whether the theory can be subjected to peer review, (3) the
technique's error rate, and (4) the technique's "general
acceptance". See id. The Ninth Circuit has cautioned, however,
that applying "an inappropriately rigid Daubert standard" to
determine the admissibility of expert testimony involving
"technical" and "other specialized knowledge", is an abuse of the
trial court's discretion. See Sullivan, 365 F.3d at 833 (citing
United States v. Alviso, 152 F.3d 1195, 1198 (9th Cir. 1998)).
Instead, for expert testimony based on specialized knowledge,
rather than scientific knowledge, the district court should apply
the Daubert factors to determine whether or not the expert's
testimony is reliable, but "the Daubert factors are not intended
to be exhaustive or unduly restrictive." Id. at 834 (citation
omitted). Accordingly, the district court has considerable
latitude in how it determines an expert's reliability. See
Kumho, 526 U.S. at 152 ("[T]he trial judge must have considerable
leeway in deciding in a particular case how to go about
determining whether particular expert testimony is reliable.

That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony.").

Although the Daubert standard for admissibility of expert testimony applies to all expert testimony, not just testimony based on novel scientific methods, survey evidence has been found to be sufficiently reliable under Daubert as long as the survey is conducted according to accepted principles. Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 1143 (9th Cir. 1997) (holding that a survey that was conducted only in the southern portion of the state and asked leading questions only went to the weight of the evidence, not the admissibility of the survey). Although surveys are often based on hearsay, they "may nevertheless be admissible under [the residual hearsay exception]," if the survey has circumstantial guarantees of trustworthiness. Pittsburgh Press Club v. United States, 579 F.2d 751, 757-58 (3d Cir. 1978) (citing Fed. R. Evid. 803(24), which is now codified at Fed. R. Evid. 807). "In the context of polls and surveys, the circumstantial guarantees of trustworthiness are for the most part satisfied if the poll is conducted in accordance with generally accepted survey principles, and if the results are used in a statistically correct way . . . ." Id. at 758; see also Keith v. Volpe, 858 F.2d 467, 480 (9th Cir. 1988) (same). Technical or

12

methodological deficiencies in the survey typically bear on the weight of the evidence, not the admissibility.  See Keith, 858 F.2d at 480.

The proponent of the survey has the burden of establishing that the survey was conducted in accordance with generally accepted survey principles and that the results were used in a statistically correct manner.  See Pittsburgh Press Club, 579 F.2d at 758; Keith, 858 F.2d at 480.  Accepted principles for conducting a survey include the following:

> A proper universe must be examined and a representative sample must be chosen; the persons conducting the survey must be experts; the data must be properly gathered and accurately reported. It is essential that the sample design, the questionnaires and the manner of interviewing meet the standards of objective surveying and statistical techniques.  Just as important, the survey must be conducted independently of the attorneys involved in the litigation.  The interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation. A fortiori, the respondents should be similarly unaware.

Pittsburgh Press Club, 579 F.2d at 758 (emphasis in original); see also Gibson v. County of Riverside, 181 F. Supp. 2d 1057, 1067-68 (C.D. Cal. 2002) (excluding the results of a survey because it was not conducted according to generally accepted principles).

I.       The Court's Order as to Evercare's Provider Networks MSJ

13

On November 20, 2009, Evercare filed a motion for partial summary judgment regarding Plaintiffs' claims that assert the State Defendants and Intervenors violated the requirements of the Medicaid statute relating to provider networks and access to services by requiring enrollment in the QExA plans offered by Evercare and WellCare of Arizona as a condition of receiving Medicaid benefits ("Evercare's MSJ" or "Evercare's motion for summary judgment"). These claims are asserted in Counts I, II, III, and V of the State Second Amended Complaint ("St. 2d Am. Compl.").

In asserting these claims, Plaintiffs relied upon three separate statutory provisions under the Medicaid act. The first and principal provision upon which Plaintiffs relied in asserting that the QExA Contractors' provider networks are inadequate is 42 U.S.C. § 1396u-2(b)(5). St. 2d Am. Compl. ¶ 71. This provision provides that:

> Each medicaid managed care organization shall provide the State and the Secretary with adequate assurances (in a time and manner determined by the Secretary) that the organization, with respect to a service area, has the capacity to serve the expected enrollment in such service area, including assurances that the organization—
>
> (A) offers an appropriate range of services and access to preventive and primary care services for the population expected to be enrolled in such service area, and

> (B) maintains a sufficient number, mix, and geographic distribution of providers of services.

42 U.S.C. § 1396u-2(b)(5).  In addition, Plaintiffs' claim under this provision relies upon two regulations that implement this statutory provision.  These regulations are 42 C.F.R. § 438.207, which establishes when an MCO must provide the state with assurances, and 42 C.F.R. § 438.206 which establishes what assurances must be made with regard to access to services.  <u>See</u> 42 C.F.R. § 438.207 (section titled "Assurances of adequate capacity and service"); 42 C.F.R. § 438.206 (section titled "Availability of services").  Specifically, 42 C.F.R. § 438.206 states in relevant part:

> (b) Delivery network.  The State must ensure, through its contracts, that each MCO . . . meets the following requirements:
>
>   (1) Maintains and monitors a network of appropriate providers that is supported by written agreements and is sufficient to provide adequate access to all services covered under the contract. In establishing and maintaining the network, each MCO . . . must consider the following:
>
>     (i) The anticipated Medicaid enrollment.
>
>     (ii) The expected utilization of services, taking into consideration the characteristics and health care needs of specific Medicaid populations represented in the particular MCO . . . .
>
>     (iii) The numbers and types (in terms of training, experience, and specialization) of providers required to furnish the contracted Medicaid services.

15

(iv) The numbers of network providers who are not accepting new Medicaid patients.

(v) The geographic location of providers and Medicaid enrollees, considering distance, travel time, the means of transportation ordinarily used by Medicaid enrollees, and whether the location provides physical access for Medicaid enrollees with disabilities.

(2) Provides female enrollees with direct access to a women's health specialist within the network for covered care necessary to provide women's routine and preventive health care services. This is in addition to the enrollee's designated source of primary care if that source is not a women's health specialist.

(3) Provides for a second opinion from a qualified health care professional within the network, or arranges for the enrollee to obtain one outside the network, at no cost to the enrollee.

(4) If the network is unable to provide necessary services, covered under the contract, to a particular enrollee, the MCO . . . must adequately and timely cover these services out of network for the enrollee, for as long as the MCO . . . is unable to provide them.

(5) Requires out-of-network providers to coordinate with the MCO . . . with respect to payment and ensures that cost to the enrollee is no greater than it would be if the services were furnished within the network.

(6) Demonstrates that its providers are credentialed as required by [42 C.F.R. §] 438.214.

Id. § 438.206.

The second provision upon which Plaintiffs relied in asserting that the QExA Contractors' provider networks are

16

inadequate is 42 U.S.C. § 1396u-2(a)(1)(A)(ii).  42 U.S.C.

§ 1396u-2(a)(1)(A)(ii) directs that a state "may restrict the

number of provider agreements with managed care entities under

the State plan if such restriction does not substantially impair

access to services."  42 U.S.C. § 1396u-2(a)(1)(A)(ii).

The third provision upon which Plaintiffs relied in

asserting that the QExA Contractors' provider networks are

inadequate states that, in order to qualify as an MCO, an

organization must:

> make[] services it provides to individuals
> eligible for benefits under this title
> accessible to such individuals, within the
> area served by the organization, to the same
> extent as such services are made accessible
> to individuals (eligible for medical
> assistance under the State plan) not enrolled
> with the organization.

42 U.S.C. § 1396b(m)(1)(A)(i).  This provision mandates that

Evercare and WellCare of Arizona make covered services accessible

to its enrollees to the same extent as such services are made

accessible to QUEST enrollees.

On March 8, 2010, the Court held hearings on both

Evercare's Provider Networks MSJ and Evercare's Meyers MIL.  For

reasons provided in a separate written order, the Court granted

Evercare's MSJ, and the joinders therein, with respect to

Plaintiffs' claims under the first two statutory provisions.  <u>See</u>

Order Granting in Part, and Denying in Part, Evercare's Motion

for Summary Judgment with Respect to Plaintiffs' Claims that the

QExA Contractors' Provider Networks are Inadequate, Docket No.
582 (March 19, 2010) ("Provider Networks Order").  However, with
respect to the third provision, the Court held that there were
genuine issues of material fact which precluded the entry of
summary judgment.  <u>See</u> Provider Networks Order at 73.
Specifically, the Court held there are genuine issues of material
fact as to whether QExA members have equal access to Medicaid
services as compared to non-ABD beneficiaries enrolled in the
QUEST Program.  <u>Id.</u>

II.      **Analysis**

   A.   **Whether Dr. Meyers' Expert Testimony Will Assist the
         Trier of Fact**

         As a result of the Provider Networks Order, the
following issues remain to be resolved at trial: (1) the claim
set forth in Counts I, II, III, and V that the QExA Contractors
do not make services accessible to QExA beneficiaries to the same
extent that services are made accessible to QUEST beneficiaries
under the QUEST program, as required by 42 U.S.C.
§ 1396b(m)(1)(A)(i); (2) the claim set forth in Counts I through
IV that the QExA Contractors failed to meet the first and third
solvency standards set forth in 42 U.S.C. § 1396b(m)(1)(A)(ii);
(3) the claim by L.P. set forth in Count VI (ADA) and Count VII
(Rehabilitation Act) that the State Defendants have violated the
integration mandate; (4) the claim by the ABD Plaintiffs set
forth in Count VI (ADA) and Count VII (Rehabilitation Act) that

they have less access to Medicaid benefits through the QExA
Program than non-disabled beneficiaries enrolled in the QUEST
Program.

        In other words, Plaintiffs' claims that the provider
networks are inadequate in contravention of 42 U.S.C.
§ 1396u-2(b)(5) and 42 C.F.R. §§ 438.206 & 207, are no longer at
issue.  Here, Plaintiffs are seeking to offer the expert
testimony of Dr. Meyers to opine on the adequacy of the QExA
provider networks.  In her Final Report, Dr. Meyers begins her
discussion by stating "[f]ederal regulations require managed care
organizations to: <u>Maintain</u> and <u>monitor</u> a network of appropriate
providers that is <u>supported by written agreements</u> and is
sufficient to provide adequate access to <u>all services</u> covered
under the contract."  Final Report at 12 (emphasis in original).
This language is an exact quote from regulations implementing 42
U.S.C. § 1396u-2(b)(5).  <u>See</u> 42 C.F.R. § 438.206 (stating that
the state must ensure, through its contracts, that the MCO
"[m]aintains and monitors a network of appropriate providers that
is supported by written agreements and is sufficient to provide
adequate access to all services covered under the contract.").
In its Provider Networks Order, however, the Court granted
summary judgment in favor of the State Defendants and Intervenors
with respect to Plaintiffs' claim under 42 U.S.C. § 1396u-2(b)(5)
and its implementing regulations.  At the hearing on this motion,

Plaintiffs conceded that Dr. Meyers' expert testimony relates to Plaintiffs' claims under 42 U.S.C. §§ 1396u-2(a)(1)(ii) & (b)(5), and not to Plaintiffs' equal access claims under 42 U.S.C. § 1396b(m)(1)(A)(i).  Tr. 67:5-25, 68:1-4.[7/]  In other words, Plaintiffs acknowledged that, having granted summary judgment in favor of the State Defendants and Intervenors with respect to Plaintiffs' claims under 42 U.S.C. §§ 1396u-2(a)(1)(ii) & (b)(5), Dr. Meyers' expert testimony is no longer relevant to the remaining issues to be tried in this case.

Pursuant to Fed. R. Evid. 702, in order for expert testimony to be admissible it must "assist the trier of fact to

_____

[7/] Specifically, Plaintiffs acknowledged the following:

> THE COURT: It seems that basically [Dr. Meyers'] report addresses the two issues of adequate assurances and substantial impairment, but not equal access with respect to QUEST.  Am I correct in that?
>
> [PLAINTIFFS' COUNSEL:] Yes, Your Honor.
>
> THE COURT: So, if I ruled against you on those first two issues, would there be any purpose in her testifying as an expert?
>
> . . .
>
> [PLAINTIFFS' COUNSEL:] Dr. Meyers' expert testimony, concerns the provider networks and their adequacy and not the issue . . . with respect to 1396b(m)(1), that's not her issue.  And so yes, we would not -- we are not relying on her report [for Plaintiffs' equal access claim].

Tr. 67:5-25, 68:1-4.

20

understand the evidence or to determine a fact in issue . . . ." Fed. R. Evid. 702.  In this case, Dr. Meyers' opinions regarding the adequacy of the provider networks would not assist the trier of fact because it is no longer at issue in this matter.  See Daubert, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").  The only issue that remains to be tried that relates to the QExA services is whether QExA members have equal access to Medicaid services as compared to non-ABD beneficiaries enrolled in the QUEST Program.  See Provider Networks Order at 73.[8]

---

[8] Even if Plaintiffs had not conceded at the hearing that Dr. Meyers' expert testimony does not relate to Plaintiffs' equal access claim under 42 U.S.C. § 1396b(m)(1)(A)(i), the Court would still conclude that Dr. Meyers' testimony would not assist the trier of fact with respect to Plaintiffs' claim under the equal access provision.  Although Dr. Meyers makes passing references to the QUEST Program in her Final Report, neither her Preliminary Report nor her Final Report purport to compare the accessibility of services under the QExA Program with the accessibility of services under the QUEST Program.  Indeed, the sole focus of Dr. Meyers' Final Report is whether the QExA Contractors have an adequate number of physicians accepting new patients such that they can adequately serve the ABD population.  See Final Report at 8 (emphasis added).  Because experts may only testify in accordance with their expert reports, and because expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them," the Court concludes that Dr. Meyers may not testify as an expert with respect to Plaintiffs' equal access claim under 42 U.S.C. § 1396b(m)(1)(A)(i).  See Fed. R. Civ. P. 26(a)(2)(B)(i).

Accordingly, the Court grants Evercare's motion in limine to exclude the proposed expert testimony and expert reports of Dr. Meyers.[9/]

**B.    Alternative Reasons to Exclude Dr. Meyers' Expert Testimony**

In its Provider Networks Order, the Court observed that even if 42 U.S.C. § 1396u-2(b)(5) were to require the Court to examine whether the MCOs are in compliance with the terms of the RFP, the State Defendants and Intervenors would still be entitled to summary judgment.  See Provider Networks Order at __.   The Court explained that this alternative basis for its ruling was premised on the notion that Dr. Meyers' expert testimony would be inadmissible regardless of whether Plaintiffs' claims under 42 U.S.C. §§ 1396u-2(a)(1)(ii) & (b)(5) survived summary judgment. See id.  Accordingly, the Court will now set forth alternative grounds for its ruling that Dr. Meyers' expert testimony and reports are inadmissible.

**i. The Survey is Inadmissible**

Evercare asserts that Dr. Meyers "is merely acting as a conduit for hearsay rather than offering an expert opinion." Evercare's Reply at 2; see also Tr. 57:10-13 ("Dr. Meyers'

---

[9/] However, Dr. Meyers may, subject to a resolution of the Court's concerns with regard to her compensation, testify as a treating physician in this matter based on her personal knowledge of the accessibility of services in the QExA Program as compared to the QUEST Program.

purported expert report is essentially hearsay with a bow tied on top of it.  Under Rule 702 and the Daubert case, expert testimony is only admissible if it requires some scientific, technical, or specialized knowledge.").  Much of the hearsay Evercare refers to comes in the form of a survey Dr. Meyers caused to be conducted. In opposition, Plaintiffs assert that Dr. Meyers' testimony regarding the results of the survey would be the only way to efficiently present the Court with information about the alleged inadequacy of the QExA Contractors' provider networks.  Pls.' Opp'n at 3-4.[10/]  As stated above, surveys based on hearsay "may nevertheless be admissible under [the residual hearsay exception]," if there are circumstantial guarantees of trustworthiness.  Pittsburgh Press Club, 579 F.2d at 757-58.

In order for a survey based on hearsay to have circumstantial guarantees of trustworthiness, it must be shown that the survey was "conducted according to accepted principles." Pittsburgh Press Club, 579 F.2d at 758; Keith, 858 F.2d at 480. The proponent of the survey has the burden of establishing that the survey was conducted in accordance with generally accepted survey principles and that the results were used in a

_____

[10/] Relying on district court cases involving trademark infringement claims, Plaintiffs argue that the survey evidence is generally admissible and sometimes the most effective means of persuasion.  Pls.' Opp'n at 4 (citing Univision Music LLC v. Banyan Entm't, civ. no 04-9242, 2004 U.S. Dist. LEXIS 30957 (C.D. Cal. 2004)).

statistically correct manner.  See Pittsburgh Press Club, 579 F.2d at 758; Keith, 858 F.2d at 480.  In this case, although, through the expert testimony of Professor Doumas, Plaintiffs have attempted to show that a representative sample was surveyed, Plaintiffs have otherwise failed to show that the survey was conducted according to accepted principles.[11/]  Upon reviewing the survey, the Court finds the survey Dr. Meyers caused to be conducted violates several of the accepted principles discussed in Pittsburgh Press Club.  579 F.2d at 758.

First, "the persons conducting the survey must be experts . . . ."  Pittsburgh Press Club, 579 F.2d at 758.  In

_____

[11/] Evercare asserts that the survey respondents were selected randomly and thus "there was no effort [on the part of Plaintiffs] to assure that the sample was representative." Evercare Reply at 10.  In her Final Report, Dr. Meyers notes that Ms. Conner "surveyed 50 randomly selected names from [the list of providers] . . . ."  Final Report at 20 (emphasis added). However, it appears that Plaintiffs have attempted to assure that the sample was representative as "the final tabulated results of the study, to the extent they are based on samples, [were] subjected to sample validity analysis by Professor Doumas." Preliminary Report at 1.  Professor Doumas explained that "[t]o assure that [Plaintiffs'] data did not reflect some fluke sampling error [he] first analyzed the data using the binomial formula."  Doumas Report at 4.  The Doumas Report concludes that "[t]he survey results strongly indicate that the [Evercare] and [WellCare of Arizona] records do not accurately reflect whether the listed PCPs are actually accepting new patients."  Id. at 5. The Court need not rule on the validity of Professor Doumas' conclusions, however, as the survey was not conducted in accordance with several other generally accepted principles noted by the Third Circuit in Pittsburgh Press Club.  579 F.2d at 758.

this case, neither Dr. Meyers nor Ms. Conner are experts in designing or conducting surveys.  See Final Report at 20.[12/]

Second, "the survey must be conducted independently of the attorneys involved in the litigation."  Pittsburgh Press Club, 579 F.2d at 758.  Here, the survey was designed and overseen by Dr. Meyers, and although Dr. Meyers is not Plaintiffs' attorney in this case, she is a law partner of Plaintiffs' counsel.  As discussed below, infra Section II(B)(iii), Dr. Meyers has served in several different roles throughout this litigation and her purported expert testimony raises ethical concerns regarding her compensation.

Third, "the interviewers or sample designers should, of course, be trained, and ideally should be unaware of the purposes of the survey or the litigation."  Pittsburgh Press Club, 579 F.2d at 758.  In this case, Ms. Conner's declaration suggests that she was aware of the connection between the survey and the litigation.  See Pls.' Opp'n to Evercare's Provider Networks MSJ CSF, Declaration of Colleen Conner; see also Final Report at 20 (noting that Ms. Conner "had experience in surveying . . . due to

---

[12/] In her Final Report, Dr. Meyers explains that Ms. Conner "had experience in surveying and as a secret shopper and, due to her experience working with the DHS program as a volunteer, and also her experience as a paralegal, proved more than capable of surveying providers and QExA beneficiaries."  Final Report at 20. Although Ms. Conner may have some surveying experience, Plaintiffs do not assert that Ms. Conner is an expert, nor is she disclosed on Plaintiffs' expert disclosures report.

her experience working with the DHS program as a volunteer, and also her experience as a paralegal . . . .")

Fourth, and finally, "the respondents should be similarly unaware [of the purposes of the survey or the litigation]." Pittsburgh Press Club, 579 F.2d at 758.  In this case, Ms. Conner identified herself as calling for the Hawaii Coalition for Heath and identified that organization as "advocat[ing] for healthcare consumers in Hawaii." See Evercare's Reply, Ex. D.  Evercare asserts that this "identification suggested to the respondent that the survey was part of an advocacy effort directed against Evercare and [WellCare of Arizona] as opposed to an impartial attempt to obtain information."  Evercare's Reply at 10.

In sum, although Plaintiffs assert that a survey would be "the only practical means of presenting sufficient evidence for the Court to determine the adequacy of the provider networks," this does not relieve Plaintiffs of their obligation to prove that the survey was conducted according to generally accepted principles.  Upon reviewing the survey, the Court finds that the survey Dr. Meyers caused to be conducted was not conducted in accordance with these principles.

**ii. Dr. Meyers' Opinion Relating to the Alleged Inadequacy of Evercare's and WellCare of Arizona's Provider Networks is Inadmissible because it is Based on Faulty Reasoning and Lacks an Adequate Factual Basis**

Dr. Meyers' opinion that the QExA Contractors' provider networks are inadequate is based in part, on an inadmissible survey, and in part on faulty reasoning that is both unreliable and lacks factual support.

Dr. Meyers' Final Report focuses almost exclusively on the number of physicians allegedly willing and able to accept new QExA patients.  She asserts that the number of physicians accepting new patients is important for four reasons: (1) a large number of patients were displaced from their fee-for-service physician relationships by QExA due to the fact that a large majority of the physicians who participated in the fee-for-service program declined to participate in QExA, (2) new enrollees, either newly eligible patients or those who have switched plans, must be able to find a new PCP, (3) the QExA patients are entitled to change providers within their plan for their safety and satisfaction, and (4) the QExA plans are not providing patients with the requisite freedom of choice if they do not have access to alternate PCPs in their communities. Final Report at 8-9.

First, Dr. Meyers' conclusion that "a <u>large number</u> of patients were displaced from their fee-for-service physician relationships by QExA due to the fact that a <u>large majority</u> of the physicians who participated in the fee-for-service program declined to participate in QExA," lacks factual support.  Final

Report at 8 (emphasis added).[13/]   To the contrary, according to Evercare, "the majority of QExA members were previously served under the Medicaid FFS program - such that they are the existing patients of the providers limiting their practice."  Evercare's Provider Networks MSJ Mem. at 30; see also Final Report at 17 ("I do not have data on how many patients are continuing with their fee-for-service participating providers.").  Not only does Dr. Meyers' Final Report not contain any data regarding the number of patients continuing to see their prior fee-for-service providers, it does not take into account the fact that two-thirds of ABD beneficiaries are dual eligible such that they can continue to see their providers under Medicare.  See Evercare's Provider Networks MSJ Reply at 12.  Thus, Dr. Meyers' assertion that "a

--------

[13/] At the hearing on this motion, Evercare elaborated:

> Dr. Meyers' testimony assumes, without any evidence, that there's a whole lot of patients that need a new physician.  Well, that ignores the evidence in the case, provided in the declaration by Patty Bazin, that most of the QUEST Expanded Access patients were served under the fee-for-service program.  There is absolutely no evidence that the providers that were caring for those patients, under the fee-for-service program, with the exception of Dr. Meyers, have decided not to serve them under the QUEST Expanded Access.  She has asserted that a lot did, but there's no evidence of that.  She has no personal knowledge of that.  There is no competent evidence underlying her opinion that there is this tremendous need for physicians accepting new patients.

Tr. 58:18-25, 59:1-6.

large number of patients were displaced from their fee-for-service physician relationships by QExA" does not take into account that two-thirds of ABD beneficiaries could continue to see their Medicare providers for Medicare services.  Id. at 8 (emphasis added).  Fed. R. Evid. 702 requires that expert opinions be "based on sufficient facts and data."  Here, there are no facts or data to support Dr. Meyers' statement that a large number of QExA members require new physicians.  Opinions that are "connected to existing data only by the ipse dixit of the expert" are inadmissible.  See General Electric Co. v. Joinder, 522 U.S. 136, 146 (1997).

Second, Dr. Meyers' conclusion that there are not enough physicians accepting new QExA patients fails to take into account that two-thirds of ABD beneficiaries are dual-eligible such that they can continue to see their providers under Medicare.  See Evercare's Provider Networks MSJ Reply at 12.  This glaring omission undermines any opinion Dr. Meyers seeks to offer regarding the number of physicians the QExA Contractors' must contract with in order to have adequate provider networks.  See In re Paoli R.R. Yard PCP Litig., 35 F.3d 717, 745 (3d Cir. 1994) ("Any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.").

Third, in both her Preliminary Report and Final Report Dr. Meyers opines that a majority of QExA beneficiaries require

an internist as their PCP. See Preliminary Report at 4 ("For purposes of evaluating the PCP network on Oahu, I have therefore assumed that at least 50% of the adults fall into this more complex category."); Final Report 19-21. However, nothing in the RFP or the Medicaid laws and regulations require that internists serve as the PCP for ABD beneficiaries with complex medical condition. See Evercare's Reply at 12 n.3.[14] Instead, Dr. Meyers imposes her own standard as to what types of providers are necessary in order for the QExA Contractors' provider networks to be considered adequate. Id. Thus, her opinion regarding the number of physicians accepting new patients is unreliable pursuant to Daubert. See In re Paoli R.R. Yard PCP Litig., 35 F.3d 717 at 745 ("Any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.").

In conclusion, Dr. Meyers' expert opinion that there are not enough physicians accepting new patients suffers from a number of defects, any of which alone may be sufficient to render Dr. Meyers' opinion inadmissible. Accordingly, the Court finds that Dr. Meyers' conclusion that there are not enough physicians accepting new patients is unreliable and lacking factual support

---

[14] At the hearing on this motion, Evercare noted that the State DHS has decided that "a general practice physician, family practice physician, or other specialities" are all capable as serving as a PCP for ABD beneficiaries. Tr. 58:2-5.

pursuant to Fed. R. Evid. 702 and <u>Daubert</u>, and therefore inadmissible.

### iii. Concerns Regarding Dr. Meyers' Compensation

Dr. Meyers' purported expert testimony also raises ethical concerns regarding her compensation.  In her Final Report, Dr. Meyers disclosed that "[t]he compensation [she] expect[s] to receive as an expert in this case is limited to [her] expenses for an assistant to collect data."  Final Report at 3.  According to Evercare, this assertion is disingenuous because Plaintiffs are seeking attorneys' fees in this matter, which would be awarded to the firm in which Dr. Meyers is a partner, Jouxson-Meyers & del Castillo.  <u>See</u> Evercare's Reply at 15 (citing St. 2d Am. Compl. Prayer for Relief).  Evercare surmises that attorneys' fees in this matter are contingent on the outcome of the litigation.  <u>See id.</u>  Thus, as Evercare explains, "Dr. Meyers' status as a named Plaintiff, a treating physician for various ABD beneficiaries, the partner of one of Plaintiffs' counsel, and now a proposed 'expert' witness, threatens to blur the lines of proper conduct for each such role she plays."  <u>Id.</u>

Rule 3.4(c) of the Hawaii Rules of Professional Conduct ("HRPC") prohibits an attorney from "pay[ing], offer[ing] to pay, or acquiesce[ing] in the payment of compensation to a witness

contingent upon . . . the outcome of a case."[15/]   HRPC 3.4(c); <u>see also</u> <u>Crowe v. Bolduc</u>, 334 F.3d 124, 132 (1st Cir. 2003) ("The majority rule in this country is that an expert witness may not collect compensation which by agreement was contingent on the outcome of a controversy."). Accordingly, Evercare requests that "[i]f Dr. Meyers' purported expert testimony is to be considered at all, she must certify that she will disclaim any interest in any attorneys' fees awarded to, or obtained via a contingency arrangement by, Plaintiffs' counsel."  Evercare's Reply at 16. The Court agrees that if Dr. Meyers is to testify as an expert in this matter, she must disclaim any interest in any attorneys' fees awarded to, or obtained via a contingency arrangement by, Plaintiffs' counsel.[16/]

---

[15/] Expert witnesses may, however, be paid a reasonable fee for their services.  <u>See</u> HRCP 3.4(c)(3) (expert witnesses may be paid "a reasonable fee for the professional services of an expert witness").

[16/] At the hearing on this motion, Plaintiffs' counsel explained:

> Dr. Meyers, to the extent there are fees available, in cases that we jointly take, shares in the profits of those cases.  This is not a joint case.  It's my case, as was the Hawaii Coalitions case before it.  And we specifically excluded Dr. Meyers from compensation or participation as an attorney in this case.  Also, the expense of the case are also being segregated. So, to the extent that the law firm has incurred any expense in the case, those will be reimbursed.

Tr. 66:21-25, 67:1-4.

32

### iv. Dr. Meyers Offers Improper Legal Conclusions

In both her Preliminary Report and Final Report, Dr. Meyers asserts that Evercare failed to comply with 42 U.S.C. § 1396u-2(b)(5) and its implementing regulations by failing to have written contracts with its providers.  <u>See</u> Preliminary Report at 7; Final Report at 17-18.  Expert's may not offer opinions on a purely legal issue or the application of legal standards to the evidence.  <u>See Aquilar v. Int'l Longshoremen's Union Local #10</u>, 966 F.2d 443, 447 (9th Cir. 1992) (trial court properly excluded expert opinion on the legal issues of reasonableness and forseeability of reliance since these were "matters of law for the court's determination").

Dr. Meyers' purported expert opinion regarding Evercare's alleged failure to comply with the requirement that it have written contracts with its providers is a legal opinion. Indeed, this assertion is addressed by the Court in its Provider Networks Order.  Accordingly, Dr. Meyers' purported expert opinion regarding Evercare's alleged failure to have written contracts with its providers is inadmissible.

### <u>CONCLUSION</u>

In light of the foregoing, the Court GRANTS Evercare's motion in limine to exclude the expert testimony and reports of Dr. Meyers.  As the Court has granted summary judgment in favor of the State Defendants and Intervenors with respect to

33

Plaintiffs' claims that the provider networks are inadequate in contravention of 42 U.S.C. §§ 1396u-2(a)(1)(ii) & (b)(5), the Court finds that the opinions set forth in Dr. Meyers' expert reports would not assist the trier of fact to understand the evidence or determine a fact in issue.  Even if Dr. Meyers' expert testimony would assist the trier of fact, her expert testimony would be inadmissible because it is either unreliable or lacking factual support.

        IT IS SO ORDERED.

        DATED:  Honolulu, Hawai'i, March 19, 2010.



_____
Alan C. Kay
Sr. United States District Judge

G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK:  Order Granting Evercare's Motion in Limine, and the Joinder Therein, to Exclude the Expert Testimony and Reports of Dr. Meyers