IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL.,   ) | Civ. No. 08-00551 ACK-BMK |
| ) | Civ. No. 09-00044 ACK-BMK |
| ) | (Consolidated) |
| Plaintiffs,   ) | |
| ) | |
| vs.   ) | |
| ) | |
| STATE OF HAWAII, DEPARTMENT OF   ) HUMAN SERVICES, ET AL.,   ) | |
| ) | |
| Defendants.   ) | |
| ———————————————————————) | |
| ) | |
| G., PARENT AND NEXT FRIEND OF   ) K., A DISABLED CHILD, ET AL.,   ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| vs.   ) | |
| ) | |
| UNITED STATES DEPARTMENT OF   ) HEALTH AND HUMAN SERVICES, ET   ) AL.,   ) | |
| ) | |
| Defendants.   ) | |
| ———————————————————————) | |

**ORDER GRANTING WELLCARE OF ARIZONA'S MOTION FOR SUMMARY JUDGMENT, AND THE JOINDERS THEREIN, ON THE REMAINING SOLVENCY ISSUES**

**PROCEDURAL BACKGROUND**

As the parties and the Court are extensively familiar with the background of this case, the Court will only present the background relevant to the instant motion for summary judgment. For a detailed description of the procedural and factual background of this case, see the order granting in part, and denying in part, the State Defendants' motion for summary

judgment, and the joinders therein, and denying Plaintiffs'
motion for summary judgment on licensure and solvency issued on
December 24, 2009.  <u>G. v. Hawaii, Dep't of Human Servs.</u>, Civ.
Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1046,
2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09
Order").

## I.        Prior Proceedings

On December 8, 2008, in Civil No. 08-00551 ACK-BMK,
Plaintiffs filed a complaint against Defendants the State of
Hawaii, Department of Human Services ("State DHS"), and Lillian
B. Koller, in her official capacity as the Director of the State
DHS (collectively, "State Defendants" or "State").  At that
point, the Plaintiffs were comprised of aged, blind, and disabled
("ABD") Medicaid beneficiaries ("ABD Plaintiffs").  Their
principal allegation is that the State Defendants have violated
certain provisions of Title XIX of the Social Security Act,
commonly known as the Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u>, by
requiring ABD beneficiaries to enroll with one of two healthcare
entities as a condition of receiving Medicaid benefits in
connection with the agency's managed care program for ABD
beneficiaries, the QUEST Expanded Access ("QExA") Program.  Those
two entities were the only ones awarded contracts to provide the
care for ABD beneficiaries under the QExA Program ("QExA
Contracts").  They are WellCare Health Insurance of Arizona, Inc.

2

d/b/a Ohana Health Plan ("WellCare of Arizona") and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors"), and they have intervened in this matter.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS ("Secretary") (collectively, "Federal Defendants").  On February 19, 2009, Civil Nos. 08-00551 and 09-00044 were consolidated.

On May 11, 2009, the Court entered an order granting in part and denying in part a motion to dismiss filed by the State Defendants and joinders therein.  See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009) ("5/11/09 Order").  The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects.  See Order Granting in Part, and Denying in Part Plaintiffs' Leave to Amend Their Complaints, Doc. No. 138 (July 14, 2009) ("7/14/09 Order").  They therefore filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended complaint against the State Defendants ("State Second Amended Complaint").  The State Second Amended

3

Complaint asserts the following nine counts: (I) deprivation of rights under federal law and 42 U.S.C. § 1983; (II) violations of preemptive federal law by virtue of the Supremacy Clause; (III) further specific violations of preemptive federal law and regulations; (IV) insufficient assurances of solvency and evidence of poor performance in other states; (V) insufficient range of services and provider networks; (VI) violation of the Americans with Disabilities Act ("ADA"); (VII) violation of the Rehabilitation Act of 1973; (VIII) violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204; and (IX) unlawful taking.

    In October and November of 2009, three motions for summary judgment were filed in the action against the State Defendants.  On December 24, 2009, the Court granted in part, and denied in part the State Defendants' motion for summary judgment. See 12/24/09 Order at *1085-*86.  Notably, the 12/24/09 Order granted the State Defendants' licensure motion for summary judgment, and the joinders therein, regarding the second solvency requirement.  In addition, particularly relevant to the instant motion for summary judgment, the Court denied Plaintiffs' motion for summary judgment as to the first and third solvency requirements for MCOs prescribed by 42 U.S.C. § 1396b(m)(1)(A). Id.  In denying Plaintiffs' motion for summary judgment as to the first solvency requirement, the Court noted that Plaintiffs

argued that, according to their proffered expert Vernon E. Leverty ("Mr. Leverty"), the "Insurance Commissioner, looking at WellCare [of Arizona], should say or should be saying that it doesn't meet the solvency requirements, for the fact that it hasn't—its financial condition has been declining over the last several years, and, in particular, since it started into the Quest program."  Id. at *1077.

On December 15, 2009, the State Defendants filed a motion in limine to exclude any expert testimony from Mr. Leverty, and to strike his report ("State Defs.' Leverty MIL"). On March 19, 2010, the Court granted the State Defendants' Leverty MIL.  See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2010 U.S. Dist. Lexis 26316 (D. Haw. Mar. 19, 2010) (as amended on April 2, 2010) ("4/2/10 Leverty Order").  The Court excluded the expert testimony and report of Mr. Leverty primarily because his opinions were not relevant to the issues that remained to be tried in this case, or because they would not assist the trier of fact.  See 4/2/10 Leverty Order at *28-*38.

II.    **WellCare of Arizona's Solvency Motion**

On June 29, 2010, WellCare of Arizona filed a motion for summary judgment on the remaining solvency issues ("WellCare of Arizona's Solvency Motion").  WellCare of Arizona's Solvency Motion was accompanied by a memorandum in support ("WellCare of

Arizona's Solvency Mot. Mem."), and a concise statement of facts ("WellCare of Arizona's Solvency CSF").

On June 30, 2010, Evercare filed a joinder in the motion.  On July 20, 2010, the State Defendants filed a joinder in the motion.

On July 22, 2010, Plaintiffs filed an opposition to WellCare of Arizona's Solvency Motion ("Pls' Opp'n"). Plaintiffs' opposition was accompanied by an omnibus concise statement of facts, which was also used in opposition to Evercare's motions for summary judgment regarding the ABD Plaintiffs' claims under the ADA and Rehabilitation Act ("Pls' Omnibus CSF").  On July 23, 2010, Plaintiffs filed an errata to their Omnibus CSF along with a declaration from Plaintiff L.P. See Doc. No. 609.

On July 29, 2010, WellCare of Arizona filed a reply to Plaintiffs' opposition ("WellCare of Arizona's Solvency Reply"). WellCare of Arizona's Solvency Reply was accompanied by a reply concise statement of facts in support its motion ("WellCare of Arizona's Solvency Reply CSF").

On July 30, 2010, because Plaintiffs suggested that the Court reconsider its prior favorable ruling in favor of Evercare with respect to the third solvency requirement, Evercare filed a substantive joinder to WellCare of Arizona's Solvency Reply

("Evercare's Substantive Joinder").[1/]

On August 12, 2010, the Court held a hearing on WellCare of Arizona's Solvency Motion ("8/12/10 Hearing").[2/]   The following day, the Court held an evidentiary hearing regarding a recent situation involving Plaintiff E.S., which related to ABD Plaintiff E.S.'s ADA and Rehabilitation Act claims and was not pertinent to the remaining solvency issues ("8/13/10 Hearing").

At the 8/12/10 Hearing, because WellCare of Arizona only came forward with evidence to establish its compliance with Hawai'i solvency standards prior to CMS approval, the Court granted WellCare of Arizona leave to file a supplemental declaration evidencing its compliance with Hawai'i solvency standards for 2009 and through the second quarter of 2010.[3/]   See 8/12/10 Tr. 12:6-9.[4/]

---

[1/] Pursuant to D. Haw. Local Rule 7.9 a party who has filed a joinder may file its own reply if the opposition addressed matters unique to the joining party.

[2/] The Court also held a hearing on Evercare's motions regarding the ABD Plaintiffs' claims under the ADA and Rehabilitation Act, which are addressed in a separate order.

[3/] At the 8/12/10 Hearing, WellCare of Arizona's counsel explained that, because the annual statement for 2010 would not be filed until December, the most recent available financial information for WellCare of Arizona would be through the first quarter of 2010.   8/12/10 Tr. 35:20-24.   The supplemental declaration filed on August 26, 2010, however, includes financial information through the second quarter of 2010.

[4/] A transcript of the hearing held on August 12, 2010, has been entered on the docket as Doc. No. 731.   The Court will refer to this transcript as the "8/12/10 Tr.".

7

On August 26, 2010, WellCare of Arizona filed a supplemental declaration from Roderick Y. Uyehara, Insurance Examiner III, of the Hawaii Insurance Division ("Uyehara Supp. Decl.").

Although Plaintiffs' response to the supplemental declaration was due by August 31, 2010, see 8/12/10 Tr. 35:9-11, Plaintiffs filed an untimely response on September 2, 2010 ("Pls' Supp. Resp.").

## FACTUAL BACKGROUND[5/]

As noted supra, the 12/24/09 Order presents a detailed description of the factual background of this case.  The following is a recitation of the general factual background, along with the facts relevant to the instant summary judgment motion.

I.        The Medicaid Act

The Medicaid Act "provides federal funding to 'enabl[e] each State, as far as practicable . . . to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services.'"  AlohaCare v. Hawaii, Dep't of Human Servs., 572 F.3d

---

[5/]  The facts in this Order are recited for the limited purpose of deciding the instant motion for summary judgment.  The facts shall not be construed as findings of fact upon which the parties may rely upon in future proceedings in this case.

740, 742 (9th Cir. 2009) (quoting 42 U.S.C. § 1396-1) (brackets in original).  The Medicaid program is "a jointly financed federal-state program that is administered by the States in accordance with federal guidelines." Id.  Each state that elects to participate in the program must submit a plan to the CMS.  42 U.S.C. §§ 1396, 1396a.  If the plan is approved, the state is entitled to Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals.  Id. § 1396b(a)(1).

"The Act, among other things, outlines detailed requirements for [state] plan eligibility, [42 U.S.C.] § 1396a, erects a complex scheme for allocating and receiving federal funds, id. § 1396b, and imposes detailed requirements on States that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), id. § 1396u-2." AlohaCare, 572 F.3d at 742-43.  "Medicaid generally requires a State to conform with federal guidelines prior to receiving federal funds; however, under 42 U.S.C. § 1315, CMS may waive compliance for certain 'experimental, pilot, or demonstration project[s].'" Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

## II.     The QExA Program

On October 10, 2007, the State DHS issued a request for proposals ("RFP") to procure the services of two managed care

9

organizations that would be responsible for providing all of the

Medicaid care for ABD beneficiaries as part of the QExA Program.

12/24/09 Order at *1071.  The RFP, which was as amended

incorporated into the QExA Contracts, includes a number of

requirements regarding solvency and provider networks that are

pertinent to the solvency claims.  Id.

### A.   Networks

With respect to the basic framework of the QExA

Program, RFP § 40.100 provides that "QExA is a managed care

program and, as such, all acute, pharmacy and long-term care

services to members shall be provided in a managed care system."

Id.  It further directs that "[t]he health plan shall develop and

maintain a provider network capable of providing the required

individualized health services needed by the members."  Id.

RFP § 40.210 provides in relevant part that:

> The health plan shall develop and maintain a
> provider network that is sufficient to ensure
> that all medically necessary covered services
> are accessible and available. . . .

> If the health plan's network is unable to
> provide medically necessary covered services
> to a particular member within its network or
> on the island of residence, the health plan
> shall adequately and timely provide these
> services out-of-network or transport the
> member to another island to access the
> service(s) for as long as it is unable to
> provide them on the island of residence.

Id.  The RFP does not require the health plan to furnish the

required care directly to members through its own facilities or

employees.  <u>Id.</u>

**B.    Solvency**

On the issue of solvency, RFP § 71.800 requires each

plan to "warrant[] that it is of sufficient financial solvency to

assure the DHS of its ability to perform the requirements of the

contract," "provide sufficient financial data and information to

prove its financial solvency," and "comply with the solvency

standards established by the State Insurance Commissioner for

private health maintenance organizations or health plans licensed

in the State of Hawaii."  <u>Id.</u> at *1071-*72.  In addition, RFP

§ 40.100 requires each plan to be "properly licensed as a health

plan in the State of Hawaii (See Chapters 431, and 432, and 432D,

HRS)," and "meet the requirements of [42 U.S.C. § 1396b(m)]."

<u>Id.</u> at *1072.

Apart from meeting licensing requirements, a health

plan must post a performance bond.  <u>Id.</u>  Specifically, RFP

§ 71.500 provides that:

> The health plan shall obtain a performance
> bond issued by a reputable surety company
> authorized to do business in the State of
> Hawaii in the amount of one-million dollars
> ($1,000,000) or more, conditioned upon the
> prompt, proper, and efficient performance of
> the contract, and shall submit same to the
> DHS prior to or at the time of the execution
> of the contract.  The performance bond shall
> be liable to forfeit by the health plan in
> the event the health plan is unable to
> properly, promptly and efficiently perform
> the contract terms and conditions or the
> contract is terminated by default or

11

bankruptcy of the health plan.

The amount of the performance bond shall be
adjusted at the time members begin enrolling
in the plan.  At that time, the amount of the
performance bond shall approximate eighty
percent (80%) of one month's capitation
payments.

Id.

Lastly, RFP § 72.130 provides that "[m]embers shall not
be liable for the debts of the health plan," and that, "in the
event of insolvency of the health plan, members may not be held
liable for the covered services provided to the member, for which
the State does not pay the health plan."  Id.

### C.    QExA Contracts

On February 1, 2008, the State DHS awarded the QExA
Contracts to Evercare and Ohana.  Id. at *1074.  The State DHS
signed the contracts with them on February 4, 2008.  Id.  On May
15, 2008, Ohana was merged into WellCare of Arizona.  Id. at
*1075.  At that point, the QExA Contract that was held by Ohana
was assumed by WellCare of Arizona.  Id.

### D.    The QExA Contractors' Performance Bonds

On January 16, 2009, a performance bond was issued in
the amount of $14,000,000, naming Evercare as the principal and
the State DHS as the obligee.  Id.  On February 21, 2009, a
performance bond was issued in the amount of $14,600,000, naming
WellCare of Arizona as the principal and the State DHS as the
obligee.  Id.  These bonds were obtained pursuant to RFP

12

§ 71.500.  <u>Id.</u>

**LEGAL STANDARD**

The purpose of summary judgment is to identify and dispose of factually unsupported claims and defenses.  <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  Summary judgment is therefore appropriate if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  <u>Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)) (citation omitted).[6]  Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial.  <u>See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  "Only admissible evidence may be considered in deciding a motion for summary judgment."  <u>Miller v. Glenn Miller Prods., Inc.</u>, 454 F.3d

---

[6] Disputes as to immaterial issues of fact do "not preclude summary judgment."  <u>Lynn v. Sheet Metal Workers' Int'l Ass'n</u>, 804 F.2d 1472, 1483 (9th Cir. 1986).

13

975, 988 (9th Cir. 2006).

    The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may do so with affirmative evidence or by "'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.[7/] Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See id. at 323; Matsushita Elec., 475 U.S. at 586; California Arch. Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).[8/] The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

---

[7/] When the moving party bears the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  Miller, 454 F.3d at 987.  When the nonmoving party bears the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party.  Id.

[8/] Nor will uncorroborated allegations and "self-serving testimony" create a genuine issue of material fact.  Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002); see also T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial.  See Celotex, 477 U.S. at 322.

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630-31.[9/]  Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied.  Anderson, 477 U.S. at 250-51.

## DISCUSSION

WellCare of Arizona moves for summary judgment as to both the first and third solvency requirements.  The Court will address each in turn.

### I.       The First Solvency Requirement

The first solvency requirement is that an organization must make "adequate provision against the risk of insolvency, which provision is satisfactory to the State."  42 U.S.C. § 1396b(m)(1)(A)(ii).  This standard is implemented in the QExA Program through RFP § 71.800, which requires each QExA Contractor to "warrant[] that it is of sufficient financial solvency to

---

[9/] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence.  Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

assure the DHS of its ability to perform the requirements of the contract," "provide sufficient financial data and information to prove its financial solvency," and "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii."  12/24/09 Order at *1076.

A.   **Summary of the Court's 12/24/09 Order**

In its 12/24/09 Order, because the RFP requires that the QExA Contractors comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations[10] or health plans licensed in the State of Hawai'i, the Court described Hawai'i solvency standards for accident and health insurers as follows:

> The financial condition of accident and health insurers is highly regulated under Hawai'i statutory law.  Accident and health insurers are required to maintain $450,000 on deposit at all times, which is greater than the $300,000 deposit required of HMOs.  HRS §§ 431:3-205, 432D-8(b). Accident and health insurers incorporated outside the State of Hawai'i (such as WellCare of Arizona and Evercare) are required to maintain additional deposits in an amount not less than $500,000.  Id. § 431:3-209.  In addition, HRS § 431:5-201 provides specific requirements with respect to the assets and liabilities of an insurer.  Accident

---

[10] As explained in the 12/24/09 Order, throughout this case the State Defendants have not claimed that the QExA Contractors meet Hawaii's solvency requirements for private health maintenance organizations, which are set forth in H.R.S. § 432D-8.  12/24/09 Order at *1078.  Instead, the State Defendants and Intervenors assert that the MCOs meet solvency standards for accident and health insurers in the State of Hawai'i.  See id.

and health insurers are also required to maintain an "unearned premium reserve on all policies in force." Id. § 431:5-301(a).  The "unearned premium reserve" means the portion of the gross premiums in force, less authorized reinsurance. Id. § 431:5-301(b).  Moreover, if the commissioner determines that an insurer's unearned premium reserves, however computed, are inadequate, the commissioner may require the insurer to compute such reserves or any part thereof according to such other method or methods as are prescribed in this code.

Id. at *1077.

After reviewing the evidence, the Court denied Plaintiffs' motion for summary judgment as to the first solvency requirement because the Court found that there were genuine issues of material fact as to whether WellCare of Arizona meets state solvency standards for accident and health insurers and thus whether it has made an adequate provision against insolvency, which provision is satisfactory to the state, as required by 42 U.S.C. § 1396b(m)(1)(A).  See id. at *1078.

**B.    WellCare of Arizona's Evidence Regarding the First Solvency Requirement**

In light of this ruling, in its current motion for summary judgment WellCare of Arizona has come forward with evidence establishing that it was in compliance with Hawai'i solvency standards for accident and health insurers prior to CMS approval of the QExA Contracts.  See WellCare of Arizona's Solvency Mot. Mem. at 14-15 ("[T]he solvency record for WellCare of Arizona 'begins' with its affirmative showings of full

17

compliance with State of Hawaii statutory insurance deposit requirements; an exceptionally high bond posting in satisfaction of RFP requirements; and the total absence of any evidence contradicting WellCare of Arizona's solvency at the time its QExA contract was approved by CMS on January 30, 2009.").

The evidence that WellCare of Arizona has come forward with, which is not disputed by Plaintiffs, includes the following.  WellCare of Arizona is domiciled in the State of Arizona and, at all material times, was licensed by the State of Hawai'i as a foreign insurer.  WellCare of Arizona's Solvency CSF ¶ 1.  At a minimum, the domiciliary state insurance department (in this case, Arizona) will perform a quarterly and annual financial analysis with respect to the insurer's statutory financial filings, including information regarding the insurer's investment holdings, insurance contract reserves, underwriting results, changes in capital structure, and policyholders' surplus levels.  Id. ¶ 4.[11/]  As a result, Hawaii's Insurance Commissioner relies primarily on the monitoring and regulation of Arizona's

_____

[11/] An insurance company's financial solvency is monitored and regulated primarily by the insurance department of its state of domicile.  WellCare of Arizona's Solvency CSF ¶ 3.  All state insurance commissioners, including those from Hawai'i and Arizona, are members of the National Association of Insurance Commissioners ("NAIC") which establishes standards for monitoring performance, including financial solvency, of domiciled insurers. Id. ¶ 2.  The NAIC Financial Regulation Standards and Accreditation Program requires accredited states to adopt certain financial regulation standards and use certain financial monitoring techniques.  Id.

Insurance Commissioner, including the Arizona Insurance Department, to determine whether WellCare of Arizona is in compliance with Hawai'i solvency standards. Id. ¶ 7. Hawaii's Insurance Division has not received a communication from the Arizona Insurance Department identifying WellCare of Arizona as a troubled or potentially troubled insurer. Id. ¶¶ 18-19.

As of January 30, 2009, the most recent statutory financial statement available to CMS prior to making its decision to approve the QExA Contracts was WellCare of Arizona's third quarter 2008 financial statement ("WellCare of Arizona's 3Q 2008 FS"). Id. ¶ 8.[12/] WellCare of Arizona's 3Q 2008 FS showed capital and surplus of approximately $72 million. Id. ¶ 10.[13/]

Moreover, WellCare of Arizona has come forward with the testimony of Roderick Y. Uyehara, Insurance Examiner III, of the Hawaii Insurance Division. Mr. Uyehara confirmed that for the

---

[12/] WellCare of Arizona's focus on the time period prior to CMS approval is a result of an incorrect interpretation of the Court's 12/24/09 Order. Specifically, WellCare of Arizona asserts that the 12/24/09 Order held that the first solvency requirement focuses solely on whether WellCare of Arizona complied with Hawai'i solvency standards prior to approval by CMS, and not at anytime thereafter. As discussed infra, this is an incorrect reading of the Court's prior order, as the RFP requires WellCare of Arizona to "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii." 12/24/09 Order at *1076 (emphasis added).

[13/] The third quarter 2008 capital and surplus amounts represented a 9.8% increase from the prior year-end figures for 2007. WellCare of Arizona's Solvency CSF ¶ 11.

periods ending 2007 and 2008, WellCare of Arizona met the applicable State solvency standards.  WellCare of Arizona's Solvency Mot. Mem. at 17; <u>see also</u> WellCare of Arizona's Solvency CSF ¶¶ 8-21.[14]

### C. Plaintiffs' Opposition

As noted <u>supra</u>, in opposition Plaintiffs do not dispute any of the facts that WellCare of Arizona has come forward with in support of its solvency motion.  Thus, WellCare of Arizona's contention that it was in compliance with the applicable solvency standards prior to CMS approval is, in effect, unopposed.  <u>See</u> D. Haw. Local Rule 56(g) ("For purposes of a motion for summary judgment, material facts set forth in the moving party's concise statement will be deemed admitted unless controverted by a separate concise statement of the opposing party.").

Instead, Plaintiffs assert that there are genuine issues of material fact with respect to whether WellCare of Arizona <u>presently</u> complies with the first solvency requirement, because WellCare of Arizona allegedly does not pay providers, or pays them late.  <u>See</u> Pls' Opp'n at 8-11; <u>see also</u> Pls' Omnibus CSF ¶¶ 1-3 (citing to the declarations of Drs. Cho, Izuka, Kandasamy, Foti, Brunel, and Meyers).  Noting that 42 U.S.C. § 1396b does not define insolvency, Plaintiffs suggest that the

---

[14] WellCare of Arizona's supplemental declaration filed on August 26, 2010, was also made by Mr. Uyehara.

Court adopt its ordinary meaning in determining whether WellCare

of Arizona meets the first solvency requirement.  Pls' Opp'n at

8-10.  In this case, Plaintiffs assert that the ordinary

definition of equity insolvency is "when the debtor cannot meet

its obligations as they fall due."  Id. at 9 (citing Black's Law

Dictionary 811, B. Garner 8th ed. 2004); see also id. (citing In

re Aldrich, 9 Haw. 237, 1893 WL 1099 (Hawaii Rep. 1983) (the

Supreme Court of the (former) Republic of Hawai'i stated that

insolvency means "a present inability to pay [debts]")).[15/]

    D.  **Discussion**

        It is undisputed that WellCare of Arizona, in its

moving papers, has established compliance with Hawai'i solvency

---

[15/] Plaintiffs also argue that the Court should not rely on
the financial records submitted by WellCare of Arizona because
they can be misleading, "especially in the 'post-Enron era.'"
Pls' Opp'n at 9.  This argument warrants prompt rejection.
Plaintiffs proceed to assert that "the WellCare organization . .
. is presently the target of multiple investigations and at least
one false claims complaint involving Wellcare's Hawaii
operations."  Id.  The Court has previously held that whether
there were allegations of fraud on the part of subsidiaries of
WellCare of Arizona's parent company in Florida is not relevant
to the question of "whether WellCare of Arizona complies with the
solvency standards established by the State Insurance
Commissioner for private health maintenance organizations or
health plans licensed in the State of Hawai'i."  4/2/10 Leverty
Order at *25.  The newly filed complaint in the Middle District
of Florida, to which Plaintiffs now refer, is no different.  As
WellCare of Arizona explains, nowhere in the complaint do the
plaintiffs in that case name WellCare of Arizona, or any other
entity doing business in Hawai'i, as a defendant.  WellCare of
Arizona's Solvency Reply at 6 n.2.  "Only Count V purports to be
based on a violation of Hawaii law (in addition to the law of
several other states), but the Count pleads no specific conduct
in Hawaii nor is it otherwise linked to the state."  Id.

standards for the period leading up to its approval by CMS.  At the end of the third quarter in 2008, WellCare of Arizona showed capital and surplus of approximately $72 million.  WellCare of Arizona's Solvency CSF ¶ 11.  This is substantially above Hawaii's required minimum of $1.05 million.  <u>See</u> WellCare of Arizona's Solvency Mot. Mem. at 6; <u>see also</u> WellCare of Arizona's Solvency CSF ¶ 9.[16/]  In addition, at the end of 2008, WellCare of Arizona had placed funds on deposit with various state insurance departments totaling in excess of $7.5 million.  WellCare of Arizona's Solvency CSF ¶ 17.  These deposits included $1.9 million in the State of Hawai'i for both the years 2007 and 2008. <u>See</u> <u>id.</u>, Ex. 1, Gen'l Interrog. 55; <u>see also</u> 8/12/10 Tr. 6:19-7:6.  Again, this is well above the State's requirement of $1.05 million.  WellCare of Arizona's Solvency CSF ¶ 9; H.R.S. 431:3-205, 431:3-209.  For the year 2008, WellCare of Arizona reported a net income of nearly $14.6 million, while generating approximately $26.9 million in net cash from operations. WellCare of Arizona's Solvency CSF ¶ 12.  Finally, as noted in the 12/24/09 Order, WellCare of Arizona has posted a performance bond of $14.6 million pursuant to RFP § 71.500.  <u>Id.</u> at *1075. "This bond provides security against the risk of insolvency." <u>Id.</u>

---

[16/] Net income through the third quarter of 2008 was $10,513,663, as compared to a deficit income of $5,229,670 for all of 2007.  WellCare of Arizona's CSF ¶ 20.

Furthermore, as the first solvency requirement is that an MCO make "adequate provision against the risk of insolvency, <u>which provision is satisfactory to the State</u>" a representative of the Hawaii Insurance Commissioner concluded that WellCare of Arizona met the applicable State solvency standards prior to CMS approval.  WellCare of Arizona's Solvency CSF ¶ 21.[17]

Despite this strong showing of solvency, the evidence submitted by WellCare of Arizona in its moving papers only establishes compliance with State solvency standards for the period prior to CMS approval.[18]  WellCare of Arizona's interpretation of the first solvency requirement is based on the Court's previous statement in a footnote that "what matters is that the entity WellCare of Arizona meets solvency standards before the CMS approves the entity's contract with the state." 12/24/09 Order at *1077.  This statement, however, was made in response to Plaintiffs' contention that the RFP was violated when

---

[17] In addition, for the years 2007 and 2008, WellCare of Arizona obtained clean audit opinions from its independent CPA auditor Deloitte & Touche LLP, and clean actuarial opinions from its in-house qualified actuary.  <u>See</u> WellCare of Arizona's Solvency CSF ¶¶ 13-15.

[18] At the 8/12/10 Hearing, WellCare of Arizona's counsel noted that the evidence submitted in its moving papers shows that there has been no negative reporting on WellCare of Arizona from the Arizona's Insurance Commissioner or the Arizona Insurance Department, and that it continues to be licensed by the State of Hawai'i.  8/12/10 Tr. 10:15-22.  These facts alone, however, are not sufficient to establish present compliance with Hawai'i solvency standards, and therefore the Court granted WellCare of Arizona's request to file supplemental briefing.

the State entered into contracts with Ohana on February 4, 2008, but before the CMS had approved the QExA Contracts.[19/]  The Court explained that, due to the nature of the Medicaid program, what mattered was that the MCOs meet solvency standards before the CMS approved the MCO's contract with the state, not at the time the state entered into contracts with the MCOs.  Implicit in the Court's analysis was the proposition that the QExA Contractors must meet State solvency standards before the CMS approves the MCO's contract with the State, and thereafter.[20/]

_____

[19/] Plaintiffs also had argued that Ohana, the MCO that was first awarded the QExA Contract along with Evercare, did not meet the first solvency requirement.  See 12/24/09 Order at *1076-*77.  In its 12/24/09 Order, however, the Court observed that on May 15, 2008, prior to the contract being approved by the CMS, Ohana was merged into WellCare of Arizona.  Id. at *1077.  As such, the Court explained that "WellCare of Arizona is the entity that should be analyzed in considering the first solvency [requirement]."  Id.

[20/] It is unclear, however, whether Plaintiffs have sufficiently alleged an ongoing violation of the first solvency requirement.  In the Complaint Plaintiffs, for the most part, broadly reference solvency standards and assert that the QExA members cannot be required to enroll with MCOs which do not provide adequate assurances of solvency.  See State Second Amended Complaint ¶ 3 ("Medicaid beneficiaries cannot be required to enroll with managed care companies . . . which do not provide . . . adequate assurances of solvency."); ¶ 4 (same); ¶ 92 ("The State Defendants, unless enjoined by this court, will continue unlawfully depriving ABD plaintiffs of their rights under federal law . . . [by requiring enrollment in an MCO with] inadequate assurances of solvency"); ¶ 98 (same).  At other times throughout the Complaint, however, Plaintiffs refer specifically to WellCare of Arizona's solvency prior to approval by the CMS.  See id. ¶¶ 35-43; ¶ 44 ("As such, under the terms of RFP 21.400, Ohana had to 'be disqualified and [its] proposal was automatically rejected . . .'"); ¶ 100 ("At the relevant time, at the very least, the
(continued...)

Indeed, at several other points in its 12/24/09 Order, the Court referred to an ongoing obligation on QExA Contractors to meet the first solvency requirement.  <u>See</u> <u>id.</u> at *1078 (the Court stated that there were genuine issues of material fact as to "whether WellCare of Arizona <u>meets</u> state solvency standards for accident and health insurers and thus whether it has made an adequate provision against insolvency"); <u>id.</u> at *1085 ("Furthermore, there are factual issues surrounding whether WellCare of Arizona <u>has complied</u> with state statutory solvency standards for accident and health insurance companies, which might assure that its QExA enrollees would not be held liable for its debts.").  In its 4/2/10 Leverty Order, the Court again characterized the obligation as ongoing.  <u>See</u> 4/2/10 Leverty Order at *23 (noting that in its 12/24/09 Order the Court found that there were genuine issues of material fact as to whether "WellCare of Arizona <u>is in</u> compliance with state solvency standards").

---

[20]/(...continued)
contract with Wellcare did not appear to be consistent with or in compliance with Hawaii law, and the State Defendants should have determined that, absent the Insurance Division's confirmation Wellcare met all applicable solvency requirements to undertake the QExA contract, it could be illegal for the State to contract with Wellcare for a $600+ million managed care program.").  At the hearing, Plaintiffs confirmed that they are asserting a present violation of the first solvency requirement.  8/12/10 Tr. 8:24-25.  Nevertheless, as described <u>infra</u>, through the supplemental declaration of Mr. Uyehara WellCare of Arizona has established its current compliance with Hawai'i solvency standards, and is therefore entitled to summary judgment.

This interpretation is consistent with the statutory language of 42 U.S.C. § 1396b(m)(1)(A)(ii).  In its entirety, 42 U.S.C. § 1396b(m)(1)(A)(ii) defines an MCO as an organization that, _inter alia_, meets the following requirements:

> [1] has made adequate provision against the risk of insolvency, which provision is satisfactory to the State, [2] meets the requirements of subparagraph (C)(i) (if applicable), and [3] which assures that individuals eligible for benefits under this subchapter are in no case held liable for debts of the organization in case of the organization's insolvency.

42 U.S.C. § 1396b(m)(1)(A)(ii) (numbering added).  Although the Court observes that "has made" is in the past tense, while "meets" and "assures" (which apply the second the third solvency requirements, respectively) are in the present tense, the Court has stated on numerous occasions that the first solvency requirement is implemented in the QExA Program through RFP § 71.800, which requires each QExA Contractor to "warrant[] that it is of sufficient financial solvency to assure the DHS of its ability to perform the requirements of the contract," "provide sufficient financial data and information to prove its financial solvency," and "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii." 12/24/09 Order at *1076.  In other words, the State has found it appropriate to require the QExA Contractors to "_comply_ with the solvency standards established by the State Insurance

Commissioner for private health maintenance organizations or

health plans licensed in the State of Hawaii." Id. (emphasis

added).  Indeed, many of the solvency standards that the State

has mandated the QExA Contractors to comply with, require the

entities to comply with the standard on an ongoing basis.  For

instance, accident and health insurers are required to maintain

$450,000 on deposit at all times.  See 12/24/09 Order at *1077

(citing H.R.S. §§ 431:3-205).  Thus, in order to satisfy the

first solvency requirement, WellCare of Arizona must establish

that it is presently in compliance with State solvency

standards.[21/]  As discussed herein, through the supplemental

declaration of Mr. Uyehara, WellCare of Arizona has done so.

In his supplemental declaration, Mr. Uyehara explains

that for the year 2009, WellCare of Arizona reported financial

---

[21/] The Court acknowledges that this results in similarities
between the first and second solvency requirements, as the second
solvency requirement is that an organization must meet "solvency
standards established by the State for private health maintenance
organizations or [be] licensed or certified by the State as a
risk-bearing entity."  42 U.S.C. § 1396b(m)(1)(C)(i).  In this
case, the QExA Contractors have accident and health insurance
licenses.  See 12/24/09 Order at *1078.  Nevertheless, as part of
its provision against the risk of insolvency, the State has
required that the QExA Contractors, inter alia, "comply with the
solvency standards established by the State Insurance
Commissioner for private health maintenance organizations or
health plans licensed in the State of Hawaii," id. at *1076, and
therefore WellCare of Arizona must demonstrate its compliance
with the applicable solvency standards to date.  As part of the
first solvency requirement a state could, of course, impose
additional obligations on the MCOs that go beyond state solvency
standards.  That is not presently an issue before the Court,
however.

security deposits of $13,846,169.  Uyehara Supp. Decl. ¶ 13.

These deposits met the State's requirements for financial

security deposits.  Id.[22/]

In addition, for the year 2009, and for the second

quarter of 2010, WellCare of Arizona reported capital and surplus

of $53,297,481 and $56,286,009 respectively.  Id. ¶ 14.  These

include capital amounts of $3,000,000 each, which is well-above

the $1.05 million minimum required by the State.  Id.

Accordingly, through the supplemental declaration of Mr. Uyehara,

WellCare of Arizona has demonstrated its compliance with the

applicable State solvency requirements through the second quarter

of 2010.

The Court is unpersuaded by Plaintiffs' argument in

opposition to WellCare of Arizona's Solvency MSJ and in response

to WellCare of Arizona's supplemental declaration.  The

definition of insolvency that Plaintiffs have advocated for in

their opposition is irrelevant to the first solvency requirement,

as the first solvency requirement is that the QExA Contractor

make "adequate provision against the risk of insolvency, which

provision is satisfactory to the State."  42 U.S.C.

---

[22/] WellCare of Arizona's quarterly financial statements, including its second quarter 2010 statement, do not report security deposit holdings.  Uyehara Supp. Decl. ¶ 13.  Plaintiffs have not come forward with any evidence to suggest that WellCare of Arizona is no longer in compliance with the applicable security deposit requirements, however.

§ 1396b(m)(1)(A)(ii) (emphasis added).  Here, the State has decided that the QExA Contractors must "comply with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawaii."  12/24/09 Order at *1076.  As a result, there is no need for the Court to apply the proffered plain meaning of insolvency that Plaintiffs have come forward with, as the State has defined the applicable requirements.

At the 8/12/10 Hearing, Plaintiffs' counsel asserted that QUEST MCOs pay almost 100% of all claims, and that payment is typically received by the provider within fifteen days of submitting the claim.  8/12/10 Tr. 31:3-6.  Plaintiffs argue that because WellCare of Arizona allegedly does not pay providers for all of the claims submitted (or pays them late), there "is an inference to be made" that WellCare of Arizona cannot afford the payments.  As discussed infra, in reply WellCare of Arizona observes that while Plaintiffs have submitted several declarations by participating and non-participating providers alleging that in some cases their claims to WellCare of Arizona have been pending in excess of 120 days, no evidence has been submitted that their claims have been denied in whole or even in part.  WellCare of Arizona's Solvency Reply at 9; see also 8/12/10 Tr. 22:1-3 ("There may be delays in payment for various reasons in terms of paperwork not being put in, bureaucratic

29

mistakes that may be made by either party . . . .").  The Court

agrees with WellCare of Arizona that there may be other reasons

for the delayed payment, and as a result Plaintiffs' evidence of

delayed or late payments is insufficient to create genuine issues

of material fact with respect to the first solvency

requirement.[23/]

The arguments raised by Plaintiffs in response to

WellCare of Arizona's supplemental declaration are similarly

unpersuasive.  Plaintiffs take issue with Mr. Uyehara's statement

that "[he] will respond to the [second quarter 2010] financial

status [of WellCare of Arizona] when Arizona's Insurance

Department completes its review . . . ."  Uyehara Supp. Decl. ¶

15.  Plaintiffs assert that Mr. Uyehara is reserving judgment on

WellCare of Arizona's financial statements for the second quarter

of 2010 "as he well should," because "[o]ne of the things the

Arizona Insurance Department will have to consider is evidence of

non-payment of claims provided in the instant matter."  Pls'

Supp. Resp. at 2.  However, Mr. Uyehara's decision to wait until

---

[23/] Plaintiffs also argue that WellCare of Arizona's failure
to pay providers violates the RFP (and thus the QExA Contracts),
which requires that 90% of clean claims be paid within 30 days,
and 99% of clean claims be paid withing 90 days.  Pls' Opp'n at
10-11 (citing RFP § 60.220).  This raises a separate question,
however, and is not relevant in analyzing WellCare of Arizona's
compliance with the first solvency requirement.  Moreover, at the
8/12/10 Hearing, Evercare's counsel explained that "[w]ith
respect to the untimely payment issue . . . there is a statutory
remedy for that.  And providers know how to use it."  8/12/10 Tr.
41:2-4.

the Arizona Insurance Department completes its review of WellCare of Arizona's second quarter 2010 financial statement is consistent with the financial monitoring system described _supra_. _See_ WellCare of Arizona's Solvency CSF ¶ 4 (explaining that the domiciliary state insurance department will perform a quarterly and annual financial analysis with respect to the insurer's statutory financial filings, including information regarding the insurer's investment holdings, insurance contract reserves, underwriting results, changes in capital structure, and policyholders' surplus levels).

Second, in response to WellCare of Arizona's supplemental filing, Plaintiffs again refer to ongoing litigation against subsidiaries of WellCare of Arizona's parent company in other states, and assert that any liability in those cases _might_ adversely impact WellCare of Arizona's financial solvency. However, the Court has held, and continues to hold, that whether there are allegations of fraud on the part of subsidiaries of WellCare of Arizona's parent company in other states is not relevant to the question of "whether WellCare of Arizona complies with the solvency standards established by the State Insurance Commissioner for private health maintenance organizations or health plans licensed in the State of Hawai'i." 4/2/10 Leverty Order at *25. In short, Plaintiffs have come forward with nothing more than speculation regarding WellCare of Arizona's

31

current financial solvency, which is insufficient to defeat a
motion for summary judgment.

Accordingly, because WellCare of Arizona has come
forward with evidence to establish its compliance with the first
solvency requirement from the time CMS approved the QExA
Contracts through the second quarter of 2010, WellCare of Arizona
is entitled to summary judgment in its favor as to Plaintiffs'
claim under the first solvency requirement.

### E.    Decision Regarding the First Solvency Requirement

In light of the foregoing, the Court grants WellCare of
Arizona's motion for summary judgment with respect to the first
solvency requirement, and the joinders therein.

### II.    The Third Solvency Requirement

The third solvency requirement that must be met to
qualify as an MCO is that the organization must assure "that
individuals eligible for benefits under [Medicaid] are in no case
held liable for debts of the organization in case of the
organization's insolvency."  42 U.S.C. § 1396b(m)(1)(A)(ii).

### A.    Summary of the Court's 12/24/09 Order

In its 12/24/09 Order, the Court found that the
accident and health insurance licenses held by Evercare and
WellCare of Arizona apply to their activities under the QExA
Contracts.  12/24/09 Order at *1083.  As such, they must comply
with the applicable statutory solvency standards in carrying out

those activities.  Id.  Moreover, § 72.130 of the RFP provides that "[m]embers shall not be liable for the debts of the health plan," and that, "in the event of insolvency of the health plan, members may not be held liable for the covered services provided to the member, for which the State does not pay the health plan." Id.

Although the RFP ensures that providers who participate in the QExA Program and sign contracts with QExA Contractors will not hold ABD beneficiaries liable for debts in the event of insolvency, in its 12/24/09 Order the Court expressed concerns as to whether non-participating providers could seek to recover from QExA patients in the event WellCare of Arizona does not make any payment to the provider due to insolvency.  Id. at *1083-*85. The same concern was not true of Evercare, however, because Evercare had submitted a form to the Court which was received by non-participating providers and included a provision stating that the "Provider agrees to look solely to the plan for payment of amounts due hereunder."  Id. at *1085.

Accordingly, taking into consideration the fact that the Court had found that there were genuine issues of material fact as to whether WellCare of Arizona is in compliance with State solvency standards, the Court concluded that there were genuine issues of material fact as to "whether WellCare of Arizona has provided sufficient assurances that the ABD

33

beneficiaries are in no case held liable for its debts in the case of its insolvency." Id.

### B.   The 4/2/10 Leverty Order

At the hearing on the State Defendants' Leverty MIL, the Court inquired as to whether WellCare of Arizona had addressed the Court's concerns expressed in its 12/24/09 Order with respect to the third solvency requirement.  In response, WellCare of Arizona's counsel asserted that "immediately after the Court's [12/24/09] ruling . . . [t]he forms were amended . . . to include verbatim the language contained in the Court's order."  4/2/10 Leverty Order at *20-*24.  WellCare of Arizona submitted these forms to the Court following the hearing.  Id. Upon reviewing the forms, however, the Court found that the submissions were insufficient, as they did not fully address the concerns the Court expressed in its 12/24/09 Order.  Id. Specifically, the Court noted that although both forms included the language "Provider/Physician agrees to look solely to the plan for payment of amounts due hereunder," the forms included additional language that appeared to contradict this provision. Id.  As a result, the Court found that there continued to be genuine issues of material fact as to whether non-participating providers could seek to recover from ABD beneficiaries in the event WellCare of Arizona did not make any payment to the provider due to insolvency.  Id.

34

C.   **WellCare of Arizona's Solvency Motion**

In response to the Court's analysis and application of the third solvency requirement in both its 12/24/09 Order and 4/2/10 Leverty Order, WellCare of Arizona has changed its prior authorization forms for non-participating providers to include the following language: "To ALL providers: Provider agrees to look solely to the plan for payments of amounts due hereunder." WellCare of Arizona's Solvency Mot. Mem. at 19; see also WellCare of Arizona's CSF ¶ 9.  In other words, WellCare of Arizona has now included the language in its prior authorization forms that the Court has previously found to be adequate in its 12/24/09 Order, and deleted the contradictory provisions identified by the Court's 4/2/10 Leverty Order.

WellCare of Arizona explains the basic framework of the out-of-network authorization process as follows:

> If a member requires services that are not available in the network, then the QExA plan must refer them out of network to a non-participating provider.  The referral by the plan will generate the paperwork that <u>commits</u> the non-participating provider to look solely to the plans for payment. However, if a QExA member sees a non-participating provider without prior authorization, there may not be coverage for the claim.  The QExA RFP requires that the QExA plans provide services out of network if the services are not available within the contracted network.

WellCare of Arizona's Solvency Reply at 12 (emphasis in original); see also id. ("Of necessity, the QExA plan must be afforded the opportunity to determine whether the services are

available within the contracted network, before any obligation
arises to refer the member out of network, and also to direct the
member to a specific out-of-network provider.").[24/]  For routine
care, the RFP requires a member seeking that care to get a
decision on whether they will be referred out of network "as
expeditiously as the member's health condition requires," but no
longer than fourteen (14) days following the MCO's receipt of the
request for service.  RFP § 50.700; see also 8/12/10 Tr. 41:12-
14.[25/]

_____

[24/] As noted supra, Section 40.210 of the RFP states in
relevant part that:

> If the health plan's network is unable to
> provide medically necessary covered services
> to a particular member within its network or
> on the island of residence, the health plan
> shall adequately and timely provide these
> services out-of-network or transport the
> member to another island to access the
> service(s) for as long as it is unable to
> provide them on the island of residence.

12/24/09 Order at *1071.

[25/] In addition, § 50.700 of the RFP provides, in relevant
part, that:

> In the event a provider indicates, or the health
> plan determines that following the standard time
> frame could seriously jeopardize the member's life
> or health or ability to attain, maintain, or
> regain maximum function, the health plan shall
> make an expedited authorization determination and
> provide notice as expeditiously as the member's
> health condition requires but no later than three
> (3) business days after receipt of the request for
> service.  The health plan may extend the three (3)
> (continued...)

**D.   Plaintiffs' Opposition**

In opposition, Plaintiffs do not dispute that WellCare of Arizona has submitted a form with identical language to that of Evercare.  See Pls' Opp'n at 1-6.  Instead, Plaintiffs casually note that the Court's previous decision regarding the third solvency requirement is subject to reconsideration.  Id. at 5.[26]  Plaintiffs proceed to take issue with the prior authorization process, asserting that non-participating providers typically perform services prior to receiving any authorization forms.  Id. at 2-6, 11-13.[27]  Plaintiffs describe WellCare of

_____

[25]/(...continued)
> business day time frame up by to fourteen (14) calendar days if the member requests an extension, or if the health plan justifies to the DHS a need for additional information and the extension is in the member's interest.

RFP § 50.700.  Emergent services, on the other hand, do not require prior authorization.  Id. ("The health plan shall not require prior authorization of emergency services, post-stabilization services, or urgent care services."); see also 8/12/10 Tr. 14:16-20.

[26]/ Evercare correctly observes that Plaintiffs' request for reconsideration of the 12/24/09 Order is improper and untimely.  See Evercare's Substantive Joinder at 2-4.  Had Plaintiffs sought reconsideration of the Court's 12/24/09 Order, they should have timely filed a separate motion, which would have provided Evercare with an adequate opportunity to respond.  Id.  Nevertheless, to be sure, the Court will address the merits of Plaintiffs' arguments with respect to WellCare of Arizona's compliance with the third solvency requirement.

[27]/ Plaintiffs state that this appears to no longer be the case with respect to Evercare after May 31, 2010.  See Pls' Opp'n at 12 n.4; see also Pls' Omnibus CSF ¶ 18 (citing the declaration
(continued...)

Arizona's current "prior" authorization process as follows:

(1) A non-participating provider receives a call from a patient requesting an appointment.

(2) At this point in time, there has been no contact between the non-participating provider and the QExA Contractor before an appointment time has been given to the patient.

(3) On the day that the QExA member arrives at the office, the provider calls the plan to verify that the patient is enrolled and eligible for coverage for that day, but no paperwork is generated.

(4) The non-participating provider's front office staff generates an "authorization" form, which is submitted along with a claim following treatment of the patient.

(5) WellCare of Arizona sends the non-participating provider the authorization form, which includes a statement that "[p]rovider agrees to look solely to the plan for payment of amounts due hereunder."[28]

---

[27]/(...continued)
of Dr. Meyers).  At the 8/12/10 Hearing, Evercare confirmed this point.  8/12/10 Tr. 42:7-9 ("Now, it is true that Evercare only recently decided to draw the line in the sand and say no, prior authorization means prior authorization.").

[28]/ Plaintiffs assert that WellCare of Arizona's prior authorization forms do not restrict the non-participating provider from holding a QExA member liable for services performed in the event of its insolvency.  See Pls' Opp'n at 4; see also Pls' Omnibus CSF ¶ 11 (citing the declaration of Dr. Meyers).  In making this argument, however, Plaintiffs cite to previous
(continued...)

See <u>id.</u> at 3-4.  Thus, according to Plaintiffs, non-participating providers are not made aware of the requirement that they must "look solely to the plan for payment," until after they have performed services.  <u>Id.</u>

Plaintiffs also argue that WellCare of Arizona's current prior authorization form is insufficient because non-payment by WellCare of Arizona allegedly results in failure of consideration.  <u>Id.</u> at 12-14.  That is, Plaintiffs assert that WellCare of Arizona has failed to pay non-participating providers for services provided to QExA members, and that non-payment results in failure of consideration supporting the contract.  <u>Id.</u>

**E.   Discussion**

Plaintiffs' argument in opposition is twofold: (1) that

---

[28]/(...continued)
versions of WellCare of Arizona's prior authorization forms, which the Court has previously agreed are inadequate.  <u>See</u> 12/24/09 Order at *1083-*85; <u>see also</u> 4/2/10 Leverty Order at *20-*24.  In its current motion, however, WellCare of Arizona has come forward with evidence that its prior authorization forms include the express written condition that the "[p]rovider agrees to look solely to the plan for payment of amounts due hereunder." <u>See</u> WellCare of Arizona's Solvency CSF ¶ 9.  Indeed, in her declaration, Dr. Meyers appears to contradict herself.  She first states that "[t]he 'preauthorization' forms [from both Evercare and WellCare of Arizona] have no terms or provisions prohibiting [her] from billing the enrollee for the services."  Pls' Omnibus CSF, Meyers Decl. ¶ 19.  She later indicates that "Evercare's authorization . . . states, 'provider agrees to look solely to the plan for payments of amounts due hereunder . . .'" <u>Id.</u> ¶ 23.  She then acknowledges that WellCare of Arizona's forms contain "terms prohibiting billing or collecting from Medicare dual-eligible patients," which likely refers to the form that the Court discussed in its 4/2/10 Leverty Order.  <u>Id.</u> ¶ 31.

non-participating providers do not receive authorization forms requiring that they look solely to the plans for payment until after they perform their services, and (2) that WellCare of Arizona's failure to pay non-participating providers voids the contract for failure of consideration.  The Court will address each in turn.

### i.    The Timing of the Authorization

In its reply, WellCare of Arizona does not appear to dispute the fact that authorization for services is sometimes given after a non-participating provider treats a QExA member.  See WellCare of Arizona's Solvency Reply at 9-10.[29/]  At the 8/12/10 Hearing, WellCare of Arizona's counsel did not deny this allegation, but rather noted that this was a "red herring issue." 8/12/10 Tr. 13:13-14.  That is, WellCare of Arizona notes that it has no obligation to cover services out of network, by non-participating providers, absent referral by the MCO.  See id. 10-

---

[29/] Although WellCare of Arizona seems to acknowledge that out-of-network authorizations were sometimes given after the fact, at the 8/12/10 Hearing WellCare of Arizona's counsel stated that, like Evercare, WellCare of Arizona will now be requiring prior authorization for non-emergent out-of-network services. 8/12/12 Tr. 43:21-24.  Both Evercare and WellCare of Arizona noted that Dr. Meyers is a special case, as they both allow Dr. Meyers to see certain patients without prior authorization.  Id. 29:13-16 (Evercare's counsel noted that Dr. Meyers is the only provider that Evercare has approved to see Evercare members who are her patients without prior authorization); 43:23-44:1 (WellCare of Arizona's counsel noted that WellCare of Arizona does not require prior authorization for Dr. Meyers "who is the special case in this situation . . . by virtue of an accommodation.").

13 (citing RFP § 40.210).  In addition, the QExA Contractor may deny payment to a provider "[if] the member self-refers to a specialist or other provider within the health plan's network without following procedures (e.g. obtaining prior authorization)."  Id. at 12 (citing § 60.240 of the RFP); see also WellCare of Arizona's Reply CSF ¶¶ 4-7 (WellCare of Arizona's member handbook states that providers may bill a member when, among other instances, a member goes to a non-participating provider without prior authorization by the MCO).

> According to Plaintiffs,
>
> a provider is not bound by the authorization language barring plaintiffs from pursuing patients for performed services, until that authorization form with such limiting language is received by the provider.  By the time of such receipt, however, the provider already has performed the services, without agreeing to any limitation.

Pls' Opp'n at 13 (emphasis in original).  In reply, WellCare of Arizona explains that, even if this is true, it does not preclude summary judgment because WellCare of Arizona is not required to cover out-of-network services unless and until it authorizes such a service.  The Court agrees.

The QExA Contractors have no obligation to hold their members harmless for services received from non-participating providers when they have not approved a prior authorization request to receive services out of network.  See WellCare of Arizona's Solvency Reply at 12-14.  That is, there is no coverage

41

for non-emergent services received from a non-participating provider in the absence of prior authorization.[30/]  Once the QExA Contractor authorizes the service, the non-participating provider is bound by the provision requiring them to look solely to the plan for payment.  Id.  In short, no "debts of the organization" can arise when a QExA plan's member self-refers to be treated by a non-participating provider.

In light of the foregoing, the Court rejects Plaintiffs' first argument regarding the timing of the

---

[30/] When asked about emergent services from non-participating providers, WellCare of Arizona's counsel explained that the MCOs were required to pay for these services without prior authorization and that ABD beneficiaries would not be held liable for these services.  8/12/10 Tr. 14:10-12 (WellCare of Arizona's counsel stated that "[e]mergency services are covered . . . as clearly outlined in the RFP and in the member handbook"); 28:12-14 (Evercare's counsel confirming the same).  In response, Plaintiffs noted that emergency services provided in hospitals were "not [their] issue."  8/12/10 Tr. 39:10-12.  Plaintiffs instead argued that in some instances emergency services should be rendered at a physician's office, rather than a hospital (for instance, Plaintiffs asserted that eye problems are often better treated in an opthamologist's office than in a hospital).  8/12/10 Tr. 39:13-40:4.  If an ABD beneficiary is in need of services on an emergency basis, however, such services by a qualified provider would be covered as well.  See RFP § 40.750.1(e) ("The health plan shall provide payment for emergency services when furnished by a qualified provider, regardless of whether that provider is in the health plan's network.").  Moreover, ABD beneficiaries are informed of where they must go to receive emergency services.  See RFP § 50.340 (noting that member handbooks must include information about "[t]he locations of any emergency settings and other locations at which providers and hospitals furnish emergency services and post-stabilization services . . ."); see also id. (noting that member handbooks must include information about "[t]he fact that a member has a right to use any hospital or other appropriate healthcare setting for emergency services").

authorization forms.

### ii.  Failure of Consideration

Plaintiffs proceed to assert that "[w]hen the contract is made does not matter as much as whether the contract is undone by the plan's non-payment."  Pls' Opp'n at 13.  According to Plaintiffs, "[n]on-payment negates the contract, if or whenever formed," and after the contract is negated, "the provider is free to pursue payment from the patient for unpaid services."  Id.[31/] Plaintiffs do not cite to much authority in support of this position, and do not cite to any authority in the Medicaid context.  Id.  Instead, Plaintiffs cite to a decision in the Eighth Circuit for the general proposition that "'[w]hen there is failure of consideration, a contract valid when formed becomes unenforceable because the performance bargained for has not been

---

[31/] In reply, WellCare of Arizona asserts that while Plaintiffs have submitted several declarations by participating and non-participating providers alleging that in some cases their claims to WellCare of Arizona have been pending in excess of 120 days, no evidence has been submitted that their claims have been denied in whole or even in part.  WellCare of Arizona's Solvency Reply at 9; see also 8/12/10 Tr. 22:1-3 ("There may be delays in payment for various reasons in terms of paperwork not being put in, bureaucratic mistakes that may be made by either party . . . .").  As a result, WellCare of Arizona argues that the evidence submitted by Plaintiffs does not support their failure of consideration argument, but merely evidences delayed payment. WellCare of Arizona's Solvency Reply at 9.  Nevertheless, because the issue before the Court is whether WellCare of Arizona adequately assures that members "are in no case held liable for debts of the organization in case of the organization's insolvency," the Court will address the merits of Plaintiffs' failure of consideration argument.

rendered.'"  In re MJK Clearing, Inc., 408 F.3d 512, 515 (8th
Cir. 2005) (internal citation omitted); see also Franklin v.
Carpenter, 309 Minn. 419, 244 N.W.2d 492, 495 (1976) ("When there
is a lack of consideration, no valid contract is ever formed.
When there is failure of consideration, a contract valid when
formed becomes unenforceable because the performance bargained
for has not been rendered.").

WellCare of Arizona's prior authorization form
provides, in part, that while it is "for medical necessity,"
"[i]t is not a guarantee of payment" and "[e]ligibility will be
investigated prior to payment" wherein "payment is subject to
limitations and exclusions of the member's contract."  See
WellCare of Arizona's Solvency CSF ¶ 9.  As noted supra, the
amended form now adds the express written condition that the
"[p]rovider agrees to look solely to the plan for payment of
amounts due hereunder."  Id.  According to WellCare of Arizona,

> [u]nder this agreement, there is no bargained
> for guarantee of payment.  Instead, the
> agreement is for payment subject to
> limitations and exclusions of the member's
> contract with WellCare of Arizona upon a
> determination of the member's eligibility and
> the QExA program rules.  Hence, the non-
> participating provider who elects to proceed,
> does so knowing payment may be reduced or
> even non-existent if the services are not
> included as member benefits or not covered in
> the QExA program.

Id. at 14-15 (emphasis in original).[32/]  WellCare of Arizona

proceeds to argue that payment is not required for there to be

consideration, but instead that there only needs to be something

of value.  Id. at 15.  In this case, the "something of value" is

the possibility of payment.  Id. (citing Harper v. Freeman, 3

Haw. App. 1, 4, 639 P.2d 1113, 1115 (1982)).  Here, WellCare of

Arizona is making a promise to pay the non-participating provider

for the authorized services, subject to reasonable conditions

(the member's eligibility and the QExA program rules).[33/]  In

other words, "[i]t is the possibility of being paid under a State

sponsored Medicaid program versus the greater uncertainty of

being able to collect anything from a financially strapped

---

[32/] At the 8/12/10 Hearing, Evercare's counsel explained that
member eligibility is a term of art which refers to whether the
Medicaid beneficiary is a member of the particular QExA plan at
the time services are rendered.  8/12/10 Tr. 25:20-26:4.  When
the prior authorization process is working properly,
authorizations are typically given at least three days prior to
the services actually being performed.  Id.  As such, payment is
contingent on whether the Medicaid beneficiary is actually a
member of the QExA plan on the date the services are rendered.
Id.  This condition complies with the third solvency requirement
because the risk of non-payment is still placed on the provider
instead of the ABD beneficiary.  Moreover, if the ABD beneficiary
is not a member of the particular QExA plan on the date services
are rendered, any service performed by non-participating
providers will not likely become a debt of the MCO, which is the
focus of the third solvency requirement.

[33/] Indeed, even where a non-participating provider performs
services prior to receiving an authorization form, Plaintiffs
admit that the day that the QExA member arrives at the office the
provider typically calls the plan to verify that the patient is
enrolled and eligible for coverage for that day, making payment
more likely.  See Pls' Opp'n at 3.

patient of limited means." Id.  Thus, according to WellCare of

Arizona, there is no lack of consideration supporting the

contract in the first instance, and as a corollary there would be

no failure of consideration if WellCare of Arizona did not pay a

non-participating provider because there was no guarantee of

payment to begin with.  See id.  The Court agrees.

     When non-participating providers treat QExA members,

they are made aware that the authorization is not a guarantee of

payment.  If a non-participating provider believes that payment

was wrongfully denied, their remedies include either suing for

breach of contract or appealing the denial of payment.[34/]  Indeed,

in their opposition, Plaintiffs acknowledge that, in the event of

non-payment, non-participating providers may "either sue WellCare

[of Arizona], or take nothing for services provided the ABD

beneficiaries."  Pls' Opp'n at 14.  At the 8/12/10 Hearing,

Plaintiffs' counsel acknowledged that a non-participating

provider may also appeal the denial of payment by a QExA

Contractor.  8/12/10 Tr. 37:25-38:12.[35/]  Although Plaintiffs

---

     [34/] As noted supra, at the 8/12/10 Hearing Evercare's counsel
explained that "[w]ith respect to the untimely payment issue . .
. there is a statutory remedy for that.  And providers know how
to use it."  8/12/10 Tr. 41:2-4.

     [35/] The RFP provides that "[t]he health plan shall have a
provider complaint, grievance and appeals process that provides
for the timely and effective resolution of any disputes between
the health plan and provider(s)."  RFP § 40.620.  At the 8/12/10
Hearing, Plaintiffs' counsel explained, "for example, if Dr.
(continued...)

assert that "[r]equiring doctors to sue [WellCare of Arizona] to recover unpaid for services [sic] will cause them not to accept ABD beneficiaries as patients, effectively denying them care under the statute," Pls' Opp'n at 14; this broad policy argument has no bearing on the third solvency requirement.[35/]   In any event, the non-participating providers are entitled to payment, subject to the QExA Program rules, if they provide services as authorized by the MCO, and the patient is eligible at the time of

----

[35/](...continued) Meyers was to put in a bill for $40 and [the MCO does not] pay it, she's got to pursue them through that appeals process . . . ."  8/12/10 Tr. 38:5-12.

[36/] Plaintiffs argue that it would be against public policy to permit such an approach, stating that "[t]he spirit of the law must trump the letter of the law."  See Pls' Opp'n at 14-15.  It is unclear, however, what exactly Plaintiffs are requesting in this instance, as this broad policy argument reaches far beyond the limited inquiry warranted by the third solvency requirement. Because Plaintiffs argue that non-payment amounts to a failure of consideration supporting the contract, Plaintiffs seem to suggest that the only way WellCare of Arizona can satisfy its obligations under the third solvency requirement would be for it to pay every claim it authorizes.  This clearly cannot be the case, as the aim of the third solvency requirement is to protect ABD beneficiaries in the event of WellCare of Arizona's insolvency, not when it is operating normally.  See 42 U.S.C. § 1396b(m)(1)(A)(ii) (the third solvency requirement is than an MCO assure "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency").  Further, as noted supra, no evidence has been submitted that the non-participating providers' claims have been denied in whole or even in part, but instead Plaintiffs have only come forward with evidence of delayed payment.  See WellCare of Arizona's Solvency Reply at 9.

services.[37/]  The third solvency requirement is that an MCO must assure "that individuals eligible for benefits under [Medicaid] are in no case held liable for debts of the organization in case of the organization's insolvency."  42 U.S.C. § 1396b(m)(1)(A)(ii).  The form submitted by WellCare of Arizona in support of its motion for summary judgment does just that.  As such, the Court rejects Plaintiffs' failure of consideration argument.

### E.  Decision Regarding the Third Solvency Requirement

Accordingly, for all of the foregoing reasons, the Court grants WellCare of Arizona's motion for summary judgment as to the third solvency requirement, and the joinders therein. Moreover, the Court denies Plaintiffs' request for the Court to reconsider the 12/24/09 Order with respect to the third solvency requirement, because the arguments presented in support of reconsideration have no merit.

### CONCLUSION

In light of the foregoing, the Court:

(1) GRANTS WellCare of Arizona's motion for summary judgment as to the first solvency requirement, and the joinders

---

[37/] As Evercare's counsel explained at the 8/12/10 Hearing, the authorization by the MCO is essentially a promise by the MCO to the non-participating provider that they will pay for the authorized service, so long as the Medicaid beneficiary is a member of the QExA plan on the day services are provided. 8/12/10 Tr. 25:15-19.

therein.  The Court finds that WellCare of Arizona has come forward with undisputed evidence that it met, and continues to meet, the first solvency requirement; and

(2) GRANTS WellCare of Arizona's motion for summary judgment as to the third solvency requirement, and the joinders therein.  WellCare of Arizona's prior authorization form includes identical language to that of Evercare's, requiring that non-participating providers look solely to the plan for payments due thereunder, and therefore satisfies the third solvency requirement.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, September 3, 2010.

_Alan C. Kay_
Alan C. Kay
Sr. United States District Judge

G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK: Order Granting WellCare of Arizona's Motion for Summary Judgment, and the Joinders Therein, on the Remaining Solvency Issues