IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) ) | Civ. No. 08-00551 ACK-BMK Civ. No. 09-00044 ACK-BMK |
| Plaintiffs, | ) ) ) | (Consolidated) |
| vs. | ) ) | |
| STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, ET AL., | ) ) ) | |
| Defendants. | ) ) | |
| ——————————————————— | ) ) | |
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, ET AL., | ) ) ) ) | |
| Defendants. | ) ) | |
| ——————————————————— | ) | |

<u>ORDER (1) DENYING EVERCARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFF L.P.'S INTEGRATION CLAIM AND THE JOINDERS THEREIN, AND (2) GRANTING EVERCARE'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PLAINTIFFS' EQUAL ACCESS CLAIMS UNDER THE ADA AND REHABILITATION ACT AND THE JOINDERS THEREIN</u>

<u>PROCEDURAL HISTORY</u>

As the parties and the Court are extensively familiar with the background of this case, the Court will only present the background relevant to the instant motions for summary judgment. For a detailed description of the procedural and factual

background of this case, see the order granting in part, and
denying in part, the State Defendants' motion for summary
judgment, and the joinders therein, and denying Plaintiffs'
motion for summary judgment on licensure and solvency issued on
December 24, 2009.  <u>G. v. Hawaii, Dep't of Human Servs.</u>, Civ.
Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1046,
2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09
Order").

**I.        Prior Proceedings**

          On December 8, 2008, in Civil No. 08-00551 ACK-BMK,
Plaintiffs filed a complaint against Defendants the State of
Hawaii, Department of Human Services ("State DHS"), and Lillian
B. Koller, in her official capacity as the Director of the State
DHS (collectively, "State Defendants" or "State").  At that
point, the Plaintiffs were comprised of aged, blind, and disabled
("ABD") Medicaid beneficiaries ("ABD Plaintiffs").  Their
principal allegation is that the State Defendants have violated
certain provisions of Title XIX of the Social Security Act,
commonly known as the Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u>, by
requiring ABD beneficiaries to enroll with one of two healthcare
entities as a condition of receiving Medicaid benefits in
connection with the agency's managed care program for ABD
beneficiaries, the QUEST Expanded Access ("QExA") Program.  Those
two entities were the only ones awarded contracts to provide the

care for ABD beneficiaries under the QExA Program ("QExA Contracts").  They are WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("WellCare of Arizona") and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors" or "Intervenors"), and they have intervened in this matter.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS ("Secretary") (collectively, "Federal Defendants").

This is the third case brought in this Court challenging the QExA Program.  See AlohaCare v. Hawaii, Dep't of Human Servs., 567 F. Supp. 2d 1238 (D. Haw. 2008), aff'd, 572 F.3d 740 (9th Cir. 2009) (upholding the district court's decision that a disappointed bidder for a QExA Contract did not have statutory standing to enforce certain provisions of the Medicaid Act); Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008), aff'd No. 08-17343, 2010 U.S. App. LEXIS 3471 (9th Cir. Feb. 19, 2010) (dismissing a health advocacy organization's complaint because, among other things, the organization did not have statutory standing to enforce certain provisions of the Medicaid Act).

On May 11, 2009, the Court entered an order granting in

part and denying in part a motion to dismiss filed by the State Defendants and joinders therein.  <u>See</u> <u>G. v. Hawaii, Dep't of Human Servs.</u>, Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009) ("5/11/09 Order"). The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects.  <u>See</u> Order Granting in Part, and Denying in Part Plaintiffs' Leave to Amend Their Complaints, Doc. No. 138 (July 14, 2009) ("7/14/09 Order").  They therefore filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

On August 10, 2009, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction against the State Defendants.  The Court denied Plaintiffs' motions for temporary restraining orders.  Plaintiffs subsequently withdrew their motions for preliminary injunctions.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended complaint against the State Defendants ("State Second Amended Complaint") and, on September 1, 2009, they filed a third amended complaint against the Federal Defendants.  Those complaints added claims on behalf of certain Medicaid healthcare providers ("Provider Plaintiffs") and new ABD beneficiaries.  The Provider Plaintiffs are physicians, pharmacists, and ancillary care providers who accepted ABD beneficiaries as patients and clients under the fee-for-service

4

program, which preceded the QExA Program, and who have provided care and services to ABD beneficiaries under the QExA Program. The State Second Amended Complaint asserts the following nine counts: (I) deprivation of rights under federal law and 42 U.S.C. § 1983; (II) violations of preemptive federal law by virtue of the Supremacy Clause; (III) further specific violations of preemptive federal law and regulations; (IV) insufficient assurances of solvency and evidence of poor performance in other states; (V) insufficient range of services and provider networks; (VI) violation of the Americans with Disabilities Act ("ADA"); (VII) violation of the Rehabilitation Act of 1973; (VIII) violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204; and (IX) unlawful taking.

On September 8, 2009, the Federal Defendants filed the administrative record ("AR"), which is roughly 5,200 pages in length. At Plaintiffs' request, the administrative record includes documents from 2004 onwards. 7/18/09 Transcript of Proceedings 28:3-22. Plaintiffs did not ask for any documents that were created prior to 2004. Id.

In October and November of 2009, three motions for summary judgment were filed in the action against the State Defendants and three motions for summary judgment were filed in the action against the Federal Defendants. With respect to the motions in the action against the Federal Defendants, on December

23, 2009, the Court granted summary judgment in favor of the Federal Defendants as to all claims asserted in the third amended complaint against them.   See <u>G. v. Hawaii, Dep't of Human Servs.</u>, Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1006, 2009 U.S. Dist. LEXIS 119670 (D. Haw. Dec. 23, 2009) ("12/23/09 Order").

As for the motions for summary judgment in the action against the State Defendants, on December 24, 2009, the Court granted summary judgment in favor of the State Defendants as to: (1) Counts VI (ADA) and VII (Rehabilitation Act) insofar as those counts assert integration claims on behalf of all ABD Plaintiffs, except for ABD Plaintiff L.P.; (2) Count VIII (42 U.S.C. § 1396a(a)(30)(A)); (3) Count IX (taking); and (4) Plaintiffs' claim that the QExA Contractors fail to meet the second solvency standard set forth in 42 U.S.C. § 1396b(m)(1)(A).  However, the Court denied the State Defendants' motion for summary judgment as to Counts VI (ADA) and VII (Rehabilitation Act) insofar as those counts assert equal access claims (in relation to QUEST) on behalf of the ABD Plaintiffs and an integration claim on behalf of ABD Plaintiff L.P.  <u>G. v. Hawaii, Dep't of Human Servs.</u>, Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1046, 2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09 Order").  In addition, the Court denied Plaintiffs' motion for summary judgment as to whether the QExA Contractors meet the

first and third solvency requirements for MCOs prescribed by 42 U.S.C. § 1396b(m)(1)(A).  Id.

On November 20, 2009, Evercare filed a motion for partial summary judgment regarding Plaintiffs' claims that assert the State Defendants violated the requirements of the Medicaid statute relating to provider networks and access to services by requiring enrollment in the QExA plans offered by Evercare and WellCare of Arizona as a condition of receiving Medicaid benefits.  These claims are asserted in Counts I, II, III, and V of the State Second Amended Complaint.

On March 19, 2010, the Court ruled on Evercare's November 20, 2009, motion for summary judgment.  G. v. Hawaii, Dep't of Human Servs., --- F. Supp. 2d ----, Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2010 Westlaw 1009990 (D. Haw. Mar. 19, 2010) (as amended June 14, 2010) (the "Provider Networks Order" or "6/14/10 Order").  In that order, the Court (1) granted Evercare's motion for summary judgment, and the joinders therein, with respect to Plaintiffs' claim that the QExA Contractors' provider networks are inadequate in contravention of 42 U.S.C. § 1396u-2(b)(5) and its corresponding regulations; (2) granted Evercare's motion for summary judgment, and the joinders therein, with regard to Plaintiffs' claim that the State Defendants' decision to restrict the number of MCOs to two substantially impaired access to services, in contravention of 42 U.S.C. §

1396u-2(a)(1)(A)(ii); and (3) denied Evercare's motion for

summary judgment, and the joinders therein, with respect to

Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i) requiring

that the MCOs make services available to the same extent as

services are made available to other Medicaid eligible

beneficiaries.

>       Accordingly, in the 6/14/10 Order, the Court explained:

>> As a result of this order, the following issues remain
>> to be resolved at trial: (1) the claim set forth in
>> Counts I, II, III, and V that the QExA Contractors do
>> not make services accessible to QExA beneficiaries to
>> the same extent that services are made accessible to
>> QUEST beneficiaries under the QUEST program, as
>> required by 42 U.S.C. § 1396b(m)(1)(A)(i) [the Medicaid
>> equal access injunctive claim]; (2) the claim set forth
>> in Counts I through IV that the QExA Contractors failed
>> to meet the first and third solvency standards set
>> forth in 42 U.S.C. § 1396b(m)(1)(A)(ii); (3) the claim
>> by L.P. set forth in Count VI (ADA) and Count VII
>> (Rehabilitation Act) that the State Defendants have
>> violated the integration mandate; (4) the claim by the
>> ABD Plaintiffs set forth in Count VI (ADA) and
>> Count VII (Rehabilitation Act) that they have less
>> access to Medicaid benefits through the QExA Program
>> than non-disabled beneficiaries enrolled in the QUEST
>> Program.

6/14/10 Order at *74-*76 (footnote omitted).

**II.        Evercare's Motion for Partial Summary Judgment Re ADA
             and Rehabilitation Act Claims and Evercare's Motion for
             Partial Summary Judgment re Plaintiff L.P.'s ADA and
             Rehabilitation Act Claims**

>       On June 21, 2010, Evercare filed a Motion to Amend the

Rule 16 Scheduling Order requesting an extension of the

dispositive motion deadline to June 29, 2010, in order to

potentially limit the issues for trial.  On June 25, 2010,

Magistrate Judge Kurren granted Evercare's Motion to Amend the Rule 16 Scheduling Order and extended the dispositive motion deadline to June 29, 2010.

Accordingly, on June 28, 2010, Evercare filed a Motion for Partial Summary Judgment Re ADA and Rehabilitation Act Claims, as well as a memorandum in support of that motion ("Evercare's ADA MSJ").[1/]  Doc. No. 624.  The same day, Evercare also filed a Separate Concise Statement of Undisputed Facts as well as numerous exhibits in support of its ADA MSJ ("Evercare's ADA CSF").  Doc. Nos. 625 and 633.  On June 30, 2010, WellCare of Arizona filed a joinder in Evercare's ADA MSJ.  Doc. No. 639.  On July 20, 2010, the State Defendants filed a joinder in the ADA MSJ as well.  Doc. No. 678.

On June 29, 2010, Evercare filed a Motion for Partial Summary Judgment Re Plaintiff L.P.'s ADA and Rehabilitation Act Claims and a memorandum in support of that motion ("Evercare's L.P. MSJ").  Doc. No. 634.  That same day, Evercare also filed a Separate Concise Statement of Undisputed Facts as well as exhibits in support of its L.P. MSJ ("Evercare's L.P. CSF").  Doc. Nos. 635 & 668.  On June 30, 2010, WellCare of Arizona filed a joinder in Evercare's L.P. MSJ.  Doc. No. 641.  On July 20, 2010, the State Defendants joined the L.P. MSJ as well.  Doc. No.

---

[1/] Also on June 29, 2010, WellCare of Arizona filed a Motion for Summary Judgment on the Remaining Solvency Issues.  Doc. No. 637.  That motion is addressed in a separate order.

679.

On July 22, 2010, Plaintiffs filed a Memorandum in Opposition to Evercare's ADA MSJ ("Plaintiffs' ADA Opposition") and a Memorandum in Opposition to Evercare's L.P. MSJ ("Plaintiffs' L.P. Opposition").  Doc. Nos. 687 & 688.  In support of their oppositions, Plaintiffs filed an Omnibus Concise Statement of Facts in Opposition to both Evercare's ADA MSJ and Evercare's L.P. MSJ, as well as WellCare of Arizona's motion for summary judgment as to the remaining solvency issues ("Plaintiffs' Omnibus CSF").  Doc. No. 689.  On July 23, 2010, Plaintiffs filed an Errata to Plaintiffs' Omnibus CSF along with a Declaration of L.P. ("Plaintiffs' CSF Errata").  Doc. No. 690.

On July 29, 2010, Evercare filed a combined reply in support of both its ADA MSJ as well as its L.P. MSJ ("Reply"). Doc. No. 698.  On July 29, 2010, WellCare of Arizona joined in Evercare's Combined Reply.  Doc. No. 701.

A hearing was held on these motions on August 12, 2010 (the 8/12/10 Hearing).  The 8/12/10 Hearing was continued to August 13, 2010, for an evidentiary hearing on an issue that had arisen regarding Plaintiff E.S.'s care on August 11, 2010 (the "8/13/10 Hearing").[2/]  At the 8/13/10 Hearing, the Court heard

_____

[2/] A transcript of the hearing held on August 12, 2010, has been entered on the docket as Doc. No. 731.  The Court will refer to this transcript as the "8/12/10 Tr."  A rough transcript of the evidentiary hearing held on August 13, 2010 was entered on
(continued...)

testimony from Dr. Arlene Jouxson Meyers for Plaintiffs, Patti
Bazin for the State Defendants, and Wendy Morriarty for
Intervenor WellCare of Arizona.

**FACTUAL BACKGROUND**[3/]

I.        **The Medicaid Act**

        The Medicaid Act "provides federal funding to 'enabl[e]
each State, as far as practicable . . . to furnish . . . medical
assistance on behalf of families with dependent children and of
aged, blind, or disabled individuals, whose income and resources
are insufficient to meet the costs of necessary medical
services.'"  AlohaCare, 572 F.3d at 742 (quoting 42 U.S.C.
§ 1396-1) (brackets in original).  The Medicaid program is "a
jointly financed federal-state program that is administered by
the States in accordance with federal guidelines."  Id.  Each
state that elects to participate in the program must submit a
plan to the CMS.  42 U.S.C. §§ 1396, 1396a.  If the plan is
approved, the state is entitled to Medicaid funds from the
federal government for a percentage of the money spent by the
state in providing covered medical care to eligible individuals.

_____

(...continued)
the docket as Doc. No. 715 (with a final version to follow) and
will be referred to as the "8/13/10 Tr."

        [3/]  The facts in this Order are recited for the limited
purpose of deciding the instant motions for partial summary
judgment.  The facts shall not be construed as findings of fact
upon which the parties may rely upon in future proceedings in
this case.

Id. § 1396b(a)(1).

"The Act, among other things, outlines detailed requirements for [state] plan eligibility, [42 U.S.C.] § 1396a, erects a complex scheme for allocating and receiving federal funds, id. § 1396b, and imposes detailed requirements on States that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), id. § 1396u-2." AlohaCare, 572 F.3d at 742-43. "Medicaid generally requires a State to conform with federal guidelines prior to receiving federal funds; however, under 42 U.S.C. § 1315, CMS may waive compliance for certain 'experimental, pilot, or demonstration project[s].'" Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

**II.      The QExA Program**

Pursuant to 42 U.S.C. § 1315, in July of 1993, the CMS granted a waiver of various provisions of the Medicaid Act to the State of Hawai'i to allow the state to conduct a demonstration project that would transform its fee-for-service Medicaid program into a managed care model for most Medicaid beneficiaries. AR 49.  The demonstration project, called Hawaii Health QUEST ("QUEST Program"), excluded ABD beneficiaries.  Id. at 49-50. ABD beneficiaries instead continued to receive benefits on a fee-for-service basis ("Medicaid FFS program" or "fee-for-service system").  Id. at 22.

12

In a fee-for-service system, the traditional framework
for state Medicaid programs, the state contracts directly with
and pays healthcare providers, such as physicians, hospitals, and
clinics, for services they provide to Medicaid beneficiaries.
5/11/09 Order at *6.  By contrast, under a managed care model,
the state contracts with MCOs, which assume the responsibility of
providing Medicaid services through their own employees or by
contracting with independent providers of such services.  Id.
at *6-*7.  The state pays each MCO on a capitated or
fixed-amount-per-enrollee basis.  Id.

The QExA Program was intended to provide primary,
acute, and long-term care services, including home- and
community-based services ("HCBS"), to ABD beneficiaries state-
wide using a managed care model.  Id.  The program would replace
the fee-for-services system that was then in place for the ABD
population.  The ABD beneficiaries that were eligible for both
Medicaid and Medicare ("dual eligibles"), however, would still be
permitted to see their providers under the Medicare program.
Importantly, approximately two-thirds of the ABD population is
dual eligible.  See id.; see also 6/14/10 Order at *11.

On October 10, 2007, the State DHS issued a request for
proposals ("RFP") to procure the services of two managed care
organizations that would be responsible for providing all of the
Medicaid care for ABD beneficiaries as part of the QExA Program.

13

AR at 3942.   Evercare and WellCare of Arizona timely submitted
their proposals in response to the RFP on December 7, 2007.   Also
on December 7, 2007, the State DHS submitted the RFP to the CMS
for its review.   Id. at 1016.   On February 1, 2008, the State DHS
awarded the QExA Contracts to Evercare and WellCare of Arizona.[4/]
Id. at 1558.   The RFP, with amendments, became part of the QExA
Contracts.   Id. at 3953.

On February 7, 2008, the CMS approved the State DHS's
fourth waiver application for the QExA Program.   Id. at 1565.   In
doing so, the CMS granted the State DHS a 42 U.S.C. § 1315(a)
waiver of the "freedom of choice" provision.   Id. at 1570.

On January 30, 2009, the CMS approved the QExA
Contracts.   AR 3925-26.   On February, 1, 2009, the QExA Program
went into full effect.   Since then, ABD beneficiaries have had to
enroll with one of the two QExA Contractors as a condition of
receiving Medicaid benefits.

Of note, the State DHS provided a transition period so
that the approximately 40,000 ABD beneficiaries could smoothly
transition from the fee-for-service system to the managed care
program.   Id. at 3696.   Of the approximately 40,000 ABD
beneficiaries, approximately 2/3 were dual eligible such that

---

[4/] Ohana was originally awarded the QExA Contract.   On May
15, 2008, Ohana was merged into WellCare of Arizona, another
subsidiary of WellCare Inc., and WellCare of Arizona assumed
Ohana's QExA Contract.   See id. at 2059-68; St. Defs.' Licensure
MSJ CSF, Decl. of Patricia M. Bazin ¶ 8.

they could continue to see their providers under the Medicare
program.  See 6/14/10 Order at *8 n.11.  During the transition
period, beneficiaries could receive services from healthcare
providers even if the providers had not participated in the QExA
Contractors' plans.  The transition period came to a close on
July 31, 2009.  In order to maintain the status quo for purposes
of this litigation, the QExA Contractors have essentially
extended the transition period for the ABD Plaintiffs in this
case until the time of trial, unless the Plaintiffs have
expressed an intent to be seen by a different primary care
physician or have been assigned to and accepted by a
participating primary care physician.[5/]  9/4/09 Tr. 17:2-6,
25:3-6.

## LEGAL STANDARD

     The purpose of summary judgment is to identify and
dispose of factually unsupported claims and defenses.  See
Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Summary
judgment is therefore appropriate if the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and

---

     [5/] At the 8/12/10 Hearing, counsel for Evercare explained
that "Dr. Meyers is a special case" and is "the only provider
that Evercare has approved to see Evercare members who are her
patients without prior authorization."  8/12/10 Tr. at 29:9-22.
Counsel for WellCare of Arizona also called Dr. Meyers a "special
case" for whom an accommodation had been made.  8/12/10 Tr. at
43:21-44:1.

that the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  "A fact is 'material' when, under the
governing substantive law, it could affect the outcome of the
case.  A 'genuine issue' of material fact arises if 'the evidence
is such that a reasonable jury could return a verdict for the
nonmoving party.'"  Thrifty Oil Co. v. Bank of Am. Nat'l Trust &
Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)) (citation
omitted).[6/]  Conversely, where the evidence could not lead a
rational trier of fact to find for the nonmoving party, no
genuine issue exists for trial.  See Matsushita Elec. Indus. Co.,
Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  "Only
admissible evidence may be considered in deciding a motion for
summary judgment."  Miller v. Glenn Miller Prods., Inc., 454 F.3d
975, 988 (9th Cir. 2006).

        The moving party has the burden of persuading the court
as to the absence of a genuine issue of material fact.  Celotex,
477 U.S. at 323; Miller, 454 F.3d at 987.  The moving party may
do so with affirmative evidence or by "'showing'—that is pointing
out to the district court—that there is an absence of evidence to

_____

    [6/] Disputes as to immaterial issues of fact do "not preclude
summary judgment."  Lynn v. Sheet Metal Workers' Int'l Ass'n, 804
F.2d 1472, 1483 (9th Cir. 1986).

support the nonmoving party's case." <u>Celotex</u>, 477 U.S. at 325.[7/]
Once the moving party satisfies its burden, the nonmoving party
cannot simply rest on the pleadings or argue that any
disagreement or "metaphysical doubt" about a material issue of
fact precludes summary judgment.  <u>See id.</u> at 323; <u>Matsushita</u>
<u>Elec.</u>, 475 U.S. at 586; <u>California Arch. Bldg. Prods., Inc. v.</u>
<u>Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).[8/]
The nonmoving party must instead set forth "significant probative
evidence" in support of its position.  <u>T.W. Elec. Serv. v. Pac.</u>
<u>Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).
Summary judgment will thus be granted against a party who fails
to demonstrate facts sufficient to establish an element essential
to his case when that party will ultimately bear the burden of
proof at trial.  <u>See Celotex</u>, 477 U.S. at 322.

When evaluating a motion for summary judgment, the
court must construe all evidence and reasonable inferences drawn

---

[7/] When the moving party bears the burden of proof at trial,
that party must satisfy its burden with respect to the motion for
summary judgment by coming forward with affirmative evidence that
would entitle it to a directed verdict if the evidence were to go
uncontroverted at trial.  <u>Miller</u>, 454 F.3d at 987.  When the
nonmoving party bears the burden of proof at trial, the party
moving for summary judgment may satisfy its burden with respect
to the motion for summary judgment by pointing out to the court
an absence of evidence from the nonmoving party.  <u>Id.</u>

[8/] Nor will uncorroborated allegations and "self-serving
testimony" create a genuine issue of material fact.  <u>Villiarimo</u>
<u>v. Aloha Island Air, Inc.</u>, 281 F.3d 1054, 1061 (9th Cir. 2002);
<u>see also</u> <u>T.W. Elec. Serv. v. Pac. Elec. Contractors Ass'n</u>, 809
F.2d 626, 630 (9th Cir. 1987).

therefrom in the light most favorable to the nonmoving party.

See T.W. Elec. Serv., 809 F.2d at 630–31.[9/]  Accordingly, if

"reasonable minds could differ as to the import of the evidence,"

summary judgment will be denied.  Anderson, 477 U.S. at 250–51.

**DISCUSSION**

I.      **The Legal Framework**

    A.   Introduction

        Title II of the ADA declares that "no qualified

individual with a disability shall, by reason of such disability,

be excluded from participation in or be denied the benefits of

the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."  42 U.S.C.

§ 12132.  This title was "expressly modeled after § 504 of the

Rehabilitation Act . . . and essentially extends coverage to

state and local government entities that do not receive federal

funds."  Pierce v. County of Orange, 526 F.3d 1190, 1216 n.27

(9th Cir. 2008).  Section 504 of the Rehabilitation Act provides

that "[n]o otherwise qualified individual with a disability in

the United States, as defined in [29 U.S.C. § 705(20)], shall,

solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to

---

[9/] At the summary judgment stage, the court may not make
credibility assessments or weigh conflicting evidence.  Anderson,
477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir.
1994).

18

discrimination under any program or activity receiving Federal

financial assistance." 29 U.S.C. § 794(a). Consequently,

"'[t]here is no significant difference in analysis of the rights

and obligations created by the ADA and the Rehabilitation Act.'"

Pierce, 526 F.3d at 1216 n.27 (quoting Zukle v. Regents of Univ.

of California, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)).

In order to establish a violation of Title II of the

ADA, a plaintiff  must show that:

> (1) he is an individual with a disability; (2) he is
> otherwise qualified to participate in or receive the
> benefit of some public entity's services, programs, or
> activities; (3) he was either excluded from
> participation in or denied the benefits of the public
> entity's services, programs, or activities, or was
> otherwise discriminated against by the public entity;
> and (4) such exclusion, denial of benefits, or
> discrimination was by reason of his disability.

O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir.

2007) (quoting McGary v. City of Portland, 386 F.3d 1259, 1265

(9th Cir. 2004)). The elements of a claim under Section 504 of

the Rehabilitation Act are essentially the same, except that the

plaintiff must also show that "the program receives federal

financial assistance."[10/]   Id. (quoting Duvall v. County of

Kitsap, 260 F.3d 1124, 1135 (9th Cir. 2001)).

Once the basic elements have been established, the

---

[10/] Because there is no significant difference in analysis of
the rights and obligations created by the ADA and Rehabilitation
Act (as discussed supra), any reference by the Court to the ADA
claim includes any Rehabilitation Act claims.

question is generally whether the plaintiff can identify reasonable modifications to avoid discrimination on the basis of his disability.  Vinson v. Thomas, 288 F.3d 1145, 1154 (9th Cir. 2002) ("[The plaintiff] bore the initial burden of producing evidence that a reasonable accommodation was possible."); Martin v. Taft, 222 F. Supp. 2d 940, 972 n.26 (S.D. Ohio 2002) ("The plaintiff in an ADA Title II action bears the burden of showing that a reasonable modification is available.").  As the Ninth Circuit has explained,

> when a state's policies, practices or procedures discriminate against the disabled in violation of the ADA, Department of Justice regulations require reasonable modifications in such policies, practices or procedures "when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

Crowder v. Kitagawa, 81 F.3d 1480, 1054 (9th Cir. 1996) (quoting 28 C.F.R. § 35.130(b)(7)).  The "fundamental alteration" defense is, however, limited to instances of disparate impact discrimination; it "has no application to cases of facial discrimination."  Lovell v. Chandler, 303 F.3d 1039, 1054 (9th Cir. 2002); see also Townsend v. Quasim, 328 F.3d 511, 518 n.2 (9th Cir. 2005) (noting "the fundamental alteration defense does not apply to cases of facial discrimination").

As the Court explained in its 12/24/09 Order:

> Plaintiffs advance two basic theories of liability. The first is that the QExA Program puts ABD

20

> beneficiaries at a greater risk of institutionalization than did the prior fee-for-service system that the program replaced.  St. 2d Am. Compl. ¶¶ 105-09.  On that basis, Plaintiffs claim that the QExA Program violates the integration mandate set forth in the ADA and the Rehabilitation Act.  Their second theory of liability is that the QExA Program is providing disabled recipients with less access to Medicaid benefits than the QUEST Program provides to non-disabled recipients.  See Plaintiff's ADA Opposition at 12; St. 2d Am. Comp. ¶¶ 94, 103, 111.  Plaintiffs assert that they are being denied equal access to Medicaid benefits on the basis of their disability.

12/24/09 Order at *1056.

    B.  The Integration Mandate

        As discussed in the 12/24/09 Order, Plaintiffs' first theory of liability, is based on the Supreme Court's decision in Olmstead v. L.C., 527 U.S. 581 (1999).  There, "the Supreme Court interpreted the failure to provide Medicaid services in a community-based setting as a form of discrimination on the basis of disability," in contravention of Title II of the ADA. Townsend v. Quasim, 328 F.3d 511, 517 (9th Cir. 2003); accord McGary, 386 F.3d at 1266 (observing that "the [Olmstead] Court held that undue institutionalization of persons with mental disabilities qualifies as discrimination 'by reason of disability' under the ADA").  "'Unjustified isolation,' the Court held, 'is properly regarded as discrimination based on disability.'"  Sanchez v. Johnson, 416 F.3d 1051, 1063 (9th Cir. 2005) (quoting Olmstead, 527 U.S. at 597).  Specifically, the Court explained that:

> States are required to provide community-based
> treatment for persons with mental disabilities when the
> State's treatment professionals determine that such
> placement is appropriate, the affected persons do not
> oppose such treatment, and the placement can be
> reasonably accommodated, taking into account the
> resources available to the state and the needs of
> others with mental disabilities.

Townsend v. Quasim, 328 F.3d at 519 (quoting Olmstead, 527 U.S. at 607).

The Olmstead Court relied in part on the ADA's regulations, which direct that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d), quoted in Olmstead, 527 U.S. at 592. The Rehabilitation Act's regulations similarly provide that "[r]ecipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d). In this respect, the ADA and the Rehabilitation Act have been read to contain an "integration mandate." Arc of Washington State Inc. v. Braddock, 427 F.3d 615, 618 (9th Cir. 2005); Pennsylvania Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare, 402 F.3d 374, 379 (3d Cir. 2005).

A state's reduction in services may violate the integration mandate where it unjustifiably forces or will likely force beneficiaries from an integrated environment into

22

institutional care.  See Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1184 (3d Cir. 2003) (holding that Medicaid participants not currently institutionalized, but at "high risk for premature entry into a nursing home," could bring claims for violation of the integration mandate); Gaines v. Hadi, No. 06-60129-CIV., 2006 WL 6035742, at *28 (S.D. Fla. Jan. 30, 2006) (observing that a plaintiff may state an integration claim by asserting that a "reduction in services will force [him] into an institutional setting against their will"); Brantley v. Maxwell-Jolly, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009) (noting that "cases involving ADA integration claims have recognized that the risk of institutionalization is sufficient to demonstrate a violation of Title II," and enjoining the implementation and enforcement of a law that would reduce the number of Adult Day Health Care days available to certain Medicaid beneficiaries from five to three days per week because the reduction would place the plaintiffs at serious risk of institutionalization); Mental Disability Law Clinic v. Hogan, CV-06-6320 (CPS)(JO), 2008 U.S. Dist. LEXIS 70684, at *50 (E.D.N.Y. Aug. 29, 2008) ("[E]ven the risk of unjustified segregation may be sufficient under Olmstead.").

At the same time, the integration mandate must be balanced against "the States' need to maintain a range of facilities for the care and treatment of persons with diverse

mental disabilities, and the States' obligation to administer
services with an even hand." Olmstead, 527 U.S. at 597. "'[T]he
State's responsibility, once it provides community-based
treatment to qualified persons with disabilities, is not
boundless.'" Sanchez, 416 F.3d at 1063 (quoting Olmstead, 527
U.S. at 603). If the fundamental alteration defense is
available,[11/] the state may show that it "has in place a
comprehensive deinstitutionalization scheme, which, in light of
existing budgetary constraints and the competing demands of other
services that the State provides, including the maintenance of
institutional care facilities, is 'effectively working.'"
Sanchez, 416 F.3d at 1067-68 (quoting Olmstead, 527 U.S. at 605)
(citation omitted); Arc of Washington State Inc., 427 F.3d
at 618-20 (illustrating that this showing is a type of
fundamental alteration defense). Courts "will not tinker with"
such a plan. Sanchez, 416 F.3d at 1067-68. "Olmstead does not
require the immediate, state-wide deinstutionalization of all

_____

[11/] In Townsend, a case involving an alleged violation of the
integration mandate, the Ninth Circuit noted that "the
fundamental alteration defense does not apply to cases of facial
discrimination," that Olmstead did not involve facial
discrimination, and that the provision at issue in the case at
hand could be read to facially discriminate against disabled
persons. 328 F.3d at 518 n.2. Nevertheless, the court assumed
without deciding that the defense applied because the plaintiff
did not challenge its applicability in the case. Id. at 518. In
the end, the court remanded the case to the district court and
noted that, on remand, the parties could present their arguments
for and against the applicability of the defense. Id. at 520.

eligible developmentally disabled persons, nor that a State's plan be always and in all cases successful." Id. at 1068. This type of plan is commonly referred to as an "Olmstead plan." Id. at 1064; AR 25 (noting that the State of Hawai'i has an "Olmstead Plan").

C.   Equal Access

As discussed in the 12/24/09 Order, Plaintiffs' second theory of liability under the ADA and Rehabilitation Act is based upon the equal access requirements of those statutes.  See Alexander v. Choate, 469 U.S. 287 (1985); see also Zamora-Quezada v. HealthTexas Med. Group of San Antonio, 34 F. Supp. 2d 433 (W.D. Tex. 1998).

In Choate, the Supreme Court assumed without deciding that Section 504 of the Rehabilitation Act reaches at least some conduct that has an unjustifiable disparate impact upon the handicapped.  469 U.S. at 299.  In discussing such conduct, the Supreme Court observed that a state participating in the Medicaid program has substantial discretion to choose the proper mix of amount, scope, and durational limitations on the benefits it will provide, so long as otherwise qualified disabled individuals are afforded meaningful and equal access to the benefits offered. Id. at 299-301.  The Supreme Court observed that, "to assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."  Id. at 301.

25

However, no such accommodations were necessary in the
case before the Supreme Court.  Id. at 306.  The state had
proposed reducing the number of annual days of inpatient hospital
care covered by its Medicaid program from twenty days to fourteen
days.  Id. at 289.  The Court reasoned that, because the disabled
plaintiffs in the case had "meaningful and equal access to that
benefit, [the state was] not obligated to reinstate its 20-day
rule or to provide the handicapped with more than 14 days of
inpatient coverage."  Id. at 306.  The Court emphasized that
"[t]he State has made the same benefit—14 days of
coverage—equally accessible to both handicapped and
nonhandicapped persons, and the State is not required to assure
the handicapped 'adequate health care' by providing them with
more coverage than the nonhandicapped."  Id. at 309.

"Following Choate, several courts of appeals have
adopted the view that the Rehabilitation Act requires public
entities to modify federally assisted programs if such a
modification is necessary to ensure that the disabled have equal
access to the benefits of that program."  Wisconsin Cmty. Servs.
v. City of Milwaukee, 465 F.3d 737, 748 (7th Cir. 2006)
(collecting cases and noting that "these circuits, including
ours, also follow the corollary principle implicit in the Choate
decision that the Rehabilitation Act helps disabled individuals
obtain access to benefits only when they would have difficulty

obtaining those benefits 'by reason of' their disabilities, and not because of some quality they share generally with the public."); see also Vaughn v. Sullivan, 906 F. Supp. 466, 474 (S.D. Ind. 1995) (explaining that, under Section 504 of the Rehabilitation Act, "a participating state may define the Medicaid benefits it will provide, so long as otherwise qualified disabled individuals are afforded meaningful and equal access to the benefits offered"); Wolford by Mackey v. Lewis, 860 F. Supp. 1123, 1134-35 (S.D. W. Va. 1994) ("[S]ection 504 ensures only that disabled individuals receive the same treatment as those who are not disabled. . . . The state . . . must afford individuals with a disability meaningful and equal access to the Medicaid benefits or services offered to those without a disability and may be required to adjust its programs to achieve that result." (citation omitted)).

In Zamora-Quezada, the court held that the plaintiffs, disabled enrollees of HMOs, had sufficiently stated a claim under the ADA and Rehabilitation Act against the HMOs by alleging, inter alia, that they had on numerous occasions been forced to wait for long periods of time and delayed or denied medical care, while at the same time, there were specific instances of non-disabled patients not having to wait for hours and receiving

27

better treatment.[12/]  <u>Zamora-Quezada</u>, 34 F. Supp. 2d at 442.

**II.      The Court's 12/24/09 Order**

    A.  <u>Plaintiffs' Integration Claim</u>

       In its 12/24/09 Order, the Court found that taking the evidence in light most favorable to Plaintiffs, there were genuine issues of material fact surrounding L.P.'s integration claim set forth in Counts VI and VII of the State Second Amended Complaint.  12/24/09 Order at *1062.  The Court, however, found that the remaining ABD Plaintiffs had not identified any genuine issues of material fact as to whether they are at risk of institutionalization as a result of the QExA Program.  <u>Id.</u> Consequently, the Court denied the State Defendants' general motion for summary judgment as to Counts VI and VII insofar as those counts assert an integration claim on behalf of L.P., but granted the motion for summary judgment as to those counts to the extent that they advanced integration claims on behalf of all other ABD Plaintiffs.  <u>Id.</u>

       The Court found that there were material issues of fact regarding L.P.'s integration claim based on Dr. Meyers' assertion that L.P. was at risk of institutionalization because he had encountered "long-running problems with securing payment from Evercare or [WellCare of Arizona] for community aides his doctors

---

    [12/] The evidence presented in <u>Zamora-Quezada</u> is discussed in greater detail <u>infra</u>.

have ordered," and that if he loses those services, he "would

have to be institutionalized."  See 12/24/09 Order at 33 (citing

Pls.' Opp'n to St. Defs.' Multi-count MSJ CSF, Dr. Meyers'

Decl. ¶ 23.).  In light of that testimony, the Court found that:

> [W]hile L.P. has not yet experienced a loss of
> community-based services, there is a question of fact
> as to whether he is at risk of suffering an imminent
> reduction in those services and having to be
> institutionalized as a result thereof.  See O'Shea v.
> Littleton, 414 U.S. 488, 496 (1974) ("[P]ast wrongs are
> evidence bearing on whether there is a real and
> immediate threat of repeated injury.").

Id. at *1061.  The Court further explained that:

> While it is abundantly clear that the QExA Program is a
> comprehensive deinstitutionalization scheme, and that
> it is working to some extent, Dr. Meyers' testimony
> regarding the potential denial of community-aide
> services to L.P. raises a question of fact as to
> whether the plan is working "effectively" as it applies
> to him.  This issue is better left for trial.

Id. at *1061-62 (footnote omitted).

    B.    The Equal Access Claim

         First, the Court analyzed whether the equal access

claim under the ADA was adequately pled in the State Second

Amended Complaint and found that it was.  See id. at *1063-*1064.

The Court then explained that Plaintiffs' argument is "that the

State DHS is unlawfully discriminating between disabled

beneficiaries in the QExA Program and non-disabled beneficiaries

in the QUEST Program, because the former have less access to

certain Medicaid benefits than the latter. . . . [T]hat type of

discrimination is not permissible under the ADA and

Rehabilitation Act." <u>Id.</u> at *1065 n.14.  After examining the

evidence submitted, the Court determined that:

> Viewing the evidence in the light most favorable to the
> ABD Plaintiffs, the Court finds that there are genuine
> issues of material fact as to whether the ABD
> Plaintiffs have equal access to Medicaid benefits as
> compared to non-disabled beneficiaries enrolled in the
> QUEST Program. <u>See</u> <u>Choate</u>, 469 U.S. at 306.  That
> question is better left for trial.

12/24/09 Order at *1067.  In reaching that decision, the Court

considered: (1) Plaintiffs' argument that there are alleged

disparities between the provider networks of the QExA and QUEST

Programs (although it found the availability of out-of-network

providers would seem to undermine the significance of the alleged

disparities); (2) the availability of specialists in the QExA

Program and Plaintiffs' evidence that it takes twelve to thirty

times as long to secure a referral to a specialist for a QExA

enrollee than for a non-disabled person in the QUEST Program; (3)

Plaintiffs' argument that the preauthorization process for

certain services and items, including non-covered prescription

drugs, under the QExA Program is onerous and lengthy compared to

the process utilized in the QUEST Program; and (4) Plaintiffs'

argument that they have been denied transportation which

increases the risks of adverse consequences because QExA patients

cannot travel to the doctor's office or the pharmacy.  <u>Id.</u> at

*1065-*1067.

III.      L.P.'s Integration Claim

As discussed above, L.P. is the only Plaintiff whose integration claim survived the State Defendants' Motion for Summary Judgment.  See 12/24/09 Order at *1062.

The Intervenors now argue that Defendants are entitled to summary judgment on L.P.'s integration claim.  Evercare argues that WellCare of Arizona:

> [H]as authorized all the home and community based care L.P. needs to avoid institutionalization.  The evidence available to the State Defendants and Intervenors, found largely in the Care Notes created by [WellCare of Arizona] employees, indicates that the only challenge to the effective operation of the 'comprehensive deinstitutionalization scheme' as to L.P. is his failure to timely complete required paperwork and the quality of his interactions with the agency caregivers assigned to his care.

Evercare's L.P. MSJ at 28.  Accordingly, Evercare argues that "L.P. cannot create an ADA claim based on his actions because, to the extent his own actions have caused him to receive less benefits than those to which he was entitled, he has not suffered any discrimination."  Id. (citing Buchanan v. Maine, 469 F.3d 158, 175-76 (1st Cir. 2006)).

In support of its argument regarding L.P.'s risk of institutionalization claim, Evercare relies largely on case notes that it has submitted as an exhibit to its L.P. CSF.  Plaintiffs assert that the case notes included in Evercare's CSFs are inadmissible because they contain hearsay and double hearsay. Plaintiffs' L.P. Opposition at 4-5; Plaintiffs' ADA Opposition at

3-4.  Intervenors argue that the case notes are admissible
pursuant to Fed. R. Evid. 803(6), the business records exception.
Reply at 18-19.  The Court agrees with Intervenors that the case
notes are admissible under the business records exception to the
hearsay rule.  Erhardt Preiteur, the Executive Director for
Intervenor WellCare of Arizona, declares that the "case notes and
medical claims reports with respect to Plaintiff L.P. [are]
created and maintained in the ordinary course of [WellCare of
Arizona's] business."  Evercare's L.P. CSF, Preiteur Decl. ¶ 2.
Mr. Preiteur further declares that the case notes reflect
WellCare of Arizona's employees' contemporaneous documentation of
events.[13/]  <u>Id.</u>

Plaintiffs argue that "courts have long held that
business records are inadmissible if they fail the 'business
duty.'  For example, 'It is well established that entries in a
police report which result from the officer's own observations
and knowledge may be admitted but that statements made by third
persons under no business duty to report may not.'"  Plaintiffs'
L.P. Opposition at 5-6.  However, at the first level, it appears
to the Court that WellCare of Arizona's employees are under a
business duty to accurately record their conversations with

---

[13/] Indeed, the Court observes that, in at least one
instance, when it appears that a note was not made
contemporaneously, the employee noted that it was a "late entry"
containing "additional home visit notes."  <u>See</u> Evercare's ADA CSF
Ex. N, Case Notes at 3.

members.[14/]  At the second level, the statements contained within

the case notes by L.P. are party admissions, which fall outside

of the hearsay rule entirely.[15/]  <u>See</u> Fed. R. Evid. 801(d)(2) (a

statement is not hearsay if "[t]he statement is offered against a

party and is (A) the party's own statement"); Evercare's Reply at

19-20.  Moreover, even considering the case notes, the Court

finds that there are issues of material fact regarding Plaintiff

---

[14/]  Furthermore, the Court observes that, while Plaintiffs'
counsel has disputed the admissibility of these case notes in
Plaintiffs' Opposition, during a deposition the following
exchange took place:
>  [Plaintiffs' Counsel]:  You want to indicate to the
>  witness what you are reading from?
>  [Counsel for Evercare]: I'm just reading from the case
>  notes.  Whenever a member or provider calls into one of
>  the health plans they make a record of the conversation
>  for follow-up.  So there's a number of attempts
>  starting in April of 2009 . . .
>  [Plaintiffs' Counsel]: At least they're supposed to
>  make a record.

Evercare's ADA CSF, Ex. C at 51:2-10.  Thus, it appears that
Plaintiffs' counsel has implicitly acknowledged that the case
notes are business records.

[15/]  The Court rejects Plaintiffs' counsel's argument that the
case notes are not admissible because Plaintiffs' statements
contained within the case notes are being vouched for by a party
opponent and not by an independent source.  8/12/10 Tr. at 64:6-
65:25.  As counsel for Evercare pointed out, none of the ABD
Plaintiffs have come forward to dispute any of the statements
contained within the case notes.  <u>Id.</u> at 59:21-60:5.
Furthermore, as the Advisory Committee Notes to Federal Rule of
Evidence 801(d) explain, "no guarantee of trustworthiness is
required in the case of an admission" and "generous treatment" is
given to this "avenue to admissibility."  Fed. R. Evid. 801(d),
advisory committee's note.

L.P.'s integration claim.[16/]

Evercare asserts that "[t]he alleged non-payment of Plaintiff L.P.'s caregivers which prompted the Court to deny the State's Multi-Count MSJ as to Plaintiff L.P.'s 'risk of institutionalization' claim, resulted solely from L.P.'s failure to complete and return the paperwork necessary for him to pay his caregivers under the self-direction program." Evercare's L.P. MSJ at 29. Thus, Evercare admits that WellCare of Arizona has, at times, failed to pay for L.P.'s home and community based services. Evercare also admits that there are times that Plaintiff L.P. was without services. See Evercare's L.P. MSJ at 30 (explaining that "[t]he record reflects there have been times when [WellCare of Arizona] was not able to find agencies willing and able to provide PA-1 services to Plaintiff L.P.").

Accordingly, the Court is left with the issue of the causes of those failures. Evercare asserts that the failure to provide services was partly caused by L.P.'s desire to self-direct and his failure to fill out the requisite paperwork; while L.P. asserts that he only requested the paperwork because WellCare of Arizona insisted that he self-direct and because he was frustrated by WellCare of Arizona's failure to provide services to him. See Plaintiffs' L.P. Opposition at 7 (¶ 11)

---

[16/] At this point, L.P. is the only ABD Plaintiff who has not been deposed.

("[WellCare of Arizona] kept insisting that [he] self-direct his care, which he was less able to do than ever as he was blind in one eye and becoming very ill."); Evercare's L.P. MSJ at 29-30; see also Plaintiffs' CSF Errata, Patee Decl. ¶. 26 ("Evercare has also tried to make it seem as if I kept requesting to be self directed, when I requested that [WellCare of Arizona] send me the packet. . . . I made the request because [WellCare of Arizona] had not arranged for an agency to provide my services.  When that went on and on, of course I requested the self-direction packet because [WellCare of Arizona] left me no choice.").

Evercare further argues that the difficulties WellCare of Arizona has encountered in providing services to L.P. are due to L.P.'s behavior.  See Evercare's L.P. MSJ at 31 ("The record reflects that [WellCare of Arizona] has a number of contracted agencies capable of providing the PA-1 services Plaintiff L.P. requires, many of which have serviced L.P. at some point. . . . Unfortunately, Plaintiff L.P. has so alienated most of those agencies, due to the quality of his interactions with his assigned caregivers, that there may come a day when [WellCare of Arizona] is unable to arrange the care L.P. needs to remain in the home.").  Plaintiff L.P., in contrast, argues that "L.P.'s confinement to The Queen's Medical Center for 29 days from March 18 to April 16, 2010, was the culmination of months of neglect that left him partially blind and with a recurrence of his

cancer." Plaintiffs' L.P. Opposition at 13.

This conflicting evidence regarding the reasons for the admitted lack of services creates genuine issues of material fact. As explained earlier, on a motion for summary judgment, the Court may not make credibility assessments or weigh conflicting evidence. Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994). Therefore, the Court finds that there are genuine issues of material fact regarding whether L.P. is at a greater risk of institutionalization because of the QExA plan's failure to provide services. However, the Court observes that Plaintiff L.P. is only seeking an injunction regarding his integration claim. 8/12/10 Tr. at 47:7-19. Thus, because all parties agree that L.P. is currently receiving the care that he needs and that he is happy with the company currently providing his care, the Court anticipates that the parties will be able to reach a settlement agreement on this claim.[17/] See Tr. at 71:7-12 (indicating that the Court expected the parties to be able to reach a settlement agreement regarding this claim). However, if no settlement is reached, then Plaintiff L.P.'s integration claim will proceed to trial for a determination whether he is entitled to an injunction.

---

[17/] L.P. is currently receiving care 24 hours a day, 7 days a week. See 8/12/10 Tr. at 51:15-21, 64:6-12; Plaintiffs' CSF Errata, Patee Decl. ¶¶ 38-40.

IV.        The ABD Plaintiffs' Equal Access Claim

As discussed in greater detail above, in its 12/24/09

Order, this Court found that there were material issues of fact

regarding Plaintiffs' ADA equal access claims.  See 12/24/09

Order at *1065-*1067.  Specifically, the Court explained:

> Viewing the evidence in the light most favorable to the
> ABD Plaintiffs, the Court finds that there are genuine
> issues of material fact as to whether the ABD
> Plaintiffs have equal access to Medicaid benefits as
> compared to non-disabled beneficiaries enrolled in the
> QUEST Program.  See Choate, 469 U.S. at 306.  That
> question is better left for trial.

12/24/09 Order at *1067.  Prior to the Court's 12/24/09 Order, it

was not clear whether Plaintiffs had alleged an equal access

claim under the ADA (see 12/24/09 Order at *1063-*1064 Section I.

C. 4 discussing whether the equal access claim was properly

pled); and none of the ABD Plaintiffs had been deposed.  Now,

with the exception of L.P., the State Defendants and Intervenors

have deposed all of the ABD Plaintiffs.  Thus, Evercare argues

"the de minimus (at most) injuries alleged by these plaintiffs

have no connection to their disabilities - they are routine

inconveniences inherent in the cost-containment, selective

contracting, and coordination mechanisms of managed care plans."

Evercare's ADA MSJ at 42.  Evercare further argues that "[t]he

ABD Plaintiffs have come forward with no evidence that their

alleged injuries had anything to do with being enrolled in

managed care QExA plans as opposed to managed care QUEST plans."

37

Id.  Additionally, Evercare points out that the "reason the ABD
Plaintiffs have not been assigned a contracted PCP is that they
demanded the right to continue to see Dr. Meyers during the
pendency of this litigation, and both [WellCare of Arizona] and
Evercare agreed.  The ABD Plaintiffs cannot now argue that
Evercare and [WellCare of Arizona] have violated the ADA by
failing to insist that they see a contracted PCP, over their
objection."  Reply at 10.  The Court agrees with Evercare.  The
ABD Plaintiffs have not come forward with any evidence that they
have suffered a harm based upon a denial of meaningful access to
any Medicaid benefits by reason of their disability.  The ABD
Plaintiffs have not come forward with any evidence that any of
their alleged injuries have anything to do with being enrolled in
QExA rather than QUEST.  The only injuries ABD Plaintiffs do
allege are not connected to their disability.  They are routine
inconveniences inherent in the cost-containment, selective
contracting, and coordination mechanisms of managed care plans.
Accordingly, Plaintiffs have not raised any issues of material
fact as to their Title II ADA and Rehabilitation Act equal access
claims.  Therefore, the State Defendants and Intervenors are
entitled to summary judgment on those claims.

    A.    <u>Provider Plaintiffs' Declarations</u>

       Although Plaintiffs have come forth with some of the
same evidence that the Court found raised issues of material fact

in December (and much of Plaintiffs' Opposition focuses on these facts); in light of the ABD Plaintiffs' deposition testimony, this evidence is no longer sufficient to raise genuine issues of material fact.  See, e.g., Plaintiffs' ADA Opposition at 10-12. This information may, however, be more significant at trial regarding Plaintiffs' request for an injunction based upon the Medicaid equal access claim.[18]  Specifically, the Court rejects

---

[18] As explained in the 6/14/10 Order, in addition to establishing solvency standards, 42 U.S.C. § 1396b(m) requires that MCOs make services available to its members to the same extent as services are made available to Medicaid beneficiaries not enrolled with the MCO.  See 42 U.S.C. § 1396b(m)(1)(A)(i). This provision is the basis for what the Court has referred to as the Medicaid equal access injunctive claim.  Specifically, subdivision (i) of 42 U.S.C. § 1396b(m) provides that, in order to qualify as an MCO, an organization must:

> make[] services it provides to individuals eligible for benefits under this title accessible to such individuals, within the area served by the organization, to the same extent as such services are made accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization.

Id.  As the Court additionally explained in its 6/14/10 Order, because here the State has set its Medicaid program up such that one group of MCOs (the QUEST program) serves the non-disabled population, and one group (the QExA program) serves the ABD population, which includes disabled persons "42 U.S.C. § 1396b(m)(1)(A)(i) is, in effect, a non-discrimination provision."  6/14/10 Order at *24.  Accordingly, "there is a great deal of overlap between Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i) and Plaintiffs' claims under the ADA and Rehabilitation Act."  Id. at *24 n.37.  There are, however, differences that are relevant here.  The Medicaid equal access claim is broader than the ADA equal access claim.  The Medicaid equal access injunctive claim also applies to persons who are non-disabled aged beneficiaries, not just those who are disabled. Further, under the Medicaid equal access injunctive claim, Plaintiffs must establish that there is a difference in access to

(continued...)

Plaintiffs' argument that:

> The issue for determination thus is whether ABD
> Plaintiffs will have the access to medical services
> equal to that enjoyed by QUEST beneficiaries <u>after</u> the
> lawsuit is concluded. Doc. 624 fails to provide that.
> It is not supported by a single affidavit by a provider
> participating with Evercare or [WellCare of Arizona]
> giving acceptable assurances of accepting primary care
> physician duties for any ABD Plaintiff.

Plaintiffs' ADA Opposition at 19-20.  To establish a violation
under the ADA or Rehabilitation Act, it is Plaintiffs' burden to
show that they have been denied meaningful access to benefits on
account of their disability.[19/]  See <u>O'Guinn v. Lovelock Corr.
Ctr.</u>, 502 F.3d 1056, 1060 (9th Cir. 2007) (quoting <u>McGary v. City
of Portland</u>, 386 F.3d 1259, 1265 (9th Cir. 2004)) (discussing the
elements Plaintiffs must establish in a Title II ADA action); <u>see
also</u> <u>Lovell v. Chandler</u>, 303 F.3d 1039, 1056-57 (9th Cir. 2002)
(explaining that compensatory damages are not available unless
there is a showing of deliberate indifference or intentional
discrimination).  ABD Plaintiffs cannot speculate that they will

───────────────────

(...continued)
services between QUEST and QExA and that they are likely to face
imminent harm in the future because of those differences.  To
succeed on their Medicaid equal access injunctive claim, they are
not required to show that they have been discriminated against in
the past because of their disability as they are required to in
order to establish an entitlement to compensatory damages under
the ADA and Rehabilitation Act.

    [19/] Because each ABD Plaintiff individually must show that
they have been harmed and suffered damages, the Court will not
consider the declarations of non-parties that have been submitted
by Plaintiffs unless they relate to the ABD Plaintiffs.

be harmed by a denial of benefits in the future and assert that Defendants have failed to show they will not be denied benefits in the future.[20]  Additionally, as discussed earlier, ABD Plaintiffs must show that the alleged denial of benefits is due to their disability and not some characteristic that they share with the general public.  <u>Wisconsin Cmty. Servs.</u>, 465 F.3d at 748.  As discussed <u>infra</u>, each ABD Plaintiff has failed to meet this burden.

      B.   <u>L.P.'s Equal Access Claim</u>

      Evercare has shown there is a lack of evidence to support L.P.'s equal access ADA claim and Plaintiff L.P. has not come forth with evidence that creates a genuine issue of material fact.  Plaintiff L.P. has complained about a lack of transportation services; however, transportation services are provided only to medical appointments, not pharmacies, in both QExA and QUEST.  Evercare's L.P. CSF ¶¶ 15-16 (citing Preitauer Decl. ¶¶ 20-21, Ex. A, Ex. E).  Ex. E is a memorandum from the State of Hawaii DHS to CYRCA, QUEST, and QExA.  It clearly states that non-emergency transportation is only for medically necessary visits when no other form of transportation is available and that no side trips to the pharmacy are allowed.  <u>Id.</u>  Furthermore,

---

[20] A risk of future harm could be addressed by an injunction; however, Plaintiffs here are not seeking an injunction based upon their ADA and Rehabilitation Act equal access claims.  <u>See</u> 8/12/10 Tr. at 69:11-16.

L.P. admits that WellCare of Arizona did provide him transportation but he asserts that he "was convinced that the driver had the wrong directions as they had in the past, and refused to go with them, so I missed appointments and even went to the wrong place."  Plaintiffs' CSF Errata, Patee Decl. ¶ 32. Plaintiff L.P. cannot establish that he was denied any meaningful access to benefits based upon an alleged failure to provide transportation services when L.P. refused to use the transportation services that were provided.

L.P. also complains that he has not been assigned a PCP; however, as a dual-eligible QExA member WellCare of Arizona has no obligation to provide a PCP for him.  Evercare's L.P. CSF ¶ 12 (citing Preiteur Decl. ¶¶ 25-26, 38, Ex. A, Ex. F).  Exhibit F is a copy of the supplemental contract between Intervenors and the State which clarifies that "[t]he health plan shall ensure that each member, who does not have Medicare or a Medicare Advantage health plan as their primary insurance, has selected or is assigned to one (1) PCP who shall be an ongoing source of primary care appropriate to his or her needs."[21/]  Evercare's L.P.

---

[21/] Plaintiffs' counsel seems to equate care coordination with having a PCP, while Evercare asserts that care coordination is an additional service provided in QExA that is not provided in QUEST.  Compare 8/12/10 Tr. at 99:3-9 with 85:22-86:5.  The Court finds that, based upon the business records submitted with Evercare's Motions, both T.I. and L.P. were provided service (care) coordination from their MCOs.  See Evercare's ADA CSF, Ex. P; Evercare's L.P. MSJ Ex. A.  They were not, however, provided a
(continued...)

CSF, Heywood Decl & Ex. F.  Furthermore, because Plaintiff L.P.

has Medicare as his primary insurance, most of his prescription

medication is covered by Medicare Part-D.  Id. ¶ 17.

Plaintiff L.P. submitted a declaration in support of

Plaintiffs' Opposition.  See Plaintiffs' CSF Errata, Patee Decl.

Considering the arguments Evercare has raised and Plaintiff

L.P.'s declaration, the Court finds that L.P. has not shown he

has suffered any harm based upon a denial of meaningful access to

medicaid benefits "by reason of disability."  See Lovell, 303

F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-

Quezada, 34 F. Supp. 2d 433.  Plaintiff L.P. has not come

forward with any evidence that he was injured or that his alleged

injuries had anything to do with being enrolled in managed care

QExA rather than managed care QUEST.  L.P. has not shown that his

access to medical services under QExA was not equal to the access

he would have received if he were a member of QUEST.  Any injury

which Plaintiff L.P. does allege has no connection to any

---

(...continued)
PCP because they are dual-eligible and may see any doctor that
accepts Medicare that they wish to.  See Evercare's L.P. CSF,
Heywood Decl & Ex. F.  Because they may see any doctor who
accepts Medicare that they wish to, they can in effect, choose
any doctor (who is willing) to act as their PCP.  Further, the
Court is not persuaded that L.P.'s declaration that "doctors are
less enthusiastic about seeing me because they are paid less than
they are with other Medicare patients on account of the fact that
Evercare and [WellCare of Arizona] refuse to pay them the copay
they collect from regular Medicare patients and which used to be
paid by the State" raises any genuine issues of material fact.
See Plaintiffs' CSF Errata, Patee Decl. ¶ 18.

discrimination based upon his disability - they are routine inconveniences inherent in the cost-containment, selective contracting, and coordination mechanisms of managed care plans. Thus, Plaintiff L.P. cannot establish a violation of Title II of the ADA.

In Wisconsin Cmty. Servs., the Seventh Circuit observed that courts "follow the corollary principle implicit in the Choate decision that the Rehabilitation Act helps disabled individuals obtain access to benefits only when they would have difficulty obtaining those benefits 'by reason of' their disabilities, and not because of some quality they share generally with the public." Wisconsin Cmty. Servs., 465 F.3d at 748. The Seventh Circuit remanded the case for further proceedings on the issue of causation, but noted that "[o]n the present record, WCS' inability to meet the City's special use criteria appears due not to its client's disabilities but to its plan to open a non-profit health clinic in a location where the City desired a commercial, taxpaying tenant instead. As far as this record indicates, the City would have rejected similar proposals from non-profit health clinics serving the disabled." Id. at 754.

Plaintiff L.P. has not shown the requisite causal link. The evidence that is set forth in this case differs from the evidence put forth in Zamora-Quezada. 34 F. Supp. 2d at 446. In

44

Zamora-Quezada, there was specific evidence that disabled
patients had been discriminated against.  The evidence in Zamora-
Quezada included, inter alia, (1) a doctor who had averred he
"personally observed disabled patients being denied the same kind
of services covered [under the HMO plan] and provided to persons
not suffering from disabilities; (2) a former employee of one of
the HMOs who stated that disabled patients were not treated as
well as health patients, including witnessing a doctor choose to
service another patient over a disabled patient;[22] and (3)
multiple patients who testified that they were denied treatment
and forced to wait long periods of time for care.  There is no
similar evidence here and L.P. has not shown he has been denied
any services based upon his disability.  As Wisconsin Cmty.

---

[22] In full, the Zamora-Quezada court quoted the witness as
follows:

> During my employment at HealthTexas, I had the
> opportunity to witness and did witness dozens of
> instances in which patients with chronic illnesses and
> disabilities were not treated as well as healthy
> patients.  The healthy patients did not have to wait as
> long to see the doctor as patients with many health
> problems.  There were some patients who would come in
> and be seen before the sicker patients, even though the
> sicker patients had been waiting longer. . . . People
> with chronic illnesses and disabilities sometimes had
> to wait two to three hours between the first waiting,
> the sub-waiting room, and the exam room.  On many
> occasions, I saw [the Medical Director of Health Texas]
> pull the patient chart from the door of an exam room,
> glance at it, return the chart to the door and go on to
> another patient, leaving the first patient to continue
> waiting.

Zamora-Quezada, 34 F. Supp. 2d at 446 (alteration in original).

<u>Servs.</u> explains, to establish a violation of Title II of the ADA, a denial of benefits must be based upon a characteristic that is not shared with the general public.  Thus, any issues or complaints that Plaintiffs have that are due to problems inherent in managed care, are not a denial of benefits due to a person's disability; the general Medicaid population in QUEST and even persons in commercial managed care programs are subject to the same issues and problems that are inherent in managed care.

L.P.'s integration claim, however, remains and will proceed to trial if the parties are unable to reach a settlement agreement.

C.   <u>V., Parent and Guardian of R.</u>

Lorraine Kapu (V.), Parent and Guardian of Ramie Vierra ®.), testified that the only thing she has asked Evercare to provide is companion transportation for her to accompany Ramie to his appointments.  Evercare's ADA MSJ at 6; Evercare's ADA CSF, Ex. A at 12:10-13.  Before her request to accompany Ramie to his doctors' appointments was approved, Ms. Kapu paid $4 for round trip transportation on the Handi-Van.  Evercare's ADA CSF Ex. A at 12:21-25.  That issue has since been resolved and Evercare has paid for her transportation to accompany Ramie to his appointments.  <u>Id.</u> at 13:4-12, 14:1-8.  At her deposition, Ms. Kapu testified that transportation was the only covered benefit she was denied.  <u>Id.</u> at 17:22-25.

46

Ms. Kapu testified that she wants to make sure Ramie "is able to see his own doctor who took care of him for a long time." Evercare's ADA CSF ¶ 3 (Ex. A at 18:16-17). She further testified that Ramie has no primary care physician, but that he has continued to see Dr. Meyers.[23/] Id. Ms. Kapu testified that Ramie has gotten the medical care he needs by seeing Dr. Meyers, and that if Dr. Meyers was participating with the QExA program, she would have no complaints.[24/] Id. ¶ 6 (Ex. A at 19:18-21), id. ¶ 11 (Ex. A at 24:21-24).

Ms. Kapu has also submitted a declaration in support of Plaintiffs' ADA Opposition. Ms. Kapu's declaration purports to contradict her deposition testimony in a number of ways. At her deposition she testified that Ramie did not have a primary care physician, that he had continued to see Dr. Meyers, and that Dr.

---

[23/] The Court acknowledges that at the 8/12/10 Hearing, Plaintiffs' counsel explained that Dr. Meyers had given notice to both QExA Contractors that she would no longer be providing care for the ABD Plaintiffs. See 8/12/10 Tr. at 105:21-106:14. Accordingly, Plaintiffs may suffer a greater harm going forward. However, they have not established the requisite elements for an ADA claim at this point.

[24/] The Court notes that Dr. Meyers has also complained about the additional paperwork and requirements for prior authorizations that QExA requires compared to QUEST. Plaintiffs' Omnibus CSF, Dr. Meyers Decl. ¶ 5-9. However, as counsel for Evercare argued, Dr. Meyers faces a different administrative burden between the programs because she does not participate in QExA whereas she participates in QUEST. 8/12/10 Tr. at 75:1-9 Counsel for Evercare further argued that there are prior authorization requirements in QUEST as well if a patient wishes to go outside of the contracted network.

47

Meyers told her Ramie could continue to see her.  <u>See</u> Evercare's
ADA CSF, Ex. A at 19:1-8, 20:16-21.  In her declaration, Ms. Kapu
declares that "Evercare assigned Ramie to primary care physicians
who were unwilling to take him as a patient."  Plaintiffs'
Omnibus CSF, Kapu Decl. ¶ 8.  She further declares that she
recently received yet another PCP assignment, this time for a
primary care doctor in Kahuku.  <u>Id.</u>  She does not know if the
doctor in Kahuku will see Ramie, but she is unwilling to take him
that far to see a doctor.  <u>Id.</u> ¶ 9.  Ms. Kapu also declares:

> I am told by Ramie's attorney that Evercare told the
> Court transportation is supposedly my only issue.  That
> is not true.  My issue is protecting my son's life and
> keeping him safe.  I want to take care of Ramie the
> best way I can.  It is very hard for me to trust a new
> doctor because they will not know him like Dr. Meyers
> does, but I would take Ramie to a new primary care
> doctor if Evercare would give him a doctor who wants to
> take care of him and who is not far, far away from
> Wahiawa.

<u>Id.</u> ¶ 10.

        However, the Court cannot consider the portions of Ms.
Kapu's declaration that contradict her deposition testimony.  A
party cannot create a genuine issue of material fact through a
declaration that contradicts prior deposition testimony.  <u>See</u>
<u>Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc.</u>, 397
F.3d 1217, 1225 (9th Cir. 2005); <u>Disc Golf Ass'n, Inc. v.</u>
<u>Champion Discs, Inc.</u>, 158 F.3d 1002, 1008 (9th Cir. 1998).

        In light of the foregoing, the Court finds that Ms.
Kapu (V.) has not raised genuine issues of material fact to show

that Ramie has suffered any harm based upon a denial of meaningful access to medicaid benefits "by reason of disability." See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  Ms. Kapu has not come forward with evidence that Ramie was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  Ms. Kapu has not shown that Ramie's access to medical services under QExA was not equal to the access he would have received if he were a member of QUEST. Any injury which Ms. Kapu does allege has no connection to any discrimination based upon Ramie's disability.  Rather, Ms. Kapu complains of the routine inconveniences inherent in managed care. Thus, Ms. Kapu cannot establish a violation of Title II of the ADA and State Defendants and Intervenors are entitled to summary judgment on this claim.

> D.    T., Parent and Next Friend of E.S.

E.S is a WellCare of Arizona member.  Evercare's ADA CSF ¶ 1 (citing to Doc. No. 427-5, T. Decl. submitted in Opposition to the State Defendants Multi-Count MSJ).  E.S. has been a patient of Dr. Meyers since he was born.  Id. ¶ 2 (citing T. Decl. ¶ 6, Ex. C. at 43:10-12).  Dr. Gregory Yim has been E.S.'s pediatric neurologist since birth.  Id.  E.S. continues to see both Dr. Meyers and Dr. Yim and has had no problems getting in to see either.  Id. ¶¶ 3, 6-7 (citing Ex. C at 24:4-21).  T.

wants E.S. to remain with Dr. Meyers as his PCP.  Evercare's ADA
CSF ¶ 3 (Ex. C at 51:19-24).

The only problems T. identified at her deposition
related to filling prescriptions for Topamax.  <u>See</u> Evercare's ADA
MSJ at 9-10.  T. has experienced an issue regarding a generic
equivalent being dispensed and an issue regarding the number of
tablets that have been dispensed.  <u>Id.</u>  E.S.'s benefits have not
been reduced under the QExA program.  Evercare's ADA CSF ¶ 10
(Ex. C. at 109:7-9).  T. has not experienced any delay in
obtaining any covered service other than the issue regarding
Topamax.  <u>Id.</u> ¶ 13 (Ex. C. at 95:12-15).

At the 8/13/10 Hearing, the Court heard testimony
regarding an incident that had occurred regarding E.S.'s
prescription formula.  E.S. requires Pediasure as his sole source
of nutrition, and there was an incident regarding E.S.'s supply.
While this incident may be troubling and frustrating for all
involved, Plaintiffs have not submitted any evidence that the
issues causing this incident were anything other than typical
issues in a managed care program.  Furthermore, Plaintiffs have
not established that E.S. was denied any benefits.  It appears
that there were concerns he was almost out of formula, but a
solution was reached.  8/13/10 Tr. at 35:8-17.  Accordingly, this
incident does not establish that E.S. was harmed by a denial of
meaningful access to Medicaid benefits on account of his

disability.

In light of the foregoing, the Court finds that T. has not raised genuine issues of material fact to show that E.S. has been harmed based upon a denial of meaningful access to medicaid benefits "by reason of disability." See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  As Evercare argues, this prescription coverage issue appears to be an issue inherent in any managed care program, including QUEST.  Furthermore, in her deposition, T. acknowledged that a prior authorization to increase E.S.'s prescription had also been required under the prior medicaid fee for service program; and Plaintiffs have not come forward with evidence that prior authorizations for increases in dosages of certain prescriptions do not occur in QUEST.[25/]  Evercare's ADA CSF ¶ 13 (Ex. C at 113:5-114:3).  T. has not come forward with evidence that E.S. was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  T. has not shown that E.S.'s access to medical services under QExA was not equal to the access he would

---

[25/] The Court rejects Plaintiffs' counsel's argument that this would not have happened in QUEST because a person with seizures would not be in the QUEST program.  The relevant comparison is whether the QUEST program requires prior authorization for certain increases in prescription medications as QExA does.  See 8/12/10 Tr. at 101:18-102:12.  Plaintiffs have not come forth with any evidence that an increase in Topamax would not require prior authorization in QUEST.

have received if he were a member of QUEST.  Any injury which T.
does allege has no connection to any discrimination based upon
E.S.'s disability.  Rather, T. complains of the routine
inconveniences inherent in managed care.

    E.    <u>M., Parent and Next Friend of I.</u>

        Isaac is a WellCare of Arizona member under the QExA
program, who has been a patient of Dr. Meyers since birth.
Evercare's ADA CSF ¶ 1 (Ex. E at 14:3-14, 17:19-21).  Isaac has
continued to receive care through Dr. Meyers and whatever
specialist Dr. Meyers refers him to.  Evercare's ADA CSF ¶ 3 (Ex.
E. at 15:18-16:13).  Isaac has not been denied any care under the
QExA Program.  <u>Id.</u> ¶¶ 6, 10 (Ex. E at 17:3-6).  If Dr. Meyers
were a participating provider and could be Isaac's PCP, Ms.
Minute (M.) would have no complaints about the QExA program.  <u>Id.</u>
¶ 11 (Ex. E at 18:11-14).  Ms. Minute has had no problems getting
Isaac his medications under the QExA program.  <u>Id.</u> ¶ 17 (Ex. E at
24:7-9).

        Ms. Minute also testified that she was having trouble
finding doctors under the QExA program.  <u>Id.</u> ¶ 14 (Ex. E at 19:5-
18).  However, Ms. Minute hasn't called the urologist's office
since last year, when she scheduled Isaac's last appointment.
<u>Id.</u> ¶ 14 (Ex. E at 20:20-22).  At that point, the urologist told
Ms. Minute that Isaac would need another surgery at age 11; Isaac
is not yet 11 years old.  <u>Id.</u> (Ex. E at 32:16-33:4).  Ms. Minute

would like for Isaac to see the urologist, even though it is not time for the next surgery, but has not called to schedule an appointment, cannot remember the new urologist's name, and Dr. Meyers offered to help Ms. Minute find a urologist just a month prior to the deposition. Id. ¶ 14 (Ex. E at 33:20-37:5). However, Isaac has been sick during that whole month and Ms. Minute would not have taken him to a urologist in any event. Id. Ms. Minute also testified that Isaac needs a plastic surgeon to repair his cleft palate. Id. However, she only "just recently" asked Dr. Meyers for a recommendation and the KMCWC is helping Ms. Minute look for one. Id. (Ex. E at 35:9-11). Ms. Minute testified that she did not feel there had been any delay in Isaac being referred to a plastic surgeon. Id. (Ex. E at 37:3-5).

Ms. Minute submitted a declaration in support of Plaintiffs' Opposition. She asserts that Isaac was assigned to a PCP who was not accepting new patients. Plaintiffs' Omnibus CSF, Minute Decl. ¶ 5. Ms. Minute further declares that "to her knowledge there are no pediatric primary care doctors in Wahiawa or Mililani who accept [WellCare of Arizona]." Id. ¶ 6. She also declares that Isaac needed "two reconstructive surgeries during this summer vacation" and "[i]t has been more difficult to find a specialist who would accept Isaac to perform especially the one surgery." Id. ¶ 2.

The Court will not consider Ms. Minute's declaration to

the extent that it contradicts her deposition testimony as a party may not raise issues of material fact by submitted a declaration in contradiction to sworn deposition testimony.  <u>See Hambleton Brothers Lumber Co. v. Balkin Enterprises, Inc.</u>, 397 F.3d 1217, 1225 (9th Cir. 2005); <u>Disc Golf Ass'n, Inc. v. Champion Discs, Inc.</u>, 158 F.3d 1002, 1008 (9th Cir. 1998).

Based on Ms. Minute's deposition testimony and considering those portions of her declaration that do not contradict her deposition testimony, the Court finds that Ms. Minute has not raised genuine issues of material fact to show that Isaac has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability."  <u>See Lovell</u>, 303 F.3d at 1052; <u>Wisconsin Cmty. Servs.</u>, 465 F.3d at 748; <u>Zamora-Quezada</u>, 34 F. Supp. 2d 433.  Ms. Minute has not come forward with evidence that Isaac was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  Ms. Minute has not shown that Isaac's access to medical services under QExA was not equal to the access he would have received if he were a member of QUEST. Any injury which Ms. Minute does allege has no connection to any discrimination based upon Isaac's disability.  Rather, Ms. Minute complains of the routine inconveniences inherent in managed care. Thus, Ms. Minute cannot establish a violation of Title II and State Defendants and Intervenors are entitled to summary judgment

54

on this claim.

    F.   <u>D., Parent and Next Friend of E.</u>

       Ethan is a WellCare of Arizona member.  Evercare's ADA CSF ¶ 1 (Ex. G. at 10:14-16, 32:12-20).  Ethan has continued to see Dr. Meyers since the QExA program began and has continued to see his pediatric cardiologist.  <u>Id.</u> ¶¶ 3, 7 (Ex. G at 18:20-24, 24:1-10).  Ethan has been able to see his cardiology specialists whenever he needs to, with no particular delay.  <u>Id.</u> ¶ 6 (Ex. G. at 33:3-8).  None of Ethan's doctors have told Lafonda Diamond (D.) that they are not going to continue seeing Ethan and nothing has changed for Ethan as a result of the QExA program.  <u>Id.</u> ¶¶ 8, 10 (Ex. G. at 34:23-25, 27:20-28:4).  Ethan has had no decrease in services provided to him since the QExA program began.  <u>Id.</u> (Ex. G at 31:24-32:11).  Ms. Diamond has also experienced no difficulty in obtaining Ethan's prescription medications.  <u>Id.</u> ¶ 17 (Ex. G. at 32:1-13).

       Ms. Diamond submitted a declaration in support of Plaintiffs' ADA Opposition.  Ms. Diamond indicates that WellCare of Arizona assigned Ethan to Waianae Coast Comprehensive Health Center as his primary care physician.  Plaintiffs' Omnibus CSF, Diamond Decl. ¶ 5.  Ms. Diamond further declares that she has told WellCare of Arizona repeatedly that she is not comfortable with WCCHC, but they have refused to give her any other option. <u>Id.</u>  Furthermore, Ms. Diamond expresses concern over whether

55

Ethan will receive care in the future because she is uncertain what WellCare of Arizona will cover.  Id. ¶ 4.

The Court finds that even considering Ms. Diamond's declaration, Ms. Diamond has not raised genuine issues of material fact to show that Ethan has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability." See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  As Evercare argues, members in both QExA and QUEST do not have the right to see a particular doctor and, in any event, Ethan has continued to see the same doctors without delay and has had no problems obtaining services or prescription medications.  Ms. Diamond's speculations about what WellCare of Arizona may cover in the future cannot support a claim for damages under ADA.  Such speculation is no more than the concerns most people have when they do not fully understand their insurance coverage or are worried that their insurance will not cover all potential expenses.  Ms. Diamond has not come forward with evidence that Ethan was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  Ms. Diamond has not shown that Ethan's access to medical services under QExA was not equal to the access he would have received if he were a member of QUEST.  Any injury which Ms. Diamond does allege has no connection to any discrimination based upon Ethan's disability.

56

Rather, Ms. Diamond complains of the routine inconveniences inherent in managed care.  Thus, Ms. Diamond cannot establish a Title II violation and State Defendants and Intervenors are entitled to summary judgment.

G.   <u>A., Parent and Next Friend of C.</u>

Evercare has come forth with evidence that A. has no complaints about WellCare of Arizona, A. has been able to get all the medical care that C. needs as a WellCare of Arizona member, and that nothing has changed for C. as a result of the QExA program.  <u>See</u> Evercare's ADA MSJ at 17-19, Evercare's ADA CSF, Ex. C.  A. testified that C. has not had to wait longer for appointments since he became a WellCare of Arizona member and A. has not had any problems getting C.'s medications filled.  <u>Id.</u>

Thus, the Court finds that A. has not raised genuine issues of material fact to show that C. has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability."  <u>See</u> <u>Lovell</u>, 303 F.3d at 1052; <u>Wisconsin Cmty. Servs.</u>, 465 F.3d at 748; <u>Zamora-Quezada</u>, 34 F. Supp. 2d 433.  A. has not come forward with evidence that C. was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  A. has not shown that C.'s access to medical services under QExA was not equal to the access he would have received if he were a member of QUEST.  Any injury which A. does allege has no connection to any

discrimination based upon C.'s disability.  Rather, A. complains of the routine inconveniences inherent in managed care. Accordingly, A. cannot establish a violation of Title II of the ADA and State Defendants and Intervenors are entitled to summary judgment on this claim.

H.   <u>G., Parent and Next Friend of K.</u>

K. is a WellCare of Arizona member.  Evercare's ADA CSF ¶ 1 (Ex. K at 9:21-10:13).  K. sees Dr. Meyers and Dr. Yim on a regular basis and those providers are being paid by WellCare of Arizona.  <u>Id.</u> (Ex. K at 9:21-10:13).  G.'s primary complaint with QExA is that she runs out of K.'s liquid anti-seizure medicine too soon, and then has trouble refiling it.  <u>Id.</u> ¶ 19 (Ex. K at 12:21-13:17).  However, when presented with the prescription claims history from WellCare of Arizona, she confirmed that K.'s prescriptions had generally been filled without incident under QExA; she had come in to refill too soon only twice.  <u>Id.</u> (Ex. K at 13:23-16:6).  G. testified that the problem of refilling too soon had been ongoing as long as K. had been taking the liquid medicine.  <u>Id.</u> (Ex. K at 17:14-18:6).  As of March 2010, the prescription is now being written for 100 milliliters, which is 10 milliliters more than is required to comply with the 90 milliliters per month dosing instructions, so that G. does not have to worry about running out of medication.  <u>Id.</u> (Ex. K at 18:7-20:4).

G. also testified to complaints regarding obtaining appointments with K.'s doctors.  However, G. testified that she does not have any difficulty getting an appointment with Dr. Meyers.  Id. ¶ 20 (Ex. K at 20:5-8).  G. did testify that it can take a while to get an appointment with Dr. Yim, but that was not a new problem with QExA; appointments with Dr. Yim had been scarce prior to the QExA program as well.  Id. ¶¶ 7, 20 (Ex. K at 20:12-22:2).  K. saw both Dr. Meyers and Dr. Yim prior to the QExA program and has continued to see them without any interruption in services.  Id. ¶ 3, 7-8 (Ex. K at 34:22-26:2, 35:4-10).  G has not had to pay for any covered services for K. under the QExA program.  Id. ¶ 16 (Ex. K at 38:9-11).  G. has experienced no new delays in receiving covered services under the QExA program compared to prior to the program.  Id. ¶ 20 (Ex. K. at 38:15-20).

Based on G.'s deposition, the Court finds that G. has not raised genuine issues of material fact to show K. has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability."  See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  G. has not come forward with evidence that K. was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  G. has not shown that R.'s access to medical services under QExA was

not equal to the access he would have received if he were a member of QUEST.  Any injury which G. does allege has no connection to any discrimination based upon R.'s disability. Rather, G. complains of the routine inconveniences inherent in managed care.  Thus, G. cannot establish a violation of Title II of the ADA and State Defendants and Intervenors are entitled to summary judgment on this claim.

 I. <u>H., Parent and next Friend of K.[H.]</u>

  Kelii Haole is a WellCare of Arizona member. Evercare's ADA CSF ¶ 1 (Ex. M at 10:14-25).  Kelii also receives health care benefits through his father's HMSA plan, the DD/MR program, and the Child and Adolescent Mental Health Division ("CAMHD") of the Department of Health for the State of Hawai'i. <u>Id.</u> ¶ 21 (Ex. M at 11:5-22).  Melodee Haole (H.) testified that she knows Kelii's insurance through HMSA is primary, but expected case coordination services through QExA.  <u>Id.</u> ¶ 21 (Ex. M at 13:23-14:3).  Ms. Haole testified that Kelii has a case manager through the DD/MR but that the DD/MR case manager has deferred to the QExA case manager for care coordination services.  <u>Id.</u> (Ex. M at 14:15-17).

  Evercare has come forth with evidence indicating that this is not the proper procedure.  <u>Id.</u> (Ex. T).  If a QExA member is also eligible for services under the DD/MR program, then the DD/MR case manager is primarily responsible for coordinating the

member's care.[26/]  Id.  Ms. Haole testified that "a lot of [Kelii's doctors] are not taking [WellCare of Arizona]."  Id. ¶ 24 (Ex. M at 27:8-11).  However, further testimony revealed that only Ms. Haole is making co-payments to only two of Kelii's treating physicians who do not participate with WellCare of Arizona; both of whom are relatively recent additions to Kelii's treatment team.

Ms. Haole also testified that she has not called WellCare of Arizona to see if she can obtain prior authorization for Kelii to see the non-participating specialists so that she does not have to make a co-payment.  Id. ¶ 24 (Ex. M at 39:23-40:24).  Ms. Haole also testified that she refused to change her doctors because Kelii had been seeing them for so long (although as noted earlier, Kelii had not been seeing the two non-participating providers prior to the QExA program).  Id. ¶ 24 (Ex. M. at 27:14-15).

Kelii is receiving the same level of services under the

_____

[26/] Plaintiffs argue that "instead of coordinating, [WellCare of Arizona] tells physicians, '[WellCare of Arizona] does not deal or arrange any kind of care management."  Plaintiffs' Opposition at 17 (citing to Plaintiffs' Omnibus CSF ¶ 23). Evercare asserts that that document has been taken out of context and does not pertain to any of the ABD Plaintiffs in this lawsuit.  Reply at 6, n.8.  The Court is not fully persuaded by that argument; but, in any event, since care coordination is not a benefit under QUEST, it is not relevant to an examination of the ADA and Rehabilitation Act equal access claims.  The Court further observes that, as Evercare argues, the case notes show that a number of patients were receiving care coordination services.

QExA plan that he was under Medicaid FFS.  Id. ¶¶  6, 10 (Ex. M at 28:1-8).  Ms. Haole has experienced no delays in receiving covered services for Kelii under the QExA program.  Dr. Meyers was Kelii's PCP prior to QExA, she has continued to act as Kelii's PCP, and Ms. Haole refuses to switch Kelii to another PCP.  Id. ¶¶ 2-3 (Ex. M at 30:9-20, 34:5, 47:9-18).

Ms. Haole submitted a declaration in support of Plaintiffs' ADA Opposition.  Ms. Haole's declaration does not raise any genuine issues of material fact.  The Court will disregard the portions that contradict her deposition testimony (e.g. Dr. Meyers is Kelii's pediatrician, not his PCP (¶ 6)).  In addition, Ms. Haole also appears to reiterate the complaints with WellCare of Arizona that she set forth in her deposition, i.e., that she is confused as to what services WellCare of Arizona is supposed to provide and that she believes they should be providing care coordination services.  Plaintiffs' Omnibus CSF, Haole Decl. ¶¶ 6, 10.

In light of the foregoing, the Court finds that Ms. Haole has not raised genuine issues of material fact to show Kelii has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability."  See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  As Evercare argues, the alleged lack of care coordination services cannot form the basis for the

ABD Plaintiffs' ADA claims as there is no evidence that a comparable benefit is offered in QUEST.  This Court explained in its 12/24/09 Order, the issue is whether ABD plaintiffs were receiving less access to benefits than they would under QUEST. Thus, Evercare requests that the Court take judicial notice of the website for the Department of Human Services, Med-QUEST division.  See Reply at 7 n.9 (citing to http://www.med-quest.us/ eligibility/EligPrograms_QUEST.html#QUESTCoveredServ and http://www.qexa.org/qa.htm#8).  Pursuant to Fed. R. Evid. 201, a court may take judicial notice of facts that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b). The Court finds that the State's Med-QUEST website, is such a source.  Accordingly, the Court finds that the lack of a benefit that is not available under QUEST cannot form the basis for an ADA discrimination claim.

Additionally, Ms. Haole's refusal to switch doctors cannot form the basis of an ADA claim, especially for doctors that her son only began seeing after the QExA program was implemented.

Thus, the Court finds that Ms. Haole has not come forward with evidence that Kelii was injured or that his alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST.  Ms. Haole has not shown

63

that Kelii's access to medical services under QExA was not equal
to the access he would have received if he were a member of
QUEST.  Any injury which Ms. Haole does allege has no connection
to any discrimination based upon Kelii's disability.  Rather, Ms.
Haole complains of the routine inconveniences inherent in managed
care and the complications of managing multiple benefit sources.
Accordingly, Ms. Haole has failed to establish a violation of
Title II of the ADA and State Defendants and Intervenors are
entitled to summary judgment on this claim.

  J. <u>T.I., a Disabled Adult, for Herself</u>

   Tinamarie Iglesias is a WellCare of Arizona member.
Evercare's ADA CSF ¶ 1 (Ex. O-1 at 67:1-4).  Ms. Iglesias has
been able to continue to see the doctors that she saw prior to
the QExA program and has not had any difficulty getting an
appointment with them.  <u>Id.</u> ¶ 26.

   Ms. Iglesias identified a number of benefit issues in
her deposition: (1) transportation service; (2) disability
status; (3) medication; (4) wheelchair repair or replacement; (5)
dental care; (6) paid caregiver; and (7) durable medical
equipment.  <u>See</u> Evercare's ADA MSJ at 29.  The Court finds that
none of these issues demonstrates that Ms. Iglesias has been
denied meaningful access to medicaid benefits on the basis of
disability.  Ms. Iglesias is either complaining of benefits which
are not covered under QExA (<u>e.g.</u> dental care and personal

services)[27/] but which she has not established are available under QUEST or about issues which only involve typical problems inherent in a managed care system, such as filling out paperwork correctly and obtaining the necessary prior approvals.  See Evercare's ADA Motion at 30-38.

        Ms. Iglesias also submitted a declaration in support of Plaintiffs' Opposition.  Ms. Iglesias's declaration only confirms that she is having trouble understanding and accepting the managed care environment.  See e.g., Plaintiffs' Omnibus CSF, Iglesias Decl. ¶ 1(b) ("My doctor is not to blame for me being denied transportation services because, even if my doctor did not submit a form [WellCare of Arizona] required, it was well known [that she needed transportation services] no forms were necessary to prove those facts as they were already known.").

        In light of the foregoing, the Court finds that Ms. Iglesias has not raised genuine issues of material fact to show that she has been harmed by a denial of meaningful access to medicaid benefits "by reason of disability."  See Lovell, 303 F.3d at 1052; Wisconsin Cmty. Servs., 465 F.3d at 748; Zamora-Quezada, 34 F. Supp. 2d 433.  Ms. Iglesias has not come forward

_____

        [27/] Emergency dental care is a covered benefit; and while Ms. Iglesias appears to assert that her dental needs qualify as emergency dental care, she does not appear to have tried to contact the company which provides dental coverage for QExA.  See Evercare's ADA MSJ at 32-33 (citing Evercare's ADA CSF Ex. Q, Section 30.730, Ex. O-3 at 170:18-171:4, Bazin Decl. ¶ 6, and Ex. R).

with evidence that she was injured or that her alleged injuries had anything to do with being enrolled in managed care QExA rather than managed care QUEST. T.I. has not shown that her access to medical services under QExA was not equal to the access she would have received if she were a member of QUEST. Any injury which Ms. Iglesias does allege has no connection to any discrimination based upon her disability. Rather, she complains of the routine inconveniences inherent in managed care or complaints about benefits that she is not entitled to under QExA and would not be entitled to under QUEST.

K.   Summary Regarding the ABD Plaintiffs' ADA Equal Access Claims

As discussed earlier, Title II of the ADA declares that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In order to establish a violation of Title II of the ADA, a plaintiff must show that:

> (1) he is an individual with a disability; (2) he is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities; (3) he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (4) such exclusion, denial of benefits, or discrimination was by reason of his disability.

O'Guinn v. Lovelock Corr. Ctr., 502 F.3d 1056, 1060 (9th Cir.

66

2007) (quoting McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004)).  The Court finds the ABD Plaintiffs have failed to meet their burden here.  In the context of government-provided health care programs, Title II does not guarantee to disabled individuals any specific quantity or type of medical services. Alexander v. Choate, 469 U.S. 287, 302-03 (1985) (the State did not violate Section 504 by limiting inpatient stays to fourteen days when such limitation was applied to the disabled and non-disabled equally).  Here, the ABD Plaintiffs have not shown that they have been injured by a denial of meaningful access to any Medicaid benefits "by reason of disability."  Lovell, 303 F.3d at 1052.  The ABD Plaintiffs have come forward with no evidence that their alleged injuries had anything to do with being enrolled in managed care QExA plans as opposed to managed care QUEST plans.

There is no evidence that Plaintiffs have been deprived of equal access to any benefits or that they have suffered any harm uniquely because of the QExA program.  The vast majority of ABD Plaintiffs admitted that they had experienced no difficulty at all in accessing covered care, or that any initial difficulty in obtaining authorization of services had been resolved.  See Evercare's ADA CSF ¶¶ 5-9, 12-14, 16-17, 25-26, 28.  Furthermore, for the most part, the ABD Plaintiffs have been able to see the same health care providers that they saw prior to the implementation of QExA.  The only complaints that the ABD

Plaintiffs have do not rise to the level of actionable ADA claims because they are features inherent in managed care, which Plaintiffs would likely encounter in QUEST as well.  The Plaintiffs do not have an absolute right to see a particular provider and their refusal to switch physicians cannot form the basis of an ADA claim.  None of these complaints raised by the ABD Plaintiffs demonstrate that they have been denied meaningful access to a benefit on account of their disability nor have they shown their access to medical services under the QExA plan is not equal to that which non-disabled members have under the QUEST plan or that which ABD Plaintiffs would have if they were members of the QUEST plan.  Accordingly, the Court grants Defendants summary judgment on the ABD Plaintiffs' equal access ADA and Rehabilitation Act claims.

## CONCLUSION

For the foregoing reasons the Court (1) DENIES Evercare's partial motion for summary judgment as to Plaintiff L.P.'s integration claim and the joinders therein, and (2) GRANTS Evercare's partial motion for summary judgment as to Plaintiffs' equal access ADA and Rehabilitation Act claims and the joinders therein.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, September 3, 2010.



_____
Alan C. Kay
Sr. United States District Judge

G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK: Order (1) Denying Evercare's Motion for Partial Summary Judgment as to Plaintiff L.P.'s Integration Claim and the Joinders Therein, and (2) Granting Evercare's Motion for Partial Summary Judgment As to Plaintiffs' Equal Access Claims Under the ADA and Rehabilitation Act and the Joinders therein.