IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| G., PARENT AND NEXT FRIEND OF K., A DISABLED CHILD, ET AL., ) | Civ. No. 08-00551 ACK-BMK |
| ) | Civ. No. 09-00044 ACK-BMK |
| ) | (Consolidated) |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| STATE OF HAWAII, DEPARTMENT OF ) HUMAN SERVICES, ET AL., ) | |
| ) | |
| Defendants. ) | |
| ───────────────────────────) | |
| ) | |
| G., PARENT AND NEXT FRIEND OF ) K., A DISABLED CHILD, ET AL., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES DEPARTMENT OF ) HEALTH AND HUMAN SERVICES, ET ) AL., ) | |
| ) | |
| Defendants. ) | |
| ───────────────────────────) | |

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND DECISION

SYNOPSIS

This litigation involves a dispute over the method by which the State of Hawaiʻi is currently providing Medicaid services to aged, blind, and disabled beneficiaries ("ABD beneficiaries").  Traditionally, states provided Medicaid benefits on a fee-for-service basis ("Medicaid FFS").  In a Medicaid FFS program, the state contracts directly with and pays

healthcare providers, such as physicians, hospitals, and clinics, for services they provide to Medicaid beneficiaries.  By contrast, under a managed care model, the state contracts with managed care organizations ("MCOs"), which assume the responsibility of providing Medicaid benefits through their own employees or by contracting with independent providers of such services.

In 1994, Hawai'i began providing Medicaid benefits to most beneficiaries in a managed care program, the QUEST program. However, ABD beneficiaries continued to receive benefits under a traditional Medicaid FFS program.  Hawai'i recently transitioned the ABD beneficiaries to a managed care program as well, the QUEST Expanded Access ("QExA") program.  As of February, 1, 2009, all ABD beneficiaries have had to enroll with one of two managed care plans as a condition of receiving Medicaid benefits.

Plaintiffs generally complain that under the QExA program they have either been delayed or denied covered benefits and care or that they have been unjustifiably burdened in order to access care, which has subjected them to increased harm.[1] State Second Amended Complaint ¶ 83.

---

[1] Plaintiffs are comprised of two groups, eight ABD beneficiaries and eight providers who provide services to ABD beneficiaries (the "Provider Plaintiffs").  Provider Plaintiffs generally assert that they have been "harmed in their property" but, at this point, do not have any separate cause of action. Provider Plaintiffs' standing to bring the claim that remained for trial is discussed infra.

Plaintiffs' State Second Amended Complaint asserted nine counts.  As a result of the Court's rulings on numerous motions, only portions of the following counts remain: Count I (Deprivation of Rights under Federal Law; 42 U.S.C. § 1983); Count II (Violations of Preemptive Federal law by Virtue of the Supremacy Clause of the U.S. Constitution); Count III (Further Specific Violations of Preemptive Federal Law and Regulations); and Count V (Insufficient Range of Services and Provider Networks).  Each of these remaining counts is based on one issue, which is whether the managed care organizations providing the Medicaid benefits under the QExA program are in compliance with 42 U.S.C. § 1396b(m)(1)(A)(i).  Specifically, subdivision (i) provides that, in order to qualify as an MCO, an organization must:

> make[] services it provides to individuals
> eligible for benefits under this title
> accessible to such individuals, within the
> area served by the organization, to the same
> extent as such services are made accessible
> to individuals (eligible for medical
> assistance under the State plan) not enrolled
> with the organization.

42 U.S.C. 1396b(m)(1)(A)(i).  Accordingly, the Court was presented with the issue whether the QExA program provides ABD beneficiaries services to the same extent such services are made accessible to beneficiaries under the QUEST program.  An eleven day non-jury trial was held on this issue and whether the Plaintiffs are entitled to injunctive relief.  As discussed

3

below, the Court finds that the managed care organizations
providing Medicaid benefits under the QExA program do provide
accessibility to such services to the same extent as does the
QUEST program and thus, they are in compliance with 42 U.S.C.
§1396b(m)(1)(A)(i).  In sum, the Court finds against Plaintiffs
on all remaining counts and finds that Plaintiffs are not
entitled to injunctive relief.

**PROCEDURAL BACKGROUND**

On December 8, 2008, in Civil No. 08-00551 ACK-BMK,
Plaintiffs filed a complaint against Defendants the State of
Hawaii, Department of Human Services ("DHS"), and Lillian B.
Koller, in her official capacity as the Director of the State DHS
(collectively, "State Defendants" or "State").  At that point,
the Plaintiffs were comprised of aged, blind, and disabled
("ABD") Medicaid beneficiaries ("ABD Plaintiffs").  Their
principal allegation is that the State Defendants have violated
certain provisions of Title XIX of the Social Security Act,
commonly known as the Medicaid Act, 42 U.S.C. § 1396 et seq., by
requiring ABD beneficiaries to enroll with one of two healthcare
entities as a condition of receiving Medicaid benefits in
connection with the agency's managed care program for ABD
beneficiaries, the QExA Program.  Those two entities were the
only ones awarded contracts to provide the care for ABD
beneficiaries under the QExA Program ("QExA Contracts").  They

4

are WellCare Health Insurance of Arizona, Inc. d/b/a Ohana Health Plan ("Ohana") and United Healthcare Insurance Company d/b/a Evercare ("Evercare") (collectively, "QExA Contractors" or "Intervenors").  Both Ohana and Evercare have intervened in this matter.

On January 30, 2009, in Civil No. 09-00044 ACK-BMK, Plaintiffs filed a complaint against the United States Department of Health and Human Services ("Federal DHHS") and the Secretary of the Federal DHHS ("Secretary") (collectively, "Federal Defendants").  These two cases were consolidated on February 19, 2009.

This is the third case brought in this Court challenging the QExA Program.  See AlohaCare v. Hawaii, Dep't of Human Servs., 567 F. Supp. 2d 1238 (D. Haw. 2008), aff'd, 572 F.3d 740 (9th Cir. 2009) (upholding the district court's decision that a disappointed bidder for a QExA Contract did not have statutory standing to enforce certain provisions of the Medicaid Act) and Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114 (D. Haw. 2008), aff'd No. 08-17343, 2010 U.S. App. LEXIS 3471 (9th Cir. Feb. 19, 2010) (dismissing a health advocacy organization's complaint because, among other things, the organization did not have statutory standing to enforce certain provisions of the Medicaid Act).

On May 11, 2009, the Court entered an order granting in

part and denying in part a motion to dismiss filed by the State Defendants and joinders therein.  See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2009 U.S. Dist. LEXIS 39851 (D. Haw. May 11, 2009) ("5/11/09 Order").  The Court thereafter granted Plaintiffs leave to amend their complaints in certain respects.  See Order Granting in Part, and Denying in Part Plaintiffs' Leave to Amend Their Complaints, Doc. No. 138 (July 14, 2009) ("7/14/09 Order").  They then filed a first amended complaint against the State Defendants and a second amended complaint against the Federal Defendants.

On August 10, 2009, Plaintiffs filed a motion for a temporary restraining order and a preliminary injunction against the State Defendants.  The Court denied Plaintiffs' motions for temporary restraining orders.  Plaintiffs subsequently withdrew their motions for preliminary injunctions.

With leave of Court, on August 31, 2009, Plaintiffs filed a second amended complaint against the State Defendants ("State Second Amended Complaint") and, on September 1, 2009, they filed a third amended complaint against the Federal Defendants.  Those complaints added claims on behalf of certain Medicaid healthcare providers ("Provider Plaintiffs") and new ABD beneficiaries.  The Provider Plaintiffs are physicians, pharmacists, and ancillary care providers who accepted ABD beneficiaries as patients and clients under the fee-for-service

program, which preceded the QExA Program, and who have provided care and services to ABD beneficiaries under the QExA Program. State Second Amended Complaint ¶ 10.

The State Second Amended Complaint asserts the following nine counts:  (I) deprivation of rights under federal law and 42 U.S.C. § 1983; (II) violations of preemptive federal law by virtue of the Supremacy Clause; (III) further specific violations of preemptive federal law and regulations; (IV) insufficient assurances of solvency and evidence of poor performance in other states; (V) insufficient range of services and provider networks; (VI) violation of the Americans with Disabilities Act ("ADA"); (VII) violation of the Rehabilitation Act of 1973; (VIII) violation of 42 U.S.C. § 1396a(a)(30)(A) and 42 C.F.R. § 447.204; and (IX) unlawful taking.

On September 8, 2009, the Federal Defendants filed the administrative record ("AR"), which is roughly 5,200 pages in length.  At Plaintiffs' request, the administrative record includes documents from 2004 onwards.  7/18/09 Transcript of Proceedings 28:3-22.  Plaintiffs did not request any documents that were created prior to 2004.  Id.

In October and November of 2009, three motions for summary judgment were filed in the action against the State Defendants and three motions for summary judgment were filed in the action against the Federal Defendants.  With respect to the

motions in the action against the Federal Defendants, the Court granted summary judgment in favor of the Federal Defendants on December 23, 2009 as to all claims asserted in the third amended complaint against them.   See G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1006, 2009 U.S. Dist. LEXIS 119670 (D. Haw. Dec. 23, 2009) ("12/23/09 Order").

As for the motions for summary judgment in the action against the State Defendants, the Court granted summary judgment in favor of the State Defendants on December 24, 2009 as to:  (1) Counts VI (ADA) and VII (Rehabilitation Act) insofar as those counts assert integration claims on behalf of all ABD Plaintiffs, except for ABD Plaintiff L.P.; (2) Count VIII (42 U.S.C. § 1396a(a)(30)(A)); (3) Count IX (taking); and (4) Plaintiffs' claim that the QExA Contractors fail to meet the second solvency standard set forth in 42 U.S.C. § 1396b(m)(1)(A).  However, the Court denied the State Defendants' motion for summary judgment as to Counts VI (ADA) and VII (Rehabilitation Act) insofar as those counts assert equal access claims (in relation to QUEST) on behalf of the ABD Plaintiffs and an integration claim on behalf of ABD Plaintiff L.P.  G. v. Hawaii, Dep't of Human Servs., Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 676 F. Supp. 2d 1046, 2009 U.S. Dist. LEXIS 120529 (D. Haw. Dec. 24, 2009) ("12/24/09 Order").  In addition, the Court denied Plaintiffs' motion for

8

summary judgment as to whether the QExA Contractors meet the
first and third solvency requirements for MCOs prescribed by 42
U.S.C. § 1396b(m)(1)(A).  Id.

On November 20, 2009, Evercare filed a motion for
partial summary judgment regarding Plaintiffs' claims that assert
the State Defendants violated the requirements of the Medicaid
statute relating to provider networks and access to services by
requiring enrollment in the QExA plans offered by Evercare and
Ohana as a condition of receiving Medicaid benefits.  These
claims are asserted in Counts I, II, III, and V of the State
Second Amended Complaint.

On March 19, 2010, the Court ruled on Evercare's
November 20, 2009, motion for summary judgment.  G. v. Hawaii,
Dep't of Human Servs., 703 F. Supp. 2d 1078, Civ. Nos. 08-00551
ACK-BMK & 09-00044 ACK-BMK, 2010 Westlaw 1009990 (D. Haw. Mar.
19, 2010) (as amended June 14, 2010) (the "Provider Networks
Order" or "6/14/10 Order").  In that order, the Court (1) granted
Evercare's motion for summary judgment, and the joinders therein,
with respect to Plaintiffs' claim that the QExA Contractors'
provider networks are inadequate in contravention of 42 U.S.C. §
1396u-2(b)(5) and its corresponding regulations; (2) granted
Evercare's motion for summary judgment, and the joinders therein,
with regard to Plaintiffs' claim that the State Defendants'
decision to restrict the number of MCOs to two substantially

impaired access to services, in contravention of 42 U.S.C. § 1396u-2(a)(1)(A)(ii); and (3) denied Evercare's motion for summary judgment, and the joinders therein, with respect to Plaintiffs' claim under 42 U.S.C. § 1396b(m)(1)(A)(i) that the Intervenors fail to make services accessible to QExA beneficiaries to the same extent as services are made accessible to QUEST beneficiaries under the QUEST program.

In the 6/14/10 Order, the Court explained:

> As a result of this order, the following issues remain to be resolved at trial: (1) the claim set forth in Counts I, II, III, and V that the QExA Contractors do not make services accessible to QExA beneficiaries to the same extent that services are made accessible to QUEST beneficiaries under the QUEST program, as required by 42 U.S.C. § 1396b(m)(1)(A)(i) [the Medicaid equal access injunctive claim]; (2) the claim set forth in Counts I through IV that the QExA Contractors failed to meet the first and third solvency standards set forth in 42 U.S.C. § 1396b(m)(1)(A)(ii); (3) the claim by L.P. set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that the State Defendants have violated the integration mandate; and (4) the claim by the ABD Plaintiffs set forth in Count VI (ADA) and Count VII (Rehabilitation Act) that they have less access to Medicaid benefits through the QExA Program than non-disabled beneficiaries enrolled in the QUEST Program.

6/14/10 Order at *74-*76 (footnote omitted).

On June 21, 2010, Evercare filed a Motion to Amend the Rule 16 Scheduling Order requesting an extension of the dispositive motion deadline to June 29, 2010, in order to potentially limit the issues for trial. On June 25, 2010, Magistrate Judge Kurren granted Evercare's Motion to Amend the

Rule 16 Scheduling Order and extended the dispositive motion deadline to June 29, 2010.

Subsequently, an additional three motions for summary judgment were filed.  On June 28, 2010, Evercare filed a Motion for Partial Summary Judgment Re ADA and Rehabilitation Act Claims, as well as a memorandum in support of that motion ("Evercare's ADA MSJ").  On June 29, 2010, Evercare filed a Motion for Partial Summary Judgment Re Plaintiff L.P.'s ADA and Rehabilitation Act Claims and a memorandum in support of that motion ("Evercare's L.P. MSJ.")  Doc. No. 634.  Also on June 29, 2010, Ohana filed a motion for summary judgment on the remaining solvency issues.

On September 3, 2010, the Court ruled on those three motions for summary judgement in two orders.  See Order (1) Denying Evercare's Motion for Partial Summary Judgment as to Plaintiff L.P.'s Integration Claim and the Joinders Therein, and (2) Granting Evercare's Motion for Partial Summary Judgment As to Plaintiffs' Equal Access Claims Under the ADA and Rehabilitation Act and the Joinders therein, G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044 ACK-BMK, 2010 WL 3489632 (D. Haw. Sept. 3, 2010) ("9/3/10 ADA Order"); and Order Granting WellCare of Arizona's [Ohana's] Motion for Summary Judgment, and the Joinders Therein, on the Remaining Solvency Issues, G. v. Hawaii, Dep't of Human Servs., Civ. Nos. 08-00551

11

ACK-BMK & 09-00044 ACK-BMK, 2010 WL 3489629 (D. Haw. Sept. 3, 2010) ("9/3/10 Solvency Order").

On October 18, 2010, the Court approved the parties' Stipulation to Dismiss Plaintiff L.P., a disabled adult, for himself. Doc. No. 803.

In light of the foregoing rulings by the Court and the parties' stipulation to dismiss Plaintiff L.P., only one of Plaintiffs' claims remained for trial — the claim set forth in Counts I, II, III, and V that the QExA Contractors do not make services accessible to QExA beneficiaries to the same extent that services are made accessible to QUEST beneficiaries under the QUEST program, as required by 42 U.S.C. § 1396b(m)(1)(A)(i) ("the Medicaid equal access injunctive claim").[2]

An eleven-day bench trial was commenced on November 9, 2010, and completed on December 13, 2010.[3]  Having heard and

---

[2] At this point, the Provider Plaintiffs do not have any separate causes of action, and their standing to assert this claim is discussed in the Conclusions of Law.

[3] After Plaintiffs rested their case on the eighth day of trial (December 6, 2010), the State Defendants made an oral motion pursuant to Fed. R. Civ. P. 52(c), which states in relevant part that:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.

(continued...)

weighed all the evidence and testimony adduced at the trial, having observed the demeanor of the witnesses and evaluated their credibility and candor, having heard the arguments of counsel and considered the memoranda submitted, and pursuant to Fed. R. Civ. P. 52(a)(1), this Court makes the following findings of fact and conclusions of law.  Where appropriate, findings of fact shall operate as conclusions of law, and conclusions of law shall operate as findings of fact.

## FINDINGS OF FACT

### I.   The Parties

1.   The ABD Plaintiffs who remain Plaintiffs are: Plaintiffs K. (suing through parent and next friend G.), E. (suing through parent and next friend D.), I. (suing through parent and next friend M.), R. (suing through parent and guardian V.), E.S. (suing through parent and next friend T.), C. (suing through parent and next friend A.), T.I., and K. (suing through parent and guardian H.) are individuals who receive QExA benefits from the DHS and have enrolled with either Evercare or Ohana.

2.   The Provider Plaintiffs who remain Plaintiffs are: Plaintiffs Kevin McGill, Malcolm Ing, M.D., Arlene Meyers, M.D.,

---

[3/](...continued)
Fed. R. Civ. P. 52(c).  The Court heard argument on the motion on the ninth and tenth days of trial (December 7-8, 2010) and then took the motion under advisement.  In view of the decision herein, the State Defendants' Fed. R. Civ. P. 52(c) motion is moot.

Jon Graham, M.D., Thomas Jones, R.Ph., Kevin Glick, R.Ph., Les Krenk, R.Ph., and Joseph Zobian, M.D. are physicians, pharmacists, and ancillary health care providers who have provided services to QExA beneficiaries.

3.   A number of former Plaintiffs in this matter have been dismissed by stipulation and order. <u>See</u> Doc. Nos. 861 (dismissing Dennis Ayon, M.D.); 838 (dismissing Nelson Agcaoili); 837 (dismissing Anita Agcaoili); 803 (dismissing L.P.); 739 (dismissing J., parent and next friend of R.J.), 706 (dismissing C., parent and next friend of M.), and 264 (dismissing A., S., C.J., and H.T).

4.   Defendant DHS is the state agency responsible for designing and administering Hawaii's Medicaid program.

5.   Defendant Lillian Koller was at relevant times the Director of DHS and is sued solely in her official capacity.

6.   Intervenors Evercare and Ohana are insurance companies licensed to offer health insurance in Hawai'i who arrange for the provision of health care services to QExA beneficiaries under separate contracts with DHS.  Exs. 321-327 (Evercare); Exs. 343-350 (Ohana).

## II.   <u>Hawaii's Medicaid Program Generally</u>

7.   The Medicaid Act, 42 U.S.C. § 1396 <u>et seq.</u> "provides federal funding to 'enabl[e] each State, as far as practicable … to furnish … medical assistance on behalf of

families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." AlohaCare v. Hawaii, Dep't of Human Servs., 572 F.3d 740, 742 (9th Cir. 2009).

8.   The Medicaid program is "a jointly financed federal-state program that is administered by the States in accordance with federal guidelines." Id.

9.   The Medicaid Act "imposes detailed requirements on States that wish to delegate the provision of health care services through contracts with managed care organizations ('MCOs'), [42 U.S.C.] § 1396u-2." AlohaCare, 572 F.3d at 742-43.

10.   Furthermore, under 42 U.S.C. § 1315, the Centers for Medicare and Medicaid Services ("CMS") may waive compliance with certain Medicaid requirements for "experimental, pilot, or demonstration project[s].'" Id. at 743 (quoting 42 U.S.C. § 1315(a)) (brackets in original).

11.   Pursuant to the waiver program, in July 1993 CMS granted the State of Hawai'i a waiver of various provisions of the Medicaid Act for the QUEST program.

12.   QUEST was a demonstration project to replace Hawaii's fee-for-service Medicaid program for beneficiaries who were not aged, blind or disabled with a managed care delivery system for covered Medicaid services.

13.   Because QUEST categorically excluded the ABD

population, this population continued to receive Medicaid benefits on a fee-for-service basis.

14.   The QUEST program continues to this day for non-ABD Medicaid beneficiaries.  VI:119:10-12[4/] (Bazin).[5/]

15.   Starting in 1997, DHS submitted various waiver applications to CMS so that it could transition the ABD population (or portions thereof) into managed care.

16.   On February 21, 2007, DHS submitted its fourth request for a waiver, seeking approval to implement the QExA program in close to its present form.

17.   On October 10, 2007, DHS issued a request for proposals ("RFP") to contract on a capitated basis with managed care organizations that would be responsible for providing all of the Medicaid covered services for ABD beneficiaries under the QExA program, other than a few "carve-outs" for certain services provided under the State's program for assistance to the

---

[4/]   Citations to the testimony at trial are reference herein by Trial Day:Page:Line.  "VIII:92:2-25" refers to Day 8:Page 92:Lines 2-25.  References to the sealed transcript for a trial day are indicated with an "(S)" following the reference to the trial day.  Two sealed transcripts were prepared for Day 4, November 30, 2010; the second sealed transcript is referenced as "(S2)."

[5/]   Patricia Bazin, the Healthcare Services Branch Administrator for the Med-QUEST Division of the DHS, testified as a witness for both the Plaintiffs and the Defendants and Intervenors.  Ms. Bazin was qualified as an expert witness on the subject of how the QUEST and QExA programs are administered by the State of Hawai'i.  VI:112:13 - 115:17 (Bazin).

developmentally disabled and mentally retarded ("DD/MR") and other Department of Health and Department of Education services. Ex. 200, §§ 10.100, 30.320.3.

18.   The RFP required that the MCOs "develop and maintain a provider network that is sufficient to ensure that all medically necessary services are accessible and available."  The RFP also: (a) specified the minimum requirements for the provider networks in terms of hospitals, primary care providers, specialists, and ancillary care providers; and (b) imposed maximum wait time requirements for certain categories of services.  Ex. 200, §§ 40.210, 40.220, 40.230, 40.240, 40.260, 51.320.2.

19.   Evercare and Ohana timely submitted their response to the RFP on December 7, 2007.

20.   On that same day, DHS submitted the RFP to CMS for its review.

21.   On February 1, 2008, DHS awarded contracts to Evercare and Ohana.

22.   The RFP is incorporated into the State Defendants' contracts with Evercare and Ohana.  Ex. 321 at 2 ("The Provider shall, in a proper and satisfactory manner as determined by the State, provide the Required Services set forth in Amendment "1" to this Contract, which is hereby made a party of this Contract, and the Request for Proposals ("RFP"), and the Provider's

17

Proposal, which are incorporated in this Contract by reference. In the event that there is a conflict among the terms of this Contract, and either the Proposal or the RFP, or both, then the terms of this Contract shall control."); Ex. 343 at 2 (same); V:42:16 - 43:5 (Koller).

23.  On February 7, 2008, CMS approved DHS' waiver application for the QExA program.

24.  On January 30, 2009, CMS approved the QExA contracts with Evercare and Ohana.

25.  The QExA program started on February 1, 2009 and the State Defendants stopped providing services through the fee-for-service program.  DHS provided a transition period until July 31, 2009, during which time QExA beneficiaries could receive services from healthcare providers even if the providers were not yet contracted with Evercare and/or Ohana.  Ex. 321 (Evercare); Ex. 343 (Ohana).

26.  Since August 1, 2009, QExA members must receive prior-authorization to receive services from a provider who is not contracted with their QExA plan (except for urgent and emergent services, and services covered by Medicare, as described below).  Ex. 200, § 50.700.

27.  "Dual-eligibles" (or "dual-eligible members") are beneficiaries who are eligible for services under both Medicaid and Medicare.  VI:90:2-9, 91:9-19 (Bazin); VIII:92:2-25

(Heywood)[6]; see also 5/11/09 Order at *4 ("'dual eligibles' [are] beneficiaries who are eligible for services under both Medicaid and Medicare programs, 42 U.S.C. § 1396u-2(a)(2)(B); . . . First Med. Health Plan. Inc. v. Vega-Ramos, 479 F.3d 46, 48 (1st Cir. 2007) ('medicare beneficiaries who are indigent are referred to as dual eligible beneficiaries, meaning that they also qualify for Medicaid assistance')").

28.  For dual-eligible members, Medicare is the primary insurance and payor for the dual-eligibles for many services such as hospital, physician and ancillary services.  VI:90:2-9, 91:9-19 (Bazin); VIII:92:2-25 (Heywood).

29.  The QExA RFP defines primary care as "all healthcare services and laboratory services customarily furnished by or through a general practitioner, family practitioner, internal medicine physician, obstetrician/gynecologist, or pediatrician, to the extent the furnishing of those services is legally authorized in the State."  Ex. 200, § 30.200 at 42.  A Primary Care Provider ("PCP") is a "provider" who has responsibility for "supervising, coordinating, and providing initial and primary care to the member and for initiating referrals and maintaining the continuity of member care."  Ex.

---

[6] David W. Heywood is the Executive Director for the Hawai'i Region for Evercare.  VIII:84:20-22 (Heywood).  Mr. Heywood was qualified as an expert in the field of managed care. IX:14:12 - 23:1 (Heywood).

200, § 30.200 at 42-43.

## III. **Hawaii's Medicaid Populations**

### A. The QExA Population

30.   As of the end of September 2010, Evercare had
19,487 members in the QExA program and Ohana had 22,187 members.
Ex. 412 (QExA Dashboard Report).

31.   Evercare's 19,487 members includes 13,027 dual-
eligible members (67% of the population) and 6,480 Medicaid only
members (33% of the member population).   Id.

32.   875 Evercare members are 21 or younger.
VIII:90:14 - 91:9 (Heywood) and Ex. 412 (QExA Dashboard Report).

33.   Ohana's 22,187 members includes 13,342 dual-
eligible members (60% of the member population) and 8,844
Medicaid only members (40% of the member population).   Ex. 412
(QExA Dashboard Report).

34.   For the services that are covered by Medicare and
provided to dual-eligibles, QExA acts as the secondary payor
covering applicable Medicare copayments and coinsurance -
regardless of whether the provider is in the QExA network.   Id.

35.   Despite the requirement that all ABD beneficiaries
enroll in QExA, dual-eligibles are still permitted to see their
providers under the Medicare program even if those providers are
not in their QExA health plan network.   VI:42:5-12 (Dr. Fink);
VIII:92:2-25 (Heywood).

36. Dual-eligibles also have the option of seeking managed care in a Medicare Advantage program.  Not all members are assigned a PCP in United's Medicare Advantage plan in Hawai'i, although they may be assigned a PCP if they would like one.  IX:23:10-19 (Heywood).

37.  Approximately 7,000 of Evercare's 13,027 dual-eligible members are members of United's Medicare Advantage Plan in Hawai'i.  IX:23:20-25 (Heywood).

**B.   The QUEST Population**

38.  QUEST beneficiaries are provided covered health care services through three managed care organizations: Hawaii Medical Service Association ("HMSA" or HMSA QUEST), Kaiser Foundation Health Plan ("Kaiser QUEST"), and AlohaCare QUEST. VI:12:11-17 (Dr. Fink).

39.  HMSA QUEST has a total enrollment of about 114,000 QUEST beneficiaries.  II:113:8-10 (Cravalho (HMSA)).  Of this number, about 63% are 21 or younger.  II:166:16-23 (Cravalho (HMSA)).

40.  AlohaCare QUEST has a total enrollment of about 75,000 - 76,000 QUEST beneficiaries.  III:117:25 - 118:2 (Brennan (AlohaCare)).  Of this number, about 58-59% are 21 or younger. III:118:7 - 119:1 (Brennan (AlohaCare)).

41.  Kaiser QUEST had 24,023 members as of December 2009.  Of that number, 15,201 were 18 years of age or younger.

Ex. 406 (Deposition of Carol Ganiron).

42.   As set forth below, the two QExA plans and the three QUEST plans are all managed care plans and, as such, utilize methods to manage care and control costs that are typical of managed care: such as selective contracting; requirements that certain health services, drugs, or devices be preauthorized; and preferred drug lists (in some cases known as formularies). V:8:8-25 (Koller); Ex. 200, §§ 30.200 (managed care definition), 40.100, 40.750.1(o), 50.700; Exs. 300, 302-310, 312-318.

43.   Medicaid is the primary health insurance for the majority of QUEST members, in contrast to the QExA program where Medicare is the primary health insurance for approximately 66% of members and thus Medicaid is only a secondary payor and provider of additional services not available in Medicare.  VI:111:23 - 112:8 (Bazin).

## IV.   QExA and QUEST Provider Networks

44.   The QExA contracts between Evercare and Ohana respectively and DHS require Evercare and Ohana to contract with health care providers to establish provider networks.  VIII:93:16 - 94:7 (Heywood); Exs. 200, 321, and 343.

45.   The capitation rates paid by the State to Evercare and Ohana under the contract are reviewed annually. V:89:20 - 92:2 (Koller)

46.   Evercare developed its provider network using

information about the health care providers who had previously served the ABD population, the existing network for Evercare's Medicare Advantage plan, and the network of its subcontractor, MDX Hawaii ("MDX").  VIII:96:14 - 97:15 (Heywood); Ex. 201.

47.  In connection with developing its provider network, Evercare analyzed the adequacy of that network using membership demographics, information about the location of members and providers, and data and experience regarding utilization of health care services from other Medicaid managed care plans operated by companies related to Evercare across the nation.  VIII:99:1-15 (Heywood); Ex. 201 at 2.

48.  Similarly, Ohana in developing its provider network undertook analysis to accurately determine requirements to meet time, distance and appointment availability standards and to target providers critical to meeting these standards and providing a comprehensive scope of services to meet the multicultural, gender, and language needs of members.  Ex. 205 at 1-3; X:34:16 - 35:21 (Preitauer).[7]

49.  Providing care through a selective, contracted network of health care providers is typical of managed care plans.  VIII:94:8-10 (Heywood).

---

[7] Erhardt Preitauer is the president of Ohana Health Plan. As such, he has responsibility for oversight of the plan, including network development, provider relations, member services, utilization management, and related clinical programs. X:39:7-16 (Preitauer).

50.   Currently, Evercare has over 4,000 provider locations statewide and 3000 unique providers.   VIII:97:16-19 (Heywood).   Many providers have more than one location, thus increasing geographic access.   VIII:102:21-104:7 (Heywood); Exs. 202, 203, 204.   If a provider has more than one office, for example an office in Waipahu and Honolulu, that is two provider locations, but only one unique provider.   Ohana currently has 4594 provider locations statewide.   Ex. 412; Exs. 206A-206F.

51.   A more specific breakdown of Evercare and Ohana's providers is provided in the comparison table set forth on the next page, which is based on the evidence that was adduced at trial and compares the numbers of various categories of Evercare and Ohana providers with the number of HMSA QUEST, AlohaCare QUEST, and Kaiser QUEST providers in the same categories: (Remainder of page intentionally left blank)

| | QUEST | | | QExA | |
|---|---|---|---|---|---|
| | HMSA[a] | AlohaCare[b] | Kaiser[c] | Evercare | Ohana |
| Primary Care Physicians (PCP) | 735 | 543 | 125 | 734 | 636 |
| Anesthesiol - ogists | category not listed | 142 | 8 | 110 | 179 |
| Cardiologists | 54 | 43 | 6 | 55 | 48 |
| Endocrinol- ogists | 9 | 7 | 1 | 13 | 10 |
| Gastroenter- ologists | 24 | 27 | 6 | 31 | 25 |
| Gerontologist | 6 | 8 | 5 | 21[d] | 32 |
| Hematology & Oncology | 27[e] | 7[f] | 1 | 20[g] | 34 |
| Infectious Diseases | 13 | 10 | 3 | 11 | 11 |
| Nephrologists | 21 | 18 | 6 | 23 | 20 |
| Neurologists | 20[h] | 18 | 4 | 28 | 19 |
| OB-GYN | 119[i] | 96[j] | 31 | 114 | 104 |
| Opthomol- ogists | 80 | 75 | 11 | 92 | 71 |
| Pediatric Neonatal & Perinatal | 16[k] | 14 | 1[l] | 14 | 20 |
| Physical Therapists | 311 | 234 | category not listed | 248 | 197 |
| Radiologists | 9[m] | 77 | 15[n] | 94[o] | 142 |
| Members | 114,000 | 75-76,000 | 24,023 | 19,487 | 22,187 |
| Medicaid Only | n/a | n/a | n/a | 6,460 | 8,844 |

Notes:

a    HMSA QUEST had 114,000 members as of November 10, 2010 (the date of the trial testimony) and 106,519 members as of January 21, 2010 (the date of

      HMSA QUEST's deposition).  See II:113:8-15; II:165-25-166:7

b     AlohaCare QUEST had approximately 75-76,000 members as of November 30, 2010 (the date of the trial testimony) and 72,531 members as of June 10, 2010 (the date of AlohaCare QUEST's deposition).  III:117:14-118:6.

c     The numbers for Kaiser QUEST are as of February 8, 2010, the date of the deposition of the Kaiser QUEST Representative.  Ex. 406 (Deposition of Carol Ganiron).  No number was provider for physical therapists.

d     Evercare also separately lists 2 "Gerontological Nurse Practitioners," which have not been included in the Gerontolgy number listed above for Evercare.  Ex. 414.

e     HMSA QUEST indicated that they have 2 hematologists and 25 oncologists, which the Court has added together to obtained the 27 listed in the chart above.  Ex. 393.

f     AlohaCare QUEST listed 6 in "Hematology and Oncology" and 1 in just hematology, which the Court has added together to obtain the 7 listed in the chart above.  Ex. 400.

g     Evercare listed 17 in "hematology/oncology" and 3 in "Hematology," which the Court has added together to obtain the 20 listed in the chart above.

h     HMSA QUEST also indicated that there are 9 neurosurgeons, which are not included in the 20 neurologists listed in the chart above.  Ex. 393.

i     HMSA QUEST also listed a separate column for ob/gyn nurse practitioners which included 7 specialists, which have not been included in the ob/gyn column for HMSA QUEST.

j     AlohaCare QUEST also lists 6 ob/gyn nurse practitioners in a separate category, which have not been included in the ob/gyn column for AlohaCare QUEST.

k     HMSA QUEST indicated that there are 2 neonatal nurse practitioners and 14 neonatology specialists; only the neonatology number has been included above.  Ex. 393.

l     Kaiser QUEST listed 1 neonatologist.  Ex. 407.

m     HMSA QUEST listed "Radiation Oncology" with 9 specialists, which have been listed although the Court is not clear whether this compares to Radiology as a general matter.  Ex. 393.

n     Kaiser QUEST listed five (5) specialists for "radiology - general" and ten (10) for "Radiology - INV/INTV."  Ex. 407.

o     Evercare also lists 18 in "Radiation Oncology," which have not been included in the total of 94 listed above. Ex. 414.

Ex. 417; Ex. 393 (HMSA QUEST); Ex. 400 (AlohaCare QUEST); Ex. 407

(Kaiser QUEST); Ex. 414 (Evercare); X:41:15 - 52:11 (Preitauer

(Ohana)).

      52.  Based on the foregoing evidence, the ratios of

members to PCP are as follows: HMSA QUEST 155:1, AlohaCare QUEST

140:1, Kaiser QUEST 192:1, Evercare 27:1,  Ohana 35:1.[8]

---

     [8] The Court notes these ratios for Evercare and Ohana both assume all of the dual-eligibles have been assigned or selected a PCP.  However, it was established that dual-eligibles may

(continued...)

53.   Thus, both Evercare and Ohana have a far better member to PCP ratio than the maximum 600:1 ratio specified in the QExA RFP and any of the QUEST plans.  VIII:105:25 - 107:7 (Heywood); Ex. 200, § 40.220.

54.   In comparison, Dr. Arlene Meyers (Dr. Meyers), who is a very dedicated doctor and who appears to be devoted to her patients, is ironically an assigned PCP for a total of 880 patients under both HMSA QUEST and AlohaCare QUEST, far exceeding the 600:1 ratio under the QUEST RFP.  I(S):12:22-13:2 (Dr. Meyers).  Including commercial insurance patients, Dr. Meyers has almost 2000 patients. I(S):14:9-20 (Dr. Meyers).

55.   Both HMSA QUEST and AlohaCare QUEST fail to monitor the total number of patients their PCPs are handling.  II:207:15 - 211:18 (Cravalho (HMSA)); III:106:21 - 110:14 (Brennan (AlohaCare)).

56.   In addition to the provider information recorded in Exhibit 417, more detailed information was provided by each QUEST plan and both QExA plans regarding the composition of their provider networks.  Exs. 393 (HMSA QUEST), 400 (AlohaCare QUEST), 407 (Kaiser QUEST), 414 (Evercare); X:41:15 - 42:13, 46:10 -

---

[8]/(...continued)
continue to see any Medicare providers or they may select a PCP or request that one be assigned to them; and, therefore, while some dual-eligibles have QExA PCPs others do not.  The actual number of dual-eligibles that do have QExA PCPs was not introduced into evidence.

47:11 (Preitauer (Ohana)).

57.   Considering the size of their memberships (even including dual-eligible members) and the fact that the ABD members generally require more care than the QUEST members, the QExA plans compare favorably to the QUEST plans in virtually every category of specialists listed above.

58.   The QExA RFP also contains requirements to ensure that the contracted providers are located within certain maximum travel times to QExA members.   Both Evercare and Ohana submit reports to DHS documenting their compliance with these requirements.   Exs. 204, 206A-206F; VIII:107:8-22, 116:15 - 121:4 (Heywood); X:49:13 - 51:7 (Preitauer); Ex. 200, § 40.240.

59.   Evercare reports its compliance with the RFP's network access standards by submitting to the DHS a quarterly provider network adequacy report which includes, among other information, the number of contracted providers who are accepting new patients and the number of members for whom each PCP is responsible.   VIII:107:23 - 116:14 (Heywood); Exs. 202 and 203.

60.   Ohana also reports its compliance with the RFP's provider network access and adequacy standards to DHS.   Exs. 206A-206F; X:49:13 - 51:7 (Preitauer).

61.   Evercare monitors the wait time before its members are able to obtain an appointment to see a health care provider, and has not identified any problems in that regard.   VIII:101:6-

15 (Heywood).

62. With respect to access to specialists, Ohana also monitors actual access through a review of specialists that are not submitting claims on a holistic level, which is one of many reports that can be run in performing a claims analysis.  Ohana also monitors members' access through Ohana's service coordinators and customer service department.  X:82:19 - 85:24 (Preitauer).

63. Although there is a shortage of certain specialists in specific areas (especially the neighbor islands), such shortages are not unique to QExA.  QUEST MCOs face the same problem.  II:18:20-24 (Dr. Graham); III:141:23 - 142:2 (Brennan (AlohaCare)).

64. If medically necessary care is not available within the QExA contracted network, the member can see a non-participating provider (subject to the prior authorization process described below), even if that provider is located on another island or the mainland.  VII:29:20 - 30:19 (Dr. Ellis); X:47:24 - 48:12, 91:21 - 92:3 (Preitauer).

**V.    Oversight of QExA and QUEST**

65. The Med-QUEST Division receives a significantly greater amount of information from the QExA plans than from the QUEST plans, approximately 40 different reports from the QExA plans compared with 25 reports from the QUEST plans.  VI:87:20-22

29

(Bazin).

66.  Representatives of the state testified that they are now trying to implement the increased monitoring which is in QExA into QUEST, which had become "extremely complacent." V:102:22 – 103:14, 105:18 – 106:9, 108:6 – 110:22 (Koller).

67.  QExA has an ombudsman, which QUEST does not have. V:102:25 – 103:5 (Koller).  The ombudsman is an added layer in QExA who is an advocate for members and who answers questions or obtains answers to questions.  V:112:10 – 113:16 (Koller).

68.  QExA also has the "Dashboard Report," which QUEST does not.  V:109:18 – 110:22 (Koller).  A sample Dashboard Report has been received into evidence as Exhibit 412.

69.  The Dashboard Report contains a great deal of information.  The Dashboard Report contains monthly data on members, providers, claims, complaints, appeals, and utilization. Ex. 412.  The provider information includes a breakdown of PCPs, specialists, and facilities.  Id.

70.  The Dashboard Report also includes information on the number of member and provider calls, the average time until the call is answered, and the average time spent on the call. Id.  In September 2010, Evercare received 3,346 member calls and spent an average of almost seven (7) minutes on the phone with the member; Ohana received 3,148 member calls and spent an average of almost six (6) minutes on the phone with the member.

30

In September 2010, Evercare also received 2,146 calls from providers and spent an average of 6:12 on the phone with providers; Ohana received 3,993 calls and spent an average of 6:07 on the phone with providers.

71.   Information on claims in the Dashboard Report is broken down into two categories based on whether the claims were submitted electronically or on paper and includes the number of claims received, the number paid, the number in process, the number denied and the average processing time in days.  <u>Id.</u>  In September 2010, Evercare processed claims in an average of 21 days; Ohana averaged 10.23 days for electronic claims and 11.33 for paper claims.  <u>Id.</u>

72.   Member and provider complaints are also reported on the Dashboard Report and are broken down into number received, number resolved, and number outstanding.  <u>Id.</u>  Evercare received 86 member complaints and 0 provider complaints in September 2010 and Ohana received 15 member complaints and 5 provider complaints.  <u>Id.</u>

73.   The utilization data reported on the Dashboard Report includes inpatient acute admissions, inpatient acute days, and the number of prescription claims.

74.   The Dashboard Report also includes health plan demographic information by island and a health plan summary of call center calls.  <u>Id.</u>

75.   The QExA program was recognized by the Centers for Healthcare Strategies as a national model in innovative managed care for long term care services.  V:83:5-11 (Koller).

76.   Based on the information available to the State, Ms. Bazin testified that Evercare is outperforming the HMSA and AlohaCare QUEST plans in providing timely access to services. VI:107:4 - 108:3 (Bazin).

77.   Ms. Bazin also testified that she believes the Medicaid beneficiaries being served under the QExA program are receiving the same level of services beneficiaries are provided under QUEST.  VI:206:21-25 (Bazin).  Director Koller testified that they are getting better care through QExA than they were previously receiving in the Medicaid FFS program and that they are receiving better service than QUEST beneficiaries.  V:88:15-17, 101:13 - 102:14. (Koller).

78.   Ms. Bazin of DHS receives complaints about both HMSA QUEST and AlohaCare QUEST.  VI:6:69:23 - 70:21 (Bazin).

79.   Med-QUEST conducts a member provider health plan satisfaction survey through the NCQA CAHPS member survey.  HMSA was advised of the most recent survey's results in either August or September 2010.  HMSA QUEST's representative at trial testified that he was not happy with the survey's results and the levels at which members rated their satisfaction with HMSA QUEST. II:151:7 - 153:11 (Cravalho (HMSA)).

32

## VI.  **Specific Issues Raised By Plaintiffs**

### A. Assignment of PCPs

#### 1.  Generally

80.  All QExA members may select a primary care provider of their choice.  If a QExA member who is not dual-eligible does not select a PCP, a PCP will be assigned to that member.  VII:31:4-16; IX:6:22 - 7:8 (Heywood); X:68:22 - 69:16 (Preitauer).

81.  All HMSA QUEST members have a PCP.  II:18-23 (Cravalho (HMSA)).  A member has ten-days to select a PCP.  If no PCP has been selected within ten days, then HMSA QUEST will automatically assign a member a PCP and a card listing the member's PCP will be sent out within three days of selection of the PCP.  II:124:10 - 129:24 (Cravalho (HMSA)).

82.  HMSA QUEST's representative testified that HMSA QUEST assigns a PCP to all members with multiple insurances, including Medicare.  However, the only situation in which he was aware of an HMSA QUEST member also being eligible for Medicare is a situation in which that person had just gained his or her eligibility for Medicare and the State was working on transitioning him or her to QExA.  He was unaware of any other situations in which an HMSA member might be covered by Medicare.  II:122:11 - 124:9, 156:14 - 157:1 (Cravalho (HMSA)).

83.  Medicare primary dual-eligible QExA members may

33

continue to obtain services from any Medicare participating physician; such members are not assigned a PCP unless the member requests one.[9/]  IX:6:22 - 7:8 (Heywood); X:69:17 - 70:22 (Preitauer).

84. Automatically assigning a PCP to a Medicare primary, dual-eligible member who has an existing relationship with a physician who has not contracted with the QExA plan would likely cause confusion and complaints about disrupting existing

---

[9/] Plaintiffs attempted to make much out of the fact that the QExA RFP § 40.260 originally stated "[t]he health plan shall ensure that each member has selected or is assigned to one (1) PCP who shall be an ongoing source of primary care appropriate to his or her needs" and was later amended to provide that "[t]he health plan shall ensure that each member, who does not have Medicare or a Medicare Advantage health plan as their primary Insurance, has selected or is assigned to one (1) PCP who shall be an ongoing source of primary care appropriate to his or her needs."  Ex. 200 § 40.260 at 85; Ex. 347 at 12 (lower right corner page number); Ex. 324 at 10 (lower right corner page number).  The Court finds, however, that this was not a major change as Plaintiffs believe, but rather a clarification.  As Director Koller explained, the contract amendment was a clarification.  Dual-eligibles had always been dual-eligible even under Medicaid FFS.  Thus, it was understood from the beginning, based on the utilization data that was provided to all bidders, that the QExA plans would be paying the Medicare copays for dual-eligible patients, but that for services that were covered by Medicare (such as primary medical care) the QExA plans were not primarily responsible for the provision of those services.  See V:59:4 - 69:11 (Koller); see also Ex. 338 (Evercare Member Handbook dated February 2009 which explains "If you have a primary care provider through Medicare, you do not have to pick another doctor or primary care provider.  Your Medicare doctor will work with your Service Coordinator to set up all your QExA services.  Tell your Service Coordinator the name of your Medicare doctor.").

patient-physician relationships.[10/]  VI:96:25 - 98:12 (Bazin);

IX:9:8-16 (Heywood); X:69:17 - 70:10, 124:18 - 126:23

(Preitauer).

85.  The number of Medicare qualified physicians is

much larger than any Medicaid contracted network, so that

clarifying that a PCP need not be assigned from the QExA provider

network was an important step in ensuring the broadest possible

access to services for their Medicare dual-eligible members.

X:69:17 - 70-:19 (Preitauer).

86.  If, however, a dual-eligible member wants to

select a PCP, the QExA plans will assist the member to find a

PCP.  IX:9:23 - 10:12 (Heywood); X:68:22 - 70:8 (Preitauer).

87.  Even if a QExA member does not have a PCP, that

member still has ready access to physician services, because QExA

members can self-refer to any specialist; there is no prior

authorization or referral paperwork necessary.  VII:29:13-19 (Dr.

Ellis); VIII:132:15 - 133:3 (Heywood); IX:26:15-22 (Heywood);

---

[10/]  Moreover, the Court finds that automatically assigning
all of the dual-eligibles to a PCP could cause additional
complications because it would artificially inflate the PCP's
patient numbers.  If a dual-eligible member is assigned to a PCP,
but does not go see the assigned PCP because he or she can seek
care from any Medicare provider, that assigned PCP's numbers
would be artificially high.  As a physician's resources are
limited and, indeed, in all of the QUEST and QExA plans the
PCP/member ratio is not supposed to exceed a certain limit, such
a result would be detrimental.  Additionally, a PCP is also
contractually obligated to perform certain tasks and it would be
both impossible and inefficient to have a doctor trying to do
that for a member who is obtaining care elsewhere.

X:54:5-16 (Preitauer).

88.   Many QExA beneficiaries are provided health care services by the same providers who provided such services under Medicaid FFS.  VIII:122:11-16 (Heywood).

89.   Specifically, many QExA beneficiaries choose as a PCP a provider already providing services to that beneficiary. VII:30:20 - 31:3 (Dr. Ellis).

90.   QExA beneficiaries can locate a contracted provider (whether that be a PCP, specialist, or other type of provider), in several ways, including by calling the plan's call center; assistance from their assigned service coordinator; or assistance from their PCP.  VIII:121:22 - 122:10 (Heywood); X:66:19 - 67:7, 68:22 - 69:16 (Preitauer).

91.   Both QExA plans maintain websites with provider search applications.  The information on the websites is updated frequently.  VIII:123:9 - 126:8 (Heywood); Exs. 328A and 328B (Evercare); X:38:6-12 (Preitauer).

92.   The QExA plans attempt to ensure that the data about participating providers on their websites and in their reports to the DHS is accurate and up-to-date.  For example, Evercare updates the information by: (a) field visits to providers' facilities by provider service representatives; (b) notification requirements in their provider contracts, including the requirement that a contracted provider notify the plan if the

provider is closing its practice to new patients; and (c) input from its service coordinators.  VIII:126:9 - 127:3 (Heywood). Ohana similarly updates the Internet provider directory in near real time.  X:38:6-12 (Preitauer).

**2.  Service Coordination**

93.  Both Evercare and Ohana assign each member a service coordinator to perform an initial assessment of each member, develop a care plan, and otherwise assist the member in accessing and coordinating services.  VIII:122:17 - 123:8 (Heywood); X:66:19 - 67:7 (Preitauer).

94.  Service Coordinators are medical professionals including advance practice registered nurses, gerontologists, registered nurses, licensed practical nurses, social workers and licensed clinical social workers.  X:67:11-16 (Preitauer).

95.  For purposes of establishing service coordinator ratios, the QExA population is divided up into four categories. For non-nursing facility level of care members the ratio is 1:750; for nursing facility level of care members residing in the community the ratio is 1:50; for nursing facility level of care members residing in an institutional setting the ratio is 1:120; and for members choosing self direction, the ratio is 1:40.  Ex. 200, § 40.810 at 161-62.

96.  Within 15 days of a member becoming enrolled in a QExA plan, a Service Coordinator will visit the member to do a

37

health and functional assessment utilizing a series of questions. The assessment can range from 30 minutes to several hours.  It will address coordination of benefits and the coordination of other care providers or physicians such as an existing primary care provider.  X:66:8 - 69:3 (Preitauer).

97.   The QUEST plans do offer care coordination and case management services, but not all members are assigned to a care coordinator or case manager and no face-to-face initial assessment is mandated.  Less than 3% of QUEST members access that service.  II:160:21 - 161:17 (Cravalho (HMSA)); III:194:3 - 197:1 (Catalan (AlohaCare)).

98.   The Court finds that while service coordinators are certainly not a substitute for a physician, they are an important benefit and resource which increases the members' access to care.[11]

99.   Additionally, both Evercare and Ohana provide phone lines staffed by nurses twenty-four (24) hours a day seven (7) days a week to help members access care.  VII:24:1-25 (Dr. Ellis); Ex. 338 at 6 (Evercare); Ex. 359 at 7-9, 17 (Ohana).

### 3.   Alleged Injuries from Delays in Assignment of PCPs

100.   The evidence about any alleged delay in

---

[11]   The Court notes both parties presented extensive evidence on service coordination and Plaintiffs' Post-Trial Proposed FF/COL devotes six pages relating to this subject.  See Plaintiffs' Post-Trial Proposed FF/COL at 18-24.

assignment of PCPs for non dual-eligible QExA members by Evercare or Ohana predominately related to former patients of Dr. Meyers.

101.   Dr. Meyers presented unique circumstances in that because of this lawsuit, both Intervenors made accommodations such that Dr. Meyers could continue to see her QExA patients without prior authorization even though she was not a contracted physician with either Intervenor.  IX:48-1 - 50:11 (Heywood); I:42:21 - 43:15 (Dr. Meyers); see also 9/3/10 ADA & Rehabilitation Act Order at *15 n.5 ("At the 8/12/10 Hearing, counsel for Evercare explained that 'Dr. Meyers is a special case' and is 'the only provider that Evercare has approved to see Evercare members who are her patients without prior authorization.'  8/12/10 Tr. at 29:9-22.  Counsel for Ohana also called Dr. Meyers a 'special case' for whom an accommodation had been made.  8/12/10 Tr. at 43:21-44:1.").

102.   Dr. Meyers' former patients continued to receive primary medical care from Dr. Meyers until September 2010, when Dr. Meyers asked that Evercare and Ohana reassign these patients. IV(S2):75:3-6 and VII(S):49:19 - 50:4 ([5]); V(S):49:2-13 and VII(S):50: 15 - 54:9 ([11]); VII(S):54:11 - 55:23 and V(S)28:4-7 ([8]); IV:122:17 - 124:13 ([7]).

103.   Upon Dr. Meyers' request that Evercare and Ohana reassign these patients, Evercare and Ohana were able to locate PCPs willing to accept all these members as patients.  VII:34:

9-23 (Dr. Ellis); IV:123:1-16 ([6] testifying that [7] has been reassigned to a new PCP).  However, Plaintiffs assert that this was not done in a timely manner.  The Court finds that there may have been some delay in assigning these members to PCPs; however, there was no delay in accessing medical care and any such delay was partially caused by the unique circumstances surrounding Dr. Meyers interactions with the health plans and her patients desire to continue to see her.

104.  Dr. Asha Chekuri agreed to serve as PCP for [8], but [8] and his mother chose not to accept that assignment, as they were entitled to do.  Evercare continues to work with [9] to identify an acceptable PCP for [8].  V(S):26:8-16; VII(S):54:25 - 55:23.

105.  Ohana member [3] had Dr. Dennis Ayon as his PCP until Dr. Ayon recently became unavailable due to Dr. Ayon's personal problems.  [3] was assigned to Dr. Tesoro and then to Dr. Texiera.  [3] did not accept the assignment to Dr. Texiera. [3] currently has an assigned PCP, Dr. Quiane, who has accepted and already seen [3] as a patient.  Exs. 133 and 134; IV(S):51:17 - 52:19; IV(S):56:9-20; IV(S):70:4 - 71:7.

106.  Plaintiff [6], mother of Ohana member [7], confirmed that [7] was receiving all needed primary care and specialty services without delay, notwithstanding any delay in reassigning [7] from Dr. Meyers to a contracted PCP.  [7] is

currently assigned to and seeing another PCP, Dr. Pascua. IV:122:1 - 124:13.

107.  The QUEST plans also experience difficulties in some cases in finding PCPs to accept their members.  II:127:17 - 128:7 (Cravalho (HMSA)).

108.  There is no evidence that any delay in assigning PCPs to any Evercare or Ohana members who are entitled to PCPs has impeded access to covered care for any QExA member as compared to QUEST members.

## B.  Alleged Injuries Because of Preauthorization Requirements

109.  Utilization management is a process used by managed care plans to determine whether a health care service is medically necessary.  VII:28:22 - 29:9 (Dr. Ellis).

110.  One aspect of utilization management is the requirement that certain medical services be authorized before they are approved for payment.  Evercare and Ohana require prior authorization for certain services and providers and members are informed of these requirements through the internet and manuals distributed to the providers and members, and through provider outreach.  VIII:129:17 - 130:18 (Heywood); Ex. 339 (Evercare); X:54:17 - 58:3, 60:13 - 63:10, 70:23 - 72:11 (Preitauer); and Exs. 358, 359, and 381 (Ohana).

111.  Prior authorization is a common requirement of managed care plans.  VIII:131:8-17 (Heywood).

112.  The QUEST plans also require prior authorization for certain services, prescription drugs, and supplies using policies similar to those of Evercare and Ohana.  II:181:7 - 182:9 (Cravalho (HMSA)), Ex. 394, and Ex. 395 (HMSA QUEST); III:124:3 - 126:11 (Brennan (AlohaCare)) and Exs. 401A, 401B, and 402 (AlohaCare QUEST).

113.  The purpose of a prior authorization requirement is to manage and coordinate care and ensure consistent coverage determinations.  VII:131:11 - 132:14 (Heywood).  It also includes a cost effectiveness aspect.  Id.

114.  Medical necessity is defined by Hawai'i law and the QExA plans are required to apply that definition in their prior authorization processes.  VII:28: 22 - 29:9 (Dr. Ellis); VIII:132:12 - 14 (Heywood); Ex. 200, § 30.200 at 39 (defining Medical Necessity "as defined in Hawaii Revised Statutes (HRS) 432E-1.4 or health interventions that the health plans are required to cover within the specified categories that meet the criteria identified below, whichever is the least restrictive: The intervention must be used for a medical condition; There is sufficient evidence to draw conclusions about the intervention's effects on health outcomes; The evidence demonstrates that the intervention can be expected to produce its intended effects on health outcomes; The intervention's beneficial effects on health outcomes outweigh its expected harmful effects; The health

42

intervention is the most cost-effective method available to address the medical condition.").

115. The Evercare form to initiate a prior authorization request is available to providers through the provider manual, online, and upon request of the provider; the form can be marked urgent for expedited review. VIII:134:6 - 135:24 (Heywood); Ex. 340.

116. The Ohana form to initiate a prior authorization is also available to providers through Ohana's provider manual and online. Provider service representatives are also available to directly assist their assigned providers regarding forms and information. Exs. 358, 377, and 381; X:54:17- 55:19, 57:19 - 58:3, 63:1-10 (Preitauer)

117. Under the RFP, Evercare and Ohana are required to decide a prior authorization request within 14 days for a normal request and 3 working days for an urgent request. VIII:135:25 - 136:8 (Heywood); Ex. 200, § 50.860.

118. QExA members may self-refer to contracted physicians. No prior authorization or referral is necessary for QExA members to access specialist physician services from Evercare or Ohana contracted providers. VII:29:13-19 (Dr. Ellis); VIII:132:15 - 133:3 (Heywood); X:54:5-16 (Preitauer).

119. Referrals must be submitted by the PCP to the HMSA and AlohaCare QUEST plans for specialty services to be paid,

43

even for contracted specialists.  I(S):17:2-9 (Dr. Meyers); II:174:24 - 175:6 (Cravalho (HMSA)); III:199:19 - 201:13 (Catalan (AlohaCare)); Ex. 403 (AlohaCare).

120.  Similarly, Jon Graham, M.D., a neurosurgeon, testified that the QUEST plans require tests to be ordered through the PCP, but for QExA beneficiaries, Dr. Graham is allowed to order tests himself.  I:100:8-17 (Graham).  Mr. Preitauer confirmed that contracted QExA specialists may order tests themselves.  X:54:5-16 (Preitauer).

121.  The means of accessing services for the QExA plans, including preauthorization and referral requirements, are substantially similar to the means of accessing services for the QUEST plans, and with respect to specialty care referrals within the contracted provider network requires less paperwork.

122.  The only specific evidence regarding any issues obtaining prior authorizations arose in the pharmaceutical context discussed below.

### C.  Alleged Injuries Relating to Prescription Medications

123.  The QExA RFP allows Evercare and Ohana to use "formularies" as long as members have access to medically necessary prescription drugs.  VII:75:24 - 76:11 (Dr. Pang); Ex. 200, § 40.750.1(o).

124.  A formulary, also known as a preferred drug list, is a list of medications selected by a health plan that are

approved for payment automatically at the point of sale.
Formularies are ubiquitous in managed care plans.   VII:76:18 -
77:12 (Dr. Pang); II:58:18-25 (Glick).

125.   Specifically, the QUEST plans have formularies
and require prior authorization for coverage of prescription
drugs not on the plan's respective formulary.   II:173:13-17
(Cravalho (HMSA)); III:123:2-15 (Brennan (AlohaCare)).

126.   Plaintiff Kevin Glick, a pharmacist who provides
services to both QUEST and QExA beneficiaries, testified that his
pharmacy receives roughly the same number of denials for QUEST
beneficiaries as for QExA beneficiaries because the prescribing
physician has prescribed a prescription medication not on the
respective plans' formularies.   II:59:1-13 (Glick).

127.   Plaintiff Leslie Krenk, another pharmacist, also
testified that Ohana's formulary is not very restrictive.
III:34:21-23 (Krenk).

128.   The Prescribing Guide, a comparison of the QUEST
and QExA plans' formularies for common prescription drugs
prepared by the John A. Burns' School of Medicine at the
University of Hawaii, demonstrates that there are as many
differences between the QUEST plans' formularies as there are
between the QUEST and QExA plans' formularies.   Ex. 374-C.

129.   The prescription drugs on Evercare's preferred
drug list have been selected as the most clinically-appropriate

45

and cost-effective prescription drugs within their therapeutic class.  VII:77:7 - 81:12 (Dr. Pang); Ex. 366 at 3.  Ohana's formulary is developed based on similar criteria with member health and safety being the most important consideration. VIII:79:19-23 (Dr. Mar); Ex. 375.

130.  Ohana's preferred drug lists contains generic alternatives to brand name drugs, in compliance with Hawai'i law, which favors generically equivalent drugs over more costly brand name drugs.  VIII:34:18 - 35:17 (Dr. Mar); H.R.S. § 328-92 (providing  inter alia that the "pharmacist shall substitute an equivalent generic drug product if the practitioner does not prohibit substitution under subsection (b), and the substitute equivalent generic drug product results in a savings.")

131.  Evercare's preferred drug list is updated quarterly based on review of new clinical information and research.  VII:79:9-18 (Dr. Pang).  Ohana's preferred drug list is updated monthly.  VIII:50:8-15 (Dr. Mar).

132.  Physicians and pharmacists may readily access the preferred drug lists for the QExA plans through the internet, either as a complete document or through a function that allows a user to search by the name of the prescription drug. VII:64:18-22, 95:12 - 96:5 (Dr. Pang) and Exs. 366 and 369 (Evercare); Ex. 358 (Ohana).

133.  Several pharmacists who testified were unaware of

46

the availability of formularies, preauthorization requirements and forms, and override information available in provider manuals and online.  II:85:1-19 (Glick); III:69:8 - 70:15 (Krenk); III:168:5-23 (Jones).

134.  Plaintiff Kevin McGill, a provider of orthotics and prosthetics who is contracted with Evercare, testified that Evercare patients experience delays in receiving orthotics and prosthetics because Evercare's preauthorization process is allegedly more burdensome and slower than that of the QUEST plans.  IV:26:17 - 27:2 (McGill).  He admitted, however, that Evercare has the same $500 threshold for prior authorization of durable medical equipment as HMSA QUEST, and a higher threshold for prior authorization for orthotics and prosthetics ($1,000) than HMSA ($500), a fact he was not aware of until his trial testimony, and that may cause him to open his practice to new Evercare members.  IV:43:22 - 44:24 (McGill); Ex. 339.  In any event, most of the Evercare members he serves are dual-eligibles for which Medicare provides primary coverage, and those members would be unaffected if he otherwise closed his practice to Evercare members.  IV:46:13 - 47:2 (McGill).

135.  Prescription drugs not on Evercare's or Ohana's preferred drug list require prior authorization as described above to determine whether the unlisted pharmaceutical is medically necessary for treatment of the member's condition.

47

VII:82:2-19 (Dr. Pang); VIII:29:10-12 (Dr. Mar).

136.   Evercare's standard is to respond to prior authorization requests within 24 hours, and that standard is usually met.   VII:83:14-18, 106:9-24 (Dr. Pang); Ex. 373.

137.   Ohana's average turn around time on prior authorization requests for oral medications is 15 to 20 hours, and for injectable medications, between 24 and 36 hours. VIII:66:1-13 (Dr. Mar); Ex. 386 (Ohana Pharmacy Operations Report for May June and July 2010).

138.   Ohana's and Evercare's records are consistent with Plaintiff Kevin Glick's experience.   He testified that it takes between one hour and three days to receive a response from Evercare and Ohana to a prior authorization request for a pharmaceutical not on the preferred drug list, with an average response time of 24 hours.   II:41:24 - 42:18, 43:6-9 (Glick).

139.   Additionally, Ohana permits dispensing pharmacists to fax written requests for prior authorizations upon receipt of oral authorization from the prescribing physician. VIII:60:17; 61:7 (Dr. Mar).

140.   Ohana will notify a pharmacist of its decision on a prior authorization request if the pharmacist's fax number is written on the prior authorization request form.   Ex. 377. VIII:62:15-23 (Dr. Mar).

141.   Less than one percent of pharmacy claims

48

submitted to Evercare require prior authorization.  VII:92:1-5 (Dr. Pang).  Less than two percent of Ohana's pharmacy claims require prior authorization.  VIII:637-21 (Dr. Mar).

142.  Direct contact by Ohana's pharmacy providers with Dr. Dexter Mar, Director of Ohana's Clinical Pharmacy, speeds up resolution of previously denied pharmacy claims.  III:174:22 - 175:14 (Jones); VIII:75:11-76:8 (Dr. Mar).

143.  Any denial of a prior authorization request by either Evercare or Ohana is subject to several layers of review, and all denials must be approved by a medical doctor and a clinical pharmacist.  VII:90:25 - 91:18 (Dr. Pang); VIII:40:22 - 41:1 (Dr. Mar) (explaining that a prior authorization request is reviewed by "technicians, pharmacists, and medical directors to determine if that request has enough information to approve its use.")

144.  When prior authorization is not required, and claims otherwise meet quantity limitations and refill restrictions, Ohana's procedures for pharmacy claims processing allow pharmacists to receive adjudication or approval of claims within seconds of their computerized submission.  VIII:63:22 - 64:7 (Dr. Mar).

145.  No prior authorization is required for urgent or emergent needs for prescription drugs.  VII:94:20-23 (Dr. Pang); Ex. 200, § 50.700.

146.   Both Evercare and Ohana are required to have a process to provide an emergency supply of medication to the member until the health plan can make a medical necessity determination regarding drugs not on the plan's formulary, pursuant to the RFP.  Ex. 200, § 40.750.1(o).

147.   Evercare and Ohana have both allowed pharmacists to dispense an emergency supply of a prescription drug while a prior authorization request is pending since the beginning of the QExA program.  Dr. Pang and MDX personnel for Evercare have given five-day overrides upon request.  VII:85:10-20 (Dr. Pang); VII:5:25 - 6:6 (Plaintiffs' witness Rick Jackson testifying that his staff had used the five day override available through the pharmacy benefit manager that Evercare contracts with in the Medicaid program).  Pharmacists can dispense a seven day emergency supply of medication for Ohana members by obtaining approval from Ohana's pharmacy call center, which is available 24 hours per day, 7 days per week.  VIII:41:10 - 42:20 (Dr. Mar).

148.   In November 2010, Evercare corrected an oversight on its part and adopted a process that allows the pharmacists to enter a code themselves to implement the override.  VII:70:14 - 71:22 (Dr. Pang).  However, Dr. Pang confirmed that the five-day override process was in place from the beginning of the program.  VII:71:15-22 (Dr. Pang).  Although Ohana has not implemented a process by which the pharmacist can input an override themselves,

its process remains similar to AlohaCare QUEST's and pharmacists can dispense a seven-day emergency supply of medication for Ohana members by obtaining approval from Ohana's pharmacy call center, which is available 24 hours per day, 7 days per week.  VIII:41:10 - 42:20 (Dr. Mar).

149.  The QUEST plans also provide for an emergency supply of medication while a prior authorization request is being processed, which they implement in varying ways.  HMSA provides an override for a seven-day medication supply upon entering a code in the claims system.  II:39:15 - 40:20 (Glick).  AlohaCare QUEST, on the other hand, requires a call by the pharmacist to obtain a three-day override.  II:40:23 - 41:7 (Glick).  Plaintiff Les Krenk, a pharmacist who provides services to QUEST and QExA beneficiaries, testified that he can only obtain the override from AlohaCare QUEST during its working hours, which are more limited than his own.  III:36:9 - 37:5, 40:15-25 (Krenk).

150.  In the case of dual-eligibles, their primary drug provider will be their Part D Medicare Plan and claims will be made by dispensing pharmacists to the Medicare plans instead of to the QExA plans.  VIII:28:15-22 (Dr. Mar).

151.  In such cases, the QExA plans have supplemental formulary lists called "federally excluded medications" available for their dual-eligible members.  Medications on these lists may include over-the-counter therapeutics and various Medicare

restricted prescription drugs such as benzodiazepine.  VIII:29:5 - 32:11 and VIII(S):25:1-12 (Dr. Mar).

152.  The differences in the ways the QUEST and QExA plans provide for an emergency supply of medication while a prior authorization request is processed do not differ sufficiently to support a finding of disparate access to pharmacy services between the two programs; and the Court finds that the varying methods all make emergency supplies equally accessible.

153.  QUEST beneficiaries also may experience delays in filling prescriptions for prescription drugs because of the prior authorization process.  II:89:24 - 90:2 (Cravalho (HMSA)).

154.  The preferred drug lists for the QExA plans, and prior authorization requirements for obtaining access to drugs not on the lists, are substantially similar to the preferred drug lists or formularies and the requirements for deviating from such lists or formularies established by the QUEST plans; and the Court finds that QExA members have equal access to prescription drugs as compared to QUEST members.

155.  The preferred drug lists for the QExA plans, and prior authorization requirements for obtaining access to drugs not on the lists, do not present any barriers to accessing services that are not typical of managed care plans, including the QUEST plans.

156.  The QExA plans and QUEST plans are also

52

substantially similar to the extent the DHS has promulgated

coverage and benefit policies that apply equally to both.  For

example, the DHS has promulgated pharmacy memoranda that apply

equally to QUEST and QExA plans.  Exs. 314-317; <u>see also</u> Ex. 312

(transportation policy); II:172:6-21 (Cravalho (HMSA));

III:121:12 - 122:10 (Brennan (AlohaCare)).

### D.    Provider Complaints

157.  Although Mr. Heywood is made aware of provider

complaints as part of his responsibilities for Evercare, he is

not aware of any provider that has terminated his or her contract

with Evercare as a result of any complaint.  IX:42:21 - 43:8

(Heywood).

158.  Neither QExA plan has lost any significant number

of providers since the program began.  Evercare has lost

approximately a hundred providers, primarily due to relocation to

the mainland and retirement, although some providers have

withdrawn because they have changed from a group practice that

was contracted to an independent practice.  However, overall, the

networks continue to grow.  IX:43:17 - 44:3 (Heywood); X:36:18-21

(Preitauer).

159.  During the initial six months of the QExA

programs, medical claims for ophthalmological services were

processed by the plans as non-medical vision claims resulting in

either non-payment or payment at lower vision rates.  These

claims processing errors were rectified and the affected providers fully paid.  The problem no longer exists.  X:52:16 - 53:4 (Preitauer); IV:52:8 - 55:25 (Dr. Zobian); IV:98:24 - 100:1 (Dr. Tortora).

160.  One of the opthalmogists, Dr. Zobian, testified that he has had problems getting claims paid by AlohaCare QUEST as well.  IV: 60:15 - 61:21, 64:20 - 65:8 (Dr. Zobian).

161.  As noted earlier, Evercare and Ohana maintain and report to DHS data about the timeliness of their claims payments on the Dashboard Report.  The average turn around time for payment of a medical claim by Evercare is twenty-one (21) days, which is consistent with industry standards and the RFP requirements.  IX:44:4 - 45:1 (Heywood); Ex. 412, Ex. 200, § 60.220 at 291-92 ("This health plan shall ensure that ninety percent (90%) of clean claims for payment (a clean claim is one for which no further written information or substantiation is required in order to make payment) are paid within thirty (30) says of the date of receipt of such claims and that ninety-nine percent (99%) of clean claims are paid within ninety (90) days of the date of receipt of such claims.").  The average turn around time for payment of medical claims by Ohana is between ten (10) and eleven (11) days, depending on whether the claim is submitted electronically or on paper.  Ex. 412.

162.  Mr. Heywood is not aware of any Evercare

54

providers who have ceased participation in QExA based on complaints that reimbursement rates are in some cases lower than QUEST reimbursement rates.  IX:46:1-8 (Heywood).

163.  The QExA contracts no longer contain a provision requiring Evercare and Ohana to pay providers no less than the Medicaid FFS rates.  Ex. 324 at 28 (lower right corner page number); Ex. 347 at 30 (lower right corner page number).  Ms. Bazin testified that the change was made to increase comparability between the QUEST and QExA programs as there is no comparable minimum in QUEST.  VI:77:15 - 83:6, 86:12 - 87:14 (Bazin).  Director Koller testified that the change allowed greater flexibility in contracting between the providers and the Intervenors because, for example, providers could accept a lower rate "if they get some requirements" or "a certain percentage of referrals" or even negotiate a bonus structure.  V:83:19 - 87:6 (Koller).  The State's concern is that the members get the services they need and not the contract terms that are negotiated between the plans and providers.  Id.; VI:77:15 - 83:6, 86:12 - 87:14 (Bazin).

164.  Evercare continues to pay its contracted physicians at Medicaid FFS rates and has no plans to reduce its payment level, even though so far Evercare has been losing money.  IX:46:11-25 (Heywood).

165.  Ohana pays its contracted physicians at or above

Medicaid FFS rates and has no plans to reduce its payment level. X:51:16 - 52:10 (Preitauer).

166.   Christopher Tortora, M.D. is a contracted provider with Ohana.  IV:88:11-14 (Dr. Tortora).  Consistent with its provider contracts, Ohana has been paying Dr. Tortora's practice at Medicaid FFS rates.  IV:94:5-12, 100:2-10 (Dr. Tortora).

167.   Dr. Tortora is also contracted with Evercare, and testified as to complaints about Evercare's payment of his claims.  However, Dr. Tortora's testimony was internally inconsistent; he testified that Evercare was failing to pay the prior Medicaid FFS rates but then said the same issue concerned a difference related to the Medicare program, thus it is unclear whether he was making the more general assertion that Medicaid pays less than Medicare or whether he was asserting that QExA reimbursements were not equal to the prior Medicaid FFS program. Compare IV:93:8-20 (testifying that payment issue related to failure to pay Medicaid FFS rates) with IV:95:17 - 96:1 (testifying that same issue was in context of Medicare primary, dual-eligible members).

168.   According to information from Evercare's claims system, Evercare paid Dr. Tortora at the established Medicaid FFS rates for providing services to non-dual-eligible QExA members, and that Evercare's payment for the facility portion of cataract

surgeries billed by Dr. Tortora is consistent with the Medicaid FFS methodology for grouping ambulatory surgical procedures. IX:50:12 - 51:13; 53:25 - 55:10 (Heywood).  Evercare pays a copayment on Dr. Tortora's Medicare dual-eligible members, with the payment processing automatically as the difference between whatever Medicare has paid on the claim and the Medicare eligible charge.  IX:52:2-17 (Heywood).  Evercare has not received any separate billings from him for lens implants in connection with cataract surgeries.  IX:55:19-22 (Heywood).  Furthermore, contrary to Dr. Tortora's testimony, Evercare's claims records reflect that Evercare has been paying claims by Dr. Tortora for eye glasses after cataract surgery.  IX:55:23 - 56:20 (Heywood).

169.  In any event, Plaintiffs have not established that even if both of the opthamologists who testified were to entirely close their practice to QExA members that there are inadequate alternative providers from whom QExA members may seek care.  Evercare has 92 contracted opthamologists and Ohana has 71.  See supra ¶ 19.

170.  Mr. Heywood is not aware of any providers closing their practices selectively to new Evercare patients because of dissatisfaction with Evercare.  IX:94:13 - 95:24 (Heywood).

171.  Even if some contracted providers may be dissatisfied with Evercare and/or Ohana, closing their practices selectively to new Evercare and/or Ohana members would violate

their provider contracts.  IX:146:6 - 147:4 (Heywood); Ex. 337 at 12 (Evercare); Ex. 358 at 34 (Ohana).  This contract provision should discourage providers from taking such action.  In any event, there are ample other contracted providers who may provide care in place of any providers who take such action.

172.  Dr. Jon Graham testified that he is not accepting new QExA patients, allegedly due to delays in reimbursement and excessive documentation requirements.  I:93:25 - 94:9, 96:16-25 (Dr. Graham).

173.  Dr. Graham testified that he did an analysis of certain common claim codes and his analysis indicated that although QExA and QUEST pay approximately the same rates for a follow-up visit; for a new patient visit, which requires an hour to an hour and fifteen minutes of his time, he is paid $38 by QExA in comparison to $137 by QUEST.  I:104:13 - 105:20, II:5:18 - 7:16 (Dr. Graham).

174.  Dr. Graham's testimony regarding the reimbursement rates was unrebutted; however, it does not establish that the Intervenors are not making services accessible to the same extent that the QUEST plans make services accessible. Evercare has 28 contracted neurologists and Ohana has 19.  <u>See supra</u> ¶ 19.

175.  Moreover, Ms. Bazin was not aware of any providers moving from QExA to QUEST because of QUEST's higher

reimbursement rates.  VI:195:15 - 196:7 (Bazin).

### E.  Alleged Injuries As A Result of Delays in Receiving Treatment

176.  Dr. Jon Graham also testified that one of his patients experienced an alleged delay in receiving neurosurgical treatment for a slow-growing brain tumor.  There was no testimony regarding the extent of the patient's or primary care doctor's efforts to secure neurosurgical treatment, whether either the PCP or the patient attempted to contact the patient's service coordinator or the Intervenor, or that the same delay would not have been experienced in the QUEST program.  II:17:4-23 (Dr. Graham).  Moreover, Dr. Graham admitted that the delay did not adversely affect the patient.  II:11:16 - 14:18; 18:1-6 (Dr. Graham).

177.  [14], an Evercare member, allegedly experienced a delay in receiving a wheelchair.  However, Evercare's medical director, Dr. Cheryl Ellis, testified that the claim was approved upon receipt of supporting documentation and that she would have approved it earlier had she received complete information about the claim.  VII(S):39:1 - 40:15 (Dr. Ellis).

178.  [15], an Evercare member, allegedly experienced a delay in a response to an urgent request for prior authorization for a prosthetic.  IV:33:5-16; 34:14-18 (McGill).  Evercare, however, responded to the request within three (3) working days as required by the RFP.  VII(S):56:6-20 (Dr. Ellis).

179.  Plaintiff [12], mother of Ohana member [13], confirmed that [13] was receiving all needed primary care and specialty services without delay.  The only delay [12] complained of was regarding the approval and payment of specialty services by her son's primary HMSA Federal plan insurance.  No request for coverage of those services has been made of Ohana by [12], and no services have been denied by Ohana.  V:(S):59:14-22 [12]; V:(S):77:13-78:25; V(S):83:25-84:9; X(S):4:11-19.

180.  Dr. Meyers continues to see [13] as his primary care provider because HMSA Federal plan insurance is the primary insurance for [13].  Additionally, other specialists also continue to provide medical care to [13].  V(S):77:13 – 78:25, 81:10 – 84:9 [12].

181.  [12] acknowledged that [13] receives case management services from the Department of Health DDMR program and is assigned a case manager from the DDMR program.  [13] also has a care coordinator assigned to him under the HMSA Federal plan insurance.  V(S):66:19-67:7, 79:1-11 [12].

182.  DDMR is the primary program coverage for case management services for [13].  The DDMR is responsible for coordinating the overall benefits for a member like [13] who has both DDMR and QExA program coverage.  VI:150:4-18 (Bazin).

183.  Plaintiff [2], an Ohana member, testified regarding an alleged delay in receiving a power wheelchair, but

admitted that she had been offered an appointment to have the
wheelchair fitted many months ago and had not accepted that
appointment.  Instead, she chose another vendor who had a wait
list and took some time to schedule an appointment for her.
There is no evidence that any delay in her receiving her
wheelchair was attributable to any action or inaction by Ohana,
or that her situation would have been handled any differently by
a QUEST plan.  IV(S):29:15-22, 32:9 - 35:14, 37:1 - 38:13 [2].

184.  [2]'s testimony that she had difficulty with
receipt of her controlled substance pain medication was countered
by Dr. Dexter Mar.  [2] provided no specifics regarding the delay
and acknowledged receiving the same dosage of oxycodone
prescribed by her doctor before and after the QExA program began.
Dr. Mar reviewed [2]'s claims history and confirmed that no
prescriptions had been denied over the period from August through
November 10, 2010 that he reviewed.  Claims were paid the same
day the prior authorization requests were presented.  IV(S):29:22
- 30:25, 31:5 [2]; (VIII S):27:4-17 (Dr. Mar).  Thus, to the
extent there were any delays, they occurred earlier in the QexA
program's relatively brief existence of eighteen months and
appear to have been resolved.

185.  As an Ohana member under the QExA program, [2]
receives door-to-door transportation services.  IV(S):38:14-19
[2].

## VII. <u>Transition issues in QExA and QUEST</u>

186.   QExA was implemented only recently (February 1, 2009) and there were some initial transition difficulties and resistance from members and providers.  These issues were similar to those faced by QUEST when it was first implemented, and have been resolved.  IX:57:21 - 59:19 (Heywood); <u>see also</u> V:98:25 - 99:7 (Director Koller explaining that "QUEST Expanded Access just started in February 2009.  Just went live February 1. Give it a little time.  QUEST is now since 1994.  The providers are all signed up, doing strong, doing well, and that's what's going to happen with QUEST Expanded Access.  This was just starting up a new managed-care program for this additional population that was left in fee-for-service.").

187.   QUEST also had similar issues building provider networks at the beginning of its program and used strategies to build the provider network similar to those that Evercare has used to build its QExA network.  VIII:100:18 - 101:5 (Heywood).

188.   QUEST has had sixteen years to overcome problems and become more efficient and thus able to pay its providers more.

189.   Plaintiffs have admitted QUEST also experienced a bumpy start.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law, filed on October 19, 2010, at 11 (Doc. No. 822) ("QUEST had a bumpy start because it was not well received

by providers and patients were separated from physicians who had been caring for them in the fee-for-service program");
Plaintiffs' Trial Brief, filed October 19, 2010, at 10 (Doc. No. 821) ("By all accounts, QUEST had a bumpy start, with skeptical providers refusing to participate and existing patient-physician relationships and continuity of care disrupted.").

190.   More problems are to be expected in a start-up program (QExA) than in a program that has been established for a long time (QUEST).  This is especially so when the population of the start-up program (QExA), generally speaking, has more complex medical needs.

VIII.     **Additional Services**

A.   **The QUEST Plan and Special Health Care Needs (SHCNs)**

191.   Section 40.325 of the QUEST RFP pertains to "Services for Members with Special Health Care Needs (SHCNs)." That provision of the QUEST RFP requires the QUEST plans to identify members with SHCNs in the QUEST population, and then provide special services for those members, not available to the general QUEST population.  The Court took judicial notice of this provision at the request of Plaintiffs and with the Defendants' and Intervenors' agreement.

192.   The Court has reviewed the requirements of Section 40.325 of the QUEST RFP and compared the special requirements imposed on the QUEST Plans for SHCN members against

63

the evidence in this case regarding the services provided by the QExA program for each QExA member.  On the other hand, the QExA population consists of the aged, blind and disabled - all of whom are considered to require special care.  The Court finds that the QExA plans provide services to each of their members comparable to the services required to be provided to only those members in the QUEST program which meet the SHCN criteria.

193.  The testimony was undisputed that in the aggregate, the QExA population is a medically needier population.

194.  The entire service coordination model appears designed to address the QExA members' special needs and the QExA RFP specifically details that "[t]he health plan shall have a Service Coordination System that complies with the requirements in 42 CFR 438.208, and is subject to DHS approval."  Ex. 200 at § 40.810, p. 159.

195.  Moreover, the contractual amendments that clarified that Intervenors were not required to assign a PCP to each dual-eligible member were reviewed by CMS for compliance with 42 CFR Part 438 and approved.  Exhibit 415.

196.  QExA members each have a care plan prepared by their service coordinator.  Each QExA member is assigned a service coordinator to assist in coordinating the member's care. The QExA plans also allow every QExA member to self-refer to any contracted specialist, and to select a specialist as their PCP.

Plaintiffs even admit that the care plan is a broader plan than a treatment plan.  See Plaintiffs' Post-Trial Proposed FF/COL at 20.

197.  There is no evidence that QExA members are receiving any less access to services than even those select QUEST members who meet the SHCN criteria of Section 40.325 of the QUEST RFP.

198.  The Court further finds that Section 40.324 of the QUEST RFP and 42 CFR § 438.208 are designed to identify members with special healthcare needs in order to provide them with additional services to treat and manage their conditions, such as care coordination; whereas the entire QExA program was designed for people that as a whole are special needs and provides those services to everyone.  Moreover, the Court finds the differences between the populations of QUEST and QExA relevant.  While there are some members in QUEST that may have other insurance, QUEST (Medicaid) is predominately the primary insurance.  In contrast, for the majority of QExA members (all of the dual- eligibles) QExA (Medicaid) is the secondary insurance and, as discussed above, those members have access to the broader networks and services provided under Medicare.

**B.  Long-Term Care Services**

199.  Long-term care, including home and community based services such as private duty nursing and personal

assistants, are a covered benefit under the QExA program if they are medically necessary.  Ex. 200, §§ 40.710, 40.740, 40.750.3, 40.750.4, 50.120.

200.  The QUEST plans do not have any similar benefit. The QUEST RFP does not contain any section comparable to the provision of the QExA RFP requiring coverage of home and community based services.  III:201:17 - 202:7 (Catalan (AlohaCare)).

201.  The QUEST plans may provide Early Periodic Screening Diagnosis and Testing ("EPSDT") services similar to those provided as home and community based services in QExA on a short-term basis to a temporarily disabled member, but any members needing such services on a long-term basis should be and routinely are transferred to QExA.  II:194:1-21, 196:11-18 (Cravalho (HMSA)); III:188:20 - 191:21, 201:17 - 203:14 (Catalan (AlohaCare)).

202.  Because long-term, home and community based services are not a covered benefit under QUEST, the extent to which QExA members receive such services is irrelevant to whether QExA provides comparable access to health care services as QUEST.

## CONCLUSIONS OF LAW

Having evaluated the factual aspects of the evidence, the Court will now make its conclusions of law.

## I.   <u>Jurisdiction & Venue</u>

1.   This court has original jurisdiction pursuant to 28 U.S.C. § 1331 and 1343(a) and venue is proper pursuant to 28 U.S.C. § 1391(b).

## II.   <u>Basic Legal Framework</u>

2.   The Medicaid Act permits a state to require that beneficiaries enroll in managed care as a condition of receiving benefits if certain requirements are met.   42 U.S.C. § 1396u-2(a)(1)(A)(i).

3.   Specifically, 42 U.S.C. § 1396u-2(a)(1)(A)(i) states

> Subject to the succeeding provisions of this section, and notwithstanding paragraph (1), (10)(B), or (23)(A) of section 1396a(a) of this title, a State may require an individual who is eligible for medical assistance under the State plan under this subchapter to enroll with a managed care entity as a condition of receiving such assistance (and, with respect to assistance furnished by or under arrangements with such entity, to receive such assistance through the entity), if--
> > (I) the entity and the contract with the State meet the applicable requirements of this section and section 1396b(m) or section 1396d(t) of this title, and
> > (II) the requirements described in the succeeding paragraphs of this subsection are met; . . .

42 U.S.C. § 1396u-2(a)(1)(A)(i).

4.   One of those succeeding provisions is 42 U.S.C. § 1396u-2(a)(3), which provides that "[a] State must permit an individual to choose a managed care entity from not less than two such entities that meet the applicable requirements of [42 U.S.C.

§ 1396u-2], and of [42 U.S.C. § 1396b(m)]."

5.   The only claim remaining for trial was that the foregoing provisions were not met because the Intervenors did not comply with 42 U.S.C. § 1396b(m)(1)(A)(i).

6.   42 U.S.C. § 1396b(m)(1)(A)(i) requires that an MCO make services available to its members to the same extent that services are made available to Medicaid beneficiaries not enrolled with the MCO.   See 42 U.S.C. § 1396b(m)(1)(A)(i). Specifically, subdivision (i) provides that, in order to qualify as an MCO, an organization must:

> make[] services it provides to individuals eligible for benefits under this title accessible to such individuals, within the area served by the organization, to the same extent as such services are made accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization.

Id.

7.   This claim is not found neatly in one of Plaintiffs' counts, but is the only remaining basis for Plaintiffs' claims under Counts I, II, III, and V.

**III.   Standing**

8. "Although standing generally is a matter dealt with at the earliest stages of litigation, usually on the pleadings," the State Defendants now appear to challenge the ABD Plaintiffs' and Provider Plaintiffs' standing.   See Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 115 n.31 (1979); Defendants'

68

Proposed FF/COL, filed Dec. 16, 2010, at 54-55.

9.   "To satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical, (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." <u>Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.</u>, 528 U.S. 167, 179 (2000).

10.   The party invoking federal jurisdiction bears the burden of establishing these elements. <u>See Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1993).   "Each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." <u>Id.</u>   At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice; in response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true.   Finally, at trial, those facts (if controverted) must be "supported adequately by the evidence adduced at trial."

69

Id.

11.  At trial, however, this issue is closely
intermingled with a party's right to relief.  See Armstrong v.
Davis, 275 F.3d 849, 860 (9th Cir. 2001) ("We start by noting
that where a district court grants system-wide injunctive relief,
the issues of standing, class certification, and the propriety
and scope of relief are often intermingled."); Monsanto Co. v.
Geertson Seed Farms, 130 S. Ct. 2743, 2752 n.1 (2010) ("The
question whether petitioners are entitled to the relief that they
seek goes to the merits, not to standing."); see also Salerno v.
Ridgewater College, No. 06-1717 PJS/RLE, 2008 WL 509001, at *4
(D. Minn. Feb. 8, 2008) ("First, [Defendant] has confused the
question whether a plaintiff has standing with the question
whether the plaintiff has a winning case.  Standing 'in no way
depends upon the merits of the plaintiff's contention that
particular conduct is illegal . . . .'  Warth v. Seldin, 422 U.S.
490, 500 (1975).  A contrary rule would mean that every plaintiff
who loses - even plaintiffs who lose after a jury trial - would
not have Article III standing.  That obviously is not the law.").

12.  Once a party establishes Article III standing,
"[a] party may seek injunctive relief under the Supremacy Clause
regardless of whether the federal statute at issue confers any
substantive rights on would-be plaintiffs."  See Indep. Living
Center of S. Cal., Inc. v. Shewry, 543 F.3d 1050, 1062 (9th Cir.

2008).

13.   The ABD Plaintiffs have met the standing requirements.   They have alleged an injury by asserting they have lost the freedom to choose their own providers and are being forced to seek medical care through a managed care organization that does not meet the requirements set forth in the Medicaid law in order to protect them.   They have alleged causation in that the alleged injury stems from the change to the QExA program from the fee-for-service system.   They have also alleged redressability in that they seek an order returning the program to the prior fee-for-service program.

14.   Moreover, the Court notes that the State Defendants have not previously challenged the ABD Plaintiffs' standing.   See 5/11/09 Order at *19 n.16 ("Unlike their standing to enforce the Medicaid Act via § 1983, [the ABD] Plaintiffs' standing to assert their preemption claim is not disputed by the State Defendants.").

15.   Finally, "[t]he general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it need not decide the standing of the others."   Indep. Living Center of S. Cal., Inc. v. Shewry, 543 F.3d 1050, 1065 (9th Cir. 2008).

16.   However, for purposes of completeness, the Court notes that contrary to Plaintiffs' argument, the Court has not

ruled that "Provider Plaintiffs have a claim under the Supremacy Clause that the MCOs are not in compliance with 42 U.S.C. §1396b(m)(1)(A)(i).  Doc. 610 at 74 n.45." <u>See</u> Plaintiffs' Post-Trial FF/COL at 30.  Plaintiffs refer to the Court's footnote in which the Court explained,

> In the State Second Amended Complaint, Provider Plaintiffs assert that they "have standing to challenge the QExA program because the State Defendants' conduct is preempted by federal law, and because they have been injured in their property as set forth [in the Second Amended Complaint]."  St. 2d Am. Compl. ¶ 2. Accordingly, <u>assuming the Provider Plaintiffs have Article III standing</u>, the Provider Plaintiffs have a claim under the Supremacy Clause that the MCOs are not in compliance with 42 U.S.C. § 1396b(m)(1).

6/14/10 Order at * 73-*74 n.43 (emphasis added).  Thus, the Court did not rule that the Provider Plaintiffs had Article III standing, and the Court now concludes that they do not.  Provider Plaintiffs' generalized assertion that they have been injured in their property by differences between QUEST and QExA is insufficient and has not been substantiated.  The Provider Plaintiffs' claim alleging an unlawful taking (Count IX) has already been decided in favor of the State Defendants.  <u>See</u> 12/24/09 Order at *93.  Provider Plaintiffs have not alleged or shown any injury that is caused by any alleged violation of 42 U.S.C. § 1396b(m)(1)(A)(i), or of any other law, or that could be redressed by the relief sought.

**IV.  <u>The Requirements of 42 U.S.C. § 1396b(m)(1)(A)(i)</u>**

17.  42 U.S.C. § 1396b(m)(1)(A)(i) mandates that

72

services be made available "to the same extent as such services are made accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization." 42 U.S.C. § 1396b(m)(1)(A)(i).  However, the statute does not explain what is meant by individuals not enrolled with the organization.

18.  Although the Court has already determined that this section requires a comparison of the services provided in both QUEST and QExA, in their trial brief, the State Defendants noted the State Defendants' and Intervenors' objection to that ruling.  See State Defendants and Intervenors Joint Trial Brief, filed Oct. 18, 2010, at 4 n.2. (Doc. No. 811).  The State Defendants and Intervenors had argued that the more appropriate comparison would be between QExA and the Medicaid FFS program.

19.  The Court reiterates its conclusion that in this case 42 U.S.C. § 1396b(m)(1)(A)(i) mandates a comparison of the services offered by both QUEST and QExA.  The plain language of the statute, which requires that an organization make services available "to the same extent as such services <u>are made</u> accessible to individuals (eligible for medical assistance under the State plan) not enrolled with the organization" and the legislative history reaffirm the Court's conclusion that the appropriate comparison is QExA and QUEST.  42 U.S.C. § 1396b(m)(1)(A)(i) (emphasis added).

73

20.   The legislative history indicates that the purpose of 42 U.S.C. § 1396b(m)(1)(A)(i) "is to permit States to enter prepaid arrangement with [non-federally qualified HMOs] provided that such entity: (a) make covered services to Medicaid enrollees accessible on the same basis as <u>other Medicaid eligibles in the area</u> . . . ." Omnibus Budget Reconciliation Act of 1981, S. Rep. No. 97-139, at 968 (1981) (Conf. Rep.) (emphasis added).[12/]

21.   The statute thus contains an ongoing obligation. Because the Medicaid FFS program no longer exists, it is not providing services to any Medicaid beneficiaries in any area.  It ceased providing services on February 1, 2010, when the QExA program went into effect.  Moreover, virtually the entire Medicaid population of the State of Hawai'i is enrolled in QUEST or QExA.  <u>See</u> State Defendants' Proposed FF/COL at 50.

---

[12/] The Court observes that this interpretation of the statute comports with an interpretation of the statute that was built into the QExA RFP.  In that RFP, a "managed care organization" is defined as follows:

> An entity that has, or is seeking to qualify for, a comprehensive risk contract under the final rule of the BBA and that is (1) a federally qualified HMO that meets the requirements under Section 1310(d) of the Public Health Service Act; [or] (2) any public or private entity that meets the advance directives requirements and meets the following conditions: (a) makes the service it provides to its Medicaid members as accessible (in terms of timeliness, amount, duration, and scope) as those services that are available to other Medicaid enrollees within the area served by the entity and (b) meets the solvency standards of 42 CFR Section 438.116 and HRS § 432-D-8.

Exhibit 200 (Section 30.200) at page AR 003990.

Therefore, as the statute imposes an ongoing obligation and virtually all of the Medicaid population is enrolled in either QExA or QUEST, the Court finds that it would not be appropriate to compare QExA to the Medicaid FFS.[13/]

22.    Plaintiffs' assertion that "[t]he federal statute requiring comparison and access to medical services governs this case in the final analysis, regardless of what the State Defendants may or may not require" is partially correct. Plaintiffs' Post-Trial Proposed FF/COL at 10.  The federal statute does govern this case; however, because the statute requires that an organization must make accessible services to its members to the same extent as services are made accessible to other Medicaid recipients eligible under the State plan, the State's plans (and thus the RFPs) are relevant as the Court must compare the services offered in both QUEST and QExA (as well as

---

[13/] For the foregoing reasons, unlike other sections of the Medicaid Act Plaintiffs have sought to enforce in this case, § 1396b(m) does not simply require that MCOs provide the State with assurances.  Instead, § 1396b(m) mandates that in order to qualify as an MCO, an organization must make accessible services to its members to the same extent as services are made accessible to other Medicaid recipients eligible under the State plan.  See 42 U.S.C. § 1396b(m)(1)(A)(i).  Accordingly, the Court has previously found that the QExA Contracts could not, in and of themselves, satisfy the requirements of 42 U.S.C. § 1396b(m)(1)(A)(i).  Instead, in order to comply with 42 U.S.C. § 1396b(m)(1)(A)(i), MCOs must actually make services accessible to its members to the same extent that services are made accessible to other Medicaid beneficiaries not enrolled with the MCO.

their respective implementation).

23.   At the summary judgment stage, Plaintiffs came forward with sufficient evidence to establish genuine issues of material fact as to whether services are being made accessible to QExA members to the same extent as services are made accessible to QUEST members.

24.   In denying the Defendants' motion for summary judgment on 42 U.S.C. § 1396b(m)(1)(A)(i) the Court explained,

> The material facts in dispute discussed by the Court in its 12/24/09 Order, however, appear to be true of the entire QExA Program.  For instance, Plaintiffs' evidence suggests that physicians are paid ten to twenty percent less in the QExA Program than they are paid in the QUEST Program.  12/24/09 Order at *56-*57.  In addition, the evidence presented by Plaintiffs suggests that it takes twelve to thirty times as long to secure a referral to a specialist for a QExA enrollee than for an enrollee in the QUEST Program.  Id.  Further, Plaintiffs assert that certain prescription drugs are not covered under the QExA Program that are covered under the QUEST Program, which means that prior-approvals must be obtained for those drugs in the QExA Program, but not in the QUEST Program.  Id. at *57-*58.  To this end, Plaintiffs maintain that the preauthorization process for certain services and items, including non-covered prescription drugs, under the QExA Program is onerous and lengthy compared to the process utilized in the QUEST Program.  Id.  Moreover, with regard to transportation services, Plaintiffs maintain that QUEST beneficiaries have better access to transportation services.  Id. at *58.  Accordingly, because all of these allegations suggest flaws with the entire QExA Program, the Court rejects Evercare's argument that a different ruling as to the entire QExA Program is warranted.

6/14/10 Order at *72, n.43.

25.   To show that the QExA Intervenors do not make

services accessible to the same extent services are made accessible to QUEST members, Plaintiffs have now asserted that they do not need to prove widespread or systemic problems. Plaintiffs' Post-Trial Proposed FF/COL at 50.  The Court rejects this argument.  Isolated, anecdotal evidence of a relatively few individual members (of the approximately 40,000 people enrolled in QExA) experiencing issues in obtaining services would not mean that an organization is generally not making such services available to the same extent that services are being made available to Medicaid members not enrolled in that organization such that it is not qualified as an MCO.  As the Court noted in denying summary judgment, "because all of these allegations suggest flaws with the <u>entire QExA Program</u>, the Court rejects Evercare's argument that a different ruling as to the entire QExA Program is warranted."  6/14/10 Order at *72, n.43 (emphasis added).  Indeed, any contrary interpretation would render it almost impossible for an insurer to ever be in compliance with 42 U.S.C. § 1396b(m)(1)(A)(i).  The Court has no doubt that it would be possible to continually find a few individuals who have not received services that may be provided under another plan.

26.  While the Court concludes that the QExA program is not perfect, the Court likewise concludes neither is QUEST.  As Plaintiffs acknowledged, "providers have issues" with the QUEST plan and "there is no such thing, as far as I know, as a plan

that's above criticism."  XI:8:16-22 (Plaintiffs' Closing
Argument).

27.  Plaintiffs have made inherently contradictory
arguments in this case.  On the one hand, they assert that the
State should not have waived their right to select providers by
forcing them to enroll in QExA and they seek an injunction
returning them to the fee-for-service framework.  On the other
hand, they assert that even dual-eligible members should be
assigned a PCP; notwithstanding the fact that the dual-eligibles
retain the choice to select their own providers in the Medicare
program just as they were able to under the former fee-for-
service program.

28.  Plaintiffs have now had a full opportunity to
prove their case and the Court finds that they have failed to
establish that the Intervenors do not make services available "to
the same extent as such services are made accessible to
individuals (eligible for medical assistance under the State
plan) not enrolled with the organization" as required by 42
U.S.C. § 1396b(m)(1)(A)(i).  The Court concludes that Plaintiffs
have not shown that they have less access to services under QExA
than beneficiaries under the QUEST program have to such services.

29.  Plaintiffs focused on the asserted failure to
timely assign PCPs to certain members, alleged issues regarding
access to prescription drugs as well as orthotics and

prosthetics, opthamologists complaints, and one neurosurgeon's testimony, all of which Plaintiffs allege contribute to a delay in their abilities to receive services.  Each of these issues has been addressed above in the Findings of Fact and the Court concludes that none of these issues (or even all of them together) establish by a preponderance of the evidence that the Intervenors are not making services accessible to the same extent services are made accessible in QUEST.

30.  In contrast, the State Defendants and Intervenors have satisfactorily implemented the assurances provided in the contracts and have shown that they have established networks that make services accessible to the same extent that services are made available under QUEST.  As detailed above, even considering that the QExA populations generally have more complex needs, Evercare's and Ohana's networks are at a minimum equally as robust as the HMSA QUEST and AlohaCare QUEST networks, which serve populations three to five times as large as the QExA populations.

31.  Thus, the Court concludes both Evercare and Ohana are qualified managed care organizations under the Medicaid Act and that they make services accessible services to QExA Medicaid beneficiaries to the same extent that services are made available to QUEST beneficiaries as required by 42 U.S.C. § 1396(b)(m)(1)(A)(i).

79

32.  As they are qualified Medicaid managed care organizations, the State Defendants may require Medicaid beneficiaries to enroll with one of the two QExA plans as a condition of receiving Medicaid assistance pursuant to 42 U.S.C. § 1396u-2(a)(1)(A)(i)(I).

33.  Plaintiffs have not proven by a preponderance of the evidence that they are entitled to prevail on their claim based on 42 U.S.C. § 1983 (Count I) because what remains of that claim is premised on Defendants' alleged deprivation of Plaintiffs' rights under 42 U.S.C. § 1396b(m)(1)(A)(i) and no such deprivation has occurred.

34.  Plaintiffs have not proven by a preponderance of the evidence that they are entitled to prevail on their claim based on federal preemption and the Supremacy Clause (Count II) because what remains of that claim is premised on the State Defendants' QExA Medicaid program being operated contrary to 42 U.S.C. § 1396b(m)(1)(A)(i), and State Defendants' QExA Medicaid program in fact complies with the requirements of 42 U.S.C. § 1396b(m)(1)(A)(i).

35.  Plaintiffs have not proven by a preponderance of the evidence that they are entitled to prevail on their claim based on further violations of preemptive federal law (Count III) because what remains of that claim is premised on the State Defendants' QExA Medicaid program being operated contrary to 42

U.S.C. § 1396b(m)(1)(A)(i), and State Defendants' QExA Medicaid program in fact complies with the requirements of 42 U.S.C. § 1396b(m)(1)(A)(i).

36.  Plaintiffs have not proven by a preponderance of the evidence that they are entitled to prevail on their claim based on insufficient range of services and provider networks (Count V) because what remains of that claim is premised on the State Defendants' QExA Medicaid program being operated contrary to 42 U.S.C. § 1396b(m)(1)(A)(i), and State Defendants' QExA Medicaid program in fact complies with the requirements of 42 U.S.C. § 1396b(m)(1)(A)(i).

37.  All of Plaintiffs' other claims have been dismissed by summary judgment.

## V.  Permanent Injunctive Relief

38.  "[W]hether a permanent injunction is appropriate . . . turns on whether the plaintiff can establish by a preponderance of the evidence that this form of equitable relief is necessary." Sheely v. MRI Radiology Network, P.A., 505 F.3d 1173, 1182 n.10 (11th Cir. 2007).  A plaintiff seeking a permanent injunction must demonstrate:

> '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.'

Reno Air Racing Ass'n v. McCord, 452 F.3d 1126, 1137 n.10 (9th Cir. 2006) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)); accord W. Org. of Res. Council v. Johanns (In re Geertson Seed Farms), 541 F.3d 938, 943 (9th Cir. 2008).

39.  With respect to the first element, if irreparable harm has not yet been suffered, there must be a likelihood that such harm will be "immediate" in the absence of injunctive relief.  See G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1107 (9th Cir. 2003).  "Irreparable harm is an essential prerequisite for a grant of injunctive relief."  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8, 13 (1st Cir. 2000) (affirming the issuance of a permanent injunction); Midwest Growers Coop. Corp. v. Kirkemo, 533 F.2d 455, 465-66 (9th Cir. 1976) (concluding that a permanent injunction was improperly issued because the plaintiff had "failed to show either irreparable harm or lack of any adequate remedy at law—both prerequisites to injunctive relief").

40.  Plaintiffs have not established any irreparable injury caused by a failure to make services equally accessible, either individually or collectively.  As discussed above, the only alleged injuries they have suffered have been alleged delays in the assignment of a PCP without any corresponding delay in medical care; a delay in one patient obtaining a treatment from a neurosurgeon, without any persuasive explanation for the delay

and with no resulting harm; and a delay in two patients obtaining a wheelchair, without any fault on the part of the QExA MCO. Moreover, the Court notes that a delay in receiving medical care can occur in many contexts without causing a corresponding harm.

41.  Nor have Plaintiffs established that there is a likelihood of any immediate or imminent harm in the future.

42.  The Court finds that Plaintiffs' reliance on the alleged stipulation is not sufficient.  Plaintiffs assert that the alleged stipulation was that delay in accessing medical care "can and will cause harm."  <u>See</u> Plaintiffs' Post-Trial Proposed FF/COL at 52.  The stipulation was that if medical care is delayed members "can face imminent harm."[14/]  <u>See</u> I(S):52:8-16. Moreover, Plaintiffs were still required to prove that such harm is likely to result from a particular delay and that the

---

[14/] The Court notes that initially counsel for the State Defendants did say "I believe the defendants and the intervenors will stipulate that harm can arise or will arise from a delay in medical care."  I(S):51:20-23.  However, counsel for Intervenors and the Court subsequently clarified the stipulation in the following exchange:

> [Counsel for Evercare]: I think [Plaintiffs' counsel] has taken that stipulation maybe just a step too far.  Harm 'can' occur if care is delayed or denied.  We did not say it 'does' occur.
> [Plaintiffs' Counsel]: I believe the Court's words were "face imminent harm."  And if they will stipulate that patients who are delayed face imminent harm. That's just exactly  - -
> The Court: Can face imminent harm
> [Plaintiffs' Counsel]: If they will stipulate to the Court's language - -

I(S):52:8-16.

likelihood of that harm is immediate or imminent.  The Court

concludes that Plaintiffs have failed to meet this burden of

proof.

43.  Accordingly, even were the Court to find that the

Intervenors are in violation of 42 U.S.C. 1396b(m)(1)(A)(i)

(which it does not), Plaintiffs have not established any past

irreparable injury by a failure of the QExA MCOs to make services

equally accessible or likelihood of future irreparable injury and

thus would not be entitled to a permanent injunction in any

event.

### DECISION

In sum, throughout the course of these proceedings it

has become evident that the transition from the Medicaid fee-for-

service program to the QExA program was not an entirely smooth

one.  There was some confusion and misinformation at the

beginning of the QExA program.  However, these problems have

effectively been resolved over the course of its approximately

eighteen-month existence.  Moreover, such problems are to be

expected with such a substantial change in programs.  In fact,

when the QUEST population was transitioned from a fee-for-service

environment to the managed care environment of QUEST similar

"bumps" were experienced.  It has also become clear that a number

of the Plaintiffs have felt individually wronged by the QExA

program and have been frustrated.  There likely will always be

84

individual complaints against managed care organizations, as
evidenced by the complaints HMSA QUEST and AlohaCare QUEST have
received and still receive.

Nevertheless, Plaintiffs have not established that the
QExA program is in violation of any federal law and they have not
shown that QExA provides any less access to medical care than
QUEST does.  Moreover, the State Defendants and Intervenors have
come forward with affirmative evidence showing that the QExA
program makes services accessible to the same extent (if not a
greater extent) as does the QUEST program.  Finally, even were
the Court to find Plaintiffs had established a violation, they
have failed to establish any irreparable injury or imminent harm
that would entitle them to the injunctive relief that they seek.

In accordance with the foregoing, the Court:

(1)   DENIES as moot the State Defendants'
      Rule 52(c) motion for judgment on
      partial findings;

(2)   FINDS that the State Defendants are
      entitled to judgment on the remaining
      portions of Counts I, II, III, and V;

(3)   FINDS that Plaintiffs have failed to
      prove that they are entitled to
      permanent injunctive relief as to their
      claims based on 42 U.S.C.
      1396b(m)(1)(A)(i) by a preponderance of
      the evidence;

(4)   DIRECTS the Clerk of the Court to enter
      judgment in favor of the Defendants on
      all counts, as all counts not addressed
      by this Findings of Fact, Conclusions of
      Law, and Decision have been previously

decided in favor of the State
Defendants.

IT IS SO ORDERED.

Dated:  Honolulu, Hawai'i, January 7, 2011.



_____
Alan C. Kay
Sr. United States District Judge


G. v. Hawai'i, Dep't of Human Servs., Civ. Nos. 08-00551 ACK-BMK & 09-00044
ACK-BMK: Findings of Fact, Conclusions of Law, and Decision